UNITED STATES DISTRICT COURT
FOR SOUTHERN DISTRICT OF NEW YORK

|  |  |
| --- | --- |
| UNIVERSAL TRADING & INVESTMENT CO., INC.<br><br>Plaintiff<br><br>-vs-<br><br>YULIA TYMOSHENKO<br><br>and DOES from 1 to 10,<br><br>Defendants | Docket No. **11 CIV 7877**<br><br>**COMPLAINT** |



## I. SUBJECT MATTER.

1.      The present Complaint is for collection of the judgment entered by the U.S. District Court for the District of Massachusetts on July 7, 2005, registered in this U.S. District Court under 28 U.S.C. §1963 on July 19, 2011, Docket #11-mc-00249-P1, for damages caused by a garnishee's withholding the judgment debtor's corporate assets from collection, and for other causes.

## II. PARTIES.

2.      Plaintiff, Universal Trading & Investment Co., Inc. ("UTICo") is a corporation organized under the laws of the State of Massachusetts in 1993. UTICo is the judgment creditor for the judgment debt in the amount of $18,344,480 against United Energy Systems of Ukraine, PFG ("UESU"), a Ukrainian corporation, whose president Yulia Tymoshenko was and whose corporate assets she has put under her personal control.  The judgment debt includes interest pursuant to 28 U.S.C. §1961.

1

3.      Defendant Yulia Tymoshenko ("Tymoshenko") is a Ukrainian national, with the substantial nexus to New York. Ukrainian law enforcement alleges that she has been effectively the owner of UESU. Tymoshenko caused wire transfers through the banks in New York for the total for over $101 million, associated with UESU's dealings and kickbacks. Tymoshenko became UESU's founder in 1995 and has become a garnishee unlawfully holding UESU's assets under her personal control. Apart from her business activities, Tymoshenko has also engaged in a political career in Ukraine, twice rising to a position of a Prime Minister, using government positions to advance the interests of UESU. Both times Tymoshenko was removed from those positions on allegations of corruption. Tymoshenko has faced numerous criminal charges alleging bribery, conversion and fraud. In October of 2011 she was convicted in Ukraine and was further charged, in a new case, with the financial crimes as the principal of UESU.

4.      Judgment debtor UESU is subject to notification of this Complaint, though UESU has not responded to claims of collecting judgments. The designation of Defendants in the present Complaint is without prejudice to joining additional parties, Does 1 to 10.

### III.  JURISDICTION.

5.      This Court has jurisdiction pursuant to 28 U.S.C. §1963. Under the laws of New York, a judgment debt may be collected from a garnishee, NY CPLR §5201, *et seq.,* such as Tymoshenko herein.

6.      This Court has subject matter jurisdiction over the parties because of the diversity of citizenship pursuant to 28 U.S.C. §1332. The claim exceeds $75,000, the statutory minimum.

7.      This Court has jurisdiction also because Tymoshenko has done business in New York, causing wire transfers to pass the bank accounts in New York. As evidence shows, Tymoshenko directed kickbacks and bribes, in the amount approximately $101,078,339, through

correspondent accounts in New York, to the former Prime Minister of Ukraine Pavlo Lazarenko ("Lazarenko"), convicted for money laundering in the U.S. Tymoshenko caused those kickbacks and bribes to be paid for Lazarenko's unlawful advancing UESU's interests.

8.      As a U.S. person within the meaning of 18 U.S.C. §1952, §1956, Tymoshenko was named by U.S. prosecutors as Lazarenko's unindicted co-conspirator in money laundering related to UESU.

9.      Apart from those kickbacks, Tymoshenko also did business in New York by directing numerous other transactions, passing the bank accounts in New York (Bank of New York, Bankers Trust, Citibank, Credit Suisse), in the multiple millions of dollars.

10.     The U.S. District Court also has jurisdiction because Tymoshenko has set up United Energy International, Ltd. ("UEI") in the State of Virginia and caused the acquisition of the office property for her needs. Tymoshenko has also been, on information and belief, in control of certain entities incorporated in the U.S. (Delaware and Oregon).

11.     This Court has jurisdiction because the grounds for the judgment, being collected herewith, were Tymoshenko's actions and representations, both as the president of UESU and individually, to UTICo in the U.S. (including Tymoshenko's executing two contracts with UTICo). Tymoshenko has also contracted public relations and consulting firms in the U.S. and came to the U.S. on various occasions. Additionally, in April of 2011, Tymoshenko filed in this Court an action *Tymoshenko v. Firtash et al.,* Docket 11-civ-2794, in which UTICo sought to intervene under F.R.Civ.R. 24. The Court denied UTICo's Motion for intervention finding the scope of her complaint unrelated to UTICo's judgment collection, but also mentioning in dicta that UTICo was free to file a separate action for collection.

# IV. PRIOR ADJUDICATION AND FACTS CONCERNING UNDERLYING JUDGMENT

12.     The underlying action, *UESU v. UTICo*, Docket 97cv12180, was filed by UESU in the U.S. District Court for the District of Massachusetts in 1997.   UESU engaged in distribution of natural gas in Eastern Europe and was controlled by Tymoshenko and Lazarenko.

