**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

Civil Action NO. 97CV12180EFH

| | |
|---|---|
| UNITED ENERGY SYSTEMS OF UKRAINE, PFG ) <br> a Ukrainian corporation, ) <br>     Defendant in counterclaim ) <br> ) <br> v. ) <br> ) <br> UNIVERSAL TRADING & INVESTMENT CO., INC. ) <br> a Massachusetts corporation, ) <br>     Plaintiff in counterclaim ) <br> ) | **AFFIDAVIT** <br> **OF DR. GEORGE** <br> **LAMBERT** <br><br> **IN SUPPORT** <br> **OF MOTION** <br> **FOR ASSESSMENT** <br> **OF DAMAGES** <br> **AND FOR ENTRY** <br> **OF DEFAULT** <br> **JUDGMENT** |

I, GEORGE A. LAMBERT, AFFIRM AND DECLARE:

1. I am, and have been since commencement of this action, president of plaintiff in counterclaim, Universal Trading & Investment Co. (hereinafter "Universal"), a Massachusetts corporation that engages in international business and consulting and has its principal place of business in Massachusetts. Except as to those matters alleged on information and belief, I have personal knowledge of the facts and information stated in this affidavit, and, if called upon, could testify competently thereto as set forth below.

2. I have a master's degree in Public Administration from the John F. Kennedy School of Government, Harvard University, and a master's degree from the Fletcher School of Law and Diplomacy, Tufts University. I also have a doctoral-level degree in international law and a doctoral-level degree in political science from academic institutions in Russia. I am a U.S. citizen. Among other affiliations, I have served as an associate of the Harvard Center for International Affairs and the Ukrainian Research Institute at Harvard University. I have

authored 5 books and many articles and I am a recipient of an award by the U.S. Institute of Peace, funded by Congress, in Washington, D.C.

<u>Criminal Proceedings against Principals of UESU</u>

3. At the present time, according to the information well established in the public domain, including media, United Energy Systems of Ukraine, PFG ("UESU"), a Ukrainian entity registered in Ukraine in November 1995, is abandoned by its principals and has no existence.

4. I authenticate the Interpol Public Notices ("Red Cards") of Wanted Fugitives that have been at some point of time in about 2002 issued against the officials of UESU who have been in and out of prison: Director General and Member of Board Y. Shago, No. 15414; Director and Member of the Board O. Tymoshenko, No. 35844; Chief Financial Officer L. Sokolchenko, No. 15457. Exh. 1-3.

5. Furthermore, other principals of UESU are believed to have been in and out of prison. For example, its Member of the Board V. Falkovich has been in and out of prison and has also been subject to Interpol Notice. Another member of UESU Board G. Tymoshenko and its Deputy Chief Financial Officer A. Balyura were arrested in Turkey in 2002, extradited to Ukraine in October of that year, and held without bail for certain time. Another Board member of UESU, O. Olenin, on information and belief, has been convicted of crimes of fraud and misappropriation of public property in Ukraine and is serving sentence.

6. Two co-conspirators of UESU, former Prime Minister Pavlo Lazarenko (hereinafter "Lazarenko") and his former assistant Petro Kiritchenko (hereinafter "Kiritchenko") who have fled justice in Ukraine, have been prosecuted first for extradition and then convicted in the USA (U.S. District Court for Northern California). See Exh. 15, 19, 47.

7. First being subject of the Swiss extradition proceedings, in 2000, both Lazarenko and Kiritchenko pled guilty *in absentia* in Switzerland, for laundering the proceeds deriving from UESU. The Swiss charges involved approximately $9.6 million. The time they spent in the federal prison was credited towards their sentences in Switzerland. For more specifics, see In the Matter of the Extradition of P. Kiritchenko and P. Lazarenko, CR99-30215, in the U.S. District of Northern California. Exh. 13. The Swiss accounting experts testified at said trial *in absentia* to the effect that the aggregated total that Lazarenko misappropriated from Ukraine, according to Swiss accounting experts, was about $880 million.

