UNITED STATES DISTRICT COURT
FOR SOUTHERN DISTRICT OF NEW YORK

UNIVERSAL TRADING & INVESTMENT
CO., INC.

      Plaintiff

  -vs-

YULIA TYMOSHENKO, aka YULIA
TIMOSHENKO;
ALEXANDER TYMOSHENKO, aka
ALEXANDRE TIMOSHENKO;
ANDREY VAVILOV

and DOES from 1 to 10

      Defendants

CIVIL ACTION
DOCKET No. 11-cv-7877 (PAC)

**PLAINTIFF'S OPPOSITION
TO MOTION OF DEFENDANT ANDREY VAVILOV
TO DISMISS THE AMENDED COMPLAINT
PURSUANT TO FEDERAL RULE 12(b)**

# TABLE OF CONTENTS

Introduction…………………………………………………………………………1

1.    Standard of Review on Motion to Dismiss………....………………………………1

2.    Procedural History……………………………………....………………………….1

3.    Restatement of Facts Concerning Vavilov Pled in the Amended Complaint…3

4.    Recent Arbitration Confirmation Matter in This Court Further Shows Vavilov's Being Resident of New York……………………………………………………………..6

5.    Vavilov's Litigation Concerning Penthouse at the Plaza Hotel………………….8

6.    Vavilov's Public Statements Concerning His Hedge Fund in New York………9

7.    This Court Has Jurisdiction over Vavilov under State Law of New York…..10

8.    Vavilov's Denials of Not Being Resident in New York Are Not Credible and Disproven by Record in Two Cases and in Numerous Publications…………………12

9.    This Court Has Jurisdiction over Vavilov Pursuant to CPLR 301, as a Result of His Continuous and Systematic Activities in New York State………………………13

10.    Against the Background of Facts Discovered in Two Actions, Vavilov's Denials Should Be Treated as Not Credible and Requiring Deposing Him……………………...13

11.    This Court Has Jurisdiction over Vavilov under CPLR 302(a)……………….....15

12.    This Court Has Jurisdiction over Vavilov under CPLR 302(a)(4)……………….16

13.    Vavilov Is Garnishee of the Illegally Obtained UESU Assets at the Present Time; Statute of Limitations Does Not Bar Recovery……………………………………17

14.    Claim against Vavilov under Count 1 Properly Pled, 'Judgment Debt Recovery; Relief under Turnover Statutes'……………………………………………………………19

15.    Allegations in Count 2, under RICO, Where Vavilov Has Been an Agent of the Enterprise, Supporting Finding Jurisdiction……………………………………………20

**16.    This Court Has Jurisdiction over Vavilov as an Agent in Racketeering Enterprise**................................................................................................................**21**

**17.    Count 3, 'Unjust Enrichment', Was Properly Pled against Vavilov**................**22**

**18.    Counts 4-6 Were Adequately Pled**……………………………………………...**23**

**19.    Relief Asked Can Be Granted by This Court. Universal Trading Complied with the Order Allowing Amendment of the RICO Claim**…………………………………**23**

**20.    In the Event of Doubts about Asserting Jurisdiction, at the Very Minimum, the Court Should Allow Expedited Jurisdictional Discovery**…………………………**25**

**Conclusion**………………………………………………………………………………..**25**

# LIST OF AUTHORITIES

| | |
|---|---:|
| *A.I. Trade Fin., Inc. v. Petra Bank*,<br>    989 F.2d 76, 79 (2d Cir.1993) | 1 |
| *ABKCO Industries, Inc. v. Lennon et al.*,<br>    52 A.D.2d 435, 384 N.Y.S.2d 781 (1st Dep't 1976) | 13 |
| *Bankrate, Inc. v. Mainline  Tavistock, Inc.*,<br>    2008  WL 341452 at  *4  (Sup. Ct. Kings County 2008) | 25 |
| *Black River Assoc. v. Newman*,<br>    218 A.D.2d 273, 637 N.Y.S.2d 880 (4th Dep't 1996), | 15, 16 |
| *Burrows Paper Corp. v. R.G. Engineering, Inc.*,<br>    2005, 363 F.Supp.2d 379 | 11 |
| *Cerberus Capital Management, L.P. v. Snelling & Snelling, Inc.*,<br>    2005 WL 4441899 (Sup. Ct. N.Y. County 2005) | 16 |
| *Cooper, Robertson & Partners, LLP v. Vail*,<br>    2001, 143 F.Supp.2d 367 | 11 |
| *Cullen v. Margiotta*,<br>    811 F.2d 698, 730 (2d Cir.), cert. denied, 483 U.S. 1021,<br>    107 S. Ct. 3266, 97 L. Ed.2d 764 (1987). | 22 |
| *Deer Consumer Products v. Little*,<br>    938 N.Y.S. 2d 767, 774-75, 35 Misc.3d 374, 381 (2012) | 10 |
| *Foman v. Davis*,<br>    371 U.S. 178, 182 (1962) | 26 |
| *Hecht v. Commerce Clearing House, Inc.*,<br>    C.A.2 (N.Y.) 1990, 897 F.2d 21, 100 A.L.R. Fed. 655. | 22 |
| *Kalichman v. Beverly Holding Co.*,<br>    130 A.D.2d 327, 520 N.Y.S.2d 255 (3d Dep't 1986) | 16 |
| *Katz v. Mogus*,<br>    2007, 538 F.Supp.2d 538 | 11 |
| *Kaye, Scholer, Fierman Hays & Handler*,<br>    266 A.D.2d 51, 51, 698 N.Y.S.2d 641, 641 (1st Dep't 1999) | 16 |
| *Kreutter v. McFadden Oil Corp.*,<br>    71 N.Y.2d 460, 466-67, 522 N.E.2d 40, 43 (1988). | 15 |
| *Lancaster v. Colonial Motor Freight Line, Inc.*,<br>    177 A.D.2d 152, 581 N.Y.S.2d 283 (1992). | 13 |
| *Landoil Resources Corp. v. Alexander & Alexander Servs.*,<br>    77 N.Y.2d 28, 33-34, 563 N.Y.S.2d 739, 565 N.E.2d 488 (1990) | 9, 13 |
| *Laufer v. Ostrow*,<br>    55 N.Y.2d 305, 435 N.E.2d 692 (1982). | 9 |
| *Mitchell v. Lyons Professional Services, Inc.*,<br>    2010, 727 F.Supp.2d 120 | 20 |
| *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Ideal Mut. Ins. Co.*,<br>    122 A.D.2d 630, 505 N.Y.S.2d 416 (1st Dep't 1986) | 25 |

| | |
|---|---|
| *Norex Petroleum Ltd. v. Access Industries, Inc.*,<br>    C.A.2 (N.Y.) 2005, 416 F.3d 146, certiorari denied 547 U.S. 1175,<br>    on remand 540 F.Supp.2d 438. | 22 |
| *NTL Capital, LLC v. Right Track Recording, LLC*,<br>    73 A.D.3d 410, 901 N.Y.S.2d 4 (1st Dep't 2010) | 20 |
| *Palmer v. Globalive Communications Corp.*,<br>    2008 WL 2971469 (S.D.N.Y. 2008) | 13 |
| *Republic of Iraq v. ABB AG*,<br>    2013 WL 441959 | 22 |
| *Southerndown, Inc. v. HSS LLC*,<br>    unpublished 2012 WL 265987, S.D.N.Y.,2012 | 6 |
| *State of New York v. Samaritan Asset Mgmt Servs., Inc.*,<br>    No. 404969/06, 2008 WL 4745487 (Sup. Ct. N.Y. Co. October 29, 2008) | 11 |
| *Sunward Electronics v. McDonald*,<br>    C.A.2 (N.Y.)2004, 362 F.3d 17. | 11 |
| *Taylor Devices, Inc. v. Walbridge Aldinger Co.*,<br>    2008, 538 F.Supp.2d 560 | 11 |
| *Taylor v. Vt. Dep't of Educ.*,<br>    313 F.3d 768, 776 (2d Cir.2002) | 1 |
| *Tovar v. Indiana*,<br>    Slip Copy, 2011 WL 5423161, S.D.N.Y.,2011. | 11 |
| *WBP Cent. Assocs., LLC v. DeCola*,<br>    50 A.D.3d 693, 855 N.Y.S.2d 210 (2d Dep't 2008). | 20 |
| *Williams v. Citigroup Inc.*,<br>    659 F.3d 208, 214 (C.A.2, 2011) | 25 |

