**INDEX OF EXHIBITS TO DECLARATION**

| | |
|---|---|
| 1 | Record of National Westminster Bank on wire transfer of $10 million to New York, UEIL |
| 2 | Instructions in the name of Somolli, signatures of owners (the Tymoshenkos), Gov. charts |
| 3 | Agency of Federal Investigations, article "Who Threatens Kuchma?" (Realty in New York) |
| 4 | Ruling in *Southernpoint Inc. v. HSS LLC*, SDNY, 11 Civ. 8619, January 12, 2012 (The Hon. Griesa) |
| 5 | Petition to affirm arbitration award, Southernpoint Inc. v. HSS LLC, SDNY, 11 Civ. 8619 |
| 6 | Arbitration award for Southernpoint Inc., against HSS LLC, contract with HSS, Nov. 17, 2011 |
| 7 | Docket sheet in *Southernpoint Inc. v. HSS LLC*, SDNY, 11 Civ. 8619, (The Hon. Griesa) |
| 8 | Affidavit, Summons in *Plaza Residential et al. v. Penthouse, Vavilov*, 8112706/08 Supr.C.NY |
| 9 | Agreement between Penthouse 2009 Inc. and Plaza Residential Owners |
| 10 | Agreement between Penthouse 2011 Inc. and Plaza Residential Owners |
| 11 | *Plaza Residential et al. v. Penthouse, Vavilov*, Complaint, transfer to Commercial Division |
| 12 | Memorandum re. jurisdiction, *Plaza Residential v. Penthouse, Vavilov*, 8112706/08 Supr.C.NY |
| 13 | Memorandum for defts, *Plaza Residential v. Penthouse, Vavilov*, 8112706/08 Supr.C.NY |
| 14 | Summons in *Plaza PH2001 LLC v. Plaza Residential Owner*, 602673/08, Supr.C.NY |
| 15 | Cross-Motion for Jurisdictional Discovery, *Plaza v. Penthouse, Vavilov*, 8112706/08 Supr.C.NY |
| 16 | Plaintiffs' Interrogatories, et. *Plaza v. Penthouse, Vavilov*, 8112706/08 Supr.C.NY |
| 17 | Plaintiffs' Requests for Production, *Plaza v. Penthouse, Vavilov*, 8112706/08 Supr.C.NY |
| 18 | Notice of Vavilov's Deposition, *Plaza v. Penthouse, Vavilov*, 8112706/08 Supr.C.NY |
| 19 | Complaint, *Penthouse 2009, Penthouse 2011 v. Plaza Residential et al.*, Supr.C.NY |
| 20 | <u>The New York Times</u>, "From Russia With Cash: Seeding a Hedge Fund", article, Sept. 23, 2007 |
| 21 | Sample of reduced reprints of article "From Russia With Cash: Seeding a Hedge Fund" |
| 22 | NYS Division of corporations, records on Southerndown Inc. |
| 23 | Barbados press on interview, laundering $1 billion through Louis d'Or Bank, June 1, 2011 |
| 24 | Sample of article on Vavilov's buying $53.3 million properties at the Plaza |
| 25 | Andrei Vavilov Calls $53.5M Plaza Hotel Penthouse "Attic-Like," Sues, article |
| 26 | Sample of media coverage of Vavilov's Plaza transactions, overseas (The Telegraph, U.K.) |
| 27 | Coverage media, 4 & New York, "The Plaza Fights Back Against Andrei Vavilov", NY Mag Daily |
| 28 | <u>The New York Times</u>, "Big Deal: Pooh to the Plaza", July 2, 2009, Realty Section |
| 29 | <u>The New York Observer</u>, "The Plaza's Big Russian Foe Has His Price: $12.5 M" |
| 30 | <u>The NY Mag</u>, "After Suits, Countersuits, and Settlement, Vavilov Buys Into Plaza Anyway" |
| 31 | Article "Russian Financier Andrei Vavilov Sues Plaza Over Tiny Windows, Ugly Air Conditioners" |
| 32 | <u>The New York Observer</u>, "Meet Andrei Vavilov! Litigious Plaza Penthouse Buyer" article |
| 33 | Article "Plaza-Destroying Oligarch Andrei Vavilov Moves On to Time Warner Center" |
| 34 | Agency of Federal Investigations: "He Leaves in American Style", article |
| 35 | <u>The New York Observer</u>, "Curtains on Eloise! Vavilov Exits Long, Strange Plaza Penthouse Trip" |
| 36 | "Senator Vavilov Moved to New York: Now I Sleep Calmly", article, Gazeta.ru, 09.24.2007 |
| 37 | "Supreme Court Decided Bringing Vavilov to Criminal Liability Lawful", article, 02.14.2007. |
| 38 | "Vavilov Felt Ill", article |
| 39 | "FBI Wants Yeltsin and Chernomyrdin's Evidence After Questioning Senator Vavilov" article |
| 40 | "Supreme Court Found Lawful Bringing Vavilov to Criminal Liability", article, 01.20.2012 |
| 41 | "From Senate to Prison. Cases with Vavilov that Were Suspended" article, MK, 02.14.2007 |
| 42 | "The Plaza Begins Settling Its Penthouse Problems", article |
| 43 | "Anything but Roulette, How Russian Billionaires Wheel and Deal for NYC Real Estate", article |
| 44 | Andrey Vavilov, "Where the Russians Live With Their Billions in New York City", article |
| 45 | Department of Justice, Government's Motion to Admit banking records, U.S. v. Lazarenko |

# EXHIBIT  1

# National Westminster Bank

005211

LONDON BRIDGE BRANCH                    1APR1997   OUR REF.   UTFCY97040100175

## PAYMENT ABROAD URGENT TRANSFER

Our Ref UTFCY97040100175   Branch Ref 2271   Remitter's Ref EA/041/NW

                              DEBIT ADVICE

Remitter's Name UNITED ENERGY INTERNATIONAL LTD

Paying Bank                          Beneficiary Bank
REPUBLIC NATIONAL BANK OF NEW YORK    /608211184
452 FIFTH AVENUE                     LOUIS D'OR INVESTMENT BANK LTD
NEW YORK                             MUSSON BLDG 2ND FL HINCKS ST
                                     BRIDGETOWN BARBADOS

Beneficiary                          Beneficiary Account no
ANGORA MANAGEMENT LTD                01420 11097 00

            *** Amount remitted -      10,000,000.00  US DLRS    ***

| Debit details | STERLING | US DLRS | EXCHANGE RATE |
|---|---|---|---|
| PAYMENT AMOUNT  - | | 10,000,000.00 | |
| PLUS CHARGES:- | | | |
| COMMISSION        - | 46.00* | 76.13 | 1.655 |
| PLUS VAT          - | 0.00 | 0.00 | |
| TRANSMISSION      - | 0.00 | | |
| PLUS VAT          - | 0.00 | | |

        DEBIT      10,000,076.13  US DLRS    ACCOUNT NO 140/01/04329791

* EQUIVALENT AMOUNT FOR INFORMATION ONLY - NOT INCLUDED IN DEBIT TOTAL

K000857

National Westminster Bank plc
Registered Number 929027 England  Registered Office 41, Lothbury, London, EC2P 2BP

Member of the NatWest Life and NatWest Unit Trust Marketing Group
Member of IMRO

# EXHIBIT  2

**ΤΡΑΠΕΖΑ ΚΥΠΡΟΥ ΛΤΔ**
**BANK OF CYPRUS LTD**

C.I.F. 03810090

Αρ. Λογ/σμου   41 – 006467 (06)
Account No.    41 – 006475 (25)

Ονομα πελάτη   SOMOLLI   ENTERPRISES   LTD
Customer's name

Αρ. Ταυτ.
I.D.Card

Διεύθυνση   1 ROMANOS STR.   NICOSIA
Address

Επάγγελμα
Occupation

Τηλ. Οικίας
Home Tel.

Τηλ. Γραφείου
Office Tel.

| Συνέταιροι/Partners - Διευθυντές/Directors | Ημερ/νία Date | ΔΕΙΓΜΑ ΥΠΟΓΡΑΦΗΣ - SPECIMEN SIGNATURE |
|---|---|---|
| Timoshenko Alexander | | |
| Timoshenko Yuliay | | |
| Grazets Alexander | | |
| | | |
| | | |
| | | |

Παρατηρήσεις:   Anyone of the above.

BANK OF CYPRUS LTD
INTERNATIONAL BUSINESS UNIT
NICOSIA

H000017

To the

# BANK OF CYPRUS LTD

At a meeting of the Directors of .......... SOMOLLI ENTERPRISES LTD ...........

Limited held at ................................................................. on .......................................................

the following resolutions were passed:

1.  That an account be opened with the Bank of Cyprus Ltd., at ........................................./that
    the account already held with Bank of Cyprus Ltd., at ........................................ is approved
    and will continue operating.

