EXHIBIT  6

## INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
### International Arbitration Tribunal

In the Matter of the Arbitration between:

Re: 50 110 T 00057 10
    Southerndown, Inc., ("Claimant")
    and
    HSS, LLC ("Respondent")

## FINAL AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having duly heard the evidence, proofs and allegations of the Parties and after careful consideration of the evidence and each of the submissions of the Parties, do hereby, FIND and AWARD, as follows:

## I. Introduction

Pursuant to the arbitration provision, (Section 9; *see also* Section 2.1.10) of the Letter of Agreement (the "LOA" or the "Agreement") dated May 26, 2009 between the Claimant, Southerndown, Inc. ("SD" or the "Owner"), and the Respondent, HSS, LCC ("HSS" or the "Firm"), the parties to that Agreement have submitted their dispute to binding arbitration. This matter was administered by the International Centre for Dispute Resolution ("ICDR"), a division

of the American Arbitration Association.  Per Section 9.1.1 of the LOA, the Arbitration has

proceeded in accordance with the Construction Industry Arbitration Rules of the American

Arbitration Association (the "Rules"), and the parties have jointly requested a "reasoned Award."

SD is a New York corporation formed for the single purpose of acquiring a full-floor penthouse

located on the 78th floor of the Time Warner Building's South Tower ("the penthouse" or

"PH78") in New York City.  Southerndown's beneficial owners, Andrey Vavilov ("Vavilov")

and Mariana Tsaregradskaya Vavilov ("Mrs. Vavilov"), are ultra-wealthy Russian nationals.

Vavilov earned two doctorate degrees in economics and was the First Deputy Finance Minister

of the Russian Federation.  Vavilov recently retired as a Russian senator.  Mrs. Vavilov is an

actress and ballerina.

HSS is a New Jersey entity owned and operated by Howard Slatkin in the New York

metropolitan area.  Mr. Slatkin is in the business of interior design and decorating for which he

has been recognized in publications over the years.

The Claimant is owned by a British Virgin Island corporation which is turn is owned by a trust in

Switzerland, the beneficiaries of which are Mr. and Mrs. Vavilov.  While at one point in time

Mr. David Prokod was the president of SD; at another point in time Mr. Andrew J. Ryan, Esq.,

the lead attorney who represented the Claimant in these Arbitration proceedings, served as

president of the SD.   There is no doubt that Mr. and Mrs. Vavilov were, *de facto*, the real clients

of HSS and that Mr. Slatkin is, *de facto*, the Respondent in this Arbitration.   Any conduct by any

2

of these people shall be deemed by the Arbitrator to be conduct authorized by the party with which each is identified.

On or about 26 May 2009, the Claimant and Respondent entered into a written LOA. Disputes arose between the Parties. The LOA at Section 9, Arbitration, indicates at Section 9.1.1 that "All claims, disputes, and other matters in question between the parties to this Agreement or the breach thereof, shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining unless the parties mutually agree otherwise."

Demand for Arbitration was filed by the Claimant on January 26, 2010. An Answer was filed by the Respondent on March 1, 2010. John P. Madden, Esq, was appointed as Arbitrator by the ICDR on April 14, 2010.

Pre-Hearing Briefs were submitted to the Arbitrator by both parties. Thereafter, thirteen (13) evidentiary hearings were conducted before the Arbitrator with the submission of five hundred (500) exhibits by the parties and testimony of witnesses by live examination and cross-examination (consisting of more than 4000 pages of transcript). Subsequent to the hearings, the parties availed themselves of the opportunity to submit Post-Hearing Briefs and Reply Post-Hearing Briefs to the Arbitrator. After a cursory review of the final briefs, the Arbitrator closed the hearings on October 19, 2011. Pursuant to the Rules, the Arbitrator is to issue an Award within thirty days thereof. This is that Award.

## II. Factual Background

The Contract contained the following terms, amongst others. The Project Address is: 1 Central Park Condominium at 25 Columbus Circle – Penthouse 78th Floor in New York City ("PH78"). The Project Scope is: "Redesign, construction, decoration & furnishing of entire apartment (approx. 9000 square feet)." The actual square footage is 8274 square feet. The Budget Scope was indicated as: "To Be Determined." The amount of the Initial Retainer was: $3,000,000.00.

This retainer was paid by the Claimant on May 27, 2009. Lengthy sections of the contract included Design Firm Services (Programming, Schematic Design Phase); Design Firm Special Responsibility with Respect to Third Parties; Design Firm Special Responsibility with Respect to Interior Design; the Owner's (also referred to as "Client") Responsibilities; Compensation; Reimbursable Expenses; Payment to the Firm; Commission Rates; Termination of Agreement; as well as a choice of law clause indicating that the LOA would be governed by the principle place of business of the Firm, which the parties agree is New Jersey. The last provision is a merger clause which states that the LOA represents the entire and integrated agreement between the Owner and the Firm and supersedes all prior negotiations, representations or agreement, either written or oral and that the agreement may only be amended by written instrument signed by both Owner and Firm. (Exs. 121 & 122.)

There is a long history between the parties prior to the signing of the LOA. In late 2007 while in the home of Adriana Elia – owner of Czarina, a high end furniture and antique retail entity in Monaco frequented by Mr. and Mrs. Vavilov – they were impressed by the interior design and

decoration of the Elia home. Upon inquiring, Mr. and Mrs. Vavilov learned from Ms. Elia that her home had been designed and decorated by HSS. The Claimant requested an introduction to Mr. Slatkin and that was arranged.

In approximately January 2008, the Vavilovs came to New York and visited Mr. Slatkin in his apartment located on Fifth Avenue facing Central Park at approximately 106th Street. Mr. and Mrs. Vavilov were given the opportunity to observe Mr. Slatkin's apartment and began the process of engaging HSS to serve as an interior designer for multiple projects, including the Vavilov's airbus (the "Plasma" project), an interim residence (apartment "70B") and an anticipated permanent residence at the Plaza Hotel (the "Plaza" project). The style of Mr. Slatkin's apartment was classical and densely filled with antiques, custom fabrics, artwork and more. Mr. Slatkin would later testify that the cost to furnish an apartment with the level of quality and detail of his apartment would be approximate $1,500/square foot.

Mrs. Vavilov was undoubtedly impressed with Mr. Slatkin's apartment and his reputation as an interior designer to well connected New York society types. While it appears that Mr. Vavilov may have held the same views, he would later testify that he was "only fifty percent pleased" with Mr. Slatkin's apartment, a percentage which the Arbitrator found dubious and convenient for Mr. Vavilov's later portrayal of his assessment of Mr. Slatkin.

Mr. Vavilov, in particular, and Mrs. Vavilov presented themselves to Mr. Slatkin as people who are exceedingly wealthy and engaged in the world of high finance and international business. Within a mere day or two, the Claimant and the Respondent had formulated a commercial

5

arrangement whereby HSS would assist Mr. and Mrs. Vavilov with (1) the interior design of apartment 70B as an interim residence (located on 70th floor of the same complex as the future PH78 project but in the north tower); (2) the interior design of the airbus, the "Plasma," for which Mr. and Mrs. Vavilov were the beneficial users; and (3) the Plaza project initially intended to be the Vavilovs' permanent residence.

The initial letter of agreement for 70B, Plasma, and the Plaza was dated January 21, 2008 (Ex. 10). On or about February 8, 2008, the Claimant provided the Respondent with a retainer in the amount of $600,000.00. The letter of agreement was later resigned for the Plasma on April 1, 2008. The 70B and Plasma projects proceeded.

The operating method between the parties for the design of the two bedroom condominium apartment 70B was as follows: a floorplan was developed by Mr. Slatkin and presented to Mr. and Mrs. Vavilov for consideration. After discussion of the details of the floorplan, a floorplan was approved by the Vavilovs. The arrangement was that Mr. Slatkin would engage in the interior design and decoration without any interface between himself and his clients until the completion of the project when Mr. and Mrs. Vavilov could just "turn the key" to the front door and walk in and see the finished project. During the course of the performance of this work, HSS provided periodic bills to SD for services rendered which included very detailed descriptions of the furniture and decorative objects that Mr. Slatkin was acquiring at auctions or by purchases from third parties for use in the ultimate design of 70B. Mrs. Vavilov did not come to the apartment during the performance of HSS's work and Mr. Vavilov did only for the limited purpose of assisting with setting up the audio visual system for his use.

70B was finished in or about late September 2008.   At the conclusion of the 70B project, Mr. and Mrs. Vavilov would advise Mr. Slatkin "the apartment is so beautiful thanks to your efforts and care" (Ex. 29).

It appears that Mr. Vavilov had reached the conclusion very rapidly (within days) that Mr. Slatkin was capable of performing the initial scope of work entailed and did so solely based upon recommendation of Ms. Elia, his observations and discussions at Mr. Slatkin's apartment.  Mr. Vavilov would later testify that he did not look into Mr. Slatkin's background any further than that.

It was clear from Mr. Vavilov's testimony that the 70B project was to be a "test" of Mr. Slatkin prior to giving him the larger project – which in the early days was anticipated to be the Plaza. In essence, Mr. Slatkin passed the test, which enabled the parties to move on to the larger project.  It would turn out that the Plaza project – the project initially meant for the large permanent residence -- would not be going forward for reasons unrelated to HSS.  Because of the difficulties with the Plaza, plans developed for Mr. Slatkin to assist the Vavilovs to find suitably large venue to serve as the permanent residence of Vavilov family.  PH78 was chosen as the large permanent residence project.

