# EXHIBIT  11

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

**ORIGINAL**

-----------------------------------------------------------------------------X
:
PLAZA RESIDENTIAL OWNER LP, CPS 1 REALTY LP,    :
EL-AD PROPERTIES NY LLC                          :
:
Plaintiff,                                :       Index No. 112706/08
:
-against-                                   :
:
PENTHOUSE 2009, INC., PENTHOUSE 2011, INC. and   :
ANDREI VAVILOV,                                  :
:
Defendants.                              :
:
-----------------------------------------------------------------------------X

## STATEMENT IN SUPPORT OF ASSIGNMENT TO THE COMMERCIAL DIVISION

Morrison Cohen LLP, counsel for Penthouse 2009, Inc., Penthouse 20011, Inc. and Andrei Vavilov, defendants in this matter, submits this Statement and the accompanying copy of the pleadings, pursuant to Section 202.70(d)(2) of the Uniform Rules for the Trial Courts ("Uniform Rules"), in support of the request of said party for the assignment of this matter to the Commercial Division of this Court.

(1)   I have reviewed the standards for assignment of cases to the Commercial Division set forth in Section 202.70.  This case meets those standards.  I therefore request that this case be assigned to the Division.

(2)   Assignment to the Commercial Division is appropriate under Uniform Rule 202.70(b)(12), in that Plaintiff seeks an amount in excess of the Commercial Division monetary threshold based on defamation arising out of business dealings.

(3)   This case falls within the standards set out in Subdivision (b) of the Section and does not fall into any of the categories set forth in Subdivision (c).

Dated:  October 2, 2008

_____
David A. Piedra, Esq.
Morrison Cohen LLP
909 Third Avenue
New York, New York  10022
(212) 735-8600

#1438923 v1 \020437 \0002

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
---------------------------------------------------------------X

PLAZA RESIDENTIAL OWNER LP, CPS 1     :     Index No. _____
REALTY LP, EL-AD PROPERTIES NY LLC,    :

                Plaintiffs,        :     **VERIFIED COMPLAINT**

      -against-            :

PENTHOUSE 2009, INC., PENTHOUSE 2011,  :     0 8 1 1 2 7 0 6
INC., and ANDREI VAVILOV,        :

            Defendants.     :
---------------------------------------------------------------X

*FILED*

*SEP 17 2009*

*COUNTY CLERK'S OFFICE*
*NEW YORK*

    Plaintiffs Plaza Residential Owner LP, CPS 1 Realty LP, and El-Ad Properties NY LLC

(collectively, the "Plaintiffs"), by their attorneys, Meister Seelig & Fein LLP, as and for their

Complaint against defendants Penthouse 2009, Inc., Penthouse 2011, Inc., and Andrei Vavilov

(collectively, the "Defendants"), allege, upon information and belief, as follows:

### NATURE OF THE ACTION

    1.    This is an action for damages arising out of the defamatory and untrue statements

made by Defendants to the media, directly and through their attorney, regarding the condition of

condominium apartments Defendants contracted to purchase at the Plaza Condominium

Residences ("The Plaza"), atop the world renowned Plaza Hotel at Fifth Avenue and Central

Park South in New York City. These false and defamatory statements were made by

Defendants, who knew such statements to be false and defamatory when made, or made them

with reckless or grossly negligent disregard for whether they were true or not, solely in an

attempt to escape their unconditional obligation to purchase such condominium apartments.

Defendants uttered these defamatory and untrue statements under the guise of describing the

allegations contained in a sham lawsuit recently brought by Defendants against Plaintiffs, in an

1

improper and abusive attempt to cloak said defamatory statements in the common law privilege which generally attaches to statements made in the course of judicial proceedings. However, because the Defendants' recently filed lawsuit is a sham proceeding, the common law privilege was lost and this suit may be maintained.

## PARTIES

2.     Plaintiff Plaza Residential Owner LP ("Plaza Residential") is a limited partnership organized and existing under the laws of the State of Delaware with its principal place of business located c/o El-Ad Properties NY LLC ("El-Ad"), 575 Madison Avenue, New York, New York 10022.

3.     Plaintiff CPS 1 Realty LP ("CPS 1") is a limited partnership organized and existing under the laws of the State of Delaware with its place of business located c/o El-Ad at 575 Madison Avenue, New York, New York 10022.

4.     Plaintiff El-Ad is a limited liability company organized and existing under the laws of the State of New York with its principal place of business located at 575 Madison Avenue, New York, New York 10022.

5.     El-Ad is a part of the El-Ad Group, a leading global real estate group of companies, with an international presence in the real estate and hotel industry, representing the best in class of residential, commercial and mixed use properties.

6.     Upon information and belief, Defendant Penthouse 2009, Inc. ("PH 2009 Inc.") is a corporation organized and existing under the laws of the State of New York with an address c/o Salisbury and Ryan LLP located at 1325 Avenue of the Americas, New York, New York 10019.

7.     Upon information and belief, Defendant Penthouse 2011, Inc. ("PH 2011 Inc.") is a corporation organized and existing under the laws of the State of New York with an address c/o

2

Salisbury and Ryan LLP located at 1325 Avenue of the Americas, New York, New York 10019.

8.      Defendant Andrei Vavilov ("Vavilov") is an individual residing in New York, New York who, upon information and belief, owns, directly or indirectly, a controlling interest in PH 2009 Inc. and PH 2011 Inc.  Upon information and belief, Vavilov is a hedge fund manager and the former Deputy Finance Minister of Russia.

## JURISDICTION AND VENUE

9.      This Court has personal jurisdiction over Defendants pursuant to CPLR § 301. Defendants are residents of New York and the actions complained of arose in New York.

10.      Venue is proper within judicial county pursuant to CPLR § 503 in that Plaintiffs and Defendants are residents of this judicial county.

## FACTS COMMON TO ALL CAUSES OF ACTION

11.      On or about October 15, 2004, CPS 1 acquired the land underlying the world renowned Plaza Hotel, located at Fifth Avenue and Central Park South, and all improvements thereon.

12.      Subsequent to CPS 1's purchase of The Plaza, El-Ad began renovating The Plaza, pursuant to a plan whereby a portion of The Plaza would be reconfigured as luxury condominium residences.

13.      In or about February 2007, PH 2009 Inc. and PH 2011 Inc., upon information and belief, at the direction of Vavilov, entered into two (2) separate contracts to purchase two (2) condominium penthouse apartments at The Plaza.

14.      Specifically, on or about February 5, 2007, PH 2009 Inc. entered into a contract to purchase Unit No. PH 2009, a triplex condominium penthouse apartment at The Plaza for the purchase price of $39,500,000 (the "PH 2009 Contract").

3

15.     Defendants paid the $7,900,000 deposit required in connection with PH 2009 Inc.'s contract to purchase Unit No. PH 2009.

16.     On or about February 5, 2007, PH 2011 Inc. entered into a contract to purchase Unit No. PH 2011, a duplex condominium penthouse apartment at The Plaza for the purchase price of $14,000,000 (the "PH 2011 Contract").

17.     Defendants paid the $2,800,000 deposit required in connection with PH 2011 Inc.'s purchase of Unit No. PH 2011.

18.     The language contained in the PH 2009 Contract and the PH 2011 Contract are identical except for the purchase prices and deposit amounts, and the fact that they relate to two (2) separate apartments.

19.     Unit No. PH 2009, the triplex apartment, covers portions of the 19th through 21st floors.

20.     Unit No. PH 2011, the duplex apartment, covers portions of the 20th and 21st floors.

21.     At the time Defendants entered into the aforesaid purchase contracts, Vavilov stated in no uncertain terms that he wished to own the largest and most expensive apartment at The Plaza.

22.     However, due to enormous success of Plaintiffs' efforts to redevelop The Plaza—nearly all of the apartments have been sold to date—PH 2009 and PH 2011 were the only condominium penthouse apartments available for purchase, with even limited contiguity between them, by the time Defendants made their purchase.

23.     At the time Defendants entered into the contracts for the purchase of units PH 2009 and PH 2011, it was fully disclosed to Vavilov by Plaintiffs, that PH 2009 and PH 2011

4

were not well suited for combination with one another, as they could only be connected through one (1) wall—the south wall of PH 2009's master bedroom and the north wall of a living room in PH 2011.