13.     The claims of UESU, aimed at enjoining UTICo's cooperation with Ukrainian authorities at the time, were dismissed by the Court with prejudice.

14.     UESU's submission to the jurisdiction of the U.S. District Court allowed counterclaims by UTICo, amended three times.   UTICo's counterclaims included relief sought under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §1961, *et seq*.

15.     The judgment of July 7, 2005 followed the litigation for about 7 years and 9 months.   During that time UTICo undertook discovery in a number of jurisdictions, including in offshore jurisdictions, using the Letters Rogatory and otherwise.   That discovery exposed numerous facts on fraudulent schemes and accounts described below.

16.     In that litigation UESU failed to respond to discovery and to go to trial on UTICo's counterclaims.   UESU's default was finally entered on February 22, 2005.   After the Court assessed UTICo's damages, the judgment was issued, as mentioned, for $18,344,480.

17.     That judgment has not been satisfied.   During that litigation UESU's assets were converted, withheld and fraudulently transferred under Tymoshenko's and her privies' control. UESU has not responded to demands to pay that judgment and it is inoperative at this time.

18.     The aggregate amount of the fraudulently transferred proceeds of UESU, placed under Tymoshenko's illegal control, constituted, according to the Prosecutor General of Ukraine, approximately $2,271,221,873.   For avoiding creditors and hiding assets, certain of UESU's

assets have been converted by and/or placed under Tymoshenko's control, and those assets have been concealed in various jurisdictions.

## V.  UNDERLYING FACTS.

19.    Tymoshenko first contacted UTICo in July of 1993 when she headed a Ukrainian company, known as Cube, Ltd. ("Cube") that had a $113 million government contract with Ukraine for bartering exports of ferrous metals in exchange for oil. Cube claimed a loss of approximately half the value of the first delivery of about $2.6 million value in ferrous metals to China, through Indian intermediaries.

20.    In April of 1994 Tymoshenko signed a contract and Power of Attorney to UTICo, in the name of Cube, for services to collect the alleged debt of the Indian and Chinese buyers.

21.    In 1995-1996 UTICo was initially able to recover $660,000 paid by the Indian intermediaries.  Tymoshenko directed those payments to be routed by Cube to Somolli Enterprises, Ltd. ("Somolli"), incorporated in Cyprus.

22.    As discovered later, Tymoshenko controlled Somolli, owning 33.4% in her own name, 33.3% in the name of her husband and the remaining 33.3% in the name of their nominee, who was unaware of his name being used.  In reality, Tymoshenko effectively owned Somolli.

23.    Unbeknownst to UTICo, the first time Tymoshenko was arrested in Ukraine took place in March of 1995, for smuggling undeclared cash (4 million karbovantsy, Ukrainian currency, and $26,000).  She was released from incarceration through Lazarenko's intervention. In July of 1995 Tymoshenko and her husband were arrested, again, for attempting to smuggle $100,000 at an airport in Moscow, without declaring.

24.    In September of 1995 Tymoshenko's privy Lazarenko was promoted from the Governor of Dnipropetrovsk Region to the First Deputy Prime Minister of Ukraine. Lazarenko's

responsibilities included energy commodities' supplies in Ukraine, mostly imported from Russia. Abusing his position, Lazarenko assisted Tymoshenko to engineer the setup of UESU.

25.     As evidence shows, Lazarenko directed a bribe of $7 million to the then Ukrainian Prime Minister Yevghen Marchuk, to license UESU for the natural gas business and distribution in Ukraine.

26.     Tymoshenko and Lazarenko were the masterminds of the UESU scheme.   On November 8, 1995 Lazarenko wrote to Russian authorities proposing that a newly founded company UESU become an intermediary for natural gas imports from Russia.   Using his governmental leverage, Lazarenko obtained the consent from the Russian authorities.

27.     On November 20-24, 1995 Tymoshenko, with several other Ukrainian nationals, arranged for the creation of UESU as a private company that she controlled.

28.     Incorporation of UESU on November 20, 2005 involved fraud.  The Minutes No. 2-1/95 of the shareholders' meeting said that it was attended by Andreas Petrou ("Petrou"), a Cypriot citizen, who represented 85% of the purported shareholders at the meeting in Ukraine.

29.     In fact, Petrou never attended that meeting in Ukraine and was unaware that any Minutes were prepared citing his 'presentation' on behalf of the shareholders.   Tymoshenko fraudulently used Petrou's fictitious name to assert and conceal her own interest in UESU.

30.     As Petrou testified, the only time he saw Tymoshenko was in 1992, when she with her husband, as tourists, walked into a travel office that Petrou's wife maintained in Cyprus. Petrou, who was an attorney, referred them to another attorney and never saw the Tymoshenkos again or heard back from them.

31.     At Petrou's deposition various documents concerning UESU were shown to him, with his forged signature; he was unaware of that forgery and of using his name.

32.    In December of 1995 Lazarenko used his position as First Deputy Prime Minister to have UESU licensed in Ukraine as the distributor of natural gas in Ukraine.  Public enterprises were obligated by Lazarenko's office to purchase the imported natural gas from UESU.