8. Exhibit 4 represents the true copy of the Swiss verdict against P. Lazarenko, obtained from the Court in Geneva by another member of the Board of Universal, with translation from French. Lazarenko pled guilty to the Swiss charges *in absentia*, accepted conviction on two counts under the Swiss money laundering statute, applied the imprisonment term already served in American prison, and paid a fine of about $6 million 552.4 thousand, which was imposed by the Swiss verdict dated June 28, 2000.

9. The criminal case of Lazarenko brought by U.S. Government in May of 2000, ultimately resulted on June 3 of 2004 in the verdict of guilty on 29 Counts involving money laundering and other illegal activities, in violation of 18 U.S.C. §§ 1956(h), 1956(a)(2), 1956(a)(1)(B), 1343, 1346 and 2314, in the action U.S. v. Pavlo Lazarenko, CR00-0284MJJ. Exh. 47.

10. At the trial of Lazarenko from March 15 through June 3, 2004, his former assistant and money launderer of proceeds from UESU, Kiritchenko, testified against Lazarenko, made admissions, having pled guilty under the plea agreement, on one Count of transportation of

stolen property (for $8.2 million), in the action <u>U.S. v. P. Kiritchenko.</u> CR00-0270MJJ in the same U.S. District Court for Northern California, San Francisco Venue. Exh. 15.

### Abandonment by UESU of This Action

11. Since the fall of 1997, when UESU initiated the action, that entity then repeatedly failed to submit its representative to a deposition. The notices of depositions by Universal were repeatedly made since 2000, the latest in November of 2004, with the ultimate no-show of any deponent on due deposition record.

12. UESU has resisted bringing this action to trial on the merits, and its principals have chosen to protract and obstruct the civil proceedings in the U.S. Among other, the limited Answers to the Interrogatories propounded by Universal on UESU were incomplete, not verified, and all attempts to obtain responsive answers were in vain.

13. UESU did not comply with the Court Order dated May 26,1998, compelling to provide truthful and complete Answers to the Interrogatories, with the Court Order of same date ordering UESU to comply with the request for production of documents. Then UESU did not comply with the Court Order dated September 23,1999, compelling, again, that it provide truthful and complete, as well as properly verified, answers to the Interrogatories. Exh. 21. Despite numerous repeated requests to supplement production of documents, nothing in the production of the documents supports the claims of UESU.

14. I am informed and believe that the only objective of UESU to initiate litigation in USA was with the efforts to intimidate Universal and to influence it not to submit evidence of its principals' crimes of misappropriation and money laundering to the Ukrainian authorities, but the criminal case was, upon information from Universal, opened in Ukraine. Exh. 147.

Lambert Affidavit in Support of Motion for Assessment of Damages, 97CV12180EFH          4

## Underlying Facts for This Litigation

15. This action commenced because of Universal's contacts with the Prosecutor General's Office of Ukraine and assistance to investigation in Ukraine and to several other government agencies in that country from 1997. Exh. 5-8, 104-124.

16. While being in a contractual relationship with Cube Ltd., the predecessor of UESU, and then UESU, in 1993-1997, Universal learnt that Cube/UESU principals eventually committed a grand-scale fraud with regard to the contract with Ukrainian public entity Ukragrotekhservice previewing the barter transactions with ferrous metals and oil products for the amount of $113 million. Exh. 29. Namely, UESU misappropriated the first installment of $1.3 million that was routed to a Cyprus-registered Somolli Enterprises Ltd., controlled by UESU's co-conspirators.

17. I incorporate by reference the factual underlying history of that contractual relationship of Universal with UESU having for its object the recovery of the proceeds allegedly lost by UESU in a ferrous metals transaction. Said transaction involved delivery of ferrous metals for $2.6 million to China, and the Letter of Credit diverted to an intermediary company in India, with cognizance of UESU principals who anticipated misappropriating about half of those sale proceeds. Exh. 104-124.