## Introduction.

Plaintiff, Universal Trading & Investment Co., Inc. ("Universal Trading"), respectfully submits that the Motion to Dismiss ("MTD") brought by Defendant Andrey Vavilov ("Vavilov") has no merit.  In addition to the present Memorandum Plaintiff files the Declaration of Roman Plyamovaty ("RP Decl.) and of W. Scott Thompson ("WST Decl.").

### 1.  Standard of Review on Motion to Dismiss.

It is established that the court must accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the nonmoving party.  *Taylor v. Vt. Dep't of Educ.*, 313 F.3d 768, 776 (2d Cir.2002).  On a motion to dismiss for lack of personal jurisdiction, plaintiff ultimately bears the burden of establishing personal jurisdiction by a preponderance of the evidence, either at an evidentiary hearing or at trial. *A.I. Trade Fin., Inc. v. Petra Bank*, 989 F.2d 76, 79 (2d Cir.1993). "But where the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor." Id. See also *Tovar v. Indiana*, Slip Copy, 2011 WL 5423161, S.D.N.Y.,2011.

### 2.  Procedural History.

On July 29, 2013 Universal Trading filed the Proof of Service on Vavilov at his penthouse apartment at: Time Warner Tower South, 10 Columbus Circle, Penthouse, 78th Fl., New York, NY, 10023. Dkt 41.  It took Vavilov 2 months and 20 days to file the Motion to Dismiss ("MTD").

The claim against Vavilov, as the garnishee holding the assets of judgment debtor United Energy Systems of Ukraine ("UESU") and as agent of the other two Defendants in the racketeering conspiracy, is relatively simple.

As the Amended Complaint ("AC") showed, on March 31, 1997 Vavilov allegedly received in New York a $10 million bribe from judgment debtor UESU.  See Exh. 1-3 to RP Decl.

That alleged bribe was received at the account in New York at National Republic Bank, through a Russian correspondent bank, for an offshore Angora Management Ltd. ("Angora"), incorporated in the Bahamas and controlled by Vavilov.  The correspondent bank was a Barbados offshore bank, Louis D'Or Investment Bank ("Louis D'Or").  According to the allegations by bankers, the Russian mafia laundered about $1 billion through Louis D'Or holding accounts in New York, used by a Russian bank Unikombank, connected to Vavilov.  See RP Exh. 23.

As relevant here, Vavilov, according to widely published allegations, used that transfer of $10 million to acquire, for about $5 million, the real estate in New York.   See RP Exh. 3.  Later in time Vavilov allegedly used those assets and the balance of that bribe for acquiring more properties in New York, in larger amounts.

At a time of receiving the alleged bribe in March of 1997, Vavilov was a high government official in Russia, a First Deputy Finance Minister.  As a matter of Russian and Ukrainian law, he has never obtained title to those assets, as a legal issue concerning the bribes to officials.

Those assets, $10 million, are still legally the assets of UESU.  Vavilov's controlling those proceeds, even though laundered through the New York real estate, still continue to be UESU's assets, as a matter of Ukrainian and Russian law.

A Notice under Rule 44.1 by Universal Trading, to be filed separately, will ask to apply, among other, Ukrainian law to the charges concerning the underlying criminal scheme, as to the lack of title to the proceeds of bribery, no matter when obtained by a government official.

In 2007, Vavilov, with a trail of criminal inquiries and proceedings and upon the Russian Supreme Court affirming prosecutors' decisions to go forward with charges, moved to New York, where he, in his words in the interview to the New York Times, "set up shop", opening a $600 million hedge fund, called IFS Hedge Fund.  See RP Exhs 20, 36, 37, 40.

Vavilov got involved, as a co-defendant, in this case after the Ukrainian law enforcement recently brought charges against Tymoshenko (who is imprisoned) and against others, based on the fraudulent scheme for $450 million.  WST Exhs 58-59.  That was Vavilov's scheme, as a result UESU and its privies illegally obtained that amount in fraudulent debt settlements.

Vavilov, on his part, being a key participant and personally benefitting from a $10 million bribe, managed to escape criminal liability so far, despite the trail of ongoing criminal proceedings. As Vavilov said in one interview upon his relocating to New York in 2007, now he can "sleep calmly" in New York.  RP Exhs 20, 21, 36.

Vavilov is a very special type of a Russian oligarch, as he is called in the press[1].  He is the only one who made his fortune not as an entrepreneur, but when he actually worked in the government, emerging from the civil service with the alleged criminally gained fortune.

In an attempt to sidetrack the Court's analysis, Vavilov spent a lot of ink on his version of the various collection proceedings upon two judgments for which Universal Trading is a judgment creditor (against UESU and Bassington Ltd.).  Vavilov's version is inaccurate and irrelevant.

What is relevant here is a very simple set of facts: (a) Vavilov is currently the garnishee of $10 million from UESU's proceeds; (b) he is a New York resident; and (c) misappropriated proceeds of bribery under his control are available in New York.

### 3.   Restatement of Facts Concerning Vavilov Pled in the Amended Complaint.

As mentioned above, Vavilov's scheme of $450 million in UESU settlements, of which he was the architect to give up UESU's debts due to Russian exporters, continues to be subject to the criminal proceedings in two countries.  Upon a demand from Russia, Ukraine opened in 2011 a criminal case, concerning that transaction, against Tymoshenko (as well as against Lazarenko who

---

[1] See RP Exh. 38 (the "gray eminence of the Finance Ministry", the "genius of evil of the 20th century"… One can cover with articles about Vavilov the walls of half of Russian prisons").

is a fugitive from Ukrainian justice[2]).   The press alleges that the reason why Vavilov is in New

York is to continue slipping from the criminal proceedings.  RP Exhs 34, 36, 37.

The AC identifies said Defendant, Vavilov, as follows:

"5. …Vavilov… is a Russian national, residing since 2007 in New York…  In 1996-
1997, Vavilov engaged in a conspiracy with the Tymoshenkos and others, to
convert $450 million in UESU's debt settlements.  That scheme was intended to
secrete UESU's assets from creditors, most of the assets ending up on offshore
accounts.  On information and belief, Vavilov received a $10 million bribe from
UESU's assets, directed by the Tymoshenkos through New York, for which he
acquired an apartment in New York for about $5 million.  While that $10 million
bribe was illegal, the title to such assets did not transfer from UESU.  Vavilov is a
garnishee of UESU's assets for $10 million, which may be used to partially satisfy
the UESU judgment.  Vavilov is a Defendant herein because he was an agent for
the racketeering enterprise."