2.  That the Bank be and are hereby authorised to honour all cheques or other orders which
    may be drawn or receipts for moneys owing by the Bank to the company which may be
    signed on behalf of the company and to debit such cheques, orders and receipts to the
    company's account or accounts whether such account or accounts be for the time being
    in credit or overdrawn or may become overdrawn in consequence of such debit, provided
    such cheques, orders or receipts are signed by .... GRANES ALEXANDER OR
    ..TIMOSHENCO ALEXANDER OR TIMOSHENCO JULIA
    EITHER ...........................................................................................................

3.  That the Bank be and are hereby authorised to honour all bills accepted and promissory
    notes made on behalf of the company and to debit such bills and notes to the company's
    account or accounts whether such account or accounts be for the time being in credit or
    overdrawn or may become overdrawn in consequence of such debit provided such bills or
    notes are signed by .................................................................................................

4.  That in the above resolutions the expression director(s) shall include alternate director(s).

5.  That ................................................................................................................

    be and is/are hereby authorised on behalf of the company to withdraw and deal with any of
    the company's property or securities to sign any indemnities or counter-indemnities to the
    Bank, to arrange for the granting of credits or the issue of guarantees by the Bank at home
    or abroad or the discounting of any bills endorsed on behalf of the company by ..........................

    and to give instructions with regard to the purchase or sale of any securities of the company
    or any foreign exchange.

6.  That all and any debit balances of any of our accounts with the Bank will be charged with
    interest at the rate of ..................... per annum. The Bank will have the right at any time to
    increase by written notice to the Company the said rate of interest upto the maximum rate
    of interest permitted by law from time to time and such increase will take effect from
    the date of despatch of such notice. Interest charged will be capitalised twice in each year
    provided that such capitalisation is not contrary to the Law in force from time to time

T.K. 323 · 10,000 · 8.84

CYPRUS LTD
INTERNATIONAL BUSINESS UNIT
NICOSIA

association and with copies of any amending special resolutions that may from time to time be passed.

8. That the Bank be furnished with a list of the names of the directors, secretary and other officers of the company and that the Bank be authorised to act on any information given by any director or the secretary as to any changes therein.

9. That these resolutions be communicated to the Bank and remain in force until an amending resolution shall be passed by the board of directors and a copy thereof certified by any one of the directors or the secretary shall be communicated to the Bank.

We certify that the foregoing resolutions have been duly entered in the minute book and signed therein by the chairman and are in accordance with the articles of the company and that the company is a public/private company.

| Names of directors | Signatures | Nationality |
|---|---|---|
| PETROU ANDREAS | A Ptrtru | Cypriot |
| | | |
| | | |
| | | |
| | | |

The secretary send herewith the following documents:-

1) Memorandum and Articles of Association.

2) The Last Balance Sheet.

3) Certificate of Registration.

Dated the 02 / 10 / 19 92

.......................................... Secretary.

ROMANOS OFFICE SERVICES LTD.
1, ROMANOS STR., P. O. BOX 533
NICOSIA – CYPRUS

BANK OF CYPRUS LTD
INTERNATIONAL BUSINESS UNIT
NICOSIA

H000019

**BANK OF CYPRUS**

_Maraoni Nicosia_
(Branch)

## APPLICATION BY A NON-RESIDENT FOR THE OPENING
## OF A FOREIGN CURRENCY ACCOUNT

1. Full name and address of the applicant _Semeli Enterprises Ltd._
   _1 Romanos Str. Nicosia_

2. (i) If the applicant is an **individual** please state:

   (a) Nationality _____ Cypriot Ethnic origin: YES/NO ★

   (b) Permanent residential address _____

   (c) Passport Number (if available) _____

   (d) Occupation _____

   (e) Employment permit number and validity (if applicant is working in Cyprus) _____

   (f) Name and address of employers _____

   _____

   (ii) If the applicant is a married woman, please state also:

   (a) Residential status of husband _____

   (b) Permanent address of husband _____

   (c) Occupation of husband _____

3. If the applicant is a **firm** or **company**, please state:

   (a) Address of registered Head Office _Romanos Str. Nicosia_

   _____

   (b) If registered in Cyprus number and date of Central Bank approval _nc 49753_

   (c) Name of Bankers abroad _____

   (d) Nature of Business _____

4. Currency in which the account will be opened _USD iocm_

5. Nature of account (notice, fixed, etc. and tenor) _notice_

6. Purpose for which the account is required _____

7. Details of any other accounts of the applicant with the Authorised Dealer:

| Designation of the a/c | Currency | Balance |
|---|---|---|
| | | |
| | | |

(a) I/We hereby declare that I am/we are non-resident(s) of Cyprus for Exchange Control purposes and that the information given above is correct.

(b) If applicant is not in Cyprus reference should be made to his/their letter or cable request.

Date: _21/10/92_          Signature of Customer: _____

(a) We are satisfied with the above application and we approve the opening of the account; or

(b) We refer this application to the Central Bank for a decision giving our comments overleaf.

Date: _21/10/92_          Signature of Authorised Dealer _____

**CENTRAL BANK OF CYPRUS decision where required**

APPROVED / NOT APPROVED

Authority Number: _____

Authorised Signature: _____

★ Strike out whichever is not applicable

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A · 120p X 50 · 6.86

BANK OF CYPRUS LTD
INTERNATIONAL BUSINESS UNIT
NICOSIA

## ΑΙΤΗΣΗ ΓΙΑ ΑΝΟΙΓΜΑ ΛΟΓΑΡΙΑΣΜΟΥ «ΚΑΤΑΘΕΣΕΙΣ ΥΠΟ ΠΡΟΕΙΔΟΠΟΙΗΣΗ» ΣΕ ΞΕΝΟ ΝΟΜΙΣΜΑ

**ΤΡΑΠΕΖΑ ΚΥΠΡΟΥ ΛΤΔ**

MAKARIOY  NICOSIA                                    Ημερομηνία   Ζ  Ιιυ   1992

Κύριοι,

Σας παρακαλώ/ούμε να ανοίξετε στ᾽ όνομά μου/μας λογαριασμό «Καταθέσεις υπό Προειδοποίηση».

Συμφωνώ/ούμε ότι ο λογαριασμός αυτός θα διέπεται από τους πιο κάτω όρους:

1. Θα τηρείται σε ............................ USD I DEM ............................ (νόμισμα).

2. Επιταγές σε πίστωση του λογαριασμού θα πιστώνονται μετά την τελική εκκαθάρισή τους.

3. Για αναλήψεις από το λογαριασμό απαιτείται γραπτή προειδοποίηση προς την Τράπεζα ............................ ημερών/μηνών.

4. Θα πιστώνεται με τόκο ανάλογα με το εκάστοτε επιτόκιο που ισχύει για λογαριασμούς σε ξένο νόμισμα και ο οποίος θα υπολογίζεται σε ημερήσια υπόλοιπα.

5. Για υπόλοιπα κάτω από £ ............................ δε θα καταβάλλεται οποιοσδήποτε τόκος.

6. Η Τράπεζα θα δικαιούται οποιαδήποτε στιγμή και χωρίς να με/μας προειδοποιήσει, να συμψηφίζει οποιοδήποτε ποσό των καταθέσεων με οποιαδήποτε οφειλή μου/μας, ανεξαρτήτως αιτίας ή λόγου, προς την Τράπεζα.

7. Η Τράπεζα θα μπορεί να μειώνει, αυξάνει ή διαφοροποιεί με οποιοδήποτε άλλο τρόπο το πιστωτικό επιτόκιο του λογαριασμού, κάθε δε αλλαγή θα φαίνεται στην κατάσταση του λογαριασμού.

Σας δίδω/ούμε πιο κάτω τις ακόλουθες πληροφορίες:

Ονοματεπώνυμο: ...... SOMOLLI  ENTERPRISES  LTD ......

Επάγγελμα: ......

Ταυτότητα /Αρ. Διαβατηρίου: ......

Εθνικότητα: ......

Μόνιμη Διαμονή: ......

Διεύθυνση Κατοικίας: ......

Διεύθυνση εργασίας: ......

῾Ονομα Εργοδότη: ......

῾Ονομα και επάγγελμα συζύγου: ......
<br>(αν πρόκειται για παντρεμένη γυναίκα)

Εργοδότης συζύγου και επάγγελμα: ......
<br>(αν πρόκειται για παντρεμένη γυναίκα)

Παρακαλώ/ούμε, όλη η αλληλογραφία να απευθύνεται ...... I ROMANO STR  NICOSIA

Δείγμα Υπογραφής: ......
<br>(Δείγμα υπογραφής σε διπλούν πρέπει να δίδεται επίσης στο έντυπο Τ.Κ. 574)

Με υπόληψη,

**BANK OF CYPRUS LTD**
**INTERNATIONAL BUSINESS UNIT**
**NICOSIA**

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 8000φ. 3.91

**H000021**

To

Bank of Cyprus Ltd..