The acquisition of PH78 came about in the normal course of investigation, and looking at properties which was done primarily by Mr. and/or Mrs. Vavilov with assistance from Mr. Slatkin.  Negotiations for purchase were led by Mr. Vavilov and an agreement on price was

made such that there could be a contract to purchase signed on or about May 1, 2009. On or around June 17, 2009, there was a closing of title and the Claimants took ownership of PH78. Between the time of the entering of the contract for purchase and the closing of that contract, there were a series of developments which would lead to the signing by the parties of the LOA on or about May 26, 2009.

Studio for Civil Architecture, PLLC ("SCA"), the architect on the 70B project as a subcontractor to HSS, was engaged as architect this time in direct contract with SD for the PH78 project, with Consulting Engineering Services ("CES") also again serving as SCA's consulting engineers. Xhema, the contractor which had done the construction work on 70B, was suggested by Mr. Slatkin as the contractor for PH78. Xhema never signed a contract with HSS or SD for PH78. Problems on the project resulted in these entities filing mechanics liens on the project.

Further details on the events that transpired will be discussed below. Suffice it to say now, that despite discussions, communications and efforts of the parties, by December 2009, no physical work had been done in PH78 except for some protection for demolition. In December 2009, the parties had a falling out and the relationship between the parties came to an end. The eventual interior decoration and design as well as the construction would be done by others relying to some extent on the work of HSS and the team that it had assembled to assist it during its tenure on the project.

The Claimant seeks an award in this Arbitration in the amount of $2,842,558.16 for the balance of the retainer held by HSS; plus $267,406.89 for the amount paid by the Claimant to SCA; plus

$32,998.64 for the SCA lien on PH78; plus $27,754.16 for the CES lien on PH78; plus

$52,915.96 for a Xhema lien on PH78 bringing the total amount sought by the Claimant to

$3,223,633.81, plus interest. In addition, the Claimant seeks $1,000,000.00 in punitive damages

attributable to the alleged fraudulent inducement by the Respondent of the Claimant to enter the

LOA. While the Claimant seeks attorney's fees, there is no provision in the LOA nor any

statutory authority allowing for such recovery and such claim can be summarily denied based on

this defense raised by this Respondent (which did not seek attorney's fees).

The Respondent seeks to keep the balance of its $3 million retainer in the amount of

$2,842,558.16, which consists of amounts attributable to termination fee, purchases made for the

project, warehouse for purchases made for the project, minor assorted items, commission on

SCA fees, sales tax and a minor airbus charge.

In its Post-Hearing Brief, the Claimant presents the case at page one: "In simplest terms, this

case concerns the propriety of HSS, LCC ("HSS") keeping $2,842,558.16 of a $3,000,000.00

retainer in accordance with Ex. 438. HSS maintains that the charges and expenses in Ex. 438 are

all entirely proper and were authorized either by the terms of Ex. 121 (the "LOA"), prior course

of dealings on TW70B or by oral authorizations by Mrs. Vavilov." (Emphasis in original.)

Claimant then proceeds to assert the key legal issues that need be decided in this dispute as

follows:

(1) there was no binding and legally enforceable contract between Claimant and the Respondent because material terms including the budget, project scope and design scheme were never mutually agreed;

(2) in the event that the LOA constitutes a binding and enforceable contract, the Claimant was fraudulently induced to enter into the LOA;

(3) in the event the LOA constitutes a binding and enforceable contract, the contract was terminated by agreement of the parties on June 25, 2009;

(4) in the event the LOA constitutes a binding and enforceable contract, HSS repeatedly breached such contract;

(5) in the event the LOA constitutes a binding and enforceable contract, Section 10.1.2 of the LOA should be deemed unenforceable as a penalty clause.

The expression of these legal issues by the Claimant is done in a balanced way and worthy of discussion and findings, as I proceed to do so below.

### III. Credibility of Mr. Slatkin

Before this story continues any further, comment must be made about the credibility of Mr. Slatkin. The evidence was clear, repetitive and extensive, and Mr. Slatkin admitted that he

frequently made false statements to Mr. Vavilov with regard to the size of the HSS staff, which

was virtually non-existent except for Mr. Slatkin and one other employee.  While Mr. Slatkin had

access to many professional "stringers" that he had used effectively in interior design over the

years, as well as many trades people, sources and contractors, Mr. Slatkin, as he testified,

indicated that he did not want to have a client know that he was actually doing mundane

administrative tasks and was therefore motivated to make false statements to Mr. and Mrs.

Vavilov.  While there are many examples, particularly glaring was a statement in an email by

Mr. Slatkin at a key time on May 25, 2009 wherein he indicated to Mr. Vavilov that he had to

"bribe" many of his office staff to work during the Memorial day weekend on Mr. Vavilov's

project when in fact there was no office staff, bribed or otherwise.  Further, in two exhibits, Exs.

474 and 475, produced as part of a production compromise in September 2010, the first of which

was purportedly a list of prior projects including the monetary scope, the Arbitrator notes that the

list changed substantially in a matter of weeks.  Hence, for the purpose of my analysis and

assessment of the testimony in this case, I find Mr. Slatkin to be utterly unreliable as a source of

information to be considered by this Arbitrator unless the information provided was an

admission against interest.  I am left to rely on the testimony the other witnesses, albeit in

varying degrees, and the documents, recognizing that Mr. Slatkin is the author of some of those

documents in evidence and there is always the concern that the statements contained in the

writings were also not true.  The Claimant indicates in its Post-Hearing Brief at page 1 that "the

facts in this case are largely not in dispute as the extensive email correspondence between Mr.

Vavilov and Mr. Slatkin is the best evidence of their contemporaneous dialogue from May to

December 2009… what is primarily in issue is the interpretation of the emails and the intentions

and understandings of the parties during that seven month period from May 1 to December 8,

2009." Fortunately, the words on the page do not change with time.  I make my assessments as I go.

## IV. Binding Contract

The Claimant's first legal argument is that no binding and legally enforceable contract was formed between Claimant and HSS because material terms including the budget, project scope and design scheme were never mutually agreed.

I must consider whether a contract exists in this situation and, specifically, whether budget, project scope, design scheme and compensation are material terms to the contract formation and whether they existed here.

### (1) Budget

The LOA specifically sets out as one of its headings Budget Scope and specifies that it is "To Be Determined".

The Claimant initially set the budget "not to exceed $30 million including all the construction, architectural works, design, commission and taxes." (Ex. 98)  The Claimant then reduce the budget to $20 million. (Ex, 158)  The budget was then reduced down to $10 million and then subsequently reduced again.

While it is very clear that there was no agreed budget over the course of the dealings between the parties it is of no effect as budget is not a material term of a contract of this nature. This contract is a contract calling for conceptual, schematic and design development. Like an architect, an interior designer is required to provide the client with design development based on budgets. Budgets often change for myriad of reasons, and in this case the budget changed quite significantly apparently due, at least in part, to the worldwide economic crisis. Mr. Slatkin provided his expertise, thoughts and design concepts based on each of these proposed maximum budgets. It is quite clear that the level of scope that can be achieved under each of these budgets would be quite different; the series of significant changes to the budget appears to be a significant root cause which led to the parties' relationship ending in December 2009.

I find that budget is not a material term of the contract. While the changes in budget were significant, the parties continued to agree to work together developing design schemes based on the different budgets under the same contract.

## (2) Project Scope

The LOA specifically identifies the Project Scope as "Redesign, construction, demolition & furnishing of entire apartment (approx. 9000 square feet)." This scope is general but is sufficient for the existence of a contract. HSS was to design the apartment. Even though the budget was changing and the extent of design was

changing, the parties' roles and obligations were specifically and clearly defined and the project scope, as set out in the LOA, is present and sufficient for the existence of a contract.

### (3) Design Scheme

Claimant alleges that the "like Plasma" design instruction was twice relayed to Mr. Slatkin in May 2009 (citing Ex. 95 and Tr. 200:14-201:22 and Ex. 98 and Tr. 197:18-198:15). Mr. Slatkin designed the Plasma with a very modern look (Ex 457, Tr. 220:17-222:21; 1281:21-1282:6). I note Exs. 95 and 98 are from Mr. Vavilov dated May 14 and 17, 2009, respectively, i.e. just prior to the signing of the LOA. As to whether design style is an essential term of an agreement between the parties, I conclude that it is not. In neither agreement for the 70B or PH78 was design style mentioned. If the Vavilovs wanted to make it a material term of the contract, they had the opportunity to include it in the contract in the process of the review of the contract terms by Mr. Ryan, SD's counsel and president. Although Mr. Ryan suggested various changes to the contract, he did not suggest the identity of design style in the contract. Moreover, Mr. Vavilov ignored Mr. Ryan's suggested changes to the contract.

While not a material term of the contract, Mr. Vavilov indicated a preference for a Plasma-like design, i.e. a modern look. It seems that Mr. Slatkin was trying to convince Mr. Vavilov to go with the classic view that he understood Mrs. Vavilov

14

preferred from their first meeting in his apartment, and as was done at 70B.  Mr.
Vavilov did testify that when it came to design he deferred to his wife.

The evidence shows either unclear direction or varying direction between the
classical and modern over a period of time.  The Claimant's calling for the
introduction of their classic-style furniture in Monaco to be used in PH78 muddied
the waters as well.  Mr. Slatkin's response to a request for a Plasma-like design was
that the modern look could be used as "point of departure."  This seems to reveal his
strong view that a significant classical aspect should be involved in PH78.

As to any alleged view that Mrs. Vavilov wanted PH78 to "look exactly like Mr.
Slatkin's apartment," I understand that to mean in terms of level of quality and detail
-- not style.