24. Subsequent to the execution of the PH 2009 Contract and the PH 2011 Contract, the construction of Unit No. PH 2009 and Unit No. PH 2011 (collectively, the "Apartments") commenced, which construction was substantially completed by June 25, 2008. Pursuant to the Contracts and the Offering Plan, the Apartments were constructed as two separate and distinct (uncombined) penthouse apartments.

25. On the morning of June 26, 2008, Vavilov and his wife, Russian actress, Maryana Tsaregradskaya, who, upon information and belief, is not an owner or principal of PH 2009 Inc. or PH 2011 Inc., were scheduled to walk through and view the Apartments.

26. Since Ms. Tsaregradskaya was running late to the appointment, Vavilov suggested that he view the Apartments while waiting for his wife to arrive.

27. Vavilov was accompanied in his first walk through of the Apartments by two (2) El-Ad employees.

28. During this initial walk through, Vavilov did not express any dissatisfaction with the Apartments.

29. Upon his wife's arrival, Vavilov, Ms. Tsaregradskaya, and the two (2) El-Ad employees, walked through and viewed the Apartments.

30. During this visit, Ms. Tsaregradskaya negatively commented on the size of the Apartments, saying in substance that they were simply not large enough for her tastes. Ms. Tsaregradskaya then inquired about the possibility of purchasing additional condominium penthouse apartments at The Plaza, and was then escorted to view another penthouse unit, which

5

was in contract, but had not yet closed.

31. Also during this visit, Ms. Tsaregradskaya stated to the El-Ad employees that she wanted to have the biggest apartment at The Plaza.

32. Later in the day on June 26, 2008, Defendants' brokers contacted Plaintiffs' brokers via email and stated that Defendants were disappointed with the size of the Apartments, and were following up on Ms. Tsaregradskaya's inquiry as to the availability of additional penthouse apartments at The Plaza, stating that Defendants were "extremely interested" in purchasing penthouse 2015, an apartment that was already under contract for sale to another buyer.

33. In that connection, Defendants' broker asked whether Plaintiffs would consider consenting to an assignment of penthouse unit 2015's contract (which had at that time not yet closed) to the Defendants.

34. Defendants' broker also expressed an interest on behalf of the Defendants in purchasing both penthouse units 2003 and 2001.

35. Following the June 26, 2008 walk through, Defendants' architect, escorted by an El-Ad employee, visited the Apartments to take measurements in order to determine the feasibility of an architectural plan combining the Apartments with one another, or with other units then being considered by Vavilov and his wife, purportedly so that Vavilov would have the largest unit at The Plaza.

36. After the Defendants' architect's visit in early July, Defendants continued to inquire as to the availability of purchasing other penthouse units at The Plaza.

37. However, in response to these inquiries, Defendants were informed by Plaintiffs' agents that there were no other available penthouse units for purchase, as they were all under

6

contract and none of the purchasers wished to assign their contracts to Vavilov.

38.     Thereafter, on or about July 15, 2008, Defendants, through their attorneys, contacted Plaintiffs' attorneys, claiming for the first time that Plaintiffs were in default under the PH 2009 Contract and the PH 2011 Contract, alleging that the design and construction of the Apartments were not in accordance with the representations made to Defendants by Plaintiffs.

39.     In connection with their specious claims, Defendants' attorney, Y. David Scharf ("Scharf") of Morrison Cohen LLP, presented Plaintiffs' attorneys with a "draft complaint" purporting to outline the alleged defaults by Plaintiffs under the Contracts for the Apartments.

40.     Defendants, through their counsel, demanded their deposits back for the Apartments and threatened to file the "draft complaint" if Plaintiffs did not acquiesce to Defendants' improper demands.

41.     Since Plaintiffs knew that Defendants' averments regarding alleged variances between the floor plans and the actual construction of the Apartments, were concocted solely in an improper attempt to void the PH 2009 Contract and the PH 2011 Contract—and that Defendants' feigned dissatisfaction was really the result of Defendants' inability to either combine PH 2009 and PH 2011 or to purchase additional penthouse apartments—Plaintiffs did not yield to Defendants' demands, and instead declared Defendants in default of both the PH 2009 Contract and the PH 2011 Contract.

42.     On September 5, 2008, Defendants filed a complaint in the Supreme Court of the State of New York, County of New York, in an action entitled, *Penthouse 2009, Inc., et. al. v. Plaza Residential Owner LP, et. al.*, Index No. 602578/2008, seeking the return of their deposits on the Apartments, alleging, *inter alia*, that the Apartments as constructed did not conform to the representations of Plaintiffs made in the PH 2009 Contract, the PH 2011Contract, building plans

7

for the Plaza and other alleged representations made by Plaintiffs (the "Sham Proceeding").

43.     Defendants filed the Sham Proceeding notwithstanding the fact that Section 20 of

both the PH 2009 Contract and the PH 2011, entitled "No Representations," states:

> "Purchaser acknowledges that Purchaser has not relied upon any
> architect's plans, sales plans, selling brochures, advertisements,
> representations, warranties, statements or estimates of any nature
> whatsoever, whether written or oral, made by Sponsor, Selling
> Agent or otherwise, including, but not limited to, any relating to
> the description or physical condition of the Property, the Building
> or the Unit, or the size of the dimensions of the Unit or the rooms
> therein contained or any other physical characteristics thereof..."

44.     Defendants prepared a press release, upon information and belief, in advance of

filing the Sham Proceeding, and promptly after filing the complaint, late in the afternoon on

Friday, September 5, 2008, Defendants, paid, upon information and belief, approximately

$15,000 to have the press release sent out over the news wires the following Monday morning

describing the allegations made in the Sham Proceeding.

45.     On Monday, September 8, 2008, Defendants, through their counsel, Scharf,

caused to be published on the news wires, a statement which included the following remarks:

> "Y. David Scharf, the buyer's attorney, said 'This is a classic bait-
> and-switch. As we allege in our complaint, my client was lead (sic)
> to believe that it would receive one of the most luxurious
> apartments in New York history; it got far less than what it
> bargained for.'"

> "Scharf added, 'The complaint alleged that El-Ad and Stribling
> misled my client through deceit and omissions about the state and
> condition of this Penthouse and its construction. When they then
> tried to deliver something vastly different than they presented, they
> had the temerity to assert the right to our multi-million dollar
> deposit. That is just plain wrong. We hope that Attorney General
> Cuomo, whose office reviewed the Offering Plan and the
> amendments, takes a close look at the facts and circumstances of
> this matter.'"

> "An attic-like space was found with ceiling heights far lower than

8

> promised, views were obstructed, window sizes dwarfed, square
> footage diminished, large unattractive drainage grates installed
> directly outside of certain windows, among other drastic changes
> not disclosed."

46.     On September 9, 2008, Defendants, through their counsel, Scharf, uttered to the

New York Post, and the New York Post published, the following statements:

> "Unlike The Plaza hotel of the children's story 'Eloise,' where
> rooms 'embodied the height of elegance and sophistication, the
> same cannot be said of the penthouses,'" said lawyer Y. David
> Scharf"

> "'The disparity between what they were supposed to get and what
> [developer] El-Ad was planning to deliver to them is outrageous.'"

47.     On September 9, 2008, Defendants, through their counsel, Scharf, uttered to The

Wall Street Journal, and The Wall Street Journal published, the following statement:

> "The suit alleges that El-Ad engaged in a 'bait and switch' in
> which the developer made—and failed to disclose—'unilateral and
> impermissible design changes' that diminished the condos' size,
> shrank windows and lowered ceilings."

48.     On September 10, 2008, Defendants, through their counsel, Scharf, uttered to the

New York Post, and the New York Post published, the following statements:

> "Vavilov's attorney argued his client was not alone in his
> discontent."

> "'Since this lawsuit was filed, people have reached out to us to
> share their experiences with El-Ad at The Plaza,' Vavilov's
> attorney, David Scharf told The Post."

49.     Despite Defendants' contentions made in the Sham Proceeding and reiterated in

the press, there were no variances between the Apartments as a finished product and the

Apartments the Defendants contracted to purchase.