33.    Lazarenko and Tymoshenko negotiated the contract between Russian gas supplier Gazprom and UESU for 1996, including talks with Gazprom's chairman Rem Viakhirev ("Viakhirev"), to whom Lazarenko later directed bribes.

34.    UESU was made a nominal subsidiary of United Energy International, Ltd., in London, U.K. ("UEIL").  UEIL was established as a shell company in October of 1995.  It was set up under the control of Tymoshenko's Somolli.  UEIL nominally held 85 percent of UESU and employed a sole director in London, a Turkish national Ekrument Aksoy ("Aksoy"), to transfer UESU proceeds on the orders in the name of Somolli.

35.    By using his governmental leverage, Lazarenko enabled Tymoshenko and UESU to conclude with Gazprom Contracts No. 4GU and No. 70, both dated December 29, 1995.

36.    The users of the natural gas in Ukraine were obligated to pay for the distributed gas to UESU and/or UEIL accounts.  Tymoshenko arranged for those proceeds routed to the offshore accounts, including: (a) UEIL at National Westminster Bank, 208 Picadilly, London, Nos. 140/0/04329791 and 06010644; (b) UESU at Golden Union (offshore) Bank, P.K. 466-Lefcosa, Mersion 10, Turkey, No. 1073601 LSCB, #59-13710 and (c) Somolli at First Trading Bank, Nauru, No. 5005702948, 173899.

37.    Lazarenko, who became Prime Minister in May of 1996, served as the key promoter of UESU, using all the governmental leverages at his disposal.  On information and belief, his arrangement with Tymoshenko was that he would get 50% interest in the ultimate illegal profits of UESU, to be directed by Tymoshenko to his offshore accounts.

38.     According to testimony of a witness, Lazarenko directed in the interests of Tymoshenko at least two bribes to Gazprom's Viakhirev, through the nominees Lucky Star Enterprises, Ltd. ($1.4 million on June 5, 1996) and Eagle Enterprises, Ltd. ($1,280,000 on June 11, 1996), both accounts at Barclays Bank in Cayman Islands.

39.     Under Tymoshenko's direction UESU principals used fabricated invoices in the name of Somolli.  They hired a Macedonian national Donco Stojanovski ("Stojanovski"), who was housed in Ukraine, to pose as Somolli's director in Cyprus.  As Stojanovski testified, he was compelled, for a small salary and free housing, to sign blank documents on Somolli's letterhead. Stojanovski did not know what was then entered into those blank documents.

40.     Aksoy, a nominal director of UEIL, stationed at the time in London, later testified that he received invoices and payment orders on Somolli's letterhead, signed by Stojanovski. Most of the invoices and payment orders were to transfer proceeds from UEIL's account at National Westminster bank in London to Somolli's accounts at Bank of Cyprus, Ltd. in Cyprus.

41.     Tymoshenko's and Lazarenko's conspiracy caused UESU to rapidly become an enormous entity generating over $11 billion in turnover in 1996, its first year of operation.  As banking records show, the proceeds generated by UESU were secretly distributed and put under Tymoshenko's control and the 50% kickbacks under Lazarenko's control, without corporate formalities, using fake contracts or no contracts, and using offshore holdings and offshore nominees.

42.     To further handicap creditors's claims, 90% of the stock in UEIL has been nominally owned, since December 1996, by Bassington, Ltd. ("Bassington"), a shell British Virgin Islands ("BVI") company, IBC No. 203394, at the agent office of Mossack and Fonseca in the BVI.

43. UTICo's discovery in the BVI showed that Bassington was set up by Credit Suisse's employees in Guernsey, the Channel Islands, Pamela Le Cheminant, Julia Church and Denise Corbet. These trust officers at Credit Suisse operated Bassington in the BVI.

44. As Aksoy testified, Bassington was further held by a trust, called BL Trust, for Tymoshenko's benefit. The BL Trust was operated at Credit Suisse in Guernsey, where both Tymoshenko and Lazarenko held assets.

45. On December 31, 1996 Lazarenko, abusing his Prime Minister's powers, obligated a member of his Cabinet to sign a Ukrainian State guarantee, primarily to secure Gazprom's deliveries of natural gas to UESU, for $200 million per month in the event of UESU's default, thus allowing UESU to continuously receive huge amounts of natural gas.

46. As mentioned above, Tymoshenko used the banks in New York to forward the kickbacks and bribes to Lazarenko, as banking records show, for ca. $101,079,339, through correspondent accounts in New York. Tymoshenko used her husband, Oleksandr Tymoshenko, to sign most of those transfers instructions to New York, in the name of Somolli in Cyprus and elsewhere. Together with UESU and other individuals, Tymoshenko formed an enterprise.

47. For example, from May 27 to June 11, 1997 Tymoshenko caused UESU to make wire transfers to account #151897 Orphin, controlled by Lazarenko's assistant Kiritchenko, held on the correspondent account at Eurofed bank ("Eurofed"), incorporated in Antigua. The total of 11 transfers was $13,970,000, through Bankers Trust Bank in New York.