18. However, the findings by Universal that it transferred to Ukrainian authorities at that time turned out to be only a small portion of the scale of activities of that entity. Acting as an organized crime group, the principals of UESU, according to the charges in Ukraine, allegedly misappropriated altogether about $2.1 billion from Ukraine, deriving from the natural gas settlements. Those natural gas settlements were routed by UESU through parent-

subsidiary links to London, British Virgin Islands, Guernsey, ending on the personal and numbered accounts of UESU's co-conspirators.

19. According to the trial exhibits and banking records, the total money-laundering turnover on one representative account managed by co-conspirators, over a period of 2 years and 3 months in the late 1990s came to $2 billion 641 million. That turnover consisted mostly of cash and assets controlled by Lazarenko and Kiritchenko, now convicts in U.S., and primarily deriving from the UESU natural gas scheme, those monetary assets were transferred to Antigua, the Bahamas, St. Kitts, and Liechtenstein.

### A. Damages Based on Breach of Contract and Misrepresentations

20. I verify the statement of damages merged in Counts I-III of Counterclaim against UESU made in 1998. Because UESU contracted Universal using false pretenses, its original terms were invalidated *de facto*. Exh. 36, 38, 46, 58. Universal, on which behalf I act herewith, is asserting the full extent of reasonable income based upon the terms in the industry, i.e. international collection of debts, that required sophisticated work of experts in that domain, especially given that performance was on contingency only. The remaining unpaid portion of the reasonable revenues under contract that had been implemented for more than 3 years, was performed in part, but could not be implemented without damages to Universal, amounted to $514,510.

### B. Damages Based upon Non-payment of Legal Fees in India, on Cross-Claim

21. I verify the assertions of stated in Count II, i.e. paragraphs 51-57, in the Counterclaim filed in 1998. Exh. 24. Under the contingency contract concluded between Cube/UESU and Universal in 1994, UESU was to pay all legal fees in India that were anticipated in relation

to Universal's recovery efforts in that country. Pursuant to that agreement, Universal retained Singhania and Co., a major law firm in India with offices in 6 cities in India, as well as in New York and in London. Exh. 129-142. Until a certain time, UESU was paying per invoices from Singhania and Co. However, from a certain point in time, UESU stopped paying on the legal fees invoices of Singhania and Co. As a result, the debt in legal fees was left unpaid, leaving Universal co-liable as a guarantor. The outstanding legal fees in India amounted to $98,640. Exh. 143.

22. Universal, on which behalf I act herewith, is asserting that cross-claim based on the unsatisfied outstanding legal fees in India from Singhania and Co., for which Universal was fraudulently left responsible by means of non-payment by UESU; and that cross-claim should be included into the judgment.

### C. Damages Based upon Count of Assault

23. I verify the assertion of damages stated in Count V of the Counterclaim filed in 1998. When in mid-1997, the real circumstances and facts of UESU's misappropriation of assets in China and India came to light, Universal demanded explanations. UESU's principals invited Universal's president to come to London, U.K., for negotiations in person scheduled for August 4, 1997. On that day, four representatives of UESU came to the hotel where I stayed. Among those four, two persons did not introduce themselves, their identities established later. UESU's four representatives attempted, with intimidation, to persuade me to leave the hotel in one of their cars and to bring the file of documents. I categorically refused to leave the premises and security of the hotel. Exh. 24.

24. Then UESU's principals threatened 'swift actions' and stayed in the hotel lobby for several hours, leaving the impression that my safety and life were in immediate danger. UESU principals made it clear that Universal's business projects in the former Soviet Union would be 'dealt with' and that Universal executives traveling to that region would be unsafe.

25. As publicly available records show, 4 representatives of UESU were arrested in Ukraine later, in 2001-2002, and held without bail on charges of misappropriation of public property, overlapping with Universal's prior findings. In 2002, two of those were released on bail, absconded and were declared wanted by Interpol. One of those UESU principals, participating in that assault in London, was posted by Interpol on its web-site with the pictures as an especially dangerous suspect at large. Exh. 2. Another shadow principal of UESU was later charged with contracting murders. The charges alleged that 5 persons were killed in Ukraine, according to letters rogatory. For those murders, according to charges and convictions in Ukraine (8 members of the killers' gang convicted in 2002, more than $2 million was paid. The alleged co-conspirator who contracted for murders, Lazarenko, is also currently convicted in the US on other charges: 14 counts of money laundering and transportation of stolen property). Exh. 47.