In the jurisdictional statement, the AC notes:

"¶11. The Tymoshenkos have undertaken illegal business activities in New York,
including money laundering transactions using New York banks….the
Tymoshenkos also made a $10 million wire transfer through a New York account
as a bribe to Vavilov, who invested a portion thereof into New York real-estate.:

The AC provides a description of the scheme, as a result of which Vavilov obtained $10

million as a kickback from the debt settlement for UESU.

"(E) Conversion by Defendants of $450 Million in UESU Proceeds as Part of
Racketeering Enterprise; Bribe of $10 Million Wire Transferred to New York.

¶53. Tymoshenko and Lazarenko conspired with Vavilov to obtain personally
UESU's assets using a fictitious settlement scheme, later declared criminal. As the
Assistant Minister of Finance of Russia, Vavilov master-minded a scheme
involving UESU, that entailed a $10 million bribe that came under his control to a
New York account.

¶54. On November 26, 1996 Vavilov and Tymoshenko, among others, signed the
first illegal protocol on the settlement of UESU's debt to Gazprom, for $250
million. Under that scheme, instead of paying Gazprom for natural gas deliveries,
UESU converted its debt into an obligation to supply the Russian Army with

_____

[2] After release upon serving the sentence of about 9 years, for money laundering, Lazarenko is
currently in the immigration detention center, fighting extradition to Ukraine.

various goods, including construction materials and foodstuffs, to be exported by UESU to Russia.

¶55. The funds, $250 million, were transferred within one day among the several accounts in Moscow. That scheme resulting in the cancellation of UESU's debt in exchange for UESU's obligation to supply goods to the Russian Army, which proved to become unenforceable. At the beginning, UESU started to deliver those goods to the Russian Army. […]

¶57. On March 3, 1997, the second protocol concerning UESU's debt was signed by Vavilov and Tymoshenko, among other parties, for a second installment of cancellation, $200 million, with the same fictitious transfers passing through the accounts in Moscow.

¶58. The total of the transactions, effectively canceling of UESU's debt to Gazprom for the natural gas, already delivered, was now $450 million. UESU's debt was canceled against promises, without guarantees…"

In Paragraphs 59-62 the AC shows, in great detail, how the alleged $10 million bribe was paid by UESU, through the Tymoshenkos, using the account at Republic National Bank in New York. Vavilov allegedly used those proceeds to buy the realty in New York for approximately $5 million.  See the quotations in the argument concerning Count 1 below.  Then the AC follows up.

"¶63. Within a few weeks of Vavilov's ouster from the Russian government… UESU stopped all further deliveries.

¶64. As a result, the natural gas supplies were converted by UESU's principals, the Tymoshenkos and Lazarenko. The net result that out of $450 million, $327 million became missing, from which the Tymoshenkos, Lazarenko and Vavilov benefitted."

The AC showed the track of the criminal proceedings related to Vavilov and his scheme with $450 million settlements, where he was a witness and person of interest, to wit:

"¶137. In light of the mounting criminal investigations of UESU frauds, in 2003 the Tymoshenkos' co-conspirator Vavilov liquidated his assets in the Russian oil sector for about $600 million and began to relocate those to the U.S. On January 5, 2004 Vavilov's private jet was forced by U.S. authorities to land in Miami, where Vavilov was questioned by the FBI agents in connection with the UESU scheme."

Then the AC shows the proceedings in Russian and Ukraine, concerning Vavilov's scheme:

5

"¶143. As a result of an investigation by the Russian authorities, General Georgy Oleynik, the head of the logistics for the Russian Army involved in the UESU settlements, was sentenced to five years in prison. However, Vavilov, who was a key organizer of that fraudulent settlement scheme, managed to escape from criminal liability."

"¶200. On October 12, 2011, a new criminal case was opened against Tymoshenko in Ukraine, concerning her attempting to dissolve UESU's liability for its debts, in the total of $405 million. That was based on the $450 million settlement engineered by Tymoshenko and Vavilov, who obtained the $10 million bribe..."

The AC identifies the assets, deriving from the alleged bribery of $10 million, which Vavilov materialized in the real estate in New York, keeping these assets outside of the reach of the Russian law enforcement:

"¶202. As mentioned above, Vavilov accumulated an illegal fortune as the assistant Finance Minister of Russia, including the $10 million bribe obtained from the Tymoshenkos, as described above. Vavilov has been subject of criminal investigations in Russia.

¶203. Since 2007, Vavilov has been residing in New York, where he has been offering financial services. In 2009, Vavilov contracted to buy two penthouses in the Plaza Hotel in Manhattan, in the name of his corporations, Penthouse 2009, Inc. and Penthouse 2011, Inc., for a total of $53.5 million, but aborted the purchase of one of those units. Vavilov then bought a penthouse in the Time Warner Tower building for $37.5 million where he resides.

¶204. Due to his living in New York, Vavilov, has been avoiding criminal proceedings in Russia concerning the UESU scheme and other schemes, and he has continued, on information and belief, to avoid providing evidence, thus acting in the interests of Tymoshenko."

### 4.  Recent Arbitration Confirmation Matter in This Court Further Shows Vavilov's Being Resident of New York.

When Vavilov moved to the penthouse at the Time Warner building on Columbus Circle, he (again) got involved in litigation.  In the matter *Southerndown, Inc. v. HSS LLC*, unpublished 2012 WL 265987, S.D.N.Y.,2012 (January 27, 2012, The Hon. Griesa), Vavilov sought to confirm the arbitration award against an interior design entity, HSS LLC (New Jersey).  Vavilov did get their arbitration award confirmed in this Court, for $3,146,243.  See RP Exh 6.  The decision states:

6

"Southerndown (Inc.) is a New York corporation organized for the purpose of acquiring a penthouse on the 78th Floor in the South Tower of the Time Warner Building for the residence of Mr. Andrey Vavilov and Mrs. Mariana Vavilov." Southerndown Inc. is listed at: 25 Columbus Cir, New York, NY 10019, tel. (212) 823-9900."

The award confirmation relied on the findings of the arbitration[3], which found, among other facts:

"SD is a New York corporation formed for the single purpose of acquiring a full-floor penthouse located on the 781h floor of the Time Warner Building's South Tower ("the penthouse" or "PH78") in New York City. **Southerndown's beneficial owners, Andrey Vavilov ("Vavilov") and Mariana Tsaregradskaya Vavilov ("Mrs. Vavilov"), are ultra-wealthy Russian nationals**." See RP Exh. 6, at p. 2.

The arbitration decision, upon evidence, uncovered Vavilov's holdings:

"[SD] is owned by a British Virgin Island corporation which is turn is owned by a trust in Switzerland, the beneficiaries of which are Mr. and Mrs. Vavilov." Ibid., RP Exh. 6, p. 2.

It also shows Vavilov's activities in New York, related to real estate, to wit:

"In approximately January 2008, the Vavilovs came to New York… Mr. and Mrs. Vavilov were given the opportunity to observe Mr. Slatkin's apartment and began the process of engaging HSS to serve as an interior designer for multiple projects, including the **Vavilov's airbus**[4] (the "Plasma" project), an interim residence (apartment "70B") and an anticipated permanent residence at the Plaza Hotel (the "Plaza" project)."

The arbitrators further found:

"At the conclusion of the 70B project, Mr. and Mrs. Vavilov would advise Mr. Slatkin "the apartment is so beautiful thanks to your efforts and care" (Ex. 29)."