. BANK OF CYPRUS LTD

. MECAPIOU (Nicosia)

BANK OF CYPRUS LTD
INTERNATIONAL BUSINESS UNIT
NICOSIA

Dear Sirs,

INSTRUCTIONS BY TELEPHONE, TELEX OR FACSIMILE

In consideration of your agreeing to act upon unauthenticated
telephone, telex or facsimile instructions purporting to be
given by me/us or on my/our behalf in respect of my/our
account(s) or other dealings with you I/we hereby:

a) agree to indemnify you and to keep you indemnified from and
   against all claims, actions, demands, liabilities, costs
   charges, damages, losses, expenses and consequences of
   whatever nature which may be brought or preferred against you
   or that you may suffer, incur or sustain by reason or on
   account of your having so acted whether wrongly or mistakenly
   or not, or of your failing to act wholly or in part in
   accordance with such instructions:

b) agree not to make any claim against you by reason of or on
   account of your having so acted or of your having acted
   wrongly or mistakenly or of your failing to act wholly or in
   part in accordance with such instructions.

c) agree that you may debit any account in my/our name(s) with
   any sums payable by me/us as a result of such instructions.

Date.....................

FULL NAMES AND ADRESSES
Samelli Enterprises Ud
1, Romanos Str...
.. Nicosia,...........

SIGNATURES
.....................
.....................
.....................

# Somolli Enterprises



United Energy Int'l Ltd.
National Westminster Bank
(London)

$148,498,982
4/96 – 12/96

$49,996,483
1/97 – 12/97

Somolli Enterprises
Bank of Cyprus

$87,078,369
4/96 – 12/96

$49,929,347
04/96 –
08/96

Orphin
AmerBank
(Poland)
(Kiritchenko)

$25,400,000
04/96 –
05/96

Bainfield
#5383
Banque SCS
(Switz)
(Lazarenko &
Kiritchenko)

$15,863,000
07/96 –
08/96

GHP Corp
Credit Suisse
(Switz)
(Kiritchenko)

$23,049,386
04/96 –
12/96

Orphin
Credit Suisse
(Switz.)
(Kiritchenko)

$39,200,000
05/96 –
10/96

NIHPRO
Credit Suisse
(Switz)
(Lazarenko)

$14,099,636
07/96 –
09/96

Wilnorth
Banque SCS
(Switz)
(Kiritchenko)

$14,100,000
09/27/96

CARPO-53
Banque SCS
(Switz)
(Lazarenko)

Somolli Enterprises
First Trading Bank
(Nauru)

$13,999,970[1]
05/97 – 06/97

Orphin
EuroFed #151897
Pacific Bk #645039
(U.S.)
(Kiritchenko)

$70,200,000
7/97 – 9/97

LAZARENKO
EuroFed
#137978
(Lazarenko)

[1]Counts 9 to 19 and 32 to 42

## Bank of America #0337-6948 ABS Enterprises Inc. – from 12/17/93 to 1/4/95
### Signatories: P. Kiritchenko & I Kiritchenko



ASS Co. (Kiritchenko) — $1,395,000  12/93 & 2/94

Beten S.A. — $799,970  3/94–4/94

Nakosta — $349,985  5/10/94

Clarendon Ltd. — $1,382,248  6/94–8/94

LIP Handel AG (Lazarenko) — $1,799,985  7/1/94[1] / $99,985  1/11/95

SA Des Minerais — $902,079  7/12/94

Oleksy Dytyatkovsky — $249,985  7/15/94

Elsner F.J. — $836,044  8/94–12/94

Messrs — $556,948  8/94–12/94

Primary Industries — $1,983,983  8/94–10/94

Reeferway Ltd — $969,970  11/94

Int'l Services — $1,383,324  11/1/94

Optech AG — $410,000  12/1/94

Other — $3,708,334

**ABS Enterprises Inc**
**Bank of America**
**San Francisco**
**#0337-6948**
**(Kiritchenko)**

$360,026  12/23/93 / $500,000  2/28/94 — Orphin SA (Kiritchenko)

$842,700  6/24/84 — Bank Hodynka

$2,309,850  6/94 & 8/94 — Transfer to Savings

$1,510,000  7/11/94[2] / $968,000  8/18/94[3] / $1,963,000  12/12/94[4] — CARPO-53 BSCS #5353 Switzerland (Lazarenko)

$150,000  10/19/94 — Precima Trading

$450,000  11/2/94 — Ao Juzhno-Rossjskij

$330,000  12/12/94 — Data Technology

$112,500  12/15/94 — Pavel Lazarenko

$112,500  12/15/94 — Petr Kirtichenko

$2,210,000  1/4/95[5] — NIHPRO Credit Suisse #21678 Switzerland (Lazarenko)

$4,322,380 — Other

**Deposits $16,827,840**          **Disbursements $16,140,956**

[1]Count 31   [2]Count 2   [3]Count 3
[4]Count 4   [5]Count 5

**"CARPO 53"** - Banque SCS Alliance S.   '5353
Jul '94 to Oct '97
Signatory: Pavlo Lazarenko

| Source | Amounts |
|---|---|
| "Orp...... SA" Amerbank #61310 Poland (Kiritchenko) | $2,000,000  7/6/94 / $1,000,000  8/22//94 |
| "ABS Enterprises" Bank America #06948 United States (Kiritchenko) | $1,510,000  7/11/94[1] / $968,000  8/18/94[2] / $1,963,000  12/13/94[3] |
| "ABS Enterprises" | $99,975 4/26/95 |
| "KATO-82" Credit Lyonaisse Switzerland (Lazarenko) | $8,000,000  9/2/94 |
| "Bainfield Ltd." Banque SCS #5383 Switzerland (Lazarenko/Kiritchenko) | $2,600,000  2/7/96 / $2,000,000  2/26/96 / $12,675,000  5/15/96 / $12,000,000  5/23/96 / $18,000,000  8/6/96 |
| "Wilnorth Inc." Banque SCS #5451 Switzerland (Kiritchenko) | $14,100,000  9/17/96 |
| "GHP Corp" Banque SCS #5452 Switzerland (Kiritchenko) | $5,445,000  9/27/96 / $12,059,000  12/13/96 / $6,400,000  1/29/97 / $6,775,000  4/14/97 / $7,758,000  5/2/97 / $3,564,000  7/1/97 |

**"CARPO 53"**
Banque SCS
Alliance  #5353
Switzerland

Deposits: $118,916,975
Interest:   $7,422,901
Total         $126,339,876

| Amounts | Destination |
|---|---|
| $1,935,035 7/12/95 | "ABS Enterprises" |
| $14,000,000 7/30/97 / $14,000,000 7/30/97 | "Orphin SA" EuroFed #151897 (Kiritchenko) |
| $48,000,000 8/5/97 / $196,100 8/15/97 | "Lady Lake Inv" Banque SCS (Nassau) Bahamas (Lazarenko) |
| $48,000,000 8/5/97 / $196,100 8/15/97 | "Fairmont Group" Banque SCS (Nassau) Bahamas (Lazarenko) |

**Total Deposits:**
**$118,916,975**

**Total Disbursements:**
**$126,327,235**

[1]Count 2
[2]Count 3
[3]Count 4



**Cash Flow through EuroFed Accounts of:**
"Pavlo I. Lazarenko" #137978
"Lady Lake Invstmnt" #132907
"Fairmont Group Ltd." #134936
Signatory: Pavlo Lazarenko