Part of the role of the HSS was to advise as to the design scheme and what could be
achieved under the proposed budget in regards to the level of quality and detail.
HSS's obligation as an interior designer advising on the ambience, style, and overall
design was an ongoing obligation under the contract.  I distinguish this ongoing
obligation *under the contract* from a term that is *necessary for the formation of a
contract*.  A specific design scheme was not a necessary term for the formation of a
contract.  HSS's obligation to advise and work with his client throughout the project
on design was an obligation that flowed from the contract.

15

I hold that design style is not a necessary term for the parties to have formed an agreement here.

## (4) <u>Compensation</u>

Compensation was extensively set out in Sections 5-7 of the LOA. The compensation HSS would receive in consideration of its obligations under the contract is set out clearly. Just because HSS's compensation was dependent on the amount of a budget, which was changing, does not defeat contract formation or existence. The fee and compensation terms were expansive and sufficiently identified to constitute a specific term of the agreement.

## (5) <u>Conclusion Regarding Contract Formation</u>

The contract defined the scope of work to be performed by the Respondent and the obligation of the Claimant for payment in rather extensive and detailed terms. The elements of a contract exist here. The Claimant's contentions that it paid the retainer to HSS only to hold time Mr. Slatkin's time is not credible in the context of having a signed LOA between the sophisticated parties. I also note that the Respondent points out that the Claimant was asking Mr. Ryan in late November 2009 how to terminate the agreement and that if the Claimant really did believe that there was no contract there would be no need to inquire as to how to terminate an agreement that did not exist.

16

## V. Fraudulent Inducement

The Claimant's second legal argument is that if the LOA constitutes a binding and enforceable contract, then the Claimant was fraudulently induced to enter into the LOA by the Respondent.

Fraudulent inducement requires that there be a material representation knowingly made with the intention that the other party rely on the representation and that representation was reasonably relied on by the other party resulting in damages. *See* Claimant's Post-Hearing Brief pg 18 (citing Jewish Center of Sussex County v. Whale 86 N.J. 619, 624 [1981] and Gennari v. Weichera Co. Realtors 148 N.J. 582, 610 [1997]). Mr. Slatkin, as pointed out above, knowingly made false statements to Mr. Vavilov in relation to his staff, etc. There is no doubt.

Mr. Vavilov, however, never relied on these false statements in choosing HSS for any of the projects. HSS was recommended by Ms. Elia. Mr. and Mrs. Vavlilov saw Mr. Slatkin's work in the Elia apartment. Mr. Vavilov used 70B as a test of Mr. Slatkin, and Mr. Slatkin clearly passed that test with "flying colors." The Claimant failed to prove the misrepresentations made by Mr. Slatkin were relied upon and therefore the Claimant has failed to prove its claim for fraudulent inducement.

## VI. Termination of 6/25/09

The Claimant's third argument is that in the event the LOA constitutes a binding enforceable contract, the contract was terminated by agreement of the parties on June 25, 2009.

In mid-June, the Vavilovs traveled to New York (Ex. 449). On June 25, 2009, Mr. Vavilov met with Mr. Slatkin at the Landmarc restaurant for lunch (Tr. 257:22-261: 18; 1570:3-1575:11). During the lunch the two men discussed the budget for the PH 78 project and the meeting abruptly ended when Mr. Slatkin walked out of the restaurant (Tr. 1574:15-1575:2). What exactly was discussed at the meeting is not clear. Mr. Vavilov contends that he said that the budget needed to be smaller and that it would have to be done soon. In reaction, Mr. Vavilov states, Mr. Slatkin stated that the Vavilovs would need to choose another designer.

After the lunch meeting, Mr. Slatkin wrote an e-mail to Mr. Vavilov (Ex. 156) stating "I hope I can be of help to you and Mariana with this apartment so please tell me the total amount you can spend on the project... and I will then think about it and let you know what is possible and what is not... please know I want to help you and Mariana, so we will work together to see if this is possible." Mrs. Vavilov testified that Mr. Slatkin told her at a dinner party later that evening that he would not do the project except above a certain dollar amount (Tr. 2816:18-20). The Claimant alleges that these facts and the surrounding circumstances do not reflect the continuing existence of a business deal and that the June 25, 2009 events were a termination of any existing arrangement.

While there were disagreements and frustrations being expressed by Mr. Slatkin, no project is without disagreement and frustration. In this context, with such significant changes in the budget, Mr. Slatkin's frustration is understandable. The conduct of June 25, 2009, however, never rose to the level of repudiation of the contract. Mr. Slatkin continued to be willing to fulfill his role to advise his clients about what was possible and what was not possible given new budgetary changes. Moreover, the parties did continue to work together under the same arrangement with the same contract even after the events of June 25, 2009. There was no termination of the contract on June 25, 2009.

## VII. Repeated Breaches of Contract

### (1) Claimant's Allegations

The Claimant sets out a myriad of clauses of the LOA which it alleges the Respondent materially breached. The alleged Respondent breaches dealt with requirements on scope, schedule and budget; design requirements and preferences; a duty to act in good faith and in a professional manner; the requirements of Client approval for purchases; the relationship of trust and confidence; a covenant to provide professional skills and judgment in furthering the interests of the Owner; and the duty to supervise the Architect and Contractor with the best interests of the Client as the priority.

## (2) Preferences of Client

In regard to the alleged breaches regarding requirements of scope, schedule, budget, and client preferences, the Claimant alleges that the Vavilovs' preferences and requirements were ignored in violation of the LOA. The Claimant further alleges that Mr. Slatkin ordered SCA to proceed "full steam ahead" on demolition planning (Tr. 1465:23-1471:18) (Exs. 100, 101, 102, 103, 104) based on Mr. Slatkin's project expectations (Exs. 100, 114, 116, 117, 118), even though Mr. Slatkin had been repeatedly told that Mr. Vavilov wanted to meet and discuss the project in detail before proceeding.

As discussed above, it was far from clear what the design for the apartment was supposed to be. While there were statements from the Vavilovs about a modern look, Mr. Slatkin urged that the modern look to be used as a point of departure and that there should be more charm and comfort. The Vavilovs appeared to take on board a "Plasma +" design. This was complicated further when the Vavilovs wished to bring their Monaco furniture into the design.

It is clear that Mr. Slatkin held the view that when it comes to aesthetics, clients often, and should, follow his suggestions and this was the procedure that had worked so well for 70B. It is also clear that Mr. Slatkin was pushing for more classical design. His scores of purchases were consistent with a classical design.

20

Mr. Slatkin is portrayed by the Claimant as an interior designer who would not listen to his clients. That is not so apparent to the Arbitrator. Mr. Slatkin put significant effort to get this project off the ground. While there is a continued overture by Mr. Vavilov that he would like to sit down with Mr. Slatkin and talk about the design, the details and the budget in the timeframe, Mr. Slatkin was doing his best to generate concrete ideas and ideal floor plans ready for any discussion to be had with the Vavilovs when they were in NY and available to sit down and discuss design. This was prudent, even if Mr. Slatkin was overzealous, in a context of clients who were out of the country and had changed the budget significantly a number of times.

The Vavilovs received benefit from HSS's work. HSS prepared plans based on what could or could not be accomplished within each budget and attempted to develop ideas and plans of various price points. The Vavilovs also received a benefit from HSS's design ideas which were later used by the following designer and used for approvals from the Department of Buildings and the condominium association.

There is no doubt that Mr. Slatkin wished for a very large budget and to have a more classical design. To conclude, however, that HSS failed to work with the clients and failed in the duties in regard to the client's preferences was not sustained by the Claimant.

**(3) Client Approval for Purchases**

The Claimant argues that the Respondent breached the LOA by making unauthorized purchases. The contract at Section 3.1.2 states "Firm will place order for goods & services only upon receipt of confirmation for such orders from Client, either verbally or via email, courier, fax or email, unless Client prefers not to be bother by such matters and has instructed Firm to order goods & services without approval required (this is the typical manner that the Client & Firm works.)" (Emphasis added.)

**(a) Authorized**

The first inquiry is whether the Client "has instructed Firm to order goods & services without approvals required."

There is no evidence that the Vavilovs instructed Mr. Slatkin to engage on a program of the purchase of goods and services without approvals by the Vavilovs. There was no instruction to justify the purchases made by Mr. Slatkin. There is evidence that Mr. Slatkin was told by Mr. Vavilov in August 2009 to stop making significant purchases shortly after Mr. Slatkin let on to him that he was making purchases.

**(b) <u>Course of Dealing</u>**

Mr. Slatkin argues that PH78 was to be a project just like 70B. He goes further to say that purchases were to be in his sole discretion just as they were on 70B. The evidence seems to indicate that Mr. Slatkin did have the right to make purchases in his sole discretion for the 70B project. Thus, the Respondent argues that there has been a course of dealing between the parties and this is bolstered by the language in the contract as to the typical manner in which the Vavilovs and Mr. Slatkin worked.

However, if one looks closer at the prior course of dealing between the Parties in the 70B project, one observes that Mr. Slatkin was obligated to, and did, provide periodic invoices to the Vavilovs during the project which contained an exhaustive detailed listing of the purchases including the description and the cost such that they could scrutinize same as that project continued.

For PH78, Mr. Slatkin either started buying pieces as early as April 2008 or as late as December 2008. He continued to do so, with a one to two month period of stoppage in July and August 2009, before he resumed and continued making purchases into December 2009. Mr. Slatkin did not provide detailed descriptions of the items or the costs as he did for the 70B project. The course of dealing on PH78 is not the same course of dealing of the parties on 70B and so the course of dealing argument must fail.