50.     Given Defendants' eagerness to purchase additional penthouse units subsequent

to the June 26, 2008 walk through of the Apartments and Defendants' disappointment when they

9

learned that no other penthouse units were available to be purchased by them, it is apparent that the Sham Proceeding is a knowingly baseless lawsuit; that Defendants' statements to the press, and allegations in their sham complaint are utterly false fabrications concocted merely in an effort to blackmail Plaintiffs into returning Defendants' deposit and that Defendants' actions were really motivated by the inability of Defendants to purchase additional penthouse apartments and by the fact that PH 2009 and PH 2011 were not readily combinable and thus, that Vavilov would not have the biggest apartment in the world renowned Plaza.

51.     By reason of the foregoing, it is clear that the Sham Proceeding was commenced by Defendants merely to injure the reputation of Plaintiffs and damage the sales at The Plaza and other El-Ad properties, all in an improper attempt to force and coerce Plaintiffs into returning Defendants' deposits.

52.     In furtherance of their scheme, after the commencement of the Sham Proceeding, Defendants, through their counsel, published numerous defamatory statements regarding the condition of the Apartments to the press, and, upon information and belief, will now assert that such statements are protected under the common law privilege generally applicable to statements made in the course of judicial proceedings.

53.     However, Defendants have waived immunity with respect to the aforementioned statements made to the press, by reason of having abused the privilege through the institution of the Sham Proceeding, a sham lawsuit, brought merely as a vehicle for Defendants to attack Plaintiffs' reputation and business with impunity.

54.     Defendants' defamatory press release—falsely charging Plaintiffs with a "classic bait and switch" and having constructed an "attic-like space"—was prepared for immediate release to the media on the morning of the next business day following the filing by Defendants

10

of their lawsuit. Defendants' 55 page, 342 paragraph sham complaint is replete with legally unnecessary and defamatory allegations, including an allegation that other unnamed but "similarly situated" purchasers of penthouse apartments are "incredibly dissatisfied," in a transparent effort to threaten a class action proceeding. Tellingly, Defendants, two shell entities and an individual buyer, paid, upon information and belief, approximately $15,000 to post their prepared-in-advance press release on the news wires. But, prior to filing their lawsuit and issuing their press release, Defendants delivered a "draft copy" of the press-release-protecting lawsuit to Plaintiffs in a blatant effort to coerce Plaintiffs into releasing Defendants' deposits— all because Defendants could not buy an additional apartment in Plaintiffs' sold-out building, or combine the two (2) units they had under contract. Lest there be any doubt about Defendants' true object—to be able to publish defamatory statements with impunity—Defendants' lawyer, Scharf, cleared matters up when he told the New York Observer, and it published, the following quote: "they [Scharf's clients] want people to know there has been a wrong perpetrated."

55.    In each of the aforementioned newspaper articles, Scharf is identified as Vavilov's attorney. Scharf had apparent authority to utter the defamatory statements on behalf of Defendants.

56.    While Vavilov may have been misled by an attorney who commenced the Sham Proceeding, for purposes of his own self-aggrandizement, once approving these actions, Vavilov's authorization made Defendants liable for the defamatory statements made by Scharf.

### AS AND FOR A FIRST CAUSE OF ACTION
(Libel *Per Se*)

57.    Plaintiffs repeat and reallege the allegations of paragraphs 1 through 56 with the same force and effect as if fully set forth herein.

58.    On Monday, September 8, 2008, Defendants, through their counsel, Scharf,

11

caused to be published on the news wires, a statement which included the following remarks:

"Y. David Scharf, the buyer's attorney, said 'This is a classic bait-and-switch. As we allege in our complaint, my client was lead (sic) to believe that it would receive one of the most luxurious apartments in New York history; it got far less than what it bargained for.'"

"Scharf added, 'The complaint alleged that El-Ad and Stribling misled my client through deceit and omissions about the state and condition of this Penthouse and its construction. When they then tried to deliver something vastly different than they presented, they had the temerity to assert the right to our multi-million dollar deposit. That is just plain wrong. We hope that Attorney General Cuomo, whose office reviewed the Offering Plan and the amendments, takes a close look at the facts and circumstances of this matter.'"

"An attic-like space was found with ceiling heights far lower than promised, views were obstructed, window sizes dwarfed, square footage diminished, large unattractive drainage grates installed directly outside of certain windows, among other drastic changes not disclosed."

59.   On September 9, 2008, Defendants, through their counsel, Scharf, uttered to the New York Post, and the New York Post published, the following statements:

"Unlike The Plaza hotel of the children's story 'Eloise,' where rooms 'embodied the height of elegance and sophistication,' the same cannot be said of the penthouses,'" said lawyer Y. David Scharf"

"'The disparity between what they were supposed to get and what [developer] El-Ad was planning to deliver to them is outrageous.'"

60.   On September 9, 2008, Defendants, through their counsel, Scharf, uttered to The Wall Street Journal, and The Wall Street Journal published, the following statement:

"The suit alleges that El-Ad engaged in a 'bait and switch' in which the developer made—and failed to disclose—'unilateral and impermissible design changes' that diminished the condos' size, shrank windows and lowered ceilings."

61.   On September 10, 2008, Defendants, through their counsel, Scharf, uttered to the

12

New York Post, and the New York Post published, the following statements:

> "Vavilov's attorney argued his client was not alone in his discontent."

> "'Since this lawsuit was filed, people have reached out to us to share their experiences with El-Ad at The Plaza,' Vavilov's attorney, David Scharf told The Post."

62.     Said statements were and are utterly false.

63.     At the time Defendants uttered and published the defamatory matter set forth above, they acted with actual malice because they knew the statements were false or, in the alternative, they failed to ascertain the accuracy of the statements and instead published them with reckless or grossly negligent disregard for whether they were true or not.

64.     In publishing this false and defamatory matter, Defendants wrongfully and willfully intended by such publication to injure Plaintiffs' business reputation and good name.

65.     The defamatory statements set forth herein were motivated by Defendants' actual malice, ill will, personal spite, or in the alternative, by their culpable recklessness or gross negligence.

66.     Defendants are not entitled to immunity for the above statements in that the Sham Proceeding is a sham lawsuit brought solely for the purpose of cloaking said statements with the appearance of privilege.

67.     As a direct result of the foregoing defamatory conduct and statements, Plaintiffs have suffered injury to their business reputation as well as humiliation and mental anguish, and have been damaged in the amount of at least $36,000,000 with the exact amount to be determined at trial.

68.     In addition, because of the wanton, willful and malicious nature of the foregoing wrongful conduct, Plaintiffs are also entitled to recover punitive damages.

13

WHEREFORE, Plaintiffs demand judgment against each of the Defendants, jointly and severally:

A. On the First Cause of Action for libel *per se*, damages to be paid to Plaintiffs in the amount of at least $36,000,000, with the exact amount of damages to be determined at trial, plus punitive damages to be determined at trial;

B. Plaintiffs' legal fees, costs and disbursements of this action; and

C. Such other and further relief as the Court deems just and proper.

Dated:    New York, New York
          September 17, 2008

                                    MEISTER SEELIG & FEIN LLP


                                    Stephen B. Meister
                                    2 Grand Central Tower
                                    140 East 45th Street, 19th Floor
                                    New York, NY 10017
                                    (212) 655-3500
                                    *Attorneys for Plaintiffs*

14

## VERIFICATION

STATE OF NEW YORK    )
                     ) ss:
COUNTY OF NEW YORK   )

Victoria Robles, being duly sworn, deposes and says as follows:

I, Victoria Robles, Assistant General Counsel to the Plaintiffs, have read the within Verified Complaint, and the same is true to my knowledge, except as to those matters alleged upon information and belief, and as to those I believe them to be true. The source of my belief is my personal knowledge of the matters set forth therein and my review of relevant documents.

_Victoria Robles_
Victoria Robles

Sworn to before me this
17th day of September, 2008

_[signature]_
Notary Public

ALIZA J. GANZ
NOTARY PUBLIC - STATE OF NEW YORK
NO. 02GA6181957
QUALIFIED IN NEW YORK COUNTY
MY COMMISSION EXPIRES 8/28/2010

ORIGINAL

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------X
PLAZA RESIDENTIAL OWNER LP, CPS 1   :      Index No. _____
REALTY LP, EL-AD PROPERTIES NY LLC,  :
                                 :
          Plaintiffs,     :
                                 :
   -against-          :
                                 :
PENTHOUSE 2009, INC., PENTHOUSE 2011,  :
INC., and ANDREI VAVILOV,     :
                                 :
         Defendants.    :
------------------------------------------------------------X

## VERIFIED COMPLAINT

MEISTER SEELIG & FEIN LLP

*Attorney(s) for*   *Plaintiffs*
2 Grand Central Tower
140 East 45th, 19th Floor
NEW YORK, NEW YORK 10017
(212) 655-3500

To                      Service of a copy of the within is hereby admitted.