48. These transfers were originated at the direction of Tymoshenko at Slaviansky Bank in Ukraine, where the UESU proceeds were switched to Somolli. Those proceeds were transferred through a nominal account in the name of another offshore bank, First Trading Bank,

incorporated in Nauru. The proceeds were wire transferred to Banker's Trust account in New York and then - to Eurofed's correspondent account in Pacific Bank, San Francisco.

49.     That series of those kickbacks/ bribes to Lazarenko from UESU's assets included: on May 27, 1997 -   $2,998,000; May 29 - $1,662,000; May 30 - $394,000; June 2 - $2,200,000; June 3 - $1,530,000; June 4 - $499,970; June 5 - $170,000; June 6 - $1,000,000; June 9 - $510,000; June 10 - $2,000,000; June 11 - $1,036,000; and June 12 - $1,000,000.

50.     These proceeds of UESU were transferred, among other proceeds, from Orphin account #151897 at Eurofed to Lazarenko's personal account #137978 at Eurofed.

51.     In May and June of 1997 Tymoshenko, as already mentioned, directed incorporation of  UEI, as a Virginia corporation, with registered address: 314 Commerce St., Alexandria, VA, 22314.  Tymoshenko also directed $1.1 million to purchase the office at 1012 Cameron St., Alexandria, VA 22314, and arranged for an account at Virginia Commerce Bank.

52.     In July of 1997 Lazarenko was removed from the position of the Prime Minister, on the allegations of corruption related to UESU.

53.     UESU's operations in the gas distribution were audited in Ukraine.  Pursuant the new Government's audit published by June of 1998, UESU was sanctioned for withdrawing proceeds, and a penalty amounting to about $704 million (at the then rate of exchange) was imposed.  That was based on the illegal transfers effected by UESU from Ukraine.

54.     In parallel with Tymoshenko's managing UESU, in January of 1997 Tymoshenko got elected to the Ukrainian Parliament, to obtain parliamentary immunity.

55.     On July 7, 1998, based on UTICo's discovery of evidence on Lazarenko's involvement in UESU, incorporated into Ukraine's Letter Rogatory, Bailiwick's office in Guernsey issued a subpoena to Credit Suisse in Guernsey, mandating the production of

documents concerning UESU, Tymoshenko, Lazarenko and a number of their co-conspirators. As a result, Credit Suisse blocked the assets related to those accounts.

56.     After Credit Suisse froze those assets, Tymoshenko, her husband, Lazarenko, UESU, UEIL and Bassington filed in Guernsey an appeal from the administrative decision to release banking records to foreign investigators. Credit Suisse blocked the assets related to UESU (of which $143 million was controlled by Lazarenko).  Whereas records on Lazarenko's assets were subsequently disclosed, the proceedings concerning disclosure of Tymoshenko's interest in BL Trust at Credit Suisse have been handicapped by Tymoshenko.  On information and belief, Tymoshenko has been the major beneficiary of BL Trust in Guernsey holding UESU's proceeds, along with her husband, forming an enterprise.

57.     Ukraine's civil claims for UESU proceeds were initiated since August of 1999 by the Prosecutor General's Office ("UPGO") that filed a case in the court in Dnipropetrovsk, to declare void the "gas contracts" of UESU, and seize the funds of UESU.  In April of 2000 the appellate court affirmed.  By June of 2001 the Supreme Commercial Court left that decision without changes.  As a result, the amount up to 3,682,273,549 hryvnas (about $657.5 million at the then rate) was frozen on the accounts of UESU, subject to the government's lien.

58.     In December of 1999 Tymoshenko engineered her being appointed as a Deputy Prime Minister in charge of the energy sector.  In that position Tymoshenko, according to the charges later on, staged kickbacks from the coal supplies and other corrupt schemes.

59.     In August of 2000 Tymoshenko's husband and her associate were arrested on the charges of misappropriation, but a year later released, the trial canceled on appeal.

60.     In January of 2001 Tymoshenko was removed from the position of the Deputy Prime Minister, amidst the allegations of corruption.  Thereupon, Tymoshenko was detained on charges of fraud with UESU proceeds and incarcerated again.

61.     After Tymoshenko was in detention for about 7 weeks, in March of 2001, a municipal court in Kyiv released Tymoshenko, under suspect circumstances, which the public opinion explained by bribery (the judge was later convicted, but on unrelated charges).

62.     From March to November of  2001 three new criminal cases against UESU principals were opened in Ukraine, charging Tymoshenko, her husband and Lazarenko of bribery from UESU proceeds, for ca. $87 million.  Likewise, in 2001 the prosecutor's office in Russia opened the criminal case against Tymoshenko as a co-conspirator of bribery, related to UESU.

63.     In July of 2002 the UPGO petitioned the Parliament to strip Tymoshenko of immunity to stand charges in connection with UESU frauds.  The vote was blocked by Tymoshenko's allies.

64.     In September of 2002 the new Prosecutor General, Sviatoslav Piskun, filed a new Petition to the Parliament to strip Tymoshenko of the parliamentary immunity.  The charges against Tymoshenko included conversion related to UESU.  According to audit and charges, in the course of her being the president of UESU, Tymoshenko converted about $2,271,221,873.