26. Upon return to U.S., I promptly complained to the FBI about the assault on me in London; a 'hot-line' number of an FBI agent assigned to those matters was given to me. Exh. 24.

27. I verify that the direct damages for the assault constituted $1,840 being the costs of round trip traveling from Boston to London for the meeting with UESU's principals that

they proposed. Further $18,000 should be assessed in punitive damages for assault. The punitive damages include the reasonable apprehension of threat by organized crime.

### D. Aggregated Damages to Business Reputation; Universal's Loss of Business and of Anticipated Profits; Damages for Abuse of Process and Outlays for Investigatory Work

28.     I verify the statement of damages made in Counts VI, XIV, XV, XVII in Universal's Counterclaim and Amended Counterclaim in 1998-1999. Exh. 124. From mid-1997, UESU engaged in retaliatory campaign with the purposes of damaging or destroying Universal's business and revenues. In 1997-2000, before UESU was ultimately defunct, UESU had large clandestine assets, essentially fruits of misappropriation and fraud, in offshore jurisdictions. Those assets were unlawfully kept by UESU's principals out of reach of Ukrainian Tax Service and of creditors. UESU engaged in contacts with Universal's business counterparts making efforts to dissuade them from doing business with Universal.

29.     Upon the assault in London, Universal's executive directors concluded that UESU, with its clandestine assets, represented an imminent threat in the countries of the former Soviet Union where UESU and its agents operated. Trips by Americans in that region were easy to trace, and any trips of Universal executive directors there would represent danger to them. From August of 1997, Universal's executive directors elected, as a matter of policy, not to travel to any of those countries, and since that time have therefore never traveled there.

30.     As a factor, the evaluation of damages involved the work time actually invested into the contracts that UESU prevented from Universal's full performance and benefit. In the face of abuse of process by UESU with its false allegations of innocense, that included also the necessary investigation of UESU's frauds, with due regard to the applicable hourly rates. For example, Universal's chairman is a Rhodes Scholar, Ph.D., with 11 books published,

with the track record of being 4 times a presidential appointee in four administrations and with the experience of over 20 years being professor at the Fletcher School of Law and Diplomacy, whose hourly consulting rate was $260/hour. As another example, I have two doctorate degrees, two master's degrees, and I am the author of 5 books, my consulting rate was $200/hour. As mentioned above, among Universal's directors there are four more Ph.Ds. Exh. 27.

31. As a representative example of the qualified expert work and of the necessary investigation to counter abuse of process in this Court, Universal's team including counsel traveled to the British Virgin Islands in June of 1998 for uncovering the offshore holdings of UESU. Universal met with the Governor of the British Virgin Islands (with two more follow-up trips), obtained a local High Court Order to search the offices of a local offshore agent firm Mossack Fonseca Ltd. to successfully discover the secret file on UESU's offshore holdings. Exh. 62.

32. As Universal discovered in the BVI, UESU was owned by United Energy International Ltd., registered in U.K., which was in turn owned by a shell entity Bassington Ltd., registered in the British Virgin Islands. Exh. 35, 56, 148. Bassington Ltd. was in turn owned by a secret trust set up in Guernsey, for the benefit of several Ukrainians conspiring to cover up for frauds, to pay kickbacks to Lazarenko, to evade taxes and creditors. Exh. 62. Universal assisted in unmasking the nucleus of the criminal organization diverting proceeds exceeding $2.1 billion, according to Ukrainian law enforcement. Such discoveries were warranted in the course of this litigation in the light of UESU's abuse of process making false assertions of innocence of its members before this Court.

33. After the assault in London in August 1997, as indicated above, Universal's executive directors made a decision of policy by necessity, not to travel to any of those countries, and since that time have therefore never traveled there.