Vavilov testified at the arbitration proceedings, which were summarized as follows:

---

[3] The arbitration proceedings were based on extensive research, to quote: "Pre-Hearing Briefs were submitted to the Arbitrator by both parties. Thereafter, thirteen (13) evidentiary hearings were conducted before the Arbitrator with the submission of five hundred (500) exhibits by the patties and testimony of witnesses by live examination and cross-examination (consisting of more than 4000 pages of transcript). Ibid, RP Exh. 6, p. 3.

[4] According to published sources, Vavilov first had his private Boing 737, then now an Airbus.

"It was clear from Mr. Vavilov's testimony that the 70B project was to be a "test" …prior to…the larger project-which in the early days was anticipated to be the Plaza. In essence, Mr. Slatkin passed the test, which enabled the parties to move on to the larger project. It would turn out that the Plaza project- the project initially meant for the large permanent residence- would not be going forward for reasons unrelated to HSS. Because of the difficulties with the Plaza, plans developed for Mr. Slatkin to assist the Vavilovs to find suitably large venue to serve as the permanent residence of Vavilov family.  PH78 was chosen as the large permanent residence project."  Ibid, RP Exh. 6, p. 7.

The arbitrators' decision established that Vavilov acquired that realty:

"The acquisition of PH78 came about in the normal course of investigation, and looking at properties which was done primarily by Mr. and/or Mrs. Vavilov with assistance from Mr. Slatkin. Negotiations for purchase were led by Mr. Vavilov and than agreement on price was made such that there could be a contract to purchase signed on or about May 1, 2009. On or around June 17, 2009, there was a closing of title and the Claimants took ownership of PH78".  RP Exh. 6, pp. 7-8.

"Mr. Vavilov did testify that when it came to design he deferred to his wife.  Ibid, RP Exh. 6, p. 13."

## 5.  Vavilov's Litigation Concerning Penthouse at the Plaza Hotel.

Jurisdiction over Vavilov in New York has already been established in yet another case. See *Plaza Residential Owner LP et al., v. Penthouse 2009, Inc., Penthouse 2011, Inc., Andrei Vavilov*, Index No. 112706/08, at the Supreme Court, New York County.  See RP Exh. 8-18.  That case was related to the matter filed by, or for, Vavilov, captioned *Penthouse 2009, Inc. and Penthouse 2011, Inc. v. Plaza Residential Owner L.P., et al*., Index No. 602578/08, also at the Supreme Court, New York County.  RP Exh. 19.  As Vavilov admitted, he was the indirect beneficial owner of these holding entities, also incorporated in New York.

As determined in that litigation concerning Vavilov, he is an individual who owned, directly or indirectly, a controlling interest in a penthouse at Plaza Hotel.  This fact was undisputed and in the MTD here.   According to his own affidavit, Vavilov is the grantor of the trust that indirectly owns the realty.  Vavilov's corporate entities, that have held the real properties,

according to the Secretary of State of New York, are the corporations organized under the laws of the State of New York.  RP Exh. 18.  Vavilov, through his corporate entities, entered into contracts to purchase two penthouse units at the Plaza hotel in New York., to be used as Vavilov's primary residence.  While Vavilov himself admitted so, he had ownership interests in these New York corporations that are actively doing business within New York State.  RP Exhs 30-33, 42-44.

### 6.   Vavilov's Public Statements Concerning His Hedge Fund in New York.

Vavilov made a series of admissions in his interviews to the press.  For example, Vavilov to the New York Times that he was "setting up shop in New York" in order to raise capital for his hedge fund, IFS Hedge Fund.  See RP Exhs 20, 21.  Obviously, in order to raise money in New York for his fund, Vavilov exploited general business contacts and avenues in New York and his "setting up shop" showed Vavilov's presence in New York State with a fair measure of permanence and continuity. See *Laufer v. Ostrow*, 55 N.Y.2d 305, 435 N.E.2d 692 (1982).

Universal Trading satisfied the test noted by this Court in this action, in that this "*requires a finding that they are 'present' in the state 'not occasionally or casually, but with a fair measure of permanence and continuity.'*" *Universal Trading*, 2012 WL 6186471 at *2 (quoting *Landoil Resources Corp. v. Alexander & Alexander Servs.,* 77 N.Y.S.2d 28, 34 (1990)).  MTD, p. 12.

Because the matter of jurisdiction was already litigated, and Vavilov had to settle, Plaintiff herewith relies on, and incorporates by reference, the argument of Meister Seelig & Fein LLP, representing the Plaza plaintiffs against Vavilov, attributing to said law firm full credit for its research on the facts and on the applicable State law (in their Memorandum in opposition to Vavilov's and Penthouses' MTD, and in other filings in that matter).  See RP Exh. 12.

The extensive record in two separate actions, concerning Vavilovs' refurbishing a penthouse at the Plaza hotel and two units at the Time Warner Tower, to match the most exquisite

9

(and highly expensive) tastes for personal permanent residence, satisfied the test in *Deer Consumer Products v. Little*, 938 N.Y.S. 2d 767, 774-75, 35 Misc.3d 374, 381 (2012), to wit: "Domicile is established by physical presence in a place in connection with a certain state of mind concerning one's intent to remain there."  It is extraordinarily rare when a paid a retainer of $3 million just to refurbish the Time Warner Tower penthouse.  See RP Exh. 4, 5.

One needs to keep in mind, that, as compared to the Plaza Hotel (built in 1907 and arguably requiring substantial repairs), the Time Warner Tower is a relatively recent, ultra-modern construction, with the nearly full window walls (as the Vavilovs required).  RP Exh. 25.  It was completed in 2002.  A budget of $3 million for refurbishing in a relatively new penthouse (8,300 sq. ft.), was for the Vavilovs' particular tastes.  The record in the arbitration proceedings, reflecting the Vavilovs' numerous instructions concerning the interior design, to match his and his wife's personal tastes, irrefutably shows that they were making that residence their permanent residence.  Essentially, no evidence to the contrary has been submitted by Vavilov (or his wife), admitting they continue to use that penthouse, and nobody else does.

Vavilov employed New York brokers to represent them in their search for the New York City apartments.  His New York brokers were in contact with the brokers.  Vavilov, his brokers and his architect placed numerous phone calls and sent several emails regarding the apartments to in New York.  Vavilov participated in separate contracts to purchase the apartments, which contracts were executed in New York.

Vavilov argues that he was not a party to the contracts himself, only his entities were.  These arguments lack merit in the context of finding jurisdiction.  In the first instance, CPLR §302(a) states that jurisdiction over a non-domiciliary will exist where that person himself "or through an agent" participates in any of the enumerated acts under said section.  The present factual

10

circumstances indicate that although Vavilov's entities executed the various contracts for the realty in New York, they did so on behalf of Vavilov as his agents.

For example, as alleged in the Complaint in the Supreme Court action against Vavilov, Vavilov visited the Plaza units with his wife, made it very clear that this was a purchase of a New York City marital residence.   See the Plaza Compl. at 35, RP Exh. 11.  Vavilov's brokers were in constant contact with representatives of the Plaza. This already confers jurisdiction over Vavilov under CPLR 302(a)(l). See *State of New York v. Samaritan Asset Mgmt Servs., Inc*., No. 404969/06, 2008 WL 4745487, at* 4 (Sup. Ct. N.Y. Co. October 29, 2008) (non-domiciliary defendants' use of New York based brokers sufficient to confer in personam jurisdiction under CPLR 302(a)(l)).