[1]Counts 30 & 53



**Cash Flow through Credit Suisse #    /09-72 – Paddox Industries Limited**
**Signatory: P. Kiritchenko**

Deposits $51,523,900        Disbursements  $51,703,000

**"LAKE INVESTMENT CORP." &**
**"FAIRMONT GROUP LTD."**
**Banque SCS Alliance (Nassau) – Accounts**
**20170 & 20171   Aug '97 to Aug '98**
**Signatory: Pavlo Lazarenko**

```
                                                    ┌──────────────┐      ┌──────────────────────┐
                                                    │ $5,500,000   │ ───▶ │ "Brancross (Cayman)" │
                                                    │ 5/4/98       │      │ Royal Bank of Scotland│
                                                    └──────────────┘      └──────────────────────┘

                          ┌──────────────────┐      ┌──────────────┐      ┌──────────────────────┐
                          │  "Fairmont Grp"  │      │ $21,000,000  │ ───▶ │ "Gruztam Stiftung"   │
  ┌───────────────┐       │                  │      │ 7/23/98      │      │ Liechtensteinische   │
  │ $48,000,000   │       │ Deposits: $48,196,100 │ └──────────────┘      │ Landesbank           │
  │ 8/5/97        │ ────▶ │                  │                            └──────────────────────┘
  │ $196,100      │       │ Interest: $ 2,573,563 │ ┌──────────────┐      ┌──────────────────────┐
  │ 8/15/97       │       │                  │      │ $21,000,000  │ ───▶ │ "NRKTO 7541"         │
  └───────────────┘       │ Total   $50,769,663 │   │ 7/23/98      │      │ LGT Bank in Liechtenstein│
                          └──────────────────┘      └──────────────┘      └──────────────────────┘

┌──────────────────┐    ┌──────────────┐ ┌──────────────┐
│   "CARPO-53"     │    │ $3,000,000   │ │ $190,974     │
│                  │    │ 8/6/98       │ │ 8/27/98      │
│ Banque SCS Alliance │ └──────────────┘ └──────────────┘
│                  │
│ Account 5353     │                        ┌──────────────┐      ┌──────────────────────┐
└──────────────────┘                        │ $18,000,000  │ ───▶ │ "Rego Ltd."          │
                                            │ 5/27/98      │      │ Raiffeisen ZentralBk (Austria)│
                          ┌──────────────────┐ └──────────────┘    └──────────────────────┘
  ┌───────────────┐       │   "Lady Lake"    │ ┌──────────────┐    ┌──────────────────────┐
  │ $48,000,000   │       │                  │ │ $9,000,000   │ ──▶│ "Guardian Investment Group│
  │ 8/5/97        │ ────▶ │ Deposits: $51,387,075 │ 7/23/98    │   │ EuroFed #119648      │
  │ $196,100      │       │                  │ └──────────────┘    │ Bankas Hermis, Lithuania│
  │ 8/15/97       │       │ Interest: $ 2,490,653 │ ┌──────────────┐└──────────────────────┘
  └───────────────┘       │                  │ │ $9,000,000[1]│ ──▶│ "Guardian Investment Group│
                          │ Total   $53,877,728 │ │ 7/23/98    │   │ EuroFed #119648      │
                          └──────────────────┘ └──────────────┘    │ Comm'l Bk of SF, (U.S.)│
                                                                    └──────────────────────┘
                                            ┌──────────────┐      ┌──────────────────────┐
                                            │ $12,000,000  │ ───▶ │ "Lesja Stiftung"     │
                                            │ 7/23/98      │      │ LGT Bank in Liechtenstein│
                                            └──────────────┘      └──────────────────────┘
                                            ┌──────────────┐      ┌──────────────────────┐
                                            │ $5,300,000[2]│ ───▶ │ "Dugsbery Inc."      │
                                            │ 8/6/98       │      │ WestAmerica Bk (U.S.)│
                                            │ $361,000     │      └──────────────────────┘
                                            │ 8/28/98      │
                                            └──────────────┘
```

**Total Deposits: $96,392,200**          **Total Disbursements: $101,161,000**

[1]Counts 28 & 51
[2]Counts 29 & 52

## Cash Flow – GHP Corp's Account #5452 at Banque SCS Alliance
### Signatory: P. Kiritchenko



| | |
|---|---|
| L.I.T.A.T Offshore | $50,790,694 09/96–12/97 |
| Dubl w SC Corp | $10,999,709 11/14/97 |
| Ferco Metal | $8,934,245 09/96 – 05/97 |
| Ste. Jean Yared & Fils | $3,083,564 09/96 – 11/96 |
| Societe Libanaise | $3,061,297 09/96 – 1/97 |
| Cabinet of Ministries | $1,415,960 2/3/97 & 3/20/97 |
| All Others | $8,593,599 09/96 – 03/97 |

**GHP Corp. #5452**
Deposits: $86,879,068
Interest: $    346,713
Total    $87,225,781
(Kiritchenko)

| | |
|---|---|
| $42,001,000 09/96 – 07/97 | **"CARPO-53" (Lazarenko)** |
| $8,200,000[1] 7/30/97 | Orphin SA EuroFed (M. Lynch) (Kiritchenko) |
| $23,300,000 9/97–2/98 | Orphin S.A. EuroFed (Kiritchenko) |
| $3,000,000 9/19/97 | United Energy Int'l Ltd |
| $2,564,000 11/21/97 | Ukrainian Info Fondatn |
| $1,870,000 5/97–7/97 | Brancross Ltd. I.O.M |
| $1,200,000 7/15/97 | U.T. & A.R. Ltd |
| $485,435 2/97–10/97 | Pacific Modern Homes |
| $4,383,191 | All Others |

**Total: $86,879,068**          **Total: $87,003,626**          [1]Counts 24 &

## Cash Flow – GHP Corp's Account #823896-22 at Credit Suisse
### Signatory: P. Kiritchenko/I. Kiritchenko



Total: $78,257,689                    Total: $78,153,193

# Cash Flow through Credit Suisse #21383 – Orphin S.A.
## Signatories: . . Kiritchenko



**Deposits $63,255,072**

**Disbursements $63,825,284**

**American Bank of Poland (Amerbank) – Acct 04      -61310 –**
**"Orphin S.A."**
**Demand Deposit & FX Purchase Accounts**
**Signatories: P. Kiritchenko/S. Novakaovskaia**

| From | Amount/Date | To |
|---|---|---|
| Ronly Holdings | $40,643,579  09/95 – 08/97 | |
| Nikopol Ferralloy | $20,414,521  12/95 – 04/96 | |
| Somolli Enterprises Bank of Cyprus | $49,929,347  04/96 – 08/96 | |
| All Others | $48,700,792  10/93 – 08/98 | |

**Orphin S.A. Demand Deposit Acct #00410-61310-00 (Kiritchenko)**

$148,576,733  12/93 – 5/98

**Orphin S.A. FX Purchase Account #00410-61310-F1 (Kiritchenko)**

| Amount/Date | To |
|---|---|
| $1,566,000  1/94 – 3/94 | "KATO" (Lazarenko) |
| $3,000,000  7/94 – 8/94 | "CARPO-53" (Lazarenko) |
| $2,171,000  11/94 – 1/95 | "NIHPRO" (Lazarenko) |
| $8,603,420  12/94 – 3/97 | "Agrosnabsbut(ASS)" (Kiritchenko) |
| $5,652,636  9/95 – 12/95 | Nikopol Ferralloy |
| $27,422,500  10/95 – 4/96 | Zaporoszhye |
| $27,000,000  1/96 – 10/96 | Bainfield (Lazarnk/Kiritch) |
| $16,100,000  4/96 – 6/96 | Orphin SA Crdt Suisse (Kirtch) |
| $18,863,013  7/96 – 1/97 | GHP Corp (Kiritchenko) |
| $1,200,000  8/96 | Paddox Ind (Kiritchenko) |
| $6,300,000  1/97 – 5/98 | Wilnorth (Kiritchenko) |
| $1,400,000  4/97 – 8/97 | Brancross (Kiritchenko) |
| $12,652,000  5/97 – 7/97 | Orphin SA EuroFed (Kiritch) |
| $11,776,164  12/93 – 5/98 | All Others |

$1,310,000  11/18/93 → **"ASS Co." BSCS #5317 (Kirithcenko)**

$9,749,594  11/93 – 7/98 → **All Others**

**Total Deposits: $159,688,239          Total Disbursements: $159,635,327**

# "LIP HANDEL AG" – Union Bank of Switzerland
## Account No. 52.607.03
### Signatory: W. Metz;   Benef Owner: P. Lazarenko



"Lazarenko" Moscow — 105,120 Sfr 3/31/93

"Szovhoz Naucnij" Dnyepropetrovszk — $1,205,000 6/9/93

?? — $430,000 7/22/93

"Jurimex Kommerz" Austria — $430,000 7/30/93

"Alexei Ditiatkovski" Dnyepropetrovszk — $450,000 7/26/93; $800,000 11/9/93; $300,000 12/2/93

"ASS Co. Ltd." American Bank in Poland — $610,000 7/29/93

"IAH Autombil-Handels GMBH" — $199,974 2/9/94; 864,643 SFr 2/9/94

$578,302 8/4/93

"LIP Handel AG" Union Bank of Switzerland #52.607.03

3,000,000 SFr 1/14/94 → "KATO-82" Credit Lyonaisse Switzerland (Lazarenko)

1,255,529 SFr 5/17/94 → "Adam Opel AG" Dresdner Bank Germany

$1,800,000[1] 7/1/94; 131,700 SFr 1/9/95 → "ABS Enterprises" Bank of America U.S. (Kiritchenko)