### (c) Oral Authorization by Mrs. Vavilov

Mr. Slatkin testified that Mrs. Vavilov authorized purchases starting at a meeting

with her in December 2008. Mrs. Vavilov testified that she gave no such

authorization for purchases (Tr. 2822:12-22). The credible evidence is that Mrs.

Vavilov did not give the authorization to Mr. Slatkin for purchases.

### (d) Material Breach

The question then becomes whether Mr. Slatkin's conduct in making these

purchases constituted a material breach of the contract which would deprive HSS

of any benefit under the contract, including the $1.5 million termination fee.

For a breach to be considered a material breach it needs to have an adverse affect

on the contract performance. That is not the case here. The Claimant did not,

and in accord with the holding below does not, have to pay for the items

purchased, and therefore has not been impacted adversely by virtue of Mr.

Slatkin's purchases. Accordingly, there is no material breach of the LOA due to

the unauthorized purchases.

### (4) Duty of Trust & Confidence

In regard to the relationship of trust and confidence and proceeding in a professional manner, the Claimant alleges that Mr. Slatkin's continuous lies constituted a breach of the LOA. While Mr. Slatkin made affirmative misrepresentations, they were not material, as concluded above. Mr. Slatkin's behavior in this regard, while far from exemplary, does not rise to the level of the material breach. I disagree with the concept of pervasive disassembling and desire to remain unaccountable. I also disagree that there were repeated breaches of trust and confidence -- but there was one important one discussed below.

### (5) Duty to Supervise

### (a) Duty to Supervise SCA

SCA was the architect on the 70B and PH78 project, with CES serving as its consulting engineer. SCA had come to the attention of the Claimant upon the recommendation of Mr. Slatkin and SCA performed in a satisfactory fashion on the 70B project. On 70B, SCA was engaged directly under contract to the Respondent and on PH78, SCA was in direct contract with the Claimant, at the suggestion of Mr. Slatkin, given the increased size of the scope of work and cost of the architectural services. The contract was signed by SD on June 2, 2009 (Ex. 86).

SCA submitted invoices starting in June 2009 for architectural services through May 31, 2009 (Ex. 150) and thereafter on a monthly basis through December 2009 (Exs. 165, 196, 209, 250, 319, 412, and 429). The last two invoices dated December 7 for services through November 30 (Ex. 412) and dated December 31 for services rendered through December 9 (Ex. 429) were not paid by the Claimant. The previous six invoices were paid by the Claimant. (Tr. 2886:11-2894:7)

The Claimant sets out in its Post-Hearing Brief at page 26 that HSS breached its duty to supervise the architect and the contractor in accordance with the best interest of the Owner. The Claimant, in support of its contentions, points out that in May 2009, SCA was preparing ideal floorplans based on $1,500/sq. ft. despite Mr. Slatkin having been told by Mr. Vavilov that he was not ready to proceed in that manner until they would meet in June. The Claimant also points out that after June, Mr. Slatkin had SCA draw new floorplans based on designs that were never agreed by Mr. Vavilov.

It appears that the work that SCA had done in preparing the various designs based on different budget levels was valid work in preparation for, or as result of, Mr. Slatkin's design discussions with Mr. Vavilov. There is no evidence to conclude that SCA was anything other than prudent in its rendering of services. Mr. Slatkin's oversight of this work was also acceptable given that this client had repeatedly changed the budget in a significant way. Mr. Slatkin's instruction to SCA to prepare a number of plans was done in order to move the project forward. The Claimant admits that the periodic invoices of SCA were not only reviewed by the Respondent but were reviewed by

26

Mr. Ryan. The Claimant paid the invoices up until the final two. HSS's oversight up until this point in regard to SCA did not breach the LOA.

This is not the end of the story however. The Claimant further alleges that HSS's failure to inform SD of SCA's designation of all of SCA's work prior to September as "additional services" under the SCA contract was a breach of the LOA. This is significant.

On November 3, 2009, apparently due to the several significant changes in the budget by Mr. Vavilov, Mr. Andrew Friedman of SCA emailed Mr. Slatkin an invoice dated November 1, 2009 for architectural services through October 31, 2009 (Ex. 319). In the cover e-mail, Mr. Friedman states "We anticipate this to be the first of three months of substantial billing, in order to take the project through the construction documents phase. Our overall fee estimate remains at 18% of construction (including low voltage systems hardware etc), with the time spent pursuing the previous scope of work, prior to September 1st, considered an additional service under the contract." (Emphasis added.) Mr. Friedman testified that this email to Mr. Slatkin was the first time that he notified Mr. Slatkin that the substantial work prior to September 1, for which the Respondent paid SCA would now be treated as additional services and that he himself did not tell the Claimant about the change in regard to additional services (Tr. 3017:5-13).

On November 3, 2009, Mr. Slatkin sent the invoice of SCA on to Mr. Ryan with copy to Mr. Vavilov (Ex. 316). Mr. Slatkin's e-mail to Mr. Ryan approved payment to SCA and pointed out that "this past month, and the following three months (sic) will involve an enormous amount of [SCA's] time, as it involved the detailed construction documents." Mr. Slatkin did not mention or hint at Mr. Friedman's statement that all previous work prior to September 1 would be considered an additional service under the Respondent/SCA contract. Mr. Slatkin admits that he did not pass the page indicating "additional services" contained in Mr. Friedman's e-mail when forwarding the invoice to Mr. Ryan with copy to Mr. Vavilov (Tr. 1771:17-21). Mr. Slatkin did testify that he told Mr. and Mrs. Vavilov in person, but he did not remember the date of the purported conversation (Tr. 1772:6-14). This is not credible. Moreover, Mr. Slatkin went on to admit that he did not tell Mr. and Mrs. Vavilov specifically about the additional services (Tr. 1773:3; 1773:12-13). From examination of the November 1 invoice (and by comparison to previous invoices), there is no way of knowing that additional services would be charged. There was no notice provided to the Claimant and brazenly Mr. Slatkin proceeded to instruct SCA to continue designs. This is a serious failure by HSS and direct violation of the obligations under the LOA for proper supervision in the best interest of the Owner.

(b) Xhema

In regard to Xhema, it appears that the Claimant was aware that Xhema was preparing items for storage and protecting the penthouse prior to demolition. There is

no suggestion that this work was improper. While it is unclear whether Xhema's work substantiates the cost that it charged, there was a failure proof by the Claimant that there was a failure of oversight by the Respondent.

### (c) Conclusion

I conclude that HSS failed in his duty to supervise with the best interest of the Owner in mind in violation of the LOA. This was a material breach, which prevents HSS from receiving the benefits under the contract, including his right to the termination fee. I discuss below whether the Claimant can recover from the Respondent on the liens for the amount of unpaid invoices. HSS materially breached the LOA in the first instance and is not entitled to recover benefit from the contract.

## VIII. Enforceability of Termination Clause

The Claimant seeks a return of the $1.5 million being held by the Respondent under Section 10.1.2, as the Claimant argues that it is a penalty clause and unlawful. The Claimant argues the clause is not a reasonable forecast of the Respondent's damages and would entitle HSS to walk away without any effort to perform.

Section 10.1.2 is not a penalty clause and is enforceable. The clause serves to compensate the Firm for its work in developing and refining design concepts and other efforts and for the foregoing of other potential clients. Without a termination fee, HSS would not receive any

compensation for its efforts. Mr. Slatkin put a tremendous amount of time and effort for the benefit of the project under circumstances where there were significant budgetary changes.

Mr. Vavilov, a sophisticated businessman, reviewed and signed the LOA after review by competent counsel. The clause is not unreasonable or unconscionable, and was clearly set out in the contract signed by both parties.

The clause is enforceable, but this conclusion has no effect due to the Respondent's material breach of the LOA.

## IX. Entitlement

### (1) Termination Fee

I have held above that HSS materially breached the LOA. As any entitlement to the termination fee did not arise until after the material breach by HSS, the Respondent is not entitled to retain the termination fee.

### (2) Purchases

HSS claims entitlement to payment for a number of purchases in Ex. 438. He indicates that $590,712.90 for items purchased by HSS plus a 35% commission results in a total charge of $797,462.42.

I have held above that the purchases made by Mr. Slatkin were not authorized. The Respondent is not entitled to retain the amount of $797,462.42 for purchases. The Respondent need not transfer the purchased items to the Claimant.

### (3) Warehouse

HSS seeks to keep the charge for the leased warehouse at a cost of $108,000.00 for a two year lease (June 2008 – May 2011) at $4,500/month for 24 months. Mr. Slatkin admitted that he signed the two year Morgan Manhattan lease on June 12, 2009 without any discussion with the Vavilovs. The Claimant argues that this was just three weeks after HSS had been instructed by Mr. Vavilov in Ex. 98 that Vavilov wanted PH78 completed 18 months after agreeing a floorplan (Tr. 1165:24-1170:19). Despite Mr. Brown's testimony that one buys storage space for the period you need to the extent you need it on an almost month by month basis, I conclude that the signing of this lease by Mr. Slatkin would have been justified (Tr. 1824:5-1844:11). However, I have held that the purchases themselves were not authorized. The Respondent is not entitled to charge the Vavilovs for the cost of storage of purchases that were not authorized. Thus, the charge for this category, which includes Slatkin's 35% commission, an expenditure of $163,377.78, should be returned to the Claimant.

### (4) Assorted Costs

31

HSS is seeking to keep a number of assorted costs, including moving costs, repair of a dresser, and photography charge. The total of these items is $29,327.56 ($15,938.12 plus $3,288.00 plus $1,448.00 plus $1,050.00 plus 35% commission). These are items specifically requested by the Claimant and are chargeable to the Claimant. The Claimant does not have entitlement to recover these costs and the Respondent need not return these amounts.