                             Dated:_____

EXHIBIT  12

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------X

PLAZA RESIDENTIAL OWNER LP, CPS 1     :
REALTY LP, EL-AD PROPERTIES NY LLC,     :

                         Plaintiffs    :

         -against-    :

PENTHOUSE 2009, INC., PENTHOUSE 2011,    :
INC., and ANDREI VAVILOV,    :

                       Defendants.    :

-------------------------------------------------------------------X

Index No. 112706/08

---

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT ANDREY VAVILOV'S MOTION TO DISMISS AND IN SUPPORT OF PLAINTIFFS' CROSS MOTION FOR EXPEDITED JURISDICTIONAL DISCOVERY

---

Meister Seelig & Fein LLP
Two Grand Central Tower
140 East 45th Street, 19th Floor
New York, New York 10017
(212) 655-3500
*Counsel for Plaintiffs*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. ii

I.      **BACKGROUND** ................................................................................... 1

II.     **ARGUMENT** ....................................................................................... 7

   A.   LEGAL STANDARDS DETERMINING A MOTION TO DISMISS ......................... 7

   B.   THIS COURT HAS JURISDICTION OVER DEFENDANT VAVILOV UNDER
        CPLR 301 ................................................................................................. 8

      1.   Defendant Vavilov is Deemed "Present" In The State Of New York Under CPLR
           301 As A Result Of His Continuous and Systematic Business Activities In New
           York State And Thus This Court Has Personal Jurisdiction
           Over Vavilov ......................................................................................... 8

      2.   At The Very Least, The Court Should Allow Expedited Jurisdictional Discovery
           To Determine Defendant Vavilov's General Business Presence
           In New York ......................................................................................... 9

   C.   THIS COURT HAS JURISDITION OVER DEFENDANT VAVILOV UNDER
        NEW YORK'S LONG ARM STATUE, CPLR 302(a)(1) ............................... 10

   D.   THIS COURT HAS JURISDICTION OVER DEFENDANT VAVILOV UNDER
        CPLR 302(a)(4) ................................................................................... 15

   E.   DEFENDANT VAVILOV'S MOTION SHOULD BE DENIED PURSUANT TO
        CPLR 3211(d) AND PLAINTIFFS' CROSS-MOTION FOR EXPEDITED
        JURISDICTIONAL DISCOVERY SHOULD BE GRANTED ................................. 16

III.    **CONCLUSION** ................................................................................ 18

**TABLE OF AUTHORITIES**

<u>Cases Cited</u>

<u>State</u>

<u>ABKCO Industries, Inc. v. Lennon et al.</u>,
52 A.D.2d 435, 384 N.Y.S.2d 781 (1st Dep't 1976) ........................................................8

<u>Bankrate, Inc. v. Mainline Tavistock, Inc.</u>,
2008 WL 341452 at *4 (Sup. Ct. Kings County 2008) ...............................................9, 10

<u>Black River Assoc. v. Newman</u>,
218 A.D.2d 273, 637 N.Y.S.2d 880 (4th Dep't 1996)...............................................11, 15

<u>Brathwaite v. Manhattan Children's Psych. Center</u>,
70 A.D.2d 810, 417 N.Y.S.2d 485 (1st Dep't 1979) .....................................................7

<u>Bridge C.A.T. Scan Associates v. Ohio-Nuclear Inc.</u>,
608 F. Supp. 1187, (S.D.N.Y. 1985)...........................................................................2, 6

<u>Carlinger v. Carlinger</u>,
21 A.D.2d 656, 249 N.Y.S.2d 761 (1st Dep't 1964) ...................................................7, 8

<u>Cerberus Capital Management, L.P. v. Snelling & Snelling, Inc.</u>,
2005 WL 4441899 (Sup. Ct. N.Y. County 2005) ............................................ 14, 15, 16

<u>Ed Moore Advertising Agency, Inc. v. I.H.R., Inc.</u>,
114 A.D.2d 484, 494 N.Y.S.2d 400 (2nd Dep't 1985) ....................................................7

<u>Guggenheimer v. Ginzberg</u>,
43 N.Y.2d 268, 401 N.Y.S.2d 182 (1977) ................................................................7, 8

<u>Johnson v. City of Newburgh</u>,
46 A.D.2d 663, 359 N.Y.S.2d 840 (2nd Dep't 1974) ......................................................7

<u>Kalichman v. Beverly Holding Co.</u>,
130 A.D.2d 327, 520 N.Y.S.2d 255 (3d Dep't 1986) ................................................. 15

<u>Katz v. American Technical Indus., Inc.</u>,
96 A.D.2d 932, 466 N.Y.S.2d 378 (2nd Dep't 1983) ......................................................7

<u>Kaye, Scholer, Fierman Hays & Handler</u>,
266 A.D.2d 51, 698 N.Y.S.2d 641 (1st Dep't 1999) ......................................................14

Kermisch v. Avis Rent A Car Systems, Inc.,
71 A.D.2d 790, 419 N.Y.S.2d 793 (4th Dep't 1979)..................................................................7

Kreutter v. McFadden Oil Corp.,
71 N.Y.2d 460, 522 N.E.2d 40 (1988)..................................................................................10

Lancaster v. Colonial Motor Freight Line, Inc.,
177 A.D.2d 152, 581 N.Y.S.2d 283 (1992) .......................................................................... 8

Landoil Resources Corp. v. Alexander & Alexander Servs.,
77 N.Y.2d 28, 563 N.Y.S.2d 739, 565 N.E.2d 488 (1990)...................................................8

Laufer v. Ostrow,
55 N.Y.2d 305, 435 N.E.2d 692 (1982)................................................................................9

Legros v. Irving,
38 A.D.2d 53, 327 N.Y.S.2d 371 (1st Dep't 1971) .......................................................11, 12

Longines-Wittnauer v. Barnes & Reinecke,
15 N.Y.2d 443 (1965) ........................................................................................................12

Montgomery v. Minarcin,
263 A.D.2d 665, 693 N.Y.S.2d 293 (3d Dep't 1999) ..........................................................11

National Union Fire Ins. Co. of Pittsburgh, Pa. v. Ideal Mut. Ins. Co.,
122 A.D.2d 630, 505 N.Y.S.2d 416 (1st Dep't 1986) ........................................................ 10

Palmer v. Globalive Communications Corp.,
2008 WL 2971469 (S.D.N.Y. 2008)......................................................................................8

Peterson v. Spartan Industries, Inc.,
33 N.Y.2d 463, 310 N.E.2d 513 (1974)...............................................................................17

State of New York v. Samaritan Asset Mgmt Servs., Inc.,
No. 404969/06, 2008 WL 4745487, at * 4 (Sup. Ct. N.Y. Co. October 29, 2008) ...........................14

The Savage is Loose Company v. United Artists Theatre Circuit, Inc.,
413 F. Supp. 555 (S.D.N.Y. 1976) ........................................................................................6

Williams v. Williams,
23 N.Y.2d 592, 298 N.Y.S.2d 473 (1969) ........................................................................3, 6

World Wide Adjustment Bureau v. Edward S. Gordon Co.,
111 A.D.2d 98, 489 N.Y.S.2d 231 (1st Dep't 1985) ............................................................8

## Statutes and Treatises Cited

CPLR 301.................................................................................................................8

CPLR 302...............................................................................................................12

CPLR 302(a) ..........................................................................................................13

CPLR 302(a)(1) ................................................................................................ *passim*

CPLR 302(a)(2) ......................................................................................................11

CPLR 302(a)(3) ......................................................................................................11

CPLR 302(a)(4) ................................................................................................15, 16

CPLR 313................................................................................................................12

CPLR 3211(d)............................................................................................1, 9, 16, 17

N.Y. Civil Rights § 74 ...........................................................................................2, 6