65.     Tymoshenko's four financial managers of UESU, including her father in law, fled from Ukraine and were declared wanted by Ukraine through Interpol on the charges of conspiracy to conceal UESU's assets.  By October of 2002, those four managers of UESU were located in Turkey, arrested by Turkish authorities and extradited to Ukraine to stand trial.

66.     In May of 2004 Tymoshenko was charged with the conspiracy to bribe the members of the Supreme Court of Ukraine, to secure the release of the UESU's senior financial officers from detention and to close their cases.

67.     As evidence shows, Tymoshenko paid $125,000, but her intermediary refused to hand over the bribe and testified against her.  As the surveillance video-tape showed, she discussed the bribe with two individuals.  Tymoshenko escaped being tried using parliamentary immunity.

68.     Tymoshenko used the fact that in the course of the criminal trial of Lazarenko in the U.S. District Court for Northern District of California, Docket 04cr0284, charges related to the kickbacks from UESU were dismissed for insufficient evidence.  However, she was identified by U.S. prosecutors as Lazarenko's 'unindicted co-conspirator'.

69.     In September of 2004 Tymoshenko was declared wanted by Interpol, per request of Russia, on charges of bribery related to UESU.

70.     In October of 2004 the presidential election took place in Ukraine, at which the then Prime Minister Viktor Yanukovich ("Yanukovich") and Viktor Yuschenko ("Yuschenko") obtained two highest number of votes.

71.     In November of 2004 the second round of presidential election took place, which resulted in the majority of votes obtained by Yanukovich.  However, that outcome caused political unrest of the opposition in Ukraine, largely staged and financed by Tymoshenko.

72.     In December of 2004 the repeated voting of the second round of the presidential election took place, upon which Yuschenko was declared the winner and the president.

73.    As soon as Yuschenko was sworn into the office, he appointed Tymoshenko as the acting Prime Minister on January 24, 2005. Tymoshenko was confirmed as the Prime Minister by the Parliament on February 4, 2005.

## VII.  GARNISHEE TYMOSHENKO ACTING TO PREVENT UTICO'S COLLECTION OF JUDGMENT

74.    Upon a Motion by UTICo in *UESU v. UTICo* action at the U.S. District Court for the District of Massachusetts in January of 2005 in light of UESU's not cooperating in discovery and for other reasons, on February 22, said Court ultimately entered default of UESU. The time coincided with Tymoshenko's becoming Ukrainian Prime Minister for the first time.

75.    As soon as Tymoshenko assumed the powers of the Prime Minister, she started to use those to prevent the collection of UESU's assets by the means of her abusing the governmental powers.

76.    As President Yuschenko's interview to Radio Liberty showed, Tymoshenko, immediately using her new powers, approached him to order the Supreme Court's Chairman Maliarenko to close UESU's criminal and civil cases. As Yuschenko indicated, Tymoshenko made such approaches about 7 times. In his turn, Maliarenko asked Yuschenko to protect him from Tymoshenko's demands to close the UESU cases.

77.    In February of 2005 the Supreme Administrative Court overturned the lower court's decision, of April 19, 2001, pursuant to which a lien against UESU's assets for approximately $657.5 million had been held, and remanded for reconsideration.

78.    In May of 2005 UESU filed a lawsuit in the court in Dnepropetrovsk, to refund and release 351,955,988 hryvnas to UESU (about $62.8 million).

79.     As mentioned above, on July 7, 2005 the U.S. District Court made the judgment in Boston against UESU, in favor of UTICo, for $18,344,480.  UTICo intended to seek the collection of that judgment debt from UESU's assets in Ukraine.  After that judgment, Tymoshenko accelerated the dissolving of the injunction freezing UESU's funds in Ukraine.

80.     On August 19, 2005, upon UESU's case instigated, on information and belief, by Tymoshenko, the court made a decision on the reversal of the lien, allowing refund to UESU.

81.     On September 8, 2005 Tymoshenko was fired by President Yuschenko upon the claims, again, of corruption.  In an interview to Associated Press on September 13, 2005 Yuschenko accused Tymoshenko of having converted through UESU 8 billion hryvnas, or $1.6 billion.  However, Tymoshenko became the second most powerful person in Ukrainian politics, controlling enormous financial means.

82.     On November 18, 2005 the Supreme Court of Ukraine revoked, on information and belief, under Tymoshenko's pressure, all cases against Tymoshenko, her husband and UESU.  Tymoshenko used that decision to lift liens on UESU's assets and to siphon those off, making UTICo's judgment uncollectible.

83.     In March of 2006 a bloc of political parties headed by Tymoshenko, gained the second largest number of votes at the parliamentary election in Ukraine.

84.     In January of 2007 Tymoshenko, on information and belief, caused UEIL in London, UESU's nominal parent, be dissolved, after it failed to submit mandatory corporate filings and tax returns.  UEIL failed to send out notices to creditors.

85.     In April of 2007 Yuschenko ordered dissolution of the Parliament and new parliamentary election.  The election was ultimately held in September of 2007.  Tymoshenko's political bloc, again, became the second largest faction in the Parliament.

86.     Despite increasing protests citing corruption, in December of 2007 Tymoshenko was voted into the Prime Minister's position.  Several parties accused Tymoshenko of having bribed a number of the Parliament members to reach the minimum necessary for that vote.