34. As a result, Universal lost several beneficial contracts, particularly those that required personal visits to that region, meetings with the counterparts, witnesses, and other steps necessary for implementing contracts. The contingency contracts that required personal trips to that region were left with unfinished performance, Universal cut its losses. That included the loss of business with the Uzbek government with regard to Almalyk Copper Mining Combine, loss of business with East West Investment Bank involving the cases of Boushkanets brothers and the TOMO Communications Systems Inc. matter; the Mosstroy Bank matter, RiSKA/Pierce case, Excalibur Inc. case, several export deliveries contracts on consignment, as with more details below.

35. Universal has submitted the materials concerning suspects residing in USA, with the trail of unsatisfied foreign debts or alleged perpetrators of financial fraud overseas, to the FBI, with benefit to U.S. law enforcement. On information and belief, the FBI assembled the files on those suspects residing in the U.S., in the New York City area, fraudulently evading large foreign debts. Exh. 80, 82-83, 12-113, 137. At the same time, Universal lost anticipated income on those contracts, because of the interference by UESU.

i. Loss of Business with Uzbek Government Regarding Almalyk Copper Mining Combine

36. From 1996, upon the invitation of the Uzbek government, Universal engaged in the preparation of an economic strategy program for restructuring Almalyk Copper Mining Combine, the largest of that kind in Uzbekistan. That Mining Combine was in crisis, with

the output plummeting to some $200 million a year instead of the potential of more than $1 billion a year. That invitation was in the light that the combine was in technical decline and required restructuring and returning it to profitability with western expertise.

37. Universal provided consulting services towards preparation of the international bidding for restructuring. Universal's representatives traveled to Uzbekistan, met with the Uzbek government representatives, prepared the consulting package and undertook the first phase of evaluation on site. Universal proposed to the Uzbek government to hold that bidding in New York. Exh. 64-69.

38. In the course of its work, Universal set up two entities in New York State, International Forum for Investments in Uzbekistan, Inc., on April 8, 1997, and a sister not-for-profit entity International Foundation for Investments in Uzbekistan, Inc., on May 27, 1997. Exh. 64-69. Pursuant to the arrangements with the Uzbek government, Universal initially set those up as its full subsidiaries, with the prospective of yielding the majority shares to the Uzbek government entities at the follow-up stage of the bidding. Exh. 65-69.

39. At the follow-up invitation of the Uzbek government, Universal's representatives were to travel to Uzbekistan again. However, after the circumstances from August of 1997, when Universal made the policy decision not to travel in that region and because of the adverse activities of UESU in that region, that invitation for further talks in Uzbekistan could not be consummated.

40. Ultimately, the Almalyk Copper Mining Combine project was to be scaled down and closed. Universal discontinued maintaining its subsidiaries in New York: International Forum for Investments in Uzbekistan, Inc., and International Foundation for Investments in

Uzbekistan, Inc. Universal's work products remained for the benefit of the Uzbek government on a *pro bono* basis, writing off all invested resources and anticipated income.

41.   In accordance with Universal Board's estimates, its anticipated profit on that project was about $28 million. For purposes of assessment, that lost anticipated profit has been conservatively scaled down.

### ii. Loss of Business with East West Investment Bank

42.   By way of recommendations and reputation, Universal obtained a contract with East West Investment Bank, at the address: 8 Bolshaia Sadovaya St., Moscow, for collection of a $1.5 million plus interest debt. That debt resulted from the misappropriation of a $1.5 million commercial loan (plus interest, the total claim being ca. $2.4 million) by one of its former clients V. Boushkanets with his brother acting for their V.B. International Trading Inc. registered in New York State. Exh. 71-78. The suspects obtained that loan, for funding deliveries of consumer electronics overseas, on the account at the Bank of New York, in New York, on March 16-22, 1994. Then the suspects discretely emigrated from Russia to the U.S. and cut off all contacts with the creditor bank. Universal's collection contract on contingency was on 50/50% basis. Exh. 71-76.