### 7. This Court Has Jurisdiction over Vavilov under State Law of New York.

Under the State law, §301 and §302, NY CPLR, governing the long-arm jurisdiction, the evaluation of jurisdiction should be based upon the totality of the circumstances. *Cooper, Robertson & Partners, LLP v. Vail*, 2001, 143 F.Supp.2d 367. The totality of all defendant's contacts is indicative the exercise of jurisdiction is proper. *Burrows Paper Corp. v. R.G. Engineering, Inc.*, 2005, 363 F.Supp.2d 379. Courts evaluate the quality and nature of nonresidents' contacts with New York under a "totality of the circumstances test". See *Taylor Devices, Inc. v. Walbridge Aldinger Co*., 2008, 538 F.Supp.2d 560. The court must consider the totality of all defendant's contacts with the forum state. *Katz v. Mogus*, 2007, 538 F.Supp.2d 538. Ultimate determination is based on the totality of circumstances. *Sunward Electronics v. McDonald*, C.A.2 (N.Y.)2004, 362 F.3d 17.  The totality of circumstances, including the record in two separate proceedings concerning Vavilov's realty in New York fully establishes that.

### 8. Vavilov's Denials of Not Being Resident in New York Are Not Credible, Disproven by Record in Two Cases and in Numerous Publications.

Vavilov argues: "There is no basis for personal jurisdiction over Vavilov. Falsely alleged to live in New York (amended complaint, ¶ 5), Vavilov is a citizen of Russia, residing in Russia, and has never resided in New York." MTD at p. 11. With reference to RP Exhs 3-44, this appears to be simply untrue.

In fact, the contrary is true. The judicial and arbitration record shows that Vavilov with his wife have had a residence at the Time Warner Towers, in the penthouse on the 78th Floor (8,300 sq. ft.), as well as in a 'intermediate' unit on the 70th floor, while the penthouse was being fully prepared. Vavilov's own sworn testimony in the course of the arbitration in New York, which contains, as mentioned above, over 4,000 pages of transcripts, including Vavilov's testimony. The record in arbitration, in the Supreme Court and subsequently in this Court, in the case to confirm the arbitration award, Docket 11-cv-08619 (The Hon. Griesa), disproves that. RP Exh. 5-7.

Vavilov also denies the allegation in the AC: "*Vavilov did not purchase apartments in New York in 1997*". (MTD, p. 11). There is not a word about his entities. It is obvious that Vavilov has acted through his corporate entities. Of course, Vavilov did not record the property in New York in his own name. On information and belief, he did so in the corporate names, being in control of his realty. For example, see RP Exh. 22.

Vavilov's admitted that he: "*…does not have a direct ownership interest in New York real estate, though **he is the beneficiary** of a trust that is the indirect owner of New York real estate and has use of the New York real estate*." Ibid, MTD, p. 11. As mentioned above, indirect ownership invokes jurisdiction over him; jurisdiction may not be rejected on the ground that the resident recorded ownership in the name of some holding entity that Vavilov controls.

**9.   This Court Has Jurisdiction over Vavilov Pursuant to CPLR 301, as a
      Result of His Continuous and Systematic Activities in New York State**

As mentioned above, Vavilov promoted his IFS Hedge Fund in New York, using even <u>the</u>
<u>New York Times</u> (to get onboard investors other than himself).  See RP Exh. 20.  As CPLR 301
states, *"[a] court may exercise such jurisdiction over persons, property, or status as might have*
*been exercised heretofore*." It is well established that New York Courts will have  in  personam
jurisdiction  over  a  defendant under CPLR 301 where the  defendant  is "engaged in such a
continuous and systematic course of 'doing business' here that a finding of its 'presence' in this
jurisdiction is warranted..."  See *Palmer v. Globalive Communications Corp*., 2008 WL 2971469
(S.D.N.Y. 2008) citing *Landoil Resources Corp. v. Alexander & Alexander Servs.*, 77 N.Y.2d 28,
33-34, 563 N.Y.S.2d 739, 565 N.E.2d 488 (1990); see also *ABKCO Industries, Inc. v. Lennon et*
*al*., 52 A.D.2d 435, 384 N.Y.S.2d 781 (1st Dep't 1976); *Lancaster v. Colonial Motor Freight Line,*
*Inc*., 177 A.D.2d 152, 581 N.Y.S.2d 283 (1992).

**10.  Against the Background of Facts Discovered in Two Actions,
       Vavilov's Denials Should Be Treated as Not Credible and Requiring
       Deposing Him.**

As mentioned above, Vavilov's denials in his Affidavit, even though of a generalized
nature, are in an irreconcilable conflict with the documented facts already discovered or
established in his prior matters in New York.

One of the false denials is in the statement: "*Vavilov does not engage in a continuous and*
*systematic course of doing business in New York…*"  MTD, p. 14.  However, Vavilov's setting his
IFS Hedge Fund in New York, for $600 million, and seeking investments into it in New York,
using the promotion of the interview in <u>the New York Times</u>, is, exactly continuous and systematic
course of doing business here, on a grand scale.  See RP Exhs 20, 21.

Against the background of the proceedings in New York, Vavilov made a misleading statement in this Affidavit: "5. I reside in Russia, in Zhukovka village.  5. I do not now, nor have I ever, resided in New York".

For a person, refurbishing his own Airbus plane (after he had Boeing 737), alleging that his only residence is in a Russian village is insulting to the intelligence of the media, of Plaintiff and of this Court.  Vavilov has numerous real properties, his dacha is just one of those.  Even in Russia, he became famous when he acquired the apartment in Moscow that before was occupied by former Soviet President Michael Gorbachev.  See RP Exh. 3.

Vavilov's further denials in his Affidavit are not credible: "7. I did not purchase or use, directly or indirectly, any apartment or other real estate in New York, in or around 1997".  Compare to RP Exh. 3, published in MK, one of the most reputable and reliable newspapers in Russia (since 1919, with circulation up to 700,000).  Vavilov did not contest the veracity of those allegations, bringing no suits for defamation nor is there any information that he asked MK to publish denials.

Vavilov's denials here of the purchase of the Plaza condominium are contradicted with his own admission, at Para 10, that both Penthouse 2009 Inc. and Penthouse 2011 Inc. merged into Hayling Island, Inc.  Then Vavilov admitted that he was a grantor of a non-US (Swiss) trust that "indirectly owned Hailing Island, Inc."  However, this alone is already an admission or indirect ownership, through his five known New York holding entities.  RP Exh. 22.

Vavilov denied being a party to the purchase agreement of a condominium in the Time Warner Tower.  Vavilov Aff., at ¶13.  Yet, again, Vavilov admitted that he had, through a trust, indirect ownership in TW70B, which has held title to the unit.  See RP Exh. 4, 9, 10.  From Vavilov's Affidavit, it follows, that he currently has, at least, two units at the Time Warner Towers.

This showing is enough for jurisdiction; Vavilov's belief that his using shell entities for owning the realty in New York insulates him from jurisdiction here, has no basis, of course.

### 11. This Court Has Jurisdiction over Vavilov under CPLR 302(a)

It is well established that CPLR 302(a)(l)...authorizes the court to exercise jurisdiction over non-domiciliaries for tort and contract claims arising from a defendant's transaction of business in this State.[5]  It is a 'single act statute' and one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted." See *Kreutter v. McFadden Oil Corp*., 71 N.Y.2d 460, 466-67, 522 N.E.2d 40, 43 (1988).

Here, Vavilov receiving $10 million, from UESU, and entering into contracts to purchase realty confers jurisdiction over Vavilov. In *Black River Assoc. v. Newman*, 218 A.D.2d 273, 637 N.Y.S.2d 880 (4th Dep't 1996), the Court found personal jurisdiction under CPLR 302(a)(1) in a context of purchasing realty in New York.