[1]Count 31

# "KATO-82" - Credit Lyonnais (Suisse) S.A.
## Jan '94 to Sep '94
### Signatory: Pavlo Lazarenko



**"LIP Handel AG"**
Union Bank of
Sw. #52.607.03
(Lazarenko)

3,000,000 SFr
1/14/94

"Orphin SA"
Amerbank
Poland
(Kiritchenko)

$216,000
1/13/94
$777,500
2/21/94
$572,475
3/18/94

"Van der Ploeg"
ABN Amro
Netherlands

$2,972,000
1/24/94
$4,000,000
3/8/94

"Dytakovski"
Bawag
Vienna

$1,236,000
2/11/94

"ABS
Enterprises"
Bank America
United States
(Kiritchenko)

$800,000
4/25/94

**"KATO-82"**
Credit Lyonnais
#08-05785-3

"Orphin SA"
Credit Suise
Switzerland
(Kiritchenko)

$4,000,000
9/29/94

**"NIHPRO"**
Credit Suisse
Switzerland
(Lazarenko)

$4,989,894
9/1/94

$8,000,000
9/1/94

**"CARPO 53"**
Banque SCS
Switzerland
(Lazarenko)

**Total Deposits: $10,573,975**
**+ 3,000,000 Swiss Fr**

**Total Disbursements: $12,989,894**



## Cash Flow through European Fed   Jt Bk Acct #151897 – Orphin S.A.
### Signatory: P. Kiritchenko

*charges DROPPED*

**Somolli Enterprises First Trading Bk(Nauru)** → **$13,999,970[1]** 5/97 – 6/97

**Orphin S.A. Amerbank 410-61310 (Kiritchenko)** → **$12,651,850[2]** 5/97 – 7/97

**M. Invest Agency** → **$1,000,000** 6/16/97

**CARPO-53 Banque SCS 5353 (Lazarenko)** → **$27,999,970** 8/1/97

**GHP Corp. Banque SCS 5452 (Kiritchenko)** → **$31,499,985** 8/97 – 2/98

**Bainfield Ltd. Banque SCS 5383 (Lazarenko & Kirtch)** → **$400,000** 3/13/98

**Unknown** → **$4,006,985** 4/16/98  **$518,604** 8/1/97

**Paddox Industries Credit Suisse 875709-72 (Kiritchenko)** → **$500,000** 9/19/97

**Other** → **$155,614** 11/97 – 5/98

**Orphin S.A. EuroFed Acct 151897 (Kiritchenko)**

→ **$26,000,000** 7/31/97  **$36,200,000** 8/1/97  **$8,000,000** 9/10/97 → **P. Lazarenko EuroFed #37978 (Lazarenko)**

→ **$1,056,604** 9/30/97–10/2997 → **Information Technologies**

→ **$1,500,000** 9/9/97 & 12/97 → **Privat Service**

→ **$2,000,000** 10/97 – 12/97 → **Opus International LLC**

→ **$18,009,557** 5/97 – 5/98 → **Others**

**Deposits: $92,732,978**        **Disbursements:  $92,766,161**

[2]Counts 20-23  & 43-46
[1]Counts 9-19 & 32-42

ROM : Panasonic PPF

# *SOMOLLI* ENTERPRISES LIMITED

$N26/U-97$

$31.03.97$

UNITED ENERGY INTERNATIONAL LTD
41 Dover Street
London W1X 3RB

As per our instruction to you, kindly effect the payment in favour of

**Payee:**            IN FAVOUR OF
                     "LOUIS D`OR INVESTMENT BANK LTD."
                     MUSSON BUILDING, 2ND FLOOR,
                     HINCKS STREET, BRIDGETOWN,
                     BARBADOS, WEST INDIES

**Bank:**             REPUBLIC NATIONAL BANK OF NEW YORK
                     NEW YORK

**Account:**          608211184

**Currency:**         US DOLLARS  10,000,000
                     (ten millions dollars only)

**payment`s details:**   for "Angora Management ltd.,"
                     acc. # 01420 11097 00

Singned for and on behalf of SOMOLLI ENTERPRISES LIMITED

**Duly Authorised**       SOMOLLI ENTERPRISES LIMITED
                         NICOSIA - CYPRUS

---

31. 1, ROMANOS Str.  POST OFFICE BOX No 533, NICOSIA - CYPRUS,  ☎. 02-455644 (6 lines), FAX 02-443990 TX: 2861 PASCO CY

K000858

EXHIBIT  3

Translation.

## AGENCY OF FEDERAL INVESTIGATIONS

### Who Threatens Kuchma?

[…] Rephrasing a well-known saying, "crime is behind any large wealth", one can say that someone's financial interests are behind every political crisis. […]

**Grand Schemer.**

[…]  In 1996-1997, Andrey Vavilov brilliantly effected two debt settlements, among Russian Gazprom and the Finance Ministry, on the one hand, and United Energy Systems of Ukraine PFK, under Yulia Tymoshenko, on the other hand.  Those settlements were precisely the basis for the political scandal in Ukraine[…]

On November 28, 1996 and March 3, 1997, the Ministry of Finance (Vavilov), State Tax Service (Artyukhov), Gazprom (Viakhirev), Defense Ministry (Rodionov) and UESU (Tymoshenko) concluded two agreements on the mutual settlements for the total of $450 million.  The subject matter of the settlements was the debts of UESU for the natural gas delivered to Ukraine….

First, Gazprom took commercial credits ($250 million at the National Reserve Bank and $200 million at the Imperial Bank) and paid its debts before the State Tax Service.  The tax officials transferred the money to the Finance Ministry, and the latter transferred it to the Defense Ministry.  That money was transferred to the English company, United Energy International Ltd. (subsidiary UESU) towards future deliveries of the building materials from Ukraine to the Defense Ministry.  The British, in their turn, transferred money back to Gazprom as a payment for the natural gas delivered to Ukraine earlier.  Then Gazprom returned the millions to the Imperial Bank and to the National Reserve Bank.

However, the scheme on paper is different from the reality.  In the real life, the pumping through of half a billion of dollars took place within a banking day.  At the same time, the accounts of all the participants were opened in advance at the National Reserve Bank and at the Imperial Bank.

From the time of the conclusion of the Ukrainian agreements (1997), UESU delivered to the Defense Ministry goods only for $120 million.  At the same time, Tymoshenko's company collected money from consumers of energy in her country very diligently…

Hence, the Finance Ministry of Russia (Andrey Petrovich Vavilov) under a nice slogan of "expenditures for the national defense" credited Tymoshenko's company for over 3 years for $330 million.  Without interest.  When the noise broke out, the responsible person became the Defense Ministry and its chief financier.

… The used of the "intermediation" of the Defense Ministry with the Ukrainian scheme of mutual settlements… had one more apparent plus.  It allowed to significantly increase the volume of commissions, due to "the concrete persons".  For that, UESU's English subsidiary was indispensable.

As the criminal case reads, shortly after the settlement the Russian bank Avrobank received, from England, through the Cypriot offshore entity $10 million.  That money was quickly cashed, and its route is being now investigated…

However, there was another interesting transfer, from United Energy International Ltd. Namely, another $10 million went to the account of a Bahamian firm Angora Management Ltd. at the bank Louis D'Or, registered in Barbados.

Some of the readers probably still remember that name.  At the relevant time Louis D'Or bank got exposed in the scandal with the moneys of MAPO MIG.  That scandal came about shortly after the auction of Sviazinvest, but, surprisingly, that scandal was quickly extinguished.  One of the main figures in that scandal was Vavilov.

Who owns Louis D'Or bank is still a secret.  However…  Its controlling stock is owned by a firm called Titan (Isle of Man) Ltd.  In 1997, the stock of Titan, for the total of $8 million was purchased by one offshore entity, 100 percent of which was held by Nadezhda Kossareva.  People who know, say that she is the trustee for…Andrey Petrovich Vavilov.

Now, the full circle?

Shortly after the Barbados transfer, two apartments were purchased, in New York on Kennedy Avenue and in London, on Chechin Street, for $5 million and &6.5 million respectively.  These apartments are those in which, while being overseas, the now former first deputy Finance Minister (Vavilov) stays on his trips overseas.  In Moscow, he also acquired a new address, at 10 Kossygina Street (that apartment was previously occupied by the president of USSR Michael Gorbachev)…

**Moskovsky Komsomolets.**

**March 14, 2001**

_____

**CERTIFICATION OF TRANSLATION**

I, Tatyana Suchkova, certify herewith that I am a permanent resident in the USA, that my native language is Russian, that I have higher education, with the specialty of the languages' instructor, that I am competent to translate from Russian into English and that the foregoing translation from Russian into English is true and correct.