#### (5) Sales Tax

The LOA calls for payment of sales tax on a variety of different items. While this is clear in the LOA, application of the sales tax is elusive. As Mr. Slatkin was not authorized to make purchases, he is not entitled to recover sales tax on those purchases, nor is he entitled sales tax on the warehouse. It is not clear whether HSS is claiming of entitled to collect sales tax on the assorted items, and regardless, any sales tax on these items would be negligible. As an aside, I note that, generally, sales tax does not apply to capital improvements in the City of New York and may not apply to services.

Sales tax, by definition, is to be collected by a seller to meet seller's obligations to collect and pay sales tax to the Governmental entity in the appropriate jurisdiction. On the subject of sales tax, there has been an utter failure of proof. The Respondent has not sufficiently established that there was or is any obligation to pay sales tax and has not sufficiently demonstrated that it has paid any sales tax or will have to pay any

sales tax. In accord with the terms of this Award, there is no item to which sales tax attaches.

The Respondent is not entitled to sales tax and must repay the Claimant the amount of $231,712.54.

(6) **Plane**

These charges in the amount of $4,774.50 relate to the prior and separate project on the airbus and do not relate to this LOA. The Claimant is entitled to recover this amount from the Respondent for this item.

(7) **Return of Amount Paid SCA**

Claimant alleges in its Post-Hearing Brief at page 1 that during the period from May through December 2009, the Claimant paid SCA the amount of $267,406.89 for work on the PH78 project (Ex. 456) (Tr. 2882:16-2883:14). Exhibit 456 consists of the invoices, which are indicative but not necessarily proof of payment by the Claimant. Mr. Freidman of SCA testified that all but the last two invoices were paid by the Claimant (Tr. 2886:11-2894:7). HSS offered nothing to contradict this evidence.

The Claimant essentially takes the position that the services rendered by SCA were of no value to it. Since the project did not go forward under the auspices of HSS and

SCA, the Claimant takes that the view that there was no benefit received from the work performed by HSS. The Claimant wants its money back.

As is indicated elsewhere, the root cause of the dispute between the parties is the enormous and repetitive reductions of the anticipated budget from $30 million, then to $20 million, then to $10 million and ultimately something on the order of $4 to $6 million before the project fell apart and the parties went their separate ways. These were changes that the Respondent, by and large, went along with.

There is no evidence to conclude that SCA was anything other than prudent in the rendering of its services and the charging therefore. These services included, *inter alia*, preparing plans for submission to the condominium board and the City of New York Department of Buildings, for general planning and permitting purposes and for redrawing plans due, primarily, to the changes in budget initiated by Mr. Vavilov on repeated occasions.

The Claimant admits that periodic invoices of SCA were reviewed not only by the Respondent each time they were submitted by SCA but, more importantly, also by Mr. Ryan, either in his capacity as president of the Claimant or in his capacity as legal adviser. In either case, the Claimant had adequate review of the invoices prior to making payment.

34

Moreover, there is evidence that the design information developed by SCA was used to some extent by the subsequently retained interior designer/architect (Ingrao/Brown) for their use in carrying out their services for the benefit of the Claimant.

The only potential wrinkle is whether HSS advised SD to no longer pay invoices after SCA announced solely to HSS that all SCA work prior to September 1, 2009 would be treated as "additional services" over and above the base contract.  At this point, perhaps SCA was justified in reaching that conclusion due to all the redrawing caused by the series of significant budget reductions by its client, Vavilov, but as between the Claimant and the Respondent, it was up to the Respondent to advise the Claimant promptly and clearly of these circumstances.  The date that SCA notified HSS of this additional services approach was November 3, 2009 (invoices at Exs. 412 and 429).

I find the payments made to SCA by the Claimant were proper and appropriate and should not be refunded to the Claimant, except for any payment made by the Claimant after Mr. Slatkin was advised that SCA claimed that all charges through August 2009 were "additional services" charges.  Therefore, the Claimant is entitled the amount of $67,731.49 from the Respondent for the amount the Claimant paid to SCA for Invoice No 6, dated November 1, 2009.

## (8) Commission on Architectural Fees

HSS is seeking to keep the commission on architectural fees at 35% on $344,793.89

totaling $120,677.86.  As discussed, the amounts charged by SCA were done through

invoices that were vetted by Mr. Ryan and paid by the Claimant, but for the last two

invoices.  These services rendered a benefit to the client.  These services did not lack

suitability.  However, HSS breached its contract with SD and is entitled to no benefit

from its contract.  Claimant is entitled to recover from the Respondent the amount of

$120,677.86.

(9) <u>SCA Lien</u>

Exhibit 473 and 473A are, respectively, the mechanic's lien and lien extension filed

by SCA.  The Claimant has failed to sufficiently prove its entitlement to be paid the

amount of the lien from the Respondent.

(10) <u>CES Lien</u>

Exhibit 458 and 458B are the mechanics lien and lien extension filed by CES.  I treat

CES in conjunction with SCA, as CES was the engineer supporting the architect.

The Claimant has failed to prove its entitlement to be paid the amount of the lien

from the Respondent.

(11) <u>Xhema Lien</u>

36

Xhema had no contract with the Claimant or the Respondent for this project. A "costs plus" contract had been proposed by Xhema, and was rejected outright by the Claimant. The burden of proof is on the Claimant to show its entitlement in relation to the amount sought. The Claimant has failed in its demonstration of this entitlement.

**(12) Punitive Damages**

I have found and hold that there was no fraudulent inducement or other behavior warranting punitive damages and, accordingly, Claimant is not entitled to recover punitive damages from the Respondent.

**(13) Interest**

I hold that Claimant is entitled to payment of interest by the Respondent on the principal amount and that it is entitled to recover herein at the rate of five percent (5%) per annum from the date of filing of the Demand for Arbitration, to wit January 27, 2010, until the date of this award, November 17, 2011, in the amount of $260,506.91. Claimant is also entitled to interest on the principal amount due herein ($2,885,736.59) at the rate of five percent (5%) per annum from the date of this Award until the date of full payment of this Award by the Respondent.

**X. Fee Allocation**

The Arbitrator's fee in the amount of $2,250.00 for the canceled hearing on July 11, 2011 is assessed against the Respondent.  The balance of all fees of the Arbitrator and the ICDR shall be split equally between the parties.

## XI. Attorney Fees

While the Claimant seeks attorney's fees, there is no provision in the LOA nor statutory authority for such recovery.  Moreover, the Respondent did not seek attorneys' fees and contested the right to do so.  The Claimant is not entitled to recover attorneys' fees.

## XII. Award

I hereby AWARD the Claimant be paid by the Respondent in the following amounts:

|    |                      |                  |
| -- | -------------------- | ---------------- |
| 1  | Termination Fee      | $ 1,500,000.00   |
| 2  | Purchases            | $   797,462.42   |
| 3  | Warehouse            | $   163,377.78   |
| 4  | Assorted Costs       | $              - |
| 5  | Sales Tax            | $   231,712.54   |
| 6  | Plane                | $     4,774.50   |
| 7  | Amount paid SCA      | $    67,731.49   |
| 8  | Commission on SCA Fees | $  120,677.86  |
| 9  | SCA Lien             | $              - |
| 10 | CES Lien             | $              - |
| 11 | Xhema Lien           | $              - |
| 12 | Punitive Damages     | $              - |
|    | **Subtotal**         | **$ 2,885,736.59** |
| 13 | Interest             | $   260,506.91   |
|    | **Total**            | **$ 3,146,243.50** |

1. Within thirty (30) days from the date of this Award, the Respondent shall pay to the Claimant the sum of $3,146,243.50, plus interest at the rate of five percent (5%) per annum to date of full payment of this Award.

2. The administrative fees of the ICDR, totaling $15,300.00, shall be borne equally between the parties. The Arbitrator's fee in the amount of $2,250.00 for the canceled hearing on July 11, 2011 is assessed against the Respondent, in which case, the fees and expenses of the arbitrator, totaling $113,677.94, shall be borne as incurred. Therefore, Respondent shall reimburse Claimant the sum of $6,025.00, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Claimant.

3. This award is in full resolution of all claims and counterclaims submitted in this Arbitration.

I hereby certify that, for the purposes of Article 1 of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, U.S.A.

November 17, 2011

_____

Date

39





# H S S      L L C

### ARCHITECTURE      &      INTERIOR DESIGN

P.O. BOX 43800,                    UPPER MONTCLAIR, N.J. 07043
TEL: 973.783.4544                              FAX: 973.744.4731

## LETTER OF AGREEMENT

**CLIENT NAME:**      Southerndown, Inc  (hereinafter referred to as the Owner)

**CLIENT ADDRESS:**   Mandarin Oriental
80 Columbus Circle - apt 70B
New York, NY 10023

**PROJECT ADDRESS:**   One Central Park Condominium
25 Columbus Circle       - Penthouse 78th Floor
New York, NY 10019

**PROJECT SCOPE:**   Redesign, construction, decoration & furnishing of entire apartment
(approx. 9,000 square feet)

**BUDGET SCOPE:**   To Be Determined

**INITIAL RETAINER:**   $  3,000,000.00

**DATE of AGREEMENT:**   18 May 2009

---

1.   Design Firm Services
1.1   Initial Programming:
1.1.1   The Firm (HSS LLC) shall consult with the Owner and other parties designated in this Agreement to ascertain the applicable requirements of the Project and shall review the understanding of such requirements with the Owner, including scope of project, schedule, and budget.