## Other Authorities

Penthouse 2009, Inc. and Penthouse 2011, Inc. v. Plaza Residential Owner L.P., et al.
Index No. 602578/08, Supreme Court, New York County.............................................2, 5

New York County Commercial Division Rule 16 ........................................................ 8 fn 1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------X

PLAZA RESIDENTIAL OWNER LP, CPS 1     :     Index No. 112706/08
REALTY LP, EL-AD PROPERTIES NY LLC,  :

                        Plaintiffs,      :

          -against-          :

PENTHOUSE 2009, INC., PENTHOUSE 2011,  :
INC., and ANDREI VAVILOV,           :

                     Defendants.    :
-------------------------------------------------------------X

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT ANDREY VAVILOV'S MOTION TO DISMISS
AND IN SUPPORT OF PLAINTIFFS' CROSS MOTION
FOR EXPEDITED JURISDICTIONAL DISCOVERY**

Plaintiffs Plaza Residential Owner LP, CPS 1 Realty LP and El-Ad Properties NY LLC

(collectively, "Plaintiffs") respectfully submit this memorandum of law in opposition to

Defendant Andrey Vavilov's ("Vavilov") motion to dismiss Plaintiffs' Verified Complaint for

lack of personal jurisdiction and in support of Plaintiffs' cross-motion for expedited

jurisdictional discovery pursuant to CPLR 3211(d).

## I.    <u>BACKGROUND</u>

This is an action for damages arising out of the defamatory and untrue statements made

by Defendants to the media, including statements made to several New York newspapers,

directly and through their attorney, regarding the alleged condition of condominium apartments

Defendants contracted to purchase at the Plaza Condominium Residences ("The Plaza"), atop the

world renowned Plaza Hotel at Fifth Avenue and Central Park South in New York City.  These

false and defamatory statements were made by Defendants initially through an unsolicited press

release prepared by Defendants describing the allegations they made (as plaintiffs) in a related

proceeding entitled *Penthouse 2009, Inc. and Penthouse 2011, Inc. v. Plaza Residential Owner L.P., et al.*, Supreme Court of the State of New York, County of New York, Index No. 602578/08. Defendants' unsolicited press release was prepared in advance of even filing their complaint, and posted at Defendants' expense on the news wires just one business day after Defendants filed their complaint. Defendants knew such statements to be false and defamatory when made, or made them with reckless or grossly negligent disregard for whether they were true or not, solely in an attempt to cause severe economic injury to Plaintiffs' reputation, in the hopes of coercing Plaintiffs into allowing Defendants to escape their unconditional obligations to purchase the contracted for condominium apartments. Defendants uttered these defamatory and untrue statements under the guise of describing the allegations contained in the aforesaid sham lawsuit recently brought by Defendants against Plaintiffs, in an improper and abusive attempt to cloak said defamatory statements in the qualified statutory privilege provided by Section 74 of the N.Y. Civil Rights Law, which states that:

> "[a] civil action cannot be maintained…for the publication of a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding…which is a fair and true headnote of the statement published. This section does not apply to a libel contained in any other matter added by any person concerned in the publication; or in the report of anything said or done at the time and place of such a proceeding which was not a part thereof."

However, the caselaw of New York construing the qualified statutory privilege makes clear that the privilege is lost, where, as here, or provides the defendant of its own volition initiates contact with the press, and intentionally stimulates or provokes press coverage (*See* Bridge C.A.T. Scan Associates v. Ohio-Nuclear Inc., 608 F. Supp. 1187, 1195 (S.D.N.Y. 1985)("[o]nce filed, the complaint is a public document with access to it available to the public and the news media. But for the plaintiff, purposely and maliciously, to stimulate press coverage and wide publicity of a complaint with its allegedly false and malicious statements is beyond the

pale of protection); see also Williams v. Williams, 23 N.Y.2d 592, 298 N.Y.S.2d 473 (1969)).

Unlike the common law privilege attaching to statements made in or during the course of judicial proceedings, the statutory privilege protecting statements made to the press (and therefore outside of the judicial proceedings) are not protected, even if they accurately describe the allegations of the complaint, where, as here they were made purposely and maliciously to stimulate press coverage.  A plaintiff in a lawsuit need not make statements to the press in order to adjudicate his rights.   In all events, the Defendants' recently filed lawsuit is a sham proceeding, and in consequence even the common law privilege for allegations made in the course of judicial proceedings was lost, as well.

In or about February 2007, PH 2009 Inc. and PH 2011 Inc., upon information and belief, at the direction of Vavilov, entered into two (2) separate contracts (the "Agreements") to purchase two (2) condominium penthouse apartments at The Plaza (the "Apartments") with the intention of making such penthouse apartments the New York City marital residence of the Vavilov and his wife, Russian actress, Maryana Tsaregradskaya.  Prior to entering into these contracts, Vavilov and his wife, had several meetings with the real estate brokers representing The Plaza, Stribling & Associates ("Stribling") in the offices of Stribling located in The Plaza. See Meister Aff., Exh. A ("Compl.") at ¶¶21, 25, 35.  Further, in connection with his purchase of the Apartments, Vavilov was represented by real estate brokers of the New York City office of Brown Harris Stevens.

As part of the process engaged in by Vavilov prior to, and after, the execution of the contracts on the Apartments, Vavilov, the brokers of the New York City office of Brown Harris Stevens acting on Vavilov's behalf, and, Vavilov's architect, placed numerous phone calls and sent several emails to both the brokers of Stribling in their New York City offices and other representatives of Plaintiffs, while the Stribling brokers and Plaintiffs' representatives were

physically present at their New York City offices or otherwise in the state of New York.
Moreover, as alleged in the Complaint, on the morning of June 26, 2008, Vavilov and his wife
toured the Apartments. Compl. at ¶¶25-31. Following this tour, Vavilov's brokers contacted The
Plaza's brokers at their offices, inquiring as to whether Vavilov could purchase additional
penthouse units at The Plaza. Compl. at ¶¶32-34. In early July 2008, Vavilov's architect visited
the Apartments to take measurements in order to determine the feasibility of an architectural plan
combining the two Apartments with one another, or with other units then being considered by
Vavilov and his wife, purportedly so that Vavilov would have the largest unit at The Plaza.
Compl. at ¶35.

Shortly after learning that no additional penthouse units were available for purchase, on
or about July 15, 2008, Defendants' attorneys, Y. David Scharf, a litigator in the New York City
based law firm, Morrison Cohen LLP, contacted Plaintiffs' transactional attorneys, Kramer
Levin Naftalis & Frankel LLP at their New York City offices, claiming for the first time that
Plaintiffs were in default under the Agreements, and alleging that the design and construction of
the Apartments were not in accordance with the representations made to Defendants by
Plaintiffs. Compl. at ¶38. After several meetings took place between Plaintiffs' and Defendants'
respective New York City counsel in an attempt to resolve the dispute about the alleged
discrepancies in the design and construction of the Apartments, Defendants, through their
attorneys, demanded their deposits back for the Apartments and threatened to file a "draft
complaint" Scharf gave to the Kramer Levin firm if Plaintiffs did not acquiesce to Defendants'
improper demands. Compl. at ¶¶38-40. Because Plaintiffs knew that Defendants' allegations
regarding alleged variances between the floor plans and the actual construction of the
Apartments, were false and concocted solely in an improper attempt to void the Agreements—
and that Defendants' feigned dissatisfaction with the Apartments was really the result of

Defendants' inability to either combine PH 2009 and PH 2011 with one another, or to purchase additional penthouse apartments—Plaintiffs did not yield to Defendants' demands, and instead declared Defendants in default of both Agreements. Compl. at ¶41.

On September 5, 2008, Defendants filed a complaint in the Supreme Court of the State of New York, County of New York, in an action entitled, *Penthouse 2009, Inc., et. al. v. Plaza Residential Owner LP, et. al.*, Index No. 602578/2008, seeking the return of their deposits on the Apartments, alleging, *inter alia*, that the Apartments as constructed did not conform to the representations of Plaintiffs made in the Agreements, building plans for The Plaza and other alleged representations made by Plaintiffs (the "Sham Proceeding"). Compl. at ¶42. Defendants prepared a press release, upon information and belief, in advance of filing the Sham Proceeding, and promptly after filing the complaint, late in the afternoon on Friday, September 5, 2008, Defendants, paid, upon information and belief, approximately $15,000 to have the press release sent out over the news wires, including several New York newspaper publications, the following Monday morning describing the allegations made in the Sham Proceeding. Compl. at ¶44.