87.     Having reached the top governmental position, Tymoshenko forced the courts' decisions to lift charges concerning UESU and liens.  Tymoshenko was further involved in a number of fraudulent schemes of which she was later charged, i.e. kickbacks and other misdeeds.

88.     In March of 2008 Tymoshenko, using her leverage as the Prime Minister and the Supreme Court's decisions, forced the UPGO to close the cases against UESU and to lift claims to the assets of UESU.  On information and belief, Tymoshenko used that for withdrawing UESU's assets from Ukraine onto the offshore accounts under her personal control.  In January of 2009, Tymoshenko engineered an illegal deal with Gazprom, targeting to shield UESU's assets under her control.

89.     Then, using the position of the Premier, Tymoshenko accumulated substantial financial means to fund her bid at the presidential election in Ukraine.  In the first round in January of 2010 Tymoshenko finished second, after Yanukovich.  Tymoshenko's interference into the judicial matters became being increasingly opposed.

90.     Already on February 4, 2010 the Supreme Administrative Court, granting reconsideration of the UPGO's cassation, reversed the court decisions of April 4, 2006, as a result of which the liens on UESU assets were released.

91.     On February 14, 2010 the second round of presidential election took place,  and Tymoshenko lost.  On March 3, 2010 the Parliament voted on no-confidence in Tymoshenko and her Cabinet, and Tymoshenko was removed from all positions.

92.     The new Government immediately initiated audit of Tymoshenko's activities.  In April of 2010 the new Prime Minister, Nikolai Azarov declared that Tymoshenko's government caused damages of 100 billion hryvnas (about $16 billion).  By October of 2010 a complex audit, ordered by the new Government from several firms in the USA, determined that the damages caused by Tymoshenko's acting as the Prime Minister, totaled ca. $7.6 billion.

93.     In May of 2010 the UPGO reopened the case against Tymoshenko on the attempted bribery ($125,000) of the Supreme Court judges for the release of UESU's top financial officers.

94.     Several more bribery schemes were uncovered, resulting in new charges of Tymoshenko.  For example, in January 2011 Tymoshenko was charged with conspiring for overinvoicing medical supplies, ordered by the Government through an entity incorporated in Oregon, USA.  The litigation in the U.S. District Court for the District of Oregon, case 10cv6297 resulted in the judgment by default for $19 million, trebled under RICO.  As another example, Tymoshenko was charged with abusing her powers to conclude in January of 2009 new gas import contracts with Gazprom at increased prices, at the expense of Ukraine, securing that Gasprom would not pursue UESU's debts for gas supplies.

95.     Tymoshenko ordered several public relations firms in the USA to stage a media campaign to counter the criminal cases against her.  For example, Tymoshenko's lobbyists in Washington D.C. organized in June of 2011 a press-conference, attacking the criminal cases against her.  On October 11, 2011 Tymoshenko was convicted by a Ukrainian Court to 7 years of imprisonment for engineering a deal with Gazprom to shield UESU's assets under her control.

96.     On October 12, 2011, a new criminal case was opened against Tymoshenko in Ukraine, concerning her attempting to dissolve UESU's liability on its debts.   Ukrainian

authorities undertook searches, including of the premises of Tymoshenko's chief accountant for UESU (extradited from Turkey in 2002, but whose matter Tymoshenko managed to dismiss).

## COUNT 1.  JUDGMENT DEBT RECOVERY

97.     Judgment Creditor incorporates by reference Paragraphs 1 through 96 above.

98.     Acting directly and through her nominees, Tymoshenko exercised control over UESU and caused the litigation *UESU v. UTICo,* docket 97cv12180 be filed in Boston in 1997.

99.     In its counterclaim UTICo alleged joint and several liability of UESU and Tymoshenko.  UTICo claimed $12,711,490 plus other damages against Tymoshenko.

100.    The counterclaims and thousands of pages of exhibits from the Boston action showed Tymoshenko's liability.  Particularly, Counts 9, 11, and 13-16 in UTICo's Second Amended Counterclaim sought to hold Tymoshenko jointly and severally liable for purposes of an anticipated judgment against UESU.

101.    Pursuant to 28 U.S.C. §1963, NY CPLR 5201 *et seq*. and other law, UTICo is entitled to sue on the judgment debt.  According to Ukrainian law enforcement, Tymoshenko has effectively owned UESU.  Tymoshenko has controlled UESU proceeds and assets, concealing those from collection, and she should be held liable for UESU's uncollected debt.

102.    Judgment Creditor is entitled to relief on this Count.

## COUNT 2.  CONVERSION.

103.    Judgment Creditor incorporates by reference Paragraphs 1 through 96 above.

104.    At all times hereinabove alleged, Tymoshenko through her privies converted the UESU proceeds to render UTICo's judgment uncollectible.

105.    UTICo, deprived of the ability to collect the judgment, asserts the claim based on conversion.  As cited above, the UPGO stated that Tymoshenko converted ca. $2,271,221,873 of

UESU's assets. By doing so, Tymoshenko handicapped UTICo's collecting its $18.3 million judgment.