43.   Universal was able to make substantial progress in the investigation towards recovery. Despite the change of the last name of the key suspect (thereupon Trainin), Universal was able to locate their whereabouts in Brooklyn, New York, and to determine that the missappropriated proceeds were invested into several video rental stores there and in Florida.

44. Universal communicated all that information to the FBI, held having several meetings on that matter, and prepared a RICO action on the civil side, with identification of the sufficient attachable assets. Exh. 80-83.

45. In 1998, East West Investment Bank became insolvent and subject to restructuring, and Universal required that its new Managing Board reaffirmed the collection contract, for which traveling by Universal representatives to Moscow was needed. Because Universal terminated all traveling plans in that region and because of the information about UESU adverse activities, Universal had to terminate that contract and project, to cut losses and to forego the anticipated income of more than $1 million, if the civil action was successfully prosecuted with trebling damages under contemplated RICO action. Exh. 82.

46. Another collection project with the same client bank, East West Investment Bank, was equally scrapped. It involved a New York registered corporation TOMO Communications Systems Inc. That entity obtained a loan at that creditor bank against the Promissory Note for $1 million 150 thousand on December 28, 1996 and then evaded repayment and any contacts with the creditor bank. Exh. 79.

47. Even when Universal had to discontinue pursuing the collection work on the civil side in New York, it transferred valuable information to the FBI about the suspects with the trace of financial fraud, with benefit to U.S. government.

### iii. Loss of Business with AOZT RiSKA, Inc.

48. By way of recommendations and reputation, Universal also obtained a beneficial agreement with AOZT RiSKA, Inc., at 2 B. Tulskaya St., Moscow, Russia, with regard to collection of $882,000 misappropriated by Alain Pierce aka Plotkin residing in Brooklyn,

New York. The latter obtained those proceeds at the account of his Luxumbourg-based entity Broadway Consulting, Ltd., committing to ship to Russia a heavy construction crane KATO (120 tons capacity and 325 ft long gib). Exh. 84. Once obtaining the proceeds in September 1995, Pierce cut off contacts with creditor AOZT RiSKA.

49. After being contracted, Universal was able to locate the whereabouts of Pierce who discretely moved to New Jersey. Universal communicated all information to the FBI whose agents visited Pierce in New Jersey. Universal's counsel contacted Pierce who agreed to settle the misappropriation matter but requested time claiming temporary financial inability.

50. Universal was also contracted by AOZT RiSKA to collect a misappropriated advance from a Canadian national Charlotte Douglas who received $300,000 at her account in the Seattle First National Bank in Washington State, in the name Excalibur Inc., and then cut off her contacts with that creditor company. Exh. 84.

51. Because of the circumstances described above, including the inability to travel to meet with the witnesses in Russia, and UESU's adverse activities, Universal had no choice but to write off all invested resources into those two projects and to leave those contingency contracts without fruition. At the same time, Universal provided substantial benefit to U.S. law enforcement transferring all relevant information.

### iv. Loss of Business with Mosstroi Bank

52. In a similar way, Universal had to forego potential profit with regard to its other client, Mosstroy Bank, at 21/18 Dmitrova St., Moscow, Russia. One of its former clients, Chehkiev, obtained a loan of $1,000,000 on May 28, 1995, for funding the wholesale imports to of mahogany furniture from Ghana, which was never delivered. Exh. 84. After

that Chehkiev moved to Ghana and cut off all contacts with the creditor bank. Universal and I were particularly interested in that recovery case, because in my early career I had worked in Ghana for three years. I was acquainted with the president of that country, I happen to have published an academic book about that country, and I had an initial advantage to materialize that particular project.

53.    As stated above, after August of 1997, in the light of the inability to travel to Russia to meet with the witnesses and with regard to the adverse activities of UESU, Universal had to close that matter and to write off all invested resources and anticipated profit.