This Court found in this case: "Jurisdiction will not extend to cover defendants with nothing more than petty contacts to the state." *Universal Trading*, 2012 WL 6186471 at *2 (quotation omitted).  This is exactly what is shown with regard to Vavilov; his contacts with the State are far more than petty.  In particularly, the alleged $10 million bribe from UESU, received in New York, is not a petty contact, of course.  Purchasing the realty in New York, first for $5 million (when he was still in the civil service), then for $53 million, refurbishing those for the millions of dollars is also, obviously, not petty contacts.  Just as an example, Vavilov's purchase

---

[5] CPLR 302(a) states: "As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent: 1. transacts any business within the state or contracts anywhere to supply goods or services in the state, et seq.

15

of the Plaza Hotel penthouse was, at the time, the most expensive acquisition of the realty in New York City in that year.  See RP Exhs 28 ("Bid Deal: Pooh to the Plaza"), 36, 42-44.

Courts have held that a formal agency relationship between a defendant and a third party does not need to be established to confer jurisdiction over the defendant pursuant to CPLR 302(a). See *Cerberus Capital Management, L.P. v. Snelling & Snelling, Inc*., 2005 WL 4441899 (Sup. Ct. N.Y. Cty 2005); see also *Kaye, Scholer, Fierman Hays & Handler*, 266 A.D.2d 51, 51, 698 N.Y.S.2d 641, 641 (1st Dep't 1999).

### 12. This Court Has Jurisdiction over Vavilov under CPLR 302(a)(4)

New York courts have recognized personal jurisdiction over a defendant where the defendant is under contract to purchase real property in New York.[6]  See *Cerberus Capital Management, L.P. v. Snelling & Snelling, Inc*., 2005 WL 4441899 (Sup. Ct. N.Y. County 2005); *Black River Associates v. Newman,* 218 A.D.2d 273, 637 N.Y.S.2d 880 (4th Dep't 1996); *Kalichman v. Beverly Holding Co*., 130 A.D.2d 327, 520 N.Y.S.2d 255 (3d Dep't 1986).  "In order to assert jurisdiction under CPLR 302(a)(4), a plaintiff must demonstrate a relationship between the defendants' real property and the plaintiffs  causes of action." *Cerberus Capital Management*, 2005 WL 4441899 at *12.

Here, the connection between Plaintiff's cause of action for collection and the realty is obvious: collection of the judgment debt from the garnishee.  The AC pled that Vavilov materialized the $10 million bribe from UESU into the realty in New York.  Therefore, the Court has personal jurisdiction pursuant to CPLR 302(a)(4) over Vavilov.

---

[6] CPLR 302(a)(4) states: "*As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent: "4. owns, uses or possesses any real property situated within the state*."

Plaintiff does not understand Vavilov's argument: "Plaintiff has not alleged that Vavilov "shared the goal of concealing United Energy-Ukraine's assets," MTD, p. 13.  The AC showed that the secretive bribe from UESU to Vavilov, of $10 million, was a product of the criminal conspiracy.  Vavilov, as a civil servant then, could not take bribes; his state of mind is irrelevant under the Russian legislation.  When Vavilov, upon moving to New York, averred in the interview to the New York Times that now he can "sleep calmly" in New York, it is obvious that he sought a safe harbor for himself and for the illegally gained assets.  See RP Exhs 20, 21, 36, 41.

### 13. Vavilov Is Garnishee of the Illegally Obtained UESU Assets at the Present Time; Statute of Limitations Does Not Bar Recovery.

Vavilov argues: "All counts are time-barred."  MTD, p. 15.[7]  To start with, the AC alleges that Vavilov has under his control UESU's assets, for $10 million, at this time, materialized in the realty in New York, identifying the realty.  Vavilov's argument fails as though: "The amended complaint does not properly allege that Vavilov is "in possession" of the assets on behalf of United Energy".  See MTD, p. 16.  As shown above, Universal Trading pled that on numerous occasions.

Those were summarized in Count 1 as follows:

"215. …Vavilov controls the assets originated from the $10 million bribe from UESU proceeds, to which he has no title. As the evidence shows, Vavilov invested at least $5 million into New York realty, from which the judgment may be collected, in light that Vavilov, as the high official in Russia at the time, never got title to the fruits of his corruption."

"219…the corporate veil of Angora, a Bahamas company, the conduit of the $10 million bribe from UESU's proceeds directed to New York, should also be pierced. Vavilov declared Angora's alter ego for purposes of satisfying the judgment debt."

---

[7] Vavilov also took out of the context the ruling of this Court in another case: "…[T]he statute of limitation on the claims is 3 years. Mass. Gen Laws ch. 260, § 2A. *Universal Trading & Inv. Co., Inc. v. Credit Suisse*, 2012 WL 6186598, *6 (S.D.N.Y. Dec. 12, 2012) (Crotty, J.). MTD, p. 15. The claims are different against Vavilov, he holds, upon having laundered, the UESU assets at the present time.  Neither law of case nor issue preclusion applies for a case on appeal (13-1639).

Then Vavilov alleges as though: "There is no allegation that Angora actually transferred the purported $10 million to Vavilov."  MTD, p. 18.  However, Angora has been, as alleged, Vavilov's own nominee entity, his alter ego, there was no purpose or need to transfer the $10 million from Angora, again, to himself; Angora was, figuratively, himself.  See RP Exhs 1-3.  Vavilov's logic, or his wrong belief about American law is incorrect on nominees.  Vavilov's using an offshore nominee does not change anything, since he was the beneficiary of both the $10 million bribe and of the realty he acquired in New York for that illegally obtained money.

It is also untrue when Vavilov alleged: "there is no allegation that Vavilov owns, controls or is connected in any way to Louis D'Or or Angora".  Ibid, at p. 18.[8]  Then, again, Vavilov improperly alleges: "Universal Trading makes no attempt to plead facts that show Vavilov ever received the alleged bribe…" MTD, p. 18-19.  This is also incorrect.  To quote:

"¶59… the Tymoshenkos directed $10 million from the UEIL Account in London, through Aksoy, to account No. 608211194, at Republic National Bank in New York, maintained by Louis D'Or Investment Bank ("Louis D'Or"), a Barbados entity."

"¶60. The nominal recipient of that transfer was Angora Management Ltd. ("Angora"), registered in the Bahamas. Angora's beneficiary was, on information and belief, Vavilov."

"¶61. As investigation has shown, Louis D'Or was controlled by Vavilov's co-conspirator, Ashot Egiazaryan ("Egiazaryan"), who managed Unikombank in Russia. Vavilov's friend, Nadezhda Kossareva, managed Louis D'Or, with a nominee office at Musson Bldg, 2nd Floor, Hincks St., Bridgetown, Barbados. Louis D'Or was owned by nominee Titan (Isle of Man) Ltd, which was controlled by Vavilov's agent, the vice chairman of Unikombank, Andrey Gloriozov ("Gloriozov"), who is currently at large wanted by Interpol."

"¶62. Shortly after that bribe was paid to Angora's sub-account at Republic National Bank in New York, on information and belief, Vavilov bought a $5 million apartment in New York. As a government official, Vavilov was prohibited from obtaining any income other than his salary. Title to the $10 million bribe did not transfer to Vavilov, the title still vests in UESU."

---

[8] Compare to RP Exh. 3, that alleges that he acquired Louis D'Or through a trustee, Nadezhda Kosareva, for $8 million.