Date: 10/10/2013.  Correct:_____

**Агентство Федеральных Расследований (www.FLB.ru)**    Печать

## Кто путчит Кучму?

**Из политического скандала на Украине торчат российские "уши"**

"**На соседней с нами Украине неладно. Тамошняя оппозиция нынешней президентской власти, возбужденная сначала "откровениями" бывшего охранника Леонида Кучмы, а потом и арестом экс-вице-премьера (она же - неформальный лидер оппозиционной парламентской фракции "Батькивщина") Юлии Тимошенко, раз за разом устраивает митинги с требованием отставки президента. И пусть эти акции протеста пока не имеют ни политического, ни общественного успеха, каждая из них обязательно оказывается под пристальным вниманием мировых СМИ. А также западных аналитиков. Официально Россия в этот скандал не вмешивается. Но это только официально. Потому что, по версии "МК", с самого начала за скандалом стояли российские чиновники, точнее, их личные интересы, а также большие, огромные деньги.**

Перефразируя известное "за каждым крупным состоянием стоит преступление", можно сказать: за любым политическим кризисом стоят чьи-то финансовые интересы. Чаще всего широкой публике они не видны, но стоит приглядеться повнимательнее да копнуть поглубже...

Начнем с очевидного. В самый разгар украинского политического кризиса в Киев неожиданно прилетел министр обороны России маршал Игорь Сергеев. Официально цель визита и тема переговоров с Леонидом Кучмой были объявлены банальным - "решение вопросов по Черноморскому флоту". Подобных "решений вопросов" в нашей новейшей истории было предостаточно.

Однако, по сведениям "МК", у маршальского броска на Украину была и другая, неофициальная цель. С уголовным подтекстом.

Первыми его озвучили члены парламентской фракции "Батькивщина". Представители украинского варианта нашего "Отечества" открыто высказали предположение, будто внеплановый визит российского министра обороны напрямую связан с возбуждением уголовного дела против вице-премьера по вопросам ТЭК Юлии Тимошенко. Напомню, что 15 января генпрокуратура Украины возбудила против Тимошенко уголовное дело по обвинению в посягательстве на контрабанду в особо крупных размерах и подделке документов.

Предположение "Батькивщины" подтвердилось буквально на следующий день. Маршал Сергеев посетил Киев 18 января. 19 января Леонид Кучма отправил в отставку Юлию Тимошенко. Менее чем через месяц ее арестовали.

Официально было объявлено, что Тимошенко замешана в уголовном деле, связанном с реэкспортом (а проще говоря, воровством) российского газа "в особо крупных размерах". И мало кто знает, что ранее на Украине уже было возбуждено еще одно дело, имевшее прямое отношение к бывшему вице-премьеру.

Оно было открыто еще 2 ноября прошлого года - "по факту взятки в 3 млн. долларов", которую "ЕЭС Украины" (во главе "ЕЭСУ" стояла все та же Юлия Тимошенко) выдало ряду должностных лиц российского Минобороны. Любопытная деталь - если отставка Тимошенко случилась сразу после появления в Киеве российского министра обороны

Сергеева, то первое дело идеально совпало по времени с визитом в столицу Украины следственной группы Главной военной прокуратуры России.

Вы не находите, что слишком много совпадений с участием людей в погонах? Хотя, казалось бы, какая может быть связь между поставками российского газа на Украину и российским Министерством обороны?

Но она есть. И самая прямая. Причем установили ее люди, чьи имена находятся на слуху у всей бизнес-элиты России…

**Великий комбинатор**

Честно говоря, в свое время я просто устал писать про этого человека. Его называли "серым кардиналом" российских финансов, самым богатым человеком страны, а нынешний премьер Михаил Касьянов, в ту пору работавший с ним в соседнем кабинете, по степени влияния на олигархов не годился даже в подметки.

Человека звали первый заместитель министра финансов Российской Федерации Андрей Петрович Вавилов. Наверное, не было на заре нашей приватизации ни одной шумной истории, из которой не торчали бы его "уши".

Есть они и в нашей истории. Следите за сюжетом.

В 1996-1997 годах Андрей Вавилов блестяще провел два международных взаимозачета - между российским "Газпромом" и Минфином с одной стороны, и ПФК "ЕЭС Украины" под руководством Юлии Тимошенко - с другой. Именно они легли в основу нынешнего политического скандала на Украине.

Справедливости ради скажу, что "украинская" схема была не нова - вначале ее "обкатали" на Белоруссии. 22 апреля 1996 года между Минфином РФ и "Газпромом" был заключен договор о проведении взаимозачета задолженности Республики Беларусь за поставки газа. Подписали договор Вавилов - от Минфина и глава РАО "Газпром" Вяхирев.

Дело в том, что к тому времени Беларусь здорово задолжала "Газпрому". Который, в свою очередь, недоплатил налоги в российскую казну. А Россия задолжала Минску за ядерные материалы. И вот, вместо того чтобы впустую гонять долговые деньги туда-сюда между странами, власти решили поступить иначе.

Специально для взаимозачета правительство Белоруссии выпустило вексель на сумму в 916791381 доллар - в счет газовых долгов. И отправило его "Газпрому". Далее "Газпром" должен был передать этот вексель Минфину РФ, в счет своих долгов перед бюджетом. А Минфин - вернуть его Белоруссии в качестве оплаты за ядерные материалы.

Казалось бы, что здесь особого? Подобный взаимозачет между нищими странами мог бы стать идеальным решением долговой проблемы. Но, как известно, любую схему воплощают в жизнь не идеальные, а конкретные люди. Которые оперируют при этом не идеальными, а реальными деньгами. И произошло вот что.

"Чисто конкретно" схема была реализована Андреем Вавиловым, председателем правления РАО "Газпром" Рэмом Вяхиревым, председателем Национального резервного банка (НРБ) Александром Лебедевым и главой Госналогслужбы России Виталием Артюховым. По крайней мере именно эти люди расписались под соглашением о взаимозачете.

В реальной жизни зачет был произведен следующим образом. Получив белорусский вексель, "Газпром" не передал его Минфину. Он… продал его. А Минфин купил, заплатив 650 млн. долларов казначейскими налоговыми освобождениями (КНО) и 200 млн. долларов "живыми" баксами. С помощью этих КНО (ничего не значащих бумажек, фикций) "Газпром" якобы рассчитался с бюджетом по своим долгам, а 200 миллионов списал на результаты собственной хозяйственной деятельности. Как эти "результаты" распределились между конкретными людьми, неизвестно…

**Губит людей не пиво...**

Удачно провернув белорусский взаимозачет, Вавилов приступил к украинской части операции. На этот раз схему решено было модернизировать - в целях собственной безопасности.

В случае с Белоруссией прямые убытки от сделки повисли на Минфине, читай - на госбюджете России, что могло быть квалифицировано как казнокрадство. Поэтому в украинском варианте сделали "прокладку" - в виде Министерства обороны России. Чьи финансовые операции, мягко говоря, мало прозрачны.

28 ноября 1996 года и 3 марта 1997 года Минфин (Вавилов), Госналогслужба (Артюхов), "Газпром" (Вяхирев), Минобороны (Родионов) и "ЕЭС Украины" (Тимошенко) заключили два соглашения о взаимозачете на общую сумму в 450 млн. долларов. Предмет соглашений - долги "ЕЭСУ" за поставленный на Украину газ.

В целом схема взаимозачета повторяла белорусский сценарий, но в конкретном исполнении выглядела немного иначе... Хочу предупредить читателя - сейчас, с точки зрения нормального человека, начнется сущий бред. И все-таки попробуйте вчитаться в подробности операции, они того стоят.

Сначала "Газпром" брал коммерческие кредиты (в НРБ - 250 млн. долларов, в "Империале" - 200) и ими гасил свои долги Госналогслужбе. Налоговики переводили деньги Минфину, а тот перебрасывал их в Минобороны. Из оборонного ведомства деньги переводились в английскую компанию "Юнайтед Энерджи Интернэшнл Лтд" (дочерняя структура "ЕЭСУ") в счет будущих поставок стройматериалов с Украины в адрес Минобороны. Англичане, в свою очередь, перебрасывали деньги назад в "Газпром" - в качестве оплаты за поставленный ранее Украине газ. А "Газпром" возвращал миллионы "Империалу" и НРБ... Это только на бумаге схема выглядит долгой. На самом деле прогонка полумиллиарда долларов произошла в течение одного банковского дня. При этом счета всех участников этой операции были заранее открыты в НРБ и "Империале".

На первый взгляд, главным здесь является вопрос: зачем в схему взаимозачета включили Минобороны? "ЕЭСУ" должно "Газпрому", "Газпром" должен госбюджету России - вот и весь круг заинтересованных лиц. Но загадкой роль Минобороны представляется только на первый взгляд. Собственно, как и роль английской дочурки "ЕЭСУ".