1.2   Schematic Design Phase
1.2.1   Consultations with Owner (in person, via phone, email, fax, etc.) pertaining to Budget and design requirements and preferences.
1.2.2   Preparation for preparing design concepts, ideas, suggestions, color schemes, floor and wall and ceiling treatments, hardware, window treatments as requested and specified by Owner.
1.2.3   Preparation of floor plan layouts for movable furniture and furnishings.
1.2.4   Market Research for ideas, architectural concepts, furnishings, antiques, fabrics, wall, floor and ceiling treatments, accessories and any additional components of the Project, as specified and requested by Owner.

- 1 -

SDN009178

1.2.5   Consultation with third parties, as directed by Owner (architect, general contractor, lighting consultant, lighting consultant, audio-video consultant, security consultant, kitchen consultant, acoustical consultant, telephone consultant, etc.) and selected by Owner or Firm. If Firm is to meet with any third party, and supervise and work directly with any third party, the commission fee (see below) will apply on any and all net charges from third party to Owner, whether third party charges are paid directly by Owner or by Firm at Owner's request. If Firm is to make only superficial and sundry suggestions to Owner's third parties hourly charges will apply (see below.)

1.2.6   Firm will work with Owner and third parties to determine a realistic Project Schedule for project, if requested. Please note that a Project Schedule is a guideline only and the accuracy of the schedule is subject to many factors outside of the control of the Firm, including Owner's timely decisions and responses. Firm is of course not responsible in any way for third party schedules.

## 2.   Design Firm Special Responsibilities with Respect to Third Parties

2.1.1   At Owner's request the Firm will work directly with third party providers (architect, general contractor, sub-contractors, audio-video consultant, security consultant, lighting consultant, kitchen consultant, acoustical consultant, telephone consultant, etc.) in management and supervisory capacity. Third party providers are outside parties who are not regular employees of Firm, who will contract directly with Owner.

2.1.2   Firm cannot guarantee any aspect of third party performance, product or schedule.

2.1.3   Firm is not responsible for either design or modification of heating, air-conditioning, plumbing, electrical or any other mechanical systems.

2.1.4   Under no circumstances will Firm perform any service required by law to be performed by a licensed professional (ie: architect, engineer, general contractor, plumber, electrician, lighting consultant, etc.)

2.1.5   If Firm is requested to work directly with any third party, Firm will receive as compensation for time, effort, management, supervisory, talent and design ideas, the standard commission fee on any and all charges from third party to Owner. Firm will provide the following services for this fee arrangement:

2.1.6   Firm will manage project and work directly with any third parties for which Firm will receive commission, and will do it's utmost to ensure Project runs as efficiently, productively and beautifully as possible. Owner will not have to work directly with third parties and can direct all inquiries and information to Firm who will channel said information to third parties and follow up on all such matters to ensure said information is being included and taken care of.

2.1.7   Firm will in no way be liable or responsible for Third Party schedule, work and behavior. Firm shall not have control or charge of and shall not be responsible for the means, methods, techniques, sequences or procedures of construction, fabrication, procurement, shipment, delivery or installation, or for safety precautions and programs in connection with the work, for the acts or omissions of the contractors, sub-contractors, suppliers or any other persons performing any of the work, or for the failure of any of them to carry out the work in accordance with the contract documents.

2.1.8   Firm will visit Project premises as deemed necessary by Firm to become generally familiar with the progress and quality of work and to determine in general if the work is proceeding. Firm shall not be required to make continuous inspections at the Project premises to check on the quality or quantity of work; this is domain of Project Supervisor.

2.1.9   Firm will request a Project Supervisor for the duration of the Project, from inception through installation. Project Supervisor will coordinate efforts of all parties (Firm, architect, general contractor, etc.) All fees for Project Supervisor, including travel expenses, living expenses (if out-of-town Project) and all job-related expenses will be paid by Owner. If Project Supervisor is referral and coordinated by Firm, Firm will receive a commission on Project Supervisor's fees.

2.1.10  The Firm's decisions in matters relating to aesthetics shall be final if consistent with the intent of the contract documents. The Firm's decisions on any other claims, disputes or other matters, including those in question between the Owner and the contractors, shall be subject to arbitration.

-2-

SDN009179

2.1.11    After Agreement is signed and Project commences, at a later date it may be determined that a third party(s) is required and that Firm shall be requested to direct and supervise. If Firm is required to generally administer work of third parties selected on behalf of Owner and endeavor to ensure that such third parties achieve quality performance and timely execution of work, Firm will be compensated with standard commission on such third party's fees.

3.    Design Firm Special Responsibilities with Respect to Interior Design

3.1.1    Owner has the assurances of Firm that the Firm's services shall be rendered in good faith and in a professional manner.

3.1.2    Firm will place orders for goods and services only upon receipt of confirmation for such orders from client, either verbally or via mail, courier, fax or email, unless Client prefers not to be bothered with such matters and has instructed Firm to order goods & services without approvals required (this is the typical manner that Client & Firm works.)

3.1.3    All items of furniture, furnishings, decorative accessories, antiques, works of art, architectural elements and design items specified and selected by Firm are to be purchased and/or ordered solely through Firm. This includes services specified requiring third parties. This protects the Firm from Owner purchasing directly from supplier merchandise and services specified by Firm, thus in effect depriving Firm of rightful compensation. This applies to type of item selected by Firm, as well as specific item selected. All goods and services are subject to standard commission rates as noted below. Owner is obligating Firm to provide interior design concepts and ideas and as such the Owner is legally obligated to compensate Firm for any ideas that are realized, no matter whether Firm, Owner or a third party brings Firm's ideas to realization. Compensation for Firm's ideas is in the form of commission that Owner pays to Firm on all goods and services used to realize the idea, no matter who procures or provides the goods and services.

3.1.4    Except with the Owner's knowledge and consent, the Firm shall not (1) accept any trade discounts or (2) undertake any activity or employment, have any significant financial or other interest, or accept any contribution, if it would reasonably appear that such activity, employment, interest or contribution could compromise the Firm's professional judgment or prevent the Firm from serving the best interests of the Owner.

3.1.5    The Firm accepts the relationship of trust and confidence established with the Owner by this Agreement, and covenants with the Owner to provide professional skill and judgment and to cooperate with other design professionals retained by the Owner in furthering the interests of the Owner.

3.1.6    The Firm represents to the Owner that the Firm's services shall be performed in accordance with the recognized professional standards and that all work shall be performed to the best of Firm's abilities.

3.1.7    Firm is not obligated to render day-to-day supervisory services and will supervise as Firm deems necessary and is required to do the job to the level of quality of Firm and as it corresponds to those items and services that the firm receives a commission on. Periodic inspections and observations of work on Project will be made as Firm considers appropriate.

3.1.8    If Owner or Firm requires daily full-time supervision, a sub-contractor will be brought to Project in role of Job Supervisor (see paragraph 2.1.10.) Such Job Supervisor will be appointed by Firm and will work full-time exclusively on Project. All fees, compensation, travel and living expenses (if out-of-town) will be paid by Firm and will be invoiced to client, subject to standard commission and state sales tax. Job Supervisor will be in addition to General Contractor's foreman and architect's staff. Job Supervisor provides daily supervision and coordination on all aspects of project and is at the direction of the Firm; responsibilities include organizing weekly site meetings (when appropriate) and maintaining minutes of meetings, schedule, delivery coordination, change orders, inspection of deliveries. It should be noted that almost all of Firm's projects involving any form of construction have said Project Supervisor to ensure Project runs as smoothly, efficiency and economically as possible.

3.1.9    Firm is not responsible for Schedule of Project, which is subject to variables involving third parties, vendor deliveries, contractor, building management, state & local agencies, permits issued by City, State or Board of building. Owner whim, and other factors outside of Firm's control. Schedule is greatly subject to Owner's timely decisions, approvals, payments and changes.

SDN009180

3.1.10  Firm is not responsible for failure of Contractors and other third parties to comply with drawings or specifications prepared or approved by Firm, nor any latent defects in their work. Firm shall not have control or charge of and shall not be responsible for the means, methods, techniques, sequences or procedures of construction, fabrication, procurement, shipment, delivery or installation, or for safety precautions and programs in connection with the work, for acts and omissions of the Contractors, sub-contractors, suppliers, or any other persons performing any of the work, or for the failure of any of them to carry out the work in accordance with the contract documents. However, where Firm receives a commission on Third Party costs, Firm will do work to the best of it's ability to ensure all runs as smoothly and professionally as possible.

3.1.11  Firm cannot and does not guarantee the goods and services installed and used under this contract from ordinary wear and tear, fading, soiling or latent defects not apparent at time of installation.

3.1.12  All good and services are subject to Firm's ability to obtain same and are contingent to strikes, accidents, natural disasters, acts of God and other causes beyond Firm's control.

3.1.13  Firm will supervise Architect and General Contractor and will be responsible for the interviewing & hiring of Architect & General Contractor, and providing all design schemes, ideas, materials, and will render supervision and guidance and be responsible for Architect & General Contractor following Firm's directions and instructions, including design, budget and schedule, to the best of Firm's ability and Firm will act in this manner as it has in past projects, always with the best interests of Client's project as the priority and in a professional manner. In compensation for this responsibility and for all design aspects of architecture & construction Firm is paid a commission on architect & General Contractor charges.

## 4.   The Owner's (also referred to as "Client") Responsibilities

4.1.1  Firm is being contracted because of it's ability, reputation and talent and therefore artistic license must be allowed in general aesthetic matters and purchases for complete success of Project; this involves purchases and expenses made in all projects undertaken by Firm.

4.1.2  Owner shall furnish structural, mechanical, chemical and technical and other laboratory tests, inspections and reports as required by law or the contract documents, if required or requested.