Given Defendants' eagerness to purchase additional penthouse units subsequent to the June 26, 2008 walk through of the Apartments and Defendants' disappointment when they learned that no other penthouse units were available to be purchased by them, it is apparent that the Sham Proceeding is a knowingly baseless lawsuit; that Defendants' statements to the press, and allegations in their sham complaint are utterly false fabrications concocted solely in an effort to blackmail Plaintiffs into returning Defendants' deposit; that Defendants' actions were really motivated by the inability of Defendants to purchase additional penthouse apartments at The Plaza; and by the fact that PH 2009 and PH 2011 were not readily combinable with one another (a fact disclosed to Vavilov prior to his entering into the Agreements); and thus, that Vavilov would not have the biggest apartment in the world renowned Plaza. Compl. at ¶50. By reason of

the foregoing, it is clear that the Sham Proceeding was commenced by Defendants merely to enable Defendants to publish to the press the false allegations set forth in Sham Proceeding in an effort to injure the reputation of Plaintiffs and damage the sales at The Plaza and other El-Ad properties, all in an improper attempt to force and coerce Plaintiffs into returning Defendants' deposits. Compl. at ¶51.

In furtherance of their scheme, immediately after the commencement of the Sham Proceeding, Defendants, through their counsel, published numerous defamatory statements to the press regarding the condition of the Apartments, and, now assert that such statements are protected under the statutory privilege set forth in Section 74 of the N.Y. Civil Rights Law, which generally allows a person to publish of "a fair and true report of any judicial proceeding, legislative proceeding or other official proceeding..."  However, unlike the common law privilege attaching to statements actually made in and during the course of judicial proceedings, the statutory privilege, which was initially enacted only to protect only news media outlets when they accurately reported on the allegations made in judicial proceedings, and was later expanded to protect statements made to the press by third parties, including arguably, the litigants themselves, when the press contacts them soliciting a statement about the pending judicial proceeding, clear New York caselaw holds that the statutory privilege for reporting allegations in judicial proceedings to the press is lost where, as here, the litigant himself <u>initiates</u> contact with the press, and releases his own press release simultaneously with the filing of the complaint in bad faith. <u>See</u> <u>Williams</u>, 23 N.Y.2d at 592; <u>Bridge</u>, 608 F. Supp. at 1187. Compl. at ¶52, ¶53. A litigant does not need to make statements to the press to adjudicate his claims, and consequently his inability to do so maliciously will not have any chilling effect on the adjudication of rights. <u>See</u> <u>The Savage is Loose Company v. United Artists Theatre Circuit, Inc.</u>, 413 F. Supp. 555 (S.D.N.Y. 1976).

Lest there be any doubt about Defendants' true object—to be able to publish defamatory statements with impunity—Defendants' lawyer, Scharf, cleared matters up when he told the New York Observer, and it published, the following quote: "they [Scharf's clients] want people to know there has been a wrong perpetrated." Compl. at ¶54.   Further, in each of the aforementioned newspaper articles, Scharf is identified as Vavilov's attorney; thus Scharf had apparent authority as Vavilov's agent to utter the defamatory statements on behalf of Defendants. Compl. at ¶55.  While Vavilov may have been misled by an attorney who commenced the Sham Proceeding, for purposes of his own self-aggrandizement, once approving these actions, Vavilov's authorization made Defendants liable for the defamatory statements uttered by Scharf. Compl. at ¶56.

## II.    ARGUMENT

### A. LEGAL STANDARDS IN DETERMINING A MOTION TO DISMISS

On a pre-answer motion to dismiss, the bar which needs to be met by the plaintiff is very low indeed, as all of the allegations of a complaint, as a matter of law are to be viewed in the light most favorable to the plaintiff.  See Katz v. American Technical Indus., Inc., 96 A.D.2d 932, 466 N.Y.S.2d 378 (2nd Dep't 1983); Ed Moore Advertising Agency, Inc. v. I.H.R., Inc., 114 A.D.2d 484, 494 N.Y.S.2d 400 (2nd Dep't 1985); Johnson v. City of Newburgh, 46 A.D.2d 663, 359 N.Y.S.2d 840 (2nd Dep't 1974). Consequently, "[a]ll allegations of the complaint, and all reasonable inferences therefrom, must be accepted as true." Brathwaite v. Manhattan Children's Psych. Center, 70 A.D.2d 810, 810, 417 N.Y.S.2d 485, 486 (1st Dep't 1979).  See Guggenheimer v. Ginzberg, 43 N.Y.2d 268, 401 N.Y.S.2d 182 (1977); Kermisch v. Avis Rent A Car Systems, Inc., 71 A.D.2d 790, 792, 419 N.Y.S.2d 793, 796 (4th Dep't 1979).

Accordingly, the pleadings must be construed so broadly and so liberally that every intendment and fair inference must be resolved in the pleader's favor.  See Carlinger v.

Carlinger, 21 A.D.2d 656, 249 N.Y.S.2d 761 (1ˢᵗ Dep't 1964).  In fact, so long as the pleading

states in some recognizable form any cause of action known to law, a motion to dismiss should

be denied.  See World Wide Adjustment Bureau v. Edward S. Gordon Co., 111 A.D.2d 98, 489

N.Y.S.2d 231 (1ˢᵗ Dep't 1985); see also Guggenheimer, 401 N.Y.S.2d at 185 (holding "unless it

has been shown that a material fact as claimed by the pleader to be one is not a fact at all and

unless it can be said that no significant dispute exists regarding it ... dismissal should not

eventuate").[1]

## B.   THIS COURT HAS JURISDICTION OVER DEFENDANT VAVILOV UNDER CPLR 301

### 1.   Defendant Vavilov is Deemed "Present" In The State Of New York Under CPLR 301 As A Result Of His Continuous and Systematic Business Activities In New York State And Thus This Court Has Personal Jurisdiction Over Vavilov

CPLR 301 states, "[a] court may exercise such jurisdiction over persons, property, or

status as might have been exercised heretofore."  It is well established that New York Courts will

have in personam jurisdiction over a defendant under CPLR 301 where the defendant is

"engaged in such a continuous and systematic course of 'doing business' here that a finding of its

'presence' in this jurisdiction is warranted…" Palmer v. Globalive Communications Corp., 2008

WL 2971469 (S.D.N.Y. 2008) citing Landoil Resources Corp. v. Alexander & Alexander Servs.,

77 N.Y.2d 28, 33-34, 563 N.Y.S.2d 739, 565 N.E.2d 488 (1990); see also ABKCO Industries,

Inc. v. Lennon et al., 52 A.D.2d 435, 384 N.Y.S.2d 781 (1ˢᵗ Dep't 1976); Lancaster v. Colonial

Motor Freight Line, Inc., 177 A.D.2d 152, 581 N.Y.S.2d 283 (1992).

Here, as alleged in the Complaint, Defendant Vavilov is an individual who owns, directly

or indirectly, a controlling interest in defendants PH 2009, Inc. and PH 2011, Inc. (collectively,

---

[1] In addition to the substantive reasons for the Court to deny Defendant Vavilov's Motion to Dismiss, the Court should also deny said motion since Vavilov has failed to attach the Verified Complaint in this action as required by Rule 16 of the New York County Commercial Division Rules.  A true and correct copy of the Verified Complaint in this action is attached to the accompanying Affirmation of Stephen Meister dated November 12, 2008 ("Meister Aff.") at Exhibit A.

the "Corporate Defendants"). Compl. at ¶8. This fact is undisputed. According to his own affidavit, Vavilov is the grantor of the trust that indirectly owns the Corporate Defendants. Vavilov Aff. at ¶3.[2] The Corporate Defendants as alleged in the Complaint, and according to the Secretary of State of New York, are corporations organized under the laws of the State of New York. Paragraphs 13 through 17 of the Complaint alleges that the Corporate Defendants entered into contracts to purchase two (2) penthouse units at the world-renowned Plaza hotel in New York City. Further, the Complaint also alleges that the Corporate Defendants contracted to purchase said penthouse units on behalf of Vavilov, to be used as Vavilov's primary residence. Compl. at ¶21. Thus, according to Vavilov himself, he has ownership interests in New York corporations that are actively doing business within New York State.