106. Judgment Creditor is entitled to relief on this Count.

## COUNT 3. UNJUST ENRICHMENT

107. Judgment Creditor incorporates by reference Paragraphs 1 through 96 above.

108. At all times relevant here, and as hereinabove alleged, Tymoshenko unjustly enriched herself using UESU's proceeds to render UTICo's judgment uncollectible.

109. As mentioned above, the UPGO asserted that Tymoshenko unjustly enriched herself for the amount of approximately $2,271,221,873, at the expense of UESU, to deprive creditors, such as UTICo, of the collection of the federal judgment.

110. Judgment Creditor is entitled to relief on this Count.

## COUNT 4. PIERCING CORPORATE VEIL, ALTER EGO

111. Judgment Creditor incorporates by reference Paragraphs 1 through 96 above.

112. Tymoshenko masterminded the setup of UESU as her vehicle for obtaining illegal proceeds under her personal control. Ukrainian law enforcement has alleged that Tymoshenko has been effectively UESU's owner, without corporate formalities.

113. UESU was never a true corporation, because it was created by fraud and fabrications. This fraud was started with the purported founders' meeting on November 20, 1995, where a purported speaker was Petrou, a Cypriot national, as though he controlled 85% of new stock. However, Tymoshenko used Perou to conceal her own interest, and Petrou was unaware that his name was used for fabricating the Minutes.

114. Petrou's name was used to cover up for the fact that Tymoshenko had her interest and control over UESU, for signing various documents concerning UESU. Petrou served as a

mayor of a city in Cyprus and was unaware of being used in the scam of setting up UESU on false pretenses.

115.    The Board of UESU was fictitious.  No proper corporate documentation was left on distributing the proceeds.  The functions of the Board were reduced to implementing Tymoshenko's instructions who abused governmental powers.

116.    At all times there were no lawful contracts under which Tymoshenko got control over UESU's proceeds and directed the transfers involving the offshore entities.

117.    UESU's corporate veil should be pierced and/or Tymoshenko held as UESU's *alter ego*, for purpose of satisfying the judgment debt.

118.    Judgment Creditor is entitled to relief on this Count.

### COUNT 5.  IMPOSITION OF CONSTRUCTIVE TRUST.

119.    Judgment Creditor incorporates by reference Paragraphs 1 through 106 above.

120.    As hereinabove alleged, at all relevant times Tymoshenko asserted personal control over UESU's assets using a sophisticated scheme of offshore holdings, including Bassington (BVI), BL Trust (Guernsey), Carlan Enterprises, Inc. (Isle of Man).

121.    Tymoshenko who retained control over UESU's proceeds, should be adjudged to be holding UESU's assets in constructive trust, for purposes of liability on the judgment.

122.    Judgment Creditor is entitled to relief on this Count.

### COUNT 6.  IMPOSITION OF EQUITABLE LIEN.

123.    Judgment Creditor incorporates by reference Paragraphs 1 through 122 above.

124.    As the investigation of Tymoshenko's converting UESU's assets shows, she has maintained BL Trust in Guernsey and other accounts still to be identified, on which she has accumulated UESU's assets.

125.     UTICo pleads that this Court imposes equitable lien on Tymoshenko's assets wherever held up to the amount of the judgment, $18,348,480 plus statutory interest, for purposes of enforcing a judgment or decree of this Court.

126.     Judgment Creditor is entitled to relief on this Count.

## COUNT 7.  FRAUDULENT CONVEYANCES.

127.     Judgment Creditor incorporates by reference Paragraphs 1 through 106 above.

128.     At all times relevant here Tymoshenko and her privies used fraudulent conveyances and transfers to convert UESU's proceeds and assets for her personal use and illegal benefit, *inter alia* within the meaning of New York's Fraudulent Conveyances law and/or the analogues statutes and laws in other jurisdictions.

129.     Due to the international scope of the UESU scheme, the transfers cited above were simultaneously fraudulent under the laws of several jurisdictions.

130.     Judgment Creditor is entitled to relief on this Count.

## COUNT 8.  CIVIL CONSPIRACY.

131.     Judgment Creditor incorporates by reference Paragraphs 1 through 96 above.

132.     As described herein, Tymoshenko conspired with other individuals to make UTICo's judgment uncollectible.  Tymoshenko conspired with others to conceal that she was, as Ukrainian law enforcement alleges, the beneficial owner of UESU, through a series of offshore holdings.

133.     Tymoshenko, using her governmental powers and illegal interference into the judiciary in Ukraine, conspired with other individuals to reclaim, through court decisions, the release of UESU's frozen proceeds.

134.     Judgment Creditor is entitled to relief on this Count.

**COUNT 9. RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT**

135.    Judgment Creditor incorporates by reference Paragraphs 1 through 96 above.

136.    As mentioned, in connection with UTICo's judgment ultimately entered on July 7, 2005 of UTICo's judgment, Tymoshenko intensified her efforts to circumvent its collection, acting in an enterprise with UESU.  When the outcome in UTICo's litigation was already clear, Tymoshenko paid $125,000 to an intermediary to bribe the judges of the Supreme Court to make a decision shielding UESU and its principals from liability.  On information and belief, the sources was UESU's proceeds.  It is well established in the public domain and follows from the charges in Ukraine  that Tymoshenko paid other bribes to obtain decisions favorable to making UESU judgment-proof.