### v.   Termination of Export Deliveries and of Anticipated Profits

54.    As a result of the assault in August 1997 and the decision that Universal had to forego any business in the republics of the former Soviet Union whenever those required traveling to that region, Universal terminated or lost several established lines of export shipments. That included the termination of the export deliveries of American-made vehicles (primarily Jeep and Ford models) and auto-parts which had surpassed $1 million in value, with the inability of collecting on the last vehicles shipped on consignment in August of 1997. Similarly, Universal discontinued exports to that region of wholesale American clothing (catalogue goods from Chadwicks of Boston, other brands), with some of the deliveries on consignment remaining unpaid. Universal cut its losses and foregoing future income on those lines of export business.

55.    With reference to this Court's Order entered on March 24, 2000 denying UESU's Motion to Dismiss the claims stated by Universal under RICO, along with UESU's failure to

answer that Amended Counterclaim, Universal is entitled to trebling these damages, as stated in Counts XIV, XV, XVI, in the amount of $12,711,490. Exh. 144.

56. Additionally, as indicated above, UESU admitted these damages while choosing not to answer the Requests for Admissions under F.R.Civ.P. 36 (over 300 requests for admissions filed, none answered). Exh. 103.

57. All other related damages such as damages to its reputation, for loss of contracts and of business, were not separately quantified and are merged into the aggregated damages above. The damages for abuse of process are not stated herewith as a separate claim and merged into these aggregated damages for loss of contracts and of business, and for the necessary outlays for investigation.

### E. Damages Based upon Cross-Claim by Indian Claimants

58. I verify the claim of damages made in Count VII of the Amended Counterclaim in 1998. On January 29, 1998, Universal first received by fax, and then by mail the demand letter, in duplicate, stating a cross-claim, served by attorney Atish Ghosh, offices at 11 Old Post Office Street, Calcutta, 700001, India, in the name of India Laminating & Packaging Co., Inc., and of its president Samdev Dasgupta, at the addresses No. P-15 Kashba Industrial Estate, Phase-I, Calcutta, 700078, and 28 Ballygunge Gardens, Calcutta 700019, India. Exh. 128.

59. That claim stated against Universal, which had acted under contract with UESU, was based on the collection work and activities undertaken in India that were prosecuted against the allegedly innocent Indian claimants. The demand letter recited Universal's applications before the appropriate India government offices to intervene with regard to India Laminating

& Packaging Co., prompting various local investigations. Exh. 128. Those cross-claims are pending in abeyance of the completion of the criminal, administrative and tax compliance proceedings by authorities in India.

60. Because UESU is defunct for any practical purposes or dissolved, Universal is the only remaining party from which that claim of the Indian claimants can be collected. That claim against UESU and Universal was initially aggressively stated by the Indian attorneys for $5 billion in damages. (See attorney Atish Ghosh's demand letter, at pp. 6, 7, Exh. 128). In the subsequent contacts towards a settlement of that claim, the Indian claimants conceded that their claim should be understood as for $5 million and that for that amount their claim could be settled with a release.

61. UESU didn't pay that settlement amount and became later defunct. UESU was that party that initially complained of the Indian claimants and contracted Universal to collect the alleged debt in India, putting false facts on paper in the contract and in the power of attorney. Exh. 36, 38, 46, 58. Hence, UESU should be made responsible on that cross-claim in the requested judgment.

62. I verified on behalf of Universal that cross-claim as cited in its reduced version of $5 million as applicable to a potential settlement with the Indian claimants or in the alternative scenario as security for the litigation costs regarding the cross-claims of the above magnitude. Universal is asserting against UESU that counterclaim based upon this pending cross-claim from India in the amount of the possible settlement of $5 million, to protect the corporation from jeopardy created by UESU or to obtain a release of the Indian claimants.

63. In conclusion, I herewith verify, on behalf of Universal, that the aggregated amount of Universal's damages against UESU is $18,344,480 and support the Motion respectfully brought by Universal before this Court to make the Default Judgment in said amount.

64. I further verify the Exhibits, volumes 1-8, Nos. 1-203, that are annexed to the pleadings in support of assessment of damages.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED: June 9, 2005

GEORGE (YOURY) A. LAMBERT
President of
Universal Trading & Investment Co., Inc.