Vavilov's reliance on the law of California for purposes of statute of limitations for fraudulent transfers (capped in California by 7 years) is misplaced.  See MTD, at p. 15, citing *Universal Trading & Inv. Co., Inc. v. Dugsbery, Inc.*, 2011 WL 62162, *4 (N.D. Cal. Jan. 7, 2011). New York does not have fraudulent transfer statutes, but fraudulent conveyances statutes.

### 14. Claim against Vavilov under Count 1 Properly Pled, 'Judgment Debt Recovery; Relief under Turnover Statutes'.

The claim against Vavilov is stated as against the garnishee of the proceeds, $10 million[9], that he obtained illegally in March of 1997 and still continues to hold, in particular having materialized UESU's bribe proceeds in the realty in New York.  Vavilov's case is typical when he actually holds the realty in New York, having his permanent residence therein.  As shown above and in relation to the law of Russia, the payer of the bribe (invested into the realty), UESU still has the title, matching the clause: "the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee". CPLR §5225(b).  Specifically, the AC states:

> "¶215. …Vavilov controls the assets originated from the $10 million bribe from UESU proceeds, to which he has no title. As the evidence shows, Vavilov invested at least $5 million into New York realty, from which the judgment may be collected, in light that Vavilov, as the high official in Russia at the time, never got title to the fruits of his corruption."

> "¶219….the corporate veil of Angora, a Bahamas company, the conduit of the $10 million bribe from UESU's proceeds directed to New York, should also be pierced[,] Vavilov declared Angora's alter ego…"

It is well established that the New York statute, permitting proceeding to be brought against and recovery to be had from transferee of money or other personal property of judgment debtor,

---

[9] A co-participant in that conspiracy, Defendant Alexander Tymoshenko, is currently a fugitive located in Czechia.   The efforts to serve him, under the Hague Service Convention, have been handicapped by his hiding in that country.  Plaintiff has contacted the Czech authorities to resolve the issue of determining the person's whereabouts to have him served.

upon showing of debtor's entitlement to property or that creditor's interest, was superior to that of transferee, provided mechanism for piercing corporate veil or asserting alter ego liability. See *Mitchell v. Lyons Professional Services, Inc.,* 2010, 727 F.Supp.2d 120.  The *Mitchell* court (the Hon. Cogan, E.D.N.Y.) articulated the law:

> "It is equally well settled that this statute may be used to pierce the corporate veil or assert alter ego liability. See *WBP Cent. Assocs., LLC v. DeCola*, 50 A.D.3d 693, 855 N.Y.S.2d 210 (2d Dep't 2008). And although no reported decision has invoked the statute to assert a theory of successor liability, see generally *NTL Capital, LLC v. Right Track Recording, LLC*, 73 A.D.3d 410, 901 N.Y.S.2d 4 (1st Dep't 2010), the Court sees no reason why that theory would be unavailable to collect a judgment debt under this statute."  Ibid, *123.

As mentioned above, Vavilov, a highly sophisticated financier, with a trail of avoiding criminal cases (all claiming fraud), having been indicted in Russia, has used, among other holdings, a Swiss trust.  That trust holds a British Virgin Islands entity that is the parent to at least five entities in the U.S., including Southdown and Hayling, which is on the title for the penthouse apartment in the Time Warner Towers, which holds the UESU bribe proceeds.  Universal Trading is entitled to enforce its superior interest, under the UESU judgment, against that property held by Vavilov through nominees.  Vavilov even admitted that he controls his realty through his trust in Switzerland (through a BVI entity).  Such scheme is not new and not that complicated.

### 15. Allegations in Count 2, under RICO, Where Vavilov Has Been an Agent of the Enterprise, Supporting Finding Jurisdiction.

Vavilov is qualified as the agent in the RICO enterprise, but is not made a co-Defendant on the RICO Count.  The allegations concerning Vavilov's being an agent for the RICO enterprise stretching to New York were summed up on the RICO Count as follows:

> "223. ...(c) transferred UESU's bribe of $10 million to Vavilov through a New York account…"

> "232. The Tymoshenkos used Louis D'Or, an offshore bank in Barbados, for directing a $10 million bribe to Vavilov, a Russian government official at the time, from the UEIL account in London. That transfer was directed to Louis D'Or's

correspondent bank account at Republic National Bank in New York. According to public allegations, Louis D'Or was used to launder approximately $1 billion for organized crime in Russia, laundering money in New York. Louis D'Or's owner, Gloriozov, is wanted by Interpol. Vavilov's co-conspirator Ergiazanyan[10], the manager of Louis D'Or, absconded from Russia to avoid charges..."

The AC showed that at the time approximately of the second tranche of the total of $450 million, namely of $200 million in settlements for UESU, Vavilov was subject to an attempted murder, typical for turf wars among competing racketeering factions, to wit:

"251. ...by March of 1997 (after a bomb exploded in his vehicle in Moscow), Vavilov was subject to a mounting public outcry demanding e his ouster. Following his dismissal as Assistant Minister of Finance of Russia in July of 1997 Vavilov was charged with a series of crimes committed while in public office. However, the efforts to bring Vavilov to justice have been ineffective. Investigators had made statements that Vavilov threatened them, referring to his protectors in high government positions. Residing since 2007 in New York, Vavilov has been abating the inquiries from Russia to question him."

The AC also showed, in a context of a racketeering enterprise:

"270. The Tymoshenkos organized an enterprise with UESU and others within the meaning of RICO. Tymoshenko was the mastermind and leader of that enterprise. She was aided by Alexander, Lazarenko, Vavilov..."

### 16. This Court Has Jurisdiction over Vavilov as an Agent in Racketeering Enterprise.

The AC asserts the Count under the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. §1961 et seq. That warrants to apply the jurisdictional criteria under the federal law, too. For example, under the money laundering statute, §1956:

"(f) There is extraterritorial jurisdiction over the conduct prohibited by this section if--(1) ...in the case of a non-United States citizen, the conduct occurs in part in the United States..."

As mentioned above, the bribery transaction of $10 million is cited in the AC on numerous occasions, namely 22 (twenty-two) times, and is one of the key allegations therein. As sister

---

[10] Egiazaryan litigated in this Court, see *Egiazaryan v. Zalmayev*, Docket. 11cv2670 (PKC).

statutes, those that are relevant here are receipt of stolen property, 18 U.S.C. §2315, 'Sale or receipt of stolen goods, securities, moneys, etc.', 18 U.S.C. §2314, 'Transportation of stolen goods, securities, moneys, etc.', 18 USC §1343, 'Fraud by wire, etc.'

Vavilov is incorrect relying on unpublished ruling in that "peripheral contacts with the United States—up to and including use of domestic bank accounts—do not bring an otherwise foreign scheme within the reach of the RICO statutes." *Republic of Iraq v. ABB AG*, 2013 WL 441959…" MTD, p. 24. There is nothing peripheral in Vavilov's receiving from UESU proceeds $10 million at an account in New York, then using it to acquire the realty, with the showing that those UESU proceeds were used for investment and then reinvestment in New York.

The AC pled the RICO civil conspiracy adequately, showing an agreement to commit at least two predicate acts. *Hecht v. Commerce Clearing House, Inc*., C.A.2 (N.Y.) 1990, 897 F.2d 21, 100 A.L.R. Fed. 655. Here, the transfer of $10 million to New York was followed by money laundering to buy realty in New York. It has been held that "a defendant may be a "RICO 'person' and one of a number of members of the RICO 'enterprise,'" See *Cullen v. Margiotta*, 811 F.2d 698, 730 (2d Cir.), cert. denied, 483 U.S. 1021, 107 S. Ct. 3266, 97 L. Ed.2d 764 (1987).