Уберите из схемы военных, и вся она моментально превращается в старый анекдот про двух ковбоев, которые поспорили друг с другом на 100 долларов, что могут съесть стакан дерьма. Оба вроде бы выиграли, а в итоге - бесплатно дерьма наелись.

Конкретные люди, задумавшие "прокрутку", были явно не ковбои, потому-то в зачетной схеме и появилось военное ведомство. Военным не дерьму не привыкать - а в результате описанной операции украинские долги за газ (вместо Минфина, как в "белорусском варианте") повисли на Министерстве обороны.

С момента заключения украинских соглашений "ЕЭС Украины" (1997 год) поставило в адрес российского Минобороны товаров всего на 120 млн. долларов. При этом компания Юлии Тимошенко деньги с потребителей энергии в своей стране собирала исправно. То есть нищей ее назвать было трудно.

И получается, что Минфин России (в лице Андрея Петровича Вавилова) под красивой вывеской "расходов на национальную оборону" прокредитовал компанию Тимошенко на три с лишним года и на сумму в 330 млн. долларов. Без процентов. А когда пошел шум, виновными объявили Минобороны и его главного финансиста...

**И главное - сухо!**

"Прокладка" в виде Министерства обороны при украинском варианте взаимозачета по сравнению с белорусским имела еще один очевидный плюс. Она позволяла существенно увеличить объем комиссионных, причитающихся "чисто конкретным людям". И здесь английская дочка "ЕЭСУ" оказалась просто незаменимой.

Сразу после проведения зачета, как написано в уголовном деле, в российский "Автобанк" из Англии через кипрский офшор поступило свыше 10 млн. долларов. Деньги были быстро обналичены, их дальнейший путь сегодня только выясняется. Благо, московский представитель интересов Юлии Тимошенко генерал-полковник Н. (его фамилию по понятным причинам мы не называем) согласился на сотрудничество со следствием - в обмен на статус свидетеля под госзащитой. Он уже дал показания. Проведены очные ставки. Называется даже общая сумма "отката"…

Но был и другой любопытный перевод из "Юнайтед Энерджи Интернэшнл Лтд". Еще десять миллионов долларов ушло на счет багамской фирмы "Ангора Менеджмент Лтд" в банке "Луидор", зарегистрированном на Барбадосе.

Возможно, кто-то из читателей еще помнит это название. В свое время банк "Луидор" "засветился" в скандале с деньгами МАПО "МиГ". Который разгорелся сразу после аукциона по "Связьинвесту", но удивительно быстро погас. Одним из главных фигурантов скандала был Вавилов.

Кому на самом деле принадлежит "Луидор" - до сих пор загадка. Впрочем… Официально его контрольным пакетом владеет фирма под названием "Тайтен (Айл оф Мэн) Лтд". В 1997 году акции "Тайтена" на общую сумму в 8 млн. долларов скупил один офшор, на 100 процентов принадлежавший некоей Надежде Коссаревой. Знающие люди называют ее поверенной в делах… Андрея Петровича Вавилова.

Круг замкнулся?..

А вскоре после барбадосского перевода в Нью-Йорке, на Кеннеди-авеню, и в Лондоне, на Чечин-стрит, были приобретены две квартиры стоимостью 5 млн. долларов и 6,5 млн. фунтов стерлингов соответственно. Именно в этих квартирах, будучи за рубежом, теперь останавливается бывший первый замминистра финансов России. В Москве у него тоже добавился новый адрес - ул. Косыгина, д. 10 (ранее в этой квартире жил президент СССР Михаил Горбачев)…

К скромному образу экс-чиновника Андрея Вавилова можно добавить разве что роскошные бриллианты его бывшей жены Марьяны Цареградской, которые еще недавно могла лицезреть вся Москва на рекламных щитах вдоль Рублевского шоссе. На щитах красовались надписи: "Любимая" и "Привет, Марьяна". Действительно - полный привет…

**Дави на газ**

Возможно, вся эта история так и осталась бы тайной за семью печатями, подобно сотням других. Но на чисто экономическое поле неожиданно влезла большая политика. И - спутала все карты.

18 апреля прошлого года Владимир Путин должен был совершить свой первый вояж в Киев. К этому моменту Украина в очередной раз заблокировала счета Черноморского флота России, а Леонид Кучма после встречи с госсекретарем США Мадлен Олбрайт сделал несколько резких, по сути антироссийских заявлений о временном статусе ЧФ РФ в Севастополе.

Похоже, в ответ на это Главная военная прокуратура России возбудила уголовное дело о нанесении ущерба государству в размере 450 млн. долларов. И сразу после встречи с Путиным Кучма резко сбавил тон. Но нынешний украинский премьер Ющенко и Тимошенко не поняли новых политических тенденций. Они продолжали вести переговоры о газовых поставках напрямую с Туркменистаном в обход России.

2 ноября 2000 года генпрокуратура Украины возбудила уголовное дело против "ЕЭСУ" о взятке в 3 млн. долларов (если помните, в этот момент в Киеве находилась следственная бригада ГВП России).

29 ноября на Украине полыхнул "кассетный" скандал, связанный с исчезновением оппозиционного журналиста Григория Гонгадзе. Кучме пришлось срочно искать свою контригру. Выручила, как всегда, Россия.

1 декабря (на следующий день после "кассетного" скандала) ГВП переквалифицировала "дело о 450 млн. долларов" в уголовное дело о злоупотреблении начальника Главного управления военного бюджета и финансирования (ГУВБФ) Минобороны РФ генерал-полковника Георгия Олейника. В рамках "нового дела" быстро проводятся очные ставки, а московский представитель Юлии Тимошенко генерал Н. получает статус свидетеля.

Такой вот идет матч, где противники по очереди делают свои ходы, то атакуя, то уходя в глухую защиту. Но игре, где сторонам то и дело приходится жертвовать собственными фигурами, грозит выйти из-под контроля. Скандал на Украине только разрастается...

В ходе следствия по злополучным 450 млн. долларов выяснился еще один любопытный нюанс. Прошлогодняя сделка о передаче от Украины в Россию 11 стратегических бомбардировщиков стоимостью 275 млн. долларов, якобы в обмен на газовые долги, на самом деле была полностью оплачена "живыми" деньгами со счетов Минобороны. А это как минимум еще 50-60 млн. долларов "отката" (только официальная комиссия в оружейном бизнесе составляет 15-20 процентов).

Ясно, что Минобороны и начальник ГУВБФ Георгий Олейник всего лишь "стрелочники" в большой политической игре. Скорее всего на сделку с бомбардировщиками ради этой игры глаза закроют. Но ради той же игры "дело Тимошенко" вынуждены будут довести до конца. А значит, на свет обязательно появятся те, кто когда-то стоял у истоков скандала. В том числе - бывший лучший, но опальный первый заместитель министра финансов России Андрей Петрович Вавилов. Со товарищи...

"

**14.03.2001**
Постоянный адрес статьи : **http://flb.su/info/375.html**        **Московский комсомолец**

Поделиться...

**Из досье FLB**

**Вавилов Андрей Петрович**
- бывш. первый заместитель министра финансов РФ

EXHIBIT  4

Not Reported in F.Supp.2d, 2012 WL 265987 (S.D.N.Y.)

United States District Court,
S.D. New York.
SOUTHERNDOWN, INC., Petitioner
v.
HSS LLC, Respondent.

No. 11 Civ. 8619(TPG).
Jan. 27, 2012.

### OPINION

THOMAS P. GRIESA, District Judge.

**\*1** In this case, Southerndown, Inc. ("Southerndown") petitions the court for an order, pursuant to 9 U.S.C. §§ 9, 13, confirming the arbitration award issued in its favor on November 17, 2011 in an arbitration between it and respondent HSS LLC ("HSS").

Petitioner's arbitration award is confirmed.

### Background

Southerndown is a New York corporation organized for the purpose of acquiring a penthouse on the 78th Floor in the South Tower of the Time Warner Building for the residence of Mr. Andrey Vavilov and Mrs. Mariana Vavilov. HSS is a New Jersey corporation organized to facilitate the interior design business of its owner and operator, Howard Slatkin.

The Vavilovs and Mr. Slatkin entered into a letter of agreement ("LOA") in 2009 whereby Mr. Slatkin was to design and furnish the penthouse ultimately acquired by the Vavilovs through Southerndown. The LOA provided that any dispute between the parties was to be decided by an arbitrator.

As the budget for the penthouse project began to shrink, disputes arose between the parties, and a claim for arbitration was ultimately submitted on January 26, 2010. Under several legal theories, Southerndown sought the return of $2,842,558.16 held by HSS as a retainer, as well various sums for expenditures and liens relating to the penthouse. It also sought punitive damages on the ground that HSS had fraudulently induced Southerndown to

enter the contract. For its part, HSS sought to keep the balance of the retainer.