4.1.3  Owner shall supply all insurance requirements for project including insurance for all items ordered from Firm. When any item or service is approved by Owner or purchased for Client by Firm its associated costs are debited from Retainer and title of ownership is then transferred to Owner at time of approval. Owner is then responsible for any insurance. Owner is responsible for any and all insurance on goods and services at point of approval and/or ordering, regardless if Firm makes arrangements for delivery, recovering, storage, repair, etc. on behalf of client.

4.1.4  Unless directed otherwise by Owner, warehouse facilities used for Firm's Project will be Morgan Manhattan (NY & NJ locations.) Allocation of space will be in Owner's name and all charges and fees from warehouse will be charged to Firm and be included in Firm's Statement to Owner. Owner will have access to any items in their storage space. Warehouse will be used for storage of all items prior to job-site installation, and said warehouse will deliver all items to job-site when by Firm. Firm will inspect all items ordered and purchased by Firm prior to delivery to warehouse and all items will be in satisfactory condition (unless noted.) Therefore Firm is not responsible for any damage to any item that occurs after item is delivered to warehouse. Firm will not inspect nor be responsible for any of Owner's items sent to warehouse at Owner's instructions.

4.1.5  The plans, elevations, drawings, specifications, services, information, surveys and reports provided by the Owner pertaining to Project shall be furnished at the Owner's expense, and the Firm shall be entitled to rely on the accuracy and completeness thereof.

4.1.6  The Owner shall furnish the required information and services and shall render decisions as expeditiously as necessary for the orderly progress of the Firm's and of the work.

4.1.7  The Owner shall contract for all temporary and permanent telephone, communications and security systems at job site and required for the project so as not to delay the performance of the Firm's services.

-4-

SDN009181

4.1.8   The Owner shall be responsible for the relocation or removal of existing facilities, furniture, furnishings and equipment, and the contents thereof, unless otherwise provided by the Agreement.

4.1.9   Owner will settle all requests for payment (via wire or check) within five business days.

5.   Compensation

5.1   Commission: Firm will charge a commission of net wholesale costs of all goods and services provided and performed as noted in the following subparagraphs.

5.1.1   All purchases and/or services specified by Firm, included both specific and like items.

5.1.2   Antiques and work of art specified by Firm, shown to client in photo or catalogue, or purchased at auction or dealer.

5.1.3   Owner will be charged by Firm for all delivery charges and installation charges. These will be subject to standard commission and applicable state sales tax.

5.3.1   Hourly rates will be charged for all consultations, work, suggestions and ideas for any and all areas that are not purchased through Firm or that Firm does not get a commission on, or that result in a commission of less than $100.00. For example, if Firm spends an hour researching, choosing and ordering an item whose commission would be less than $100.00, Owner will pay an hourly rate.

5.3.1.1   Hourly rates would include any work involved with third parties where Firm is not charging a commission for said supervisory work. For example, Owner will pay Firm an hourly rate if consulting with Owner on an idea that Firm or a third party developed. Owner is also legally obligated to pay an hourly rate for all time spent in architectural work and creation of all presentations and ideas with architectural firms, general contractors, sub-contractors, etc., if Firm is not receiving commission to work with Third Parties, as well as travel and other minor activities.

5.3.1.2   All plans, drawings, elevations, sketches, models, room renderings as required and/or requested by Owner will be charged at an hourly rate.

5.3.1.3   Any market shopping and research time for items and ideas that will not result in purchases of goods/services by Firm will be charged at an hourly rate. These are requests undertaken at Owner's request, for special conditions, specific items, whims or for working with third parties when there is no commission on such work.

5.3.1.4   Mr. Howard Slatkin: $1,000.00/hour

5.3.1.5   Design Principal: $400.00/hour

5.3.1.6   Design Associate: $250.00/hour

5.3.1.7   Design Assistant: $100.00/hour

5.3.1.8   Clerical: $90.00/hour

5.3.2   Architectural fees, if required of Firm, will be determined and discussed with Owner at time of request from Owner. Rates will be determined by architectural firm that is sub-contracted for Project. All fees will be subject to Firm's commission, sales tax, and reimbursable expenses if applicable if Firm is to manage, supervise, direct, provide designs to and work with architectural firm. Client will, however, be invoiced directly by architectural firm, but Firm will review and approve architectural firm's invoice before forwarding it to Client.

5.3.3   All of above, hourly rates will be debited from Retainer and are subject to all applicable sales tax.

6.   Reimbursable Expenses

6.1   Reimbursable expenses are in addition to the compensation as detailed above, and include actual expenditures made by Firm and Firm's contractors and consultants in the interest of the project for the expenses listed in the following Subparagraphs:

6.1.1   Expense of transportation in connection with Project; living expenses in connection with out-of-town travel; long distance communications.

6.1.2   Expense of reproductions, postage and handling, of Drawings, Schedules, Specifications and other documents.

SDN009182

8.    Ownership and Use of Documents

8.1.1    Drawings, plans, blueprints, photographs, designs, sketches, specifications, documents, models, mock-ups and room renderings prepared by Firm are instruments of service for the execution of work on Project and are the exclusive property of Firm, whether work on the Project is executed or not. Owner shall be permitted to retain copies, including reproducible copies of drawings, schedules and specifications for information and reference in connection with the Owner's use and occupancy of the Project.

8.1.2    The Firm reserves the copyright on these instruments of service, whether the work on the Project is executed or not, and said instruments of service shall not be used on any other project, or additions to this Project, or for further completion to this Project, without the Firm's prior written consent and unless Firm receives appropriate compensation.

9.    Arbitration

9.1.1    All claims, disputes and other matters in question between the parties to this Agreement or the breach thereof, shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining unless the parties mutually agree otherwise.  No arbitration arising out of or relating to this Agreement, shall include, by consolidation, joinder or in any other manner, any additional person not a party to this Agreement except written consent containing a specific reference to this Agreement and signed by the Firm, the Owner and any other person sought to be joined.  Any consent to arbitration involving an additional person or persons shall not constitute consent to arbitration of any dispute not described therein or with any person not named or described therein.  This Agreement to arbitrate and any agreement to arbitrate with the additional person or persons duly consented to by the parties hereto, shall be specifically enforceable under the prevailing arbitration law.

9.1.2    Notice of demand for arbitration shall be filed in writing with the other party to this Agreement and with the American Arbitration Association.  The demand shall be made within a reasonable time after the claim, dispute or other matter in question has arisen.  In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations.

9.1.3    The award rendered by the arbitrators shall be final, and judgment may be entered upon in accordance with applicable law in any court having jurisdiction thereof.

9.1.4    The Firm's decisions in matters relating to aesthetics shall be final if consistent with the intent of the Project.

10.    Termination of Agreement

10.1.1    Firm may terminate the project at any time upon seven days notice to Owner.

10.1.2    If after 30 days of signing of Agreement Owner or Firm breaks relationship for whatever reason, fifty percent of Initial Retainer will be kept by Firm as Design Fee and compensation for Firm's time, effort, talent and ideas that Firm develops in the conceptual first stages of design process, including events and work leading up to Owner's purchase of Project.  This fee also compensates Firm for having foregone projects from other potential clients in order to accept and work on Owner's project.  This fee is not compensation for any tangible goods or services relating to Project.  This Design Fee will be in addition to payments to be debited from the remaining fifty percent of Initial Retainer for any purchases and goods or services approved and/or ordered or purchased during this thirty day period (and prior) and any reimbursable expenses, delivery charges, sales tax, etc.  If the remaining fifty percent balance of Initial Retainer does not cover these charges, an Invoice will be issued to Owner with payment to be received by Firm within five business days.

10.1.3    The Firm shall be compensated in full for all services performed to termination date, together with reimbursable expenses then due and all Termination Expenses as defined in paragraph 10.1.4.

~ 7 ~

SDN009184

10.1.4    Termination Expenses include expenses directly attributable to termination for which the Firm is not otherwise compensated, plus an amount computed as a percentage of total Basic and Additional compensation earned to the time of termination, as follows:

10.1.4.1    Twenty percent if termination occurs after ninety days of signing of contract.

10.1.4.2    Ten percent if termination occurs after sixty days of signing of contract.

11.    Miscellaneous Provisions

11.1.1    Unless otherwise specified, this Agreement shall be governed by the law of the principal place of business of the Firm.

11.1.2    As between the parties to this Agreement: as to all acts or failures to act by either party to this Agreement, any applicable statue of limitations shall commence to run and, any alleged cause of action shall be deemed to have accrued in any and all events not later than the relevant Date of Substantial Completion, not later than the date of issuance of the final request for Payment.

12.    Successors and Assigns

12.1.1    The Owner and the Firm, respectively, bind themselves, their partners, successors, assigns and legal representatives to the other party to this Agreement and to the partners, successors, assigns and legal representatives of such other party with respect to all covenants of this Agreement. Neither the Owner nor the Firm shall assign, sublet or transfer any interest in this Agreement without the written consent of the other.

13.    Extent of Agreement

13.1.1    This Agreement represents the entire and integrated agreement between the Owner and the Firm and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both Owner and Firm.

13.1.2    The Agreement is binding and remains in force, regardless of any change in Owner's situation or circumstances such as relocation, separation, divorce, illness, incapacitation or death.

13.1.3    Agreement is to be signed by both partners in marriage.

---

Southerndown, Inc                  Date          Witness                  Date

---

Howard S. Shatkin                  Date          Witness                  Date

- 8 -

SDN009185

10.1.4    Termination Expenses include expenses directly attributable to termination for which the Firm is not otherwise compensated, plus an amount computed as a percentage of total Basic and Additional Compensation earned to the time of termination as follows:

10.1.4.1    Twenty percent if termination occurs after ninety days of signing of contact.

10.1.4.2    Ten percent if termination occurs after sixty days of signing of contact.

**11.    Miscellaneous Regulations**

11.1.1    Unless otherwise specified, this Agreement shall be governed by the law of the principal place of business of the Firm.