Additionally, as recent press reports indicate, defendant Vavilov is far more involved in the New York City area than his affidavit alleges. According to the New York Times, defendant Vavilov "is setting up shop in New York" in order to raise capital for his hedge fund. See Meister Aff., Ex. B. Clearly, in order to raise money in New York for his fund, Vavilov exploited general business contacts with New York and his "setting up shop" indicates that Vavilov's presence in New York State is not occasional or casual and has a fair measure of permanence and continuity. See Laufer v. Ostrow, 55 N.Y.2d 305, 435 N.E.2d 692 (1982).

### 2. At The Very Least, The Court Should Allow Expedited Jurisdictional Discovery To Determine Defendant Vavilov's General Business Presence In New York

Moreover, as more fully discussed in Point E below, where a plaintiff can demonstrate that "facts essential to establish a jurisdictional basis may be uncovered during discovery, the Court should deny defendant's motion to dismiss without prejudice to renewal after discovery limited to the issue of personal jurisdiction, in accordance with CPLR 3211(d)." Bankrate, Inc. v.

---

[2] References to the October 6, 2008 Affidavit of Andrey Vavilov are in the form of "Vavilov Aff. at ¶__."

Mainline Tavistock, Inc., 2008 WL 341452 at *4 (Sup. Ct. Kings County 2008); see also

National Union Fire Ins. Co. of Pittsburgh, Pa. v. Ideal Mut. Ins. Co., 122 A.D.2d 630, 505

N.Y.S.2d 416 (1st Dep't 1986). Here, Vavilov does not, as he could have, prove to the Court that

he lacks contact with the state of New York. Given Vavilov's failure to put forward evidence

that he does not "do business" in New York, and the media reports of Vavilov's intention to set

up shop in New York, the Court should in the very least allow the parties to engage in expedited

jurisdictional discovery.

### C. THIS COURT HAS JURISDITION OVER DEFENDANT VAVILOV UNDER NEW YORK'S LONG ARM STATUTE, CPLR 302(a)(1)

CPLR 302(a)(1) states:

> As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

> 1. transacts any business within the state or contracts anywhere to supply goods or services in the state

According to the Court of Appeals:

> "So long as a party avails itself of the benefits of the forum, has sufficient minimum contacts with it, and should reasonably expect to defend its actions there, due process is not offended if that party is subjected to jurisdiction even if not 'present' in that State…

> \* \* \*

> CPLR 302(a)(1)…authorizes the court to exercise jurisdiction over non-domiciliaries for tort and contract claims arising from a defendant's transaction of business in this State. It is a 'single act statute' and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted."

> Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 466-67, 522 N.E.2d 40, 43 (1988).

Here, the Defendants' mere act of entering into the Agreements will confer jurisdiction

over Vavilov under CPLR 302(a)(1). In <u>Black River Assoc. v. Newman</u>, 218 A.D.2d 273, 637

N.Y.S.2d 880 (4th Dep't 1996), the Court found personal jurisdiction under CPLR 302(a)(1) over

a Californian defendant who contracted to purchase property in New York from plaintiff. The

Court found that although all of the negotiations took place out of state, and defendant did not

enter New York at any point, defendant's contract to purchase New York real property satisfied

the single business act for purposes of jurisdiction under CPLR 302(a)(1).

> "We conclude that, under the circumstances presented here, defendant's
> entering into a contract to purchase New York realty constitutes the
> transaction of business in New York, and that the interest of defendant as
> a contract vendee in New York property satisfies the 'minimum contacts'
> test for maintenance of a suit to enforce that contract in New York…"

<u>Id</u>. at 279.

Given that here Vavilov cannot dispute that he was physically present in New York in

connection with the Agreements on numerous occasions, both prior to and after the execution of

the Agreements, the instant action presents an even more compelling argument for jurisdiction

under CPLR 302 (a)(1) than <u>Black River Assoc.</u>

Moreover, New York Courts have found that "where the defamation complained of arises

from or is connected with the transaction of business in the State, jurisdiction may be acquired

pursuant to CPLR 302(a)(1)." <u>Legros v. Irving</u>, 38 A.D.2d 53, 327 N.Y.S.2d 371 (1[st] Dep't

1971); <u>see also</u> <u>Montgomery v. Minarcin</u>, 263 A.D.2d 665, 693 N.Y.S.2d 293 (3d Dep't

1999)("The assertion of jurisdiction over [defendant] under CPLR 302(a)(1) does not

excessively inhibit the constitutional freedoms of speech and press which the Legislature sought

to protect by excluding defamation actions from the tort provisions of CPLR 302(a)(2) and (3),

where the defamation complained of arises directly from [defendant's] purposeful and extended

transaction of business as a journalist in this State.")

In <u>Legros</u>, an art dealer brought a defamation action based upon alleged false statements

contained in a book which was authored by a defendant, and published by the co-defendant. The individual defendant author was served personally in Spain under CPLR 313 and moved to dismiss the complaint for lack of personal jurisdiction. In holding that the individual defendant was subject to personal jurisdiction under CPLR 302(a)(1), the First Department stated the following:

> "There is a clear distinction between a situation where the only act which occurred in New York was the mere utterance of the libelous material and on the other hand, a situation where purposeful business transactions have taken place in New York giving rise to the cause of action. Where purposeful transactions of business have taken place in New York, it may not be said that subjecting the defendant to this State's jurisdiction is an 'unnecessary inhibition on freedom of speech or the press.'
>
> In this case, it is clear that virtually all the work attendant upon publication of the book occurred in New York. The book was in part researched in this State by defendant Irving; negotiations with McGraw-Hill took place in New York; the contract with McGraw-Hill was executed in New York; the book was printed in New York. The above facts are not contested.
>
> The defendant Irving takes the position that the foregoing is irrelevant. He asserts that the cause of action for defamation arose only upon publication of the libelous material to third parties, and because such tortious conduct is specifically excluded from the operation of CPLR 302 jurisdiction cannot attach. The plain answer is that defendant misinterprets the statute. There is no requirement that jurisdiction be grounded upon either the final act or the ultimate act causing the injury (cf. *Longines-Wittnauer v. Barnes & Reinecke*, 15 N Y 2d 443, 456-457). It is sufficient if the cause of action is related to and grows out of the transaction of business in New York. Where as here, all the significant actions culminating in the publication of the book occurred in New York, it is quite evident that the cause of action does arise out of those transactions of business. We conclude that jurisdiction was properly acquired by virtue of CPLR 302(a)(1)."

Id. at 55.

In the instant action, it is indisputable that the defamation claim regarding the alleged condition of the penthouse units at The Plaza related to utterances that solely arose out of the Defendants' contracts to purchase real property in New York. In fact, the entire fact pattern that

gives rise to the Complaint has no other jurisdictional connection besides New York.   Here, Defendants employed New York brokers to represent them in their search for a New York City apartment.   Defendants' New York brokers were in contact with the Plaza's New York brokers on behalf of the Defendants.   Compl. at ¶¶32-34.   Vavilov, his brokers and, his architect, placed numerous phone calls and sent several emails regarding the Apartments to both The Plaza's New York City brokers, as well as, other representatives of The Plaza while at their New York City offices.   Compl. at ¶¶31-36.   The two (2) separate contracts to purchase the Apartments were executed in New York.   And, the defamatory statements were uttered after Vavilov and his wife toured the New York City Apartments and Vavilov authorized his New York City attorney to make such statements to various New York City news publications.   Thus, all of the significant actions arose out of a New York business transaction which then culminated in the publication of the defamatory statements in New York.

In order to get around this obvious connection, Vavilov argues that because he was not a party to the contracts for the Apartments, is not the owner of the Corporate Defendants, and the Complaint did not allege that Vavilov himself made the defamatory statements, he is not subject to personal jurisdiction under CPLR 302(a).   These arguments lack merit.