137.    As evidence shows, Tymoshenko used her position as the Prime Minister to approach President Yuschenko about 7 times, establishing a pattern, to illegally order the Chairman of the Supreme Court Malyarenko to dismiss all UESU's cases and release its assets, making UESU judgment-proof.  Malyarenko complained to the President to protect him from Tymoshenko, but ultimately Tymoshenko had her way.

138.    Tymoshenko, illegally interfering into the judiciary in Ukraine, obtained on August 19, 2005 a decision, lifting the government's lien on UESU's assets for about $62.8 million. On November 18, 2005 Tymoshenko illegally forced the Supreme Court's closing all UESU-related cases.

139.    Using these decisions and abusing governmental powers, in 2008 Tymoshenko further forced the decisions of the UPGO to close the cases against her and UESU, thus lifting the last hurdle for removing UESU's assets from the freeze in Ukraine and for placing those

proceeds under her control outside of Ukraine. In 2009, Tymoshenko made an illegal deal with Gazprom (for which she is now convicted), targeting to protect UESU's assets under her control.

140. Tymoshenko's actions constituted a pattern, including her attempted bribery of the judges of the Supreme Court of Ukraine, alleged above, its cover-up, and other illegal acts. That pattern included a number of predicate acts, including under 18 U.S.C. §1952, §1956, whereas Tymoshenko was a U.S. person for purposes of those statutes.

141. As a result of these actions, Tymoshenko made UTICo's judgment uncollectible, because UESU's assets were withdrawn and controlled by Tymoshenko, whereas virtually no assets were left in the name of UESU to collect from. Tymoshenko personally benefitted from circumventing UTICo's collection, because she held UESU's remaining assets under her personal control and used those proceeds, in the amount of the judgment, $18,344,480.

142. Tymoshenko organized an enterprise with UESU, within the meaning of RICO. Tymoshenko was the driving force in that enterprise, and she was aided by several other members of the enterprise, who implemented her directives. Tymoshenko used her privies in an *ad hoc* enterprise to illegally push through the decisions in Ukraine shielding UESU from judgment creditors, including UTICo,

143. Judgment Creditor is entitled to relief, allowed by 18 U.S.C. §§1952, 1962(c), 1962(d) and 1964(c), without limitation, with the trebling of its claim.

## COUNT 10. DECLARATORY JUDGMENT

144. Judgment Creditor incorporates by reference Paragraphs 1 through 96 and 111-118 above.

145. There is an actual controversy whether UESU was a true corporation or rather its corporate veil should be pierced for purposes of collecting UTICo's judgment from

Tymoshenko. Declaratory relief is warranted on that issue, for purposes of collection. In particular, Ukrainian law enforcement alleges that Tymoshenko has been effectively the owner of UESU, which allegations warrants adjudication as a declaratory relief.

146. Judgment Creditor is entitled to relief on this Count and for the declaratory relief.

WHEREFORE, Judgment Creditor prays for the following relief:

a) To declare that Defendant Yulia Tymoshenko is severally and jointly liable for the judgment debt under UTICo's judgment of July 7, 2005 against UESU;

b) To order Tymoshenko to pay the judgment amount from her BL Trust at Credit Suisse Bank in Guernsey and/or from the assets of Bassington (BVI) and/or from other accounts and/or trusts under her control;

c) To declare the corporate veil of UESU pierced for purposes of satisfying the judgment debt from the assets held for the benefit of Tymoshenko through her nominees and trustees;

d) To hold annulled the fraudulent conveyances and transfers of UESU proceeds and assets to Tymoshenko and her privies, staged for avoiding the payment of the judgment debt owed to UTICo, including but not limited, under the State law, common law and foreign law as applicable;

e) To allow post-judgment remedies, including imposition of constructive trust, imposition of equitable lien, writs of attachment, injunctive relief, deposits into Court and/or appointing a receiver;

f) To allow the statutory calculation of the interest on the judgment debt amount from the date of the judgment entered on July 7, 2005, 28 U.S.C. §1961;

g) To award damages for actions, undertaken by Tymoshenko, to handicap UTICo's collection of the judgment debt, including trebling as applicable under 18 U.S.C. §1964(c);

h) To pay attorneys' fees and such other relief, without limitation, towards collection of the judgment debt, as the Court deems just and proper.

The present Complaint is without prejudice to any and all other remedies available to a judgment creditor for collection of its judgment.

Respectfully submitted,

Dated: October ..., 2011

/s/

Peter A. Joseph, Esq.
Bar PJ-9723
177 Waverly Place # 5F
New York, NY, 10014-3552
Tel. (212) 924 1498

/s/

George Lambert, Esq.
D.C. bar #979327,
subject to application
for pro hac vice admission
Law Offices of Leonard Suchanek
1025 Connecticut Ave., #1000 NW
Washington, D.C., 20036
Tel. (202) 640 1897, Fax (202) 747 7797

Attorneys for Plaintiff and
Judgment Creditor
Universal Trading & Investment Co., Inc.