It should be noted that Russia was held not to be an alternative forum in an action on RICO. See *Norex Petroleum Ltd. v. Access Industries, Inc*., C.A.2 (N.Y.) 2005, 416 F.3d 146, certiorari denied 126 S.Ct. 2320, 547 U.S. 1175, 164 L.Ed.2d 860, on remand 540 F.Supp.2d 438.

### 17. Count 3, 'Unjust Enrichment', Was Properly Pled against Vavilov.

Another claim against Vavilov is cited on the Count 3, for unjust enrichment. Universal Trading will seek to apply the law of Russia to that Count, where a former Russian government official (or former government official) has no title to the proceeds obtained illegally as a bribe. Accordingly, the AC pleads:

"282. …Vavilov was unjustly enriched by a bribe from UESU for $10 million, illegally invested into the realty in New York, for which proceeds Vavilov has no title. Vavilov was unjustly enriched at the expense of UESU, and the $10 million at issue, from UESU, should be used to pay the judgment debt".

### 18. Counts 4 - 6 Were Adequately Pled.

Vavilov is also named a co-Defendant on Counts 4-5, i.e. 'Constructive Trust and Equitable Lien' and 'Fraudulent Conveyances'.  Even though the forum is in New York, these Counts are for equitable relief, and in this particular matter it is appropriate to apply the Russian law, applicable to its former high official.  It would be improper that a Russian high official escapes the applicability of equitable relief here, once he causes to transfer the bribery proceeds to New York, which is not a safe harbor for that.  The grounds for relief are adequately pled, to wit:

"288. In addition, Vavilov's assets in New York should be adjudged, up to $10 million, originated from UESU, to be held in constructive trust for UESU, with equitable lien."

Likewise, it would be fair to apply the Russian law on the fraudulent transfers, where a former official never obtains the title to the bribery proceeds; those could be challenged or claimed for collection (consistent with the universal principle that a thief never gets a title).

Finally, the claim against Vavilov is cited in Count 6, 'Civil Conspiracy'.  Vavilov challenges that Count only in a conclusory fashion: "Universal Trading fails to state causes of action for any tort underlying the alleged conspiracy".  MTD, p. 23.  Vavilov is in denial of the allegations, which should not be repeated again here.

### 19. Relief Asked Can Be Granted by This Court. Universal Trading Complied with the Order Allowing Amendment of the RICO Claim.

In the prayers, relief asked for against Vavilov is stated as follows:

"b) To declare Vavilov liable for up to $10 million on the UESU judgment (the amount of the bribe from UESU, thereafter invested into the New York real estate);

g) To annul the fraudulent conveyances and transfers of UESU's and
Bassington's assets to the Tymoshenkos, their accomplices and privies, including
the transfer of $10 million to Vavilov in New York, staged for avoiding the
payment of the judgment debt owed to Universal Trading, including but not
limited, under the State law, common law and foreign law as applicable…"

Vavilov made an emphasis (MTD Memo, at pp. 6 and 23-24) as though Universal Trading

exceeded the leave to amend, formulated in the Order on the F.R.Civ.P. 59(e) Motion, to wit:

"Universal Trading's motion to amend its complaint, 'including possibly adding...
New York agents as co-defendants, [which] may cure defects of asserting
jurisdiction under [RICO] is GRANTED.  Only amendments related to its RICO
cause of action will be allowed, however, and its motion is DENIED in all other
respects."  See 2013 WL 1500430, *2 (S.D.N.Y. April 10, 2013).

Vavilov is in fact one of those **agents** in the RICO conspiracy, which is amply shown in

the AC.  However, amending the RICO claims, by necessity, required a substantial amplification

of the allegations and updating on newly discovered facts and on new developments.[11]  That was

accomplished in the AC.  Furthermore, F.R.Civ.P. 15 mandates a liberal approach to amendments

in general.  Vavilov's attempting to interpret the language of the Order by way of curtailing the

right to allege facts, that essentially all support showing of the RICO enterprise stretching to New

York, has no basis.   For example, Vavilov attributed to this honorable Court as though Universal

Trading is prohibited from pleading "*collection of a second judgment--the Bassington judgment—*

*the addition of which was expressly prohibited by this Court*".  Vavilov, MTD Memo, p. 8.

Prohibiting pleading collection of the federal judgment, as Vavilov attributed to this Court,

has no grounds.  Additionally, this is contrary to the federal policy of encouraging collecting

federal judgment, registered under 28 U.S.C. §1961, as here, in this Court.  Vavilov's interpreting

---

[11] It should be noted that between the date of the initial Complaint, on November 4, 2011, and the
Amended Complaint, June 4, 2013, 19 months elapsed.  For example, see WST Exhs 58-59, the
criminal proceedings relating to Vavilov's $450 million scheme.

the Court's ruling is contrary to the liberal standards under the controlling law in *Foman v. Davis*, 371 U.S. 178, 182 (1962), *Williams v. Citigroup Inc*., 659 F.3d 208, 214 (C.A.2, 2011).

### 20. In the Event of Doubts about Asserting Jurisdiction, at the Very Minimum, the Court Should Allow Expedited Jurisdictional Discovery.

Where a plaintiff can demonstrate that "facts essential to establish a jurisdictional basis may be uncovered during discovery, the Court should deny defendant's motion to dismiss without prejudice to renewal after discovery limited to the issue of personal jurisdiction, in accordance with CPLR 321l(d)." *Bankrate, Inc. v. Mainline Tavistock, Inc*., 2008 WL 341452 at *4 (Sup. Ct. Kings County 2008); see also *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Ideal Mut. Ins. Co*., 122 A.D.2d 630, 505 N.Y.S.2d 416 (1st Dep't 1986).

Vavilov does not, as he could have, prove to the Court that he lacks contact with the state of New York. Given Vavilov's failure to put forward credible evidence that he does not "do business" in New York, and the massive media reports of Vavilov's setting up shop in New York (IFS Hedge Fund of $600 million), the Court should in the very least allow the parties to engage in expedited jurisdictional discovery. RP Exhs 3-44.

In any event, jurisdictional discovery is warranted. Just as one example, cited above, Vavilov's arbitration has left over 4,000 pages of testimony, including sworn testimony by Vavilov. RP Exhs 5-7. On information and belief, Vavilov was deposed in his Supreme Court actions, too. See RP Exh 18 (Notice of Deposition). Universal Trading proffers that such evidence, easily discoverable on production of documents, will show the irrefutable evidence, to be found, with a high degree of certainty, in conflict with the denials of Vavilov in his MTD.

### Conclusion.

Vavilov's Motion should be denied in its entirety. Alternatively, expedited jurisdictional discovery should be allowed, with leave to amend upon its conclusion.

Respectfully submitted,

Dated: November 15, 2013

                    Peter A. Joseph, Esq.
                    Bar PJ-9723
                    177 Waverly Place # 5F
                    New York, NY, 10014-3552
                    Tel. (212) 924 1498

                    /"s/_____
                    George Lambert, Esq.
                    D.C. bar #979327, pro hac vice,
                    Law Offices of Leonard Suchanek
                    1025 Connecticut Ave., #1000 NW
                    Washington, D.C., 20036
                    Tel. (202) 640 1897, Fax (800) 852 1980

                    Attorneys for Plaintiff
                    Universal Trading & Investment Co., Inc.