John Madden was appointed to arbitrate the dispute, and he issued a decision after presiding over thirteen evidentiary hearings in which more than 500 exhibits were presented. Mr. Madden first concluded that a contract had been formed between the parties, notwithstanding the lack of a definitive agreement on such issues as the budget for the penthouse project, the design scheme for the penthouse, and the scope of the project. He then determined that Southerndown had not proven its claim of fraudulent inducement. Finally, he concluded that HSS had materially breached the contract between the parties by failing to properly notify Southerndown regarding certain expenses charged to the penthouse project by an architectural form. As a result, the arbitrator held that that HSS was not entitled to any benefit under the contract, such that it must return the retainer to Southerndown. The arbitrator also awarded a portion of the remaining monetary relief sought by petitioner, as well as interest, yielding a total award of $3,146,243.50.

On November 28, 2011, petitioner filed this action to confirm its arbitration award. It seeks an order confirming the award and directing judgment against respondent in the total of $3,146,243.50 at an annual interest rate of 5% until full payment, per the terms of the award. HSS has not opposed this petition and has notified the court that it has no intention of doing so.

## Discussion

A petition to confirm an arbitration award is treated as a motion in federal court. *See D.H.Blair & Co. v. Gottdiener,* 462 F.3d 95, 108 (2d Cir.2006). Accordingly, when a respondent fails to oppose such a petition, the proper procedure is not to enter default judgment, but to treat the petition as an unopposed motion for summary judgment. *See id.* at 110. Thus the court must scrutinize the record before it to determine whether petitioner is entitled to the relief it seeks. *See id.* However, the court should defer to the arbitrator's decision so long as there is a "barely colorable justification" for it. *See Laundry, Dry Cleaning Workers & Allied Indus. Health Fund v. Stain Less, Inc.,* No. 07 Civ. 3202, 2008 U.S. Dist. LEXIS 22402, at *2 (E.D.N.Y. Mar. 18, 2008).

*2 The award in the underlying arbitration action surely meets this standard. After reviewing the petition and the underlying arbitration award, the court is struck by the exhaustive fact-finding undertaken by Mr. Madden and his careful findings. It cannot be doubted that the arbitration award was

issued in a lawful and prudent exercise of Mr. Madden's powers as an arbitrator.

## Conclusion

For the foregoing reasons, petitioner's arbitration award is confirmed. Judgment should be entered in the amount of $3,146,243.50, with interest payable at an annual rate of 5% until the judgment is paid in full.

S.D.N.Y.,2012.
Southerndown, Inc. v. HSS LLC
Not Reported in F.Supp.2d, 2012 WL 265987 (S.D.N.Y.)


Motions, Pleadings and Filings (Back to top)

• 2011 WL 7947719 (Trial Pleading) Petition to Confirm Arbitration Award (Nov. 28, 2011) Original Image of this Document (PDF)
• 1:11cv08619 (Docket) (Nov. 28, 2011)
• 2009 WL 8572010 (Arbitration Award) Final Award of Arbitrator (May 26, 2009) Original Image of this Document (PDF)

Judges and Attorneys (Back to top)
Judges

Judges

• **Griesa, Hon. Thomas Poole**
United States District Court, Southern New York
New York, New York 10007
Litigation History Report | Judicial Motion Report | Judicial Reversal Report | Judicial Expert Challenge Report| Profiler

EXHIBIT  5

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

JUDGE GRIESA

11 CIV 8619

------------------------------------------------------------X

SOUTHERNDOWN, INC.,

        Petitioner,

ECF CASE

-against-

CASE NO.

HSS LLC,

        Respondent.

------------------------------------------------------------X

RECEIVED
NOV 28 2011
U.S.D.C. S.D. N.Y.
CASHIERS

## PETITION TO CONFIRM ARBITRATION AWARD

1.     Petitioner, Southerndown, Inc. ("Petitioner" or "Southerndown") petitions the Court for an order, pursuant to 9 U.S.C.A. §§ 9, 13, confirming the award of the arbitrator Mr. John Madden in the matter of the arbitration between Petitioner and respondent HSS LLC ("Respondent" or "HSS"), made on November 17, 2011 (the "Award"), and directing that judgment be entered accordingly.  A copy of the Award is attached as <u>Exhibit</u> 1 to the accompanying affidavit of Olga Smelkova dated November 23, 2011 ("Smelkova Affidavit"), and incorporated herein by reference.

### Jurisdiction

2.     The Court has jurisdiction over this matter pursuant to 9 U.S.C.A. § 9 and 28 U.S.C.A. § 1332.  The amount in controversy, exclusive of interest and costs, exceeds $75,000.

### Venue

3.     Venue is proper in the Court pursuant to 9 U.S.C.A. § 9 as the Award was made in New York, New York.  (Smelkova Aff., <u>Ex</u>. 2, p. 39.)

## Background

4.      At all times mentioned, Petitioner was, and still is, a corporation duly organized and existing under the laws of the State of New York, formed for the single purpose of acquiring a full-floor penthouse located on the 78th floor of the Time Warner Building's South Tower, with its principal office located in PH 78, at Time Warner (South Tower), One Central Park Condominium, 250 Columbus Circle, New York, New York.  (Smelkova Aff., ¶ 2.)

5.      At all times mentioned Respondent was, and still is, a corporation duly organized and existing under the laws of the State of New Jersey, with its principal office located in Upper Montclair, Essex County, New Jersey.  (Smelkova Aff., Ex. 1.)

6.      Petitioner and Respondent entered into a written letter of agreement dated May 26, 2009 (the "Agreement"), by which Petitioner engaged Respondent for the purpose of redesign, construction, decoration and furnishing of a full-floor penthouse located on the 78th floor of the Time Warner Building's South Tower, New York, New York.  A copy of the Agreement is attached as Exhibit "2" to the Smelkova Affidavit, and incorporated herein by reference.  (Smelkova Aff., ¶ 3.)

7.      The Agreement evidences a transaction involving commerce within the meaning of 9 U.S.C.A. §§ 1, 2, as Petitioner, a New York company, contracted with HSS, a New Jersey LLC, for work and services to be performed by HSS in Manhattan, New York.  (Smelkova Aff., Ex. 2.)

8.      The Agreement contains an arbitration clause which, among other things, specifies that the "award rendered by the arbitrators shall be final, and judgment may be entered upon in accordance with applicable law in any court having jurisdiction thereof."  (Smelkova Aff., Ex. 2, § 9.1.3.)

2

9.      A dispute arose between Petitioner and Respondent in which Petitioner claimed *inter alia*, breach of the Agreement and fraudulent inducement.  (Smelkova Aff., ¶ 5.)

10.     Pursuant to the arbitration clause of the Agreement, Petitioner filed a Demand for Arbitration on January 26, 2010 with the American Arbitration Association (the "AAA").  The case was assigned to the AAA's International Centre for Dispute Resolution, Case No. 50 110 T 00057 10.  Mr. John Madden was appointed as the Arbitrator by Petitioner and Respondent. (Smelkova Aff., ¶ 6.)

11.     On November 17, 2011, after holding fourteen (14) days of hearings at which both parties appeared and after considering all the evidence, the Arbitrator made his Award in writing.  (Smelkova Aff., Ex. 1.)

12.     No notice of a motion to vacate, modify, or correct the Award has been filed.

### Legal Standard

13.     "[C]onfirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court." D.H. Blair & Co. v. Gottdiener, 462 F.2d 95, 110 (2d Cir. 2006) (internal quotation marks omitted).  "[T]he court must grant the award unless the award is vacated, modified, or corrected…The arbitrator's rationale for an award need not be explained, and the award should be confirmed if a ground for the arbitrator's decision can be inferred from the facts of the case." Id. (quoting Barbier v. Shearson Lehman Hutton, Inc., 948 F.2d 117, 121 (2d Cir. 1991)); see 9 U.S.C. § 12.

WHEREFORE, Petitioner requests an order:

1.      Confirming the Award made by the arbitrator on November 17, 2011 in the above-entitled proceedings;

2.    Directing the entry of judgment on the Award in favor of Petitioner and against Respondent for the sum of $3.146,243.50, plus interest at the rate of five percent (5%) per annum to date of full payment of the Award; and

3.    Granting Petitioner such other and further relief as the court deems just and proper.

Dated: New York, New York
      November 28, 2011

SALISBURY & RYAN LLP

By: _____
    Andrew Ryan, Esq.
    Matthew Feser, Esq.
1325 Avenue of the Americas, 7th Floor
New York, New York 10019
Telephone:  (212) 977-4660
Facsimile:  (212) 977-4668

**COUNSEL FOR PETITIONER**
**SOUTHERNDOWN, INC.**