11.1.2    As between the parties to this Agreement as to all acts or failures to act by either party to this Agreement, any applicable statute of limitations shall commence to run any alleged cause of action shall be deemed to have accrued in any and all events not later than the relevant Date of Substantial Completion, not later than the date of issuance of the final request for Payment.

**12.    Successors and Assigns**

12.1.1    The Owner and the Firm, respectively, bind themselves, their partners, successors, assigns and legal representatives to the other party to this Agreement and to the partners, successors, assigns and legal representatives of such other party with respect to all covenants of this Agreement. Neither the Owner nor the Firm shall assign, sublet or transfer any interest in this Agreement without the written consent of the other.

**13.    Extent of Agreement**

13.1.1    This Agreement represents the entire and integrated agreement between the Owner and the Firm and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both Owner and Firm.

13.1.2    The Agreement is binding and remains in force regardless of any change in Owner's structure or circumstances such as relocation, separation, divorce, illness incorporation or death.

13.1.3    Agreement to to be signed by both partners in marriage.


_____        _____        _____        _____
Southard/Wynn, Inc.           Date          Witness                       Date


_____   5/26/09            Maria Cremaschi   May 26, 2009
Edward S. Slatkin          Date             Witness                       Date

SDN009186

EXHIBIT  7

CLOSED, ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:11-cv-08619-TPG

Southerndown, Inc. v. HSS LLC
Assigned to: Judge Thomas P. Griesa
Cause: 28:1332 Diversity-Other Contract

Date Filed: 11/28/2011
Date Terminated: 01/30/2012
Jury Demand: None
Nature of Suit: 190 Contract: Other
Jurisdiction: Diversity

| Date Filed | # | Docket Text |
|---|---|---|
| 11/28/2011 | 1 | PETITION TO CONFIRM ARBITRATION AWARD. (Filing Fee $ 350.00, Receipt Number 465401022898).Document filed by Southerndown, Inc.. (Attachments: # 1 Exhibit Exhibit 1, # 2 Exhibit Exhibit 2)(pl) (Entered: 12/02/2011) |
| 11/28/2011 | | Magistrate Judge Michael H. Dolinger is so designated. (pl) (Entered: 12/02/2011) |
| 11/28/2011 | | Case Designated ECF. (pl) (Entered: 12/02/2011) |
| 11/28/2011 | 2 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by Southerndown, Inc..(pl) (Entered: 12/02/2011) |
| 11/28/2011 | | SUMMONS ISSUED as to HSS LLC. (pl) (Entered: 12/02/2011) |
| 01/09/2012 | 3 | AFFIDAVIT OF SERVICE of Petition to Confirm Arbitration, Affidavit in Support, ECF Rules, Judge Griesa's Inidvidual Practices served on HSS LLC on December 12, 2011. Service was accepted by Selma Gutierrez, Housekeeper. Document filed by Southerndown, Inc.. (Feser, Matthew) (Entered: 01/09/2012) |
| 01/09/2012 | 4 | AFFIDAVIT OF SERVICE of Petition to Confirm Arbitration, Affidavit in Support, ECF Rules, Judge Griesa's Inidvidual Practices served on Howard Slatkin on December 21, 2011. Service was accepted by John Doe, Doorman. Document filed by Southerndown, Inc.. (Feser, Matthew) (Entered: 01/09/2012) |
| 01/09/2012 | 5 | AFFIDAVIT OF SERVICE of Petition to Confirm Arbitration, Affidavit in Support, ECF Rules, Judge Griesa's Inidvidual Practices served on Howard Slatkin on December 22, 2011. Service was made by Mail. Document filed by Southerndown, Inc.. (Feser, Matthew) (Entered: 01/09/2012) |

| 01/27/2012 | 6 | OPINION: #101354 For the foregoing reasons, petitioner's arbitration award is confirmed. Judgment should be entered in the amount of $3,146,243.50, with interest payable at an annual rate of 5% until the judgment is paid in full. (Signed by Judge Thomas P. Griesa on 1/27/2012) (mro) Modified on 1/31/2012 (jab). (Entered: 01/30/2012) |
| 01/27/2012 | | Transmission to Judgments and Orders Clerk. Transmitted re: 6 Memorandum & Opinion, to the Judgments and Orders Clerk. (mro) (Entered: 01/30/2012) |
| 01/30/2012 | 7 | CLERK'S JUDGMENT # 12,0169 That for the reasons stated in the Court's Opinion dated January 27, 2012, petitioners arbitration award is confirmed, and judgment is entered in the amount of $3,146,243.50, with interest payable at an annual rate of 5% until the judgment is paid in full. (Signed by Clerk of Court Ruby Krajick on 1/30/12) (Attachments: # 1 NOTICE OF RIGHT TO APPEAL)(ml) (Entered: 01/30/2012) |
| 03/20/2013 | 8 | NOTICE OF APPEARANCE by Robert Konstantine Dakis on behalf of Southerndown, Inc. (Dakis, Robert) (Entered: 03/20/2013) |
| 03/21/2013 | 9 | SATISFACTION OF JUDGMENT re: 7 Clerk's Judgment #12,0169 entered In favor of Southerndown, Inc. Against HSS LLC in the amount of $3,146,243.50. Document filed by Southerndown, Inc. (mro) (Entered: 03/22/2013) |
| 03/22/2013 | 10 | STIPULATION OF DISMISSAL: that any and all counts, claims and/or causes of action alleged against defendant HSS by plaintiff Southerndown in this action are hereby dismissed with prejudice, each party to bears its own respective costs, expenses and legal fees. (Signed by Judge Thomas P. Griesa on 3/22/201.) (tro) (Entered: 03/25/2013) |

**PACER Service Center**

**Transaction Receipt**

| | | | |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

EXHIBIT  8

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X
PLAZA RESIDENTIAL OWNER LP, CPS 1   :   Index No. 112706/08
REALTY LP, EL-AD PROPERTIES NY LLC,  :
                 :
        Plaintiffs,   :
                 :
    -against-       :   **AFFIRMATION OF**
                 :   **STEPHEN B. MEISTER**
PENTHOUSE 2009, INC., PENTHOUSE 2011,  :
INC., and ANDREI VAVILOV,      :
                 :
        Defendants.  :
-------------------------------------------------------------------X

   STEPHEN B. MEISTER, an attorney duly admitted to practice before the Courts of the

State of New York, affirms the following to be true under penalties of perjury:

   1.   I am an attorney and a member of Meister Seelig & Fein LLP, attorneys for

Plaintiffs Plaza Residential Owner LP, CPS 1 Realty LP and El-Ad Properties NY LLC

(collectively, "Plaintiffs").

   2.   I respectfully submit this affirmation in opposition to the motion brought

defendants Penthouse 2009, Inc., Penthouse 2011, Inc. and Andrei Vavilov ("Defendants"),

pursuant to CPLR Rule 3211(a)(1) and (7) and N.Y. Civil Rights Law § 74, seeking to dismiss

Plaintiffs' complaint herein.

   3.   Attached hereto as **Exhibit A** is a true and correct copy of the Verified Complaint

in this action.

   4.   Attached hereto as **Exhibit B** is a true and correct copy of the contract Defendants

entered into to purchase Penthouse condominium Unit No. 2009 The Plaza.

   5.   Attached hereto as **Exhibit C** is a true and correct copy of the contract Defendants

entered into to purchase Penthouse condominium Unit No. 2011 The Plaza.

6.        Attached hereto as **Exhibit D** is a true and correct copy of a September 23, 2007

New York Times article "From Russia With Cash: Seeding a Hedge Fund."

Dated: New York, New York
       November 12, 2008

                                         STEPHEN B. MEISTER

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------X
PLAZA RESIDENTIAL OWNER LP, CPS 1     :
REALTY LP, EL-AD PROPERTIES NY LLC,     :

                                 :
                   Plaintiffs,     :

     -against-     :
                                 :

PENTHOUSE 2009, INC., PENTHOUSE 2011,   :
INC., and ANDREI VAVILOV,     :
                                 :
               Defendants.     :
------------------------------------------------------------X

Index No. 811 2706/08

Date Purchased: 9/17/2008

**SUMMONS**

Plaintiffs designate New York
County as the place of trial

The basis of venue is that Defendants
maintain their principal place of
business in New York County

Defendants' principal offices are
located at 1325 Avenue of the
Americas, New York, NY

TO THE ABOVE-NAMED DEFENDANTS:

    YOU ARE HEREBY SUMMONED to answer the complaint in this action and serve a

copy of your answer, or, if the complaint is not served with this Summons, to serve a notice of

appearance, on Plaintiffs' attorneys within twenty (20) days after service of this summons,

exclusive of the day of service (or within thirty (30) days after the service is complete if this

summons is not personally delivered to you within the State of New York); and in case of your

failure to appear or answer, judgment will be taken against you by default for the relief

demanded in this complaint.

Dated: New York, New York
      September 17, 2008

                **NEW YORK**
        **COUNTY CLERK'S OFFICE**

          **[SEP 17 2008**

      - **NOT COMPARED**
      **WITH COPY FILED**

                      MEISTER SEELIG & FEIN LLP

                      Stephen B. Meister
                      2 Grand Central Tower
                      140 East 45th Street, 19th Floor
                      New York, NY 10017
                      (212) 655-3500
                      *Attorneys for Plaintiffs*