In the first instance, CPLR 302(a) states that jurisdiction over a non-domiciliary will exist where that person himself "or through an agent" participates in any of the enumerated acts under said section.   The present factual circumstances indicate that although the Corporate Defendants executed the contracts for the Apartments, they did so, on behalf of Vavilov as his agent.   As alleged in the Complaint, it was Vavilov who visited the units in late June 2008 with his wife, and who made it very clear that this was a purchase of a New York City marital residence for the Vavilovs.   Compl. at ¶35.   Moreover, Vavilov's brokers were in constant contact with representatives of The Plaza in connection with his personal residential purchase.   This fact alone

will confer jurisdiction over Vavilov under CPLR 302(a)(1). See State of New York v. Samaritan Asset Mgmt Servs., Inc., No. 404969/06, 2008 WL 4745487, at * 4 (Sup. Ct. N.Y. Co. October 29, 2008) (Fried, J.) (non-domiciliary defendants' use of New York based broker to effectuate trades alone sufficient to confer in personam jurisdiction under CPLR 302(a)(1)).

Additionally, the Complaint alleges that the defamatory statements were uttered on behalf of Vavilov by Vavilov's agent, his attorney, Y. David Scharf of Morrison Cohen, and that by approving these actions, Vavilov's authorization made Defendants, including Vavilov, liable for the defamatory statements made by Scharf.   None of the foregoing agency allegations are disputed by Vavilov.   See Vavilov Aff. generally.   In fact, notwithstanding his attempt to distance himself from the Corporate Defendants, Vavilov's affidavit clearly states that he indirectly owns the Corporate Defendants. Vavilov Aff. at ¶ 3.

Secondly, New York Courts have held that a formal agency relationship between a defendant and a third party does not need to be established to confer jurisdiction over the defendant pursuant to CPLR 302(a).   See Cerberus Capital Management, L.P. v. Snelling & Snelling, Inc., 2005 WL 4441899 (Sup. Ct. N.Y. County 2005)("plaintiff need not establish a formal agency relationship between a defendant and a third-party acting on the defendant's behalf; rather a plaintiff need only convince the court that the third party engaged in purposeful activities in this State in relation to his transaction for the benefit of and with the knowledge and consent of the …defendants and that they exercised some control over the third party in the matter."); see also Kaye, Scholer, Fierman Hays & Handler, 266 A.D.2d 51, 51, 698 N.Y.S.2d 641, 641 (1st Dep't 1999)("[t]he individual defendant's numerous trips to New York admittedly for the specific purpose of meeting with plaintiff to obtain legal services on behalf of the corporate defendants constituted purposeful activity sufficient to confer jurisdiction over himself as well as the corporate defendants.").

Finally, according to Section 37.2 of the contracts, the Corporate Defendants:

> "acknowledge[d] and agree[d] that all disputes arising, directly or indirectly, out of or relating to [the Agreements] may be dealt with and adjudicated in the state courts of New York or the federal courts sitting in New York, and hereby expressly and irrevocably submits the person of Purchaser to the jurisdiction of such courts in any suit, action or proceeding arising, directly or indirectly, out of or relating to [these Agreements].   So far as is permitted under the applicable law, this consent to personal jurisdiction shall be self-operative and no further instrument or action shall be necessary in order to confer jurisdiction upon the person of Purchaser in any such court." (emphasis added).

> Meister Aff., Ex. C.

Therefore, the parties to the Agreements contemplated the question of personal jurisdiction as it related to the person behind the purchasers.  Given the indisputable fact that the Apartments were contracted by the Corporate Defendants for Vavilov's personal residence, Section 37.2 of the Agreements confers personal jurisdiction over Vavilov.

### D. THIS COURT HAS JURISDICTION OVER DEFENDANT VAVILOV UNDER CPLR 302(a)(4)

> CPLR 302(a)(4) states:

> As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

> 4. owns, uses or possesses any real property situated within the state.

New York courts have recognized personal jurisdiction over a defendant where the defendant is under contract to purchase real property in New York. See Cerberus Capital Management, L.P. v. Snelling & Snelling, Inc., 2005 WL 4441899 (Sup. Ct. N.Y. County 2005); Black River Associates v. Newman, 218 A.D.2d 273, 637 N.Y.S.2d 880 (4th Dep't 1996); Kalichman v. Beverly Holding Co., 130 A.D.2d 327, 520 N.Y.S.2d 255 (3d Dep't 1986). "In order to assert jurisdiction under CPLR 302(a)(4), a plaintiff must demonstrate a relationship

between the defendants' real property and the plaintiff's causes of action." Cerberus Capital

Management, 2005 WL 4441899 at *12.

Here, the connection between Plaintiff's cause of action for defamation and the

defendants' contracted New York real property could not be any more pronounced.   The

Complaint alleges that after the Defendants entered into two (2) contracts to purchase penthouse

units at The Plaza, Defendants, dismayed that said units were not well suited for combination to

make the largest single family unit at The Plaza, and the fact that there were no additional

available units to purchase, caused to be published several defamatory statements in various

newspapers about the condition of the units.  The Complaint further alleges that Defendants

caused to be published said defamatory statements under the guise of reporting on a lawsuit filed

by the Corporate Defendants against Plaintiffs, which Plaintiffs allege was filed merely to injure

the reputation of Plaintiffs and damage the sales at The Plaza and other El-Ad properties, all in

an improper attempt to force and coerce Plaintiffs into returning the Defendants' deposits on the

units. Compl. at ¶51.  Therefore, the Court has personal jurisdiction pursuant to CPLR 302(a)(4)

over Vavilov by reason of his agents (the Corporate Defendants') contracts to purchase real

property in New York and their indisputable connection to the Plaintiff's claims in the

Complaint.

### E. DEFENDANT VAVILOV'S MOTION SHOULD BE DENIED PURSUANT TO CPLR 3211(d) AND PLAINTIFFS' CROSS-MOTION FOR EXPEDITED JURISDICTIONAL DISCOVERY SHOULD BE GRANTED

According to CPLR 3211(d):

> "Should it appear from affidavits submitted in opposition to a motion
> made under subdivision (a) or (b) that facts essential to justify opposition
> may exist but cannot then be stated, the court may deny the motion,
> allowing the moving party to assert the objection in his responsive
> pleading, if any, or may order a continuance to permit further affidavits
> to be obtained or disclosure to be had and may make such other order as
> may be just."

In holding that plaintiff made a "sufficient start" as to proving personal jurisdiction over defendant, and affirming an order granting plaintiff's cross-motion for jurisdictional discovery pursuant to CPLR 3211(d) before deciding defendant's motion to dismiss, the Court of Appeals in Peterson v. Spartan Industries, Inc., 33 N.Y.2d 463, 466, 310 N.E.2d 513, 515 (1974) stated:

> "[The practice under CPLR 3211(d)] protects the party to whom essential jurisdictional facts are not presently known, especially where those facts are within the exclusive control of the moving party. The opposing party need only demonstrate that facts 'may exist' whereby to defeat the motion. It need not be demonstrated that they do exist. This obviously must await discovery."

Assuming arguendo the Court finds that the Plaintiffs have not already met their burden on jurisdiction, the instant action presents the exact situation that CPLR 3211(d) contemplates. Although Vavilov makes conclusory statements that he is not the owner of the Corporate Defendants, he does say that he is not an indirect owner of same, nor does he dispute that they are his agents. Plaintiffs should have the opportunity to explore the extent of this relationship through expedited discovery. Further, as stated above, although he could have, Vavilov did not speak to his business activities in New York. As Exhibit B of the accompanying Meister Aff. indicates, as of last year, Vavilov has been actively pursuing his New York contacts to set up his hedge fund, thereby indicating a meaningful and continuing presence in New York. This article alone demonstrates that facts exist (or at the very least "may exist") which warrant the denial (or minimally the holding in abeyance) of Vavilov's motion and an order granting leave to Plaintiffs to take the deposition of Vavilov and ordering Vavilov to respond to the expedited jurisdictional discovery of Plaintiffs as requested in their discovery demands attached as Exhibit D to the Meister Aff.

### III.   <u>CONCLUSION</u>

For all of the foregoing reasons, it is respectfully requested that the Court deny the Defendants' motion in all respects, and grant Plaintiffs the relief sought in their cross-motion and all such other and further relief as the Court deems just and proper.

Dated: New York, New York
       November 12, 2008

MEISTER SEELIG & FEIN LLP

Stephen B. Meister
2 Grand Central Tower
140 East 45th Street, 19th Floor
New York, New York  10017
(212) 655-3500
*Attorneys for Plaintiffs*