EXHIBIT  13

**ORIGINAL**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

----------------------------------------------------------------------X

PLAZA RESIDENTIAL OWNER LP, CPS 1
REALTY LP, EL-AD PROPERTIES NY LLC,

                         Plaintiffs,

           -against-

PENTHOUSE 2009, INC., PENTHOUSE 2011,
INC., and ANDREI VAVILOV,

                        Defendants.

----------------------------------------------------------------------X

Index No.: 112706/08

## DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO DISMISS THE DEFAMATION COMPLAINT

**MorrisonCohen**LLP

909 Third Avenue, New York, NY 10022-4731 • p:212.735.8600 • f:212.735.8708

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ................................................................................................ 2

     A.    The Parties and the Dispute Between Them .............................................. 2

     B.    Purchasers File the Real Estate Complaint ............................................... 4

     C.    The Defamation Complaint ......................................................................... 6

ARGUMENT ................................................................................................................... 7

I.     THE FOUR STATEMENTS AT ISSUE ARE ABSOLUTELY
     PRIVILEGED UNDER SECTION 74 OF THE CIVIL RIGHTS LAW ..................... 7

     A.    Every Out-of-Court Statement Cited in the Defamation Complaint
         is Privileged Under New York Civil Rights Law Section 74 ..................... 7

         1.    The Statements Describe a Judicial Proceeding ............................. 8

         2.    The Statements Were a "Fair and True" Report of a
            Judicial Proceeding ......................................................................... 9

     B.    The Real Estate Proceeding is Absolutely Privileged and Cannot
         Be The Basis for Liability Being Imposed Upon Defendants ................... 11

         1.    Statements Made in the Course of a Legal Proceeding are
            Absolutely Privileged .................................................................... 11

         2.    Any Statements in the Real Estate Complaint Were
            "Possibly Pertinent" to the Real Estate Action and Were
            Therefore Protected by the Absolute Privilege ............................. 14

         3.    Plaintiffs Cannot Circumvent the Privilege With a
            Conclusory Allegation of "Malice" or "Sham" Pleading ............. 17

i

II.    THE FOUR STATEMENTS AT ISSUE ARE NON-ACTIONABLE
       OPINION ............................................................................................................ 18

       A.    The Statements Attributed to Scharf Used Ambiguous and
             Indefinite Language that Lacked Precise Meaning and Could Not
             Be Objectively Characterized as True or False ........................................ 19

       B.    The Context in Which the Statements Appeared and the Broader
             Social Context Surrounding the Statement Support a Finding that
             the Statement was Opinion ...................................................................... 21

             1.    Scharf was Identified in the Article as the Lawyer
                   Representing the Plaintiffs in the Real Estate Action and
                   was Clearly Not a Disinterested Observer .................................... 22

             2.    The Statements Were Clearly Identified as Allegations in a
                   Lawsuit, Not Statements of Fact .................................................. 22

             3.    The Statements Were Identified as Being Made in the
                   Context of Litigation .................................................................... 24

CONCLUSION ............................................................................................................ 26

## TABLE OF AUTHORITIES

**Page**

### STATE CASES

600 W. 115th St. Corp. v. Von Gutfield, 80 N.Y.S.2d 130, 589 N.Y.S.2d 825 (1992) ................. 20

Amodei v. New York State Chiropractic Ass'n, 160 A.D.2d 279, 553 N.Y.S.2d 713
    (1st Dep't 1990) ........................................................................ 21

Andrews v. Gardiner, 224 N.Y. 440, 121 N.E. 341 (1918) ........................................... 12

Arts4All, Ltd. v. Hancock, 5 A.D.3d 106, 773 N.Y.S.2d 348 (1st Dep't 2004) ........................ 16

Baratta v. Hubbard, 136 A.D.2d 467, 523 N.Y.S.2d 107 (1st Dep't 1988) .......................... 12, 13

Branca v. Mayesh, 101 A.D.2d 872, 476 N.Y.S.2d 187 (2d Dep't 1984),
    aff'd, 63 N.Y.2d 994, 483 N.Y.S.2d 1011 (1984); ......................................... 10

Brian v. Richardson, 87 N.Y.2d 46, 637 N.Y.S.2d 347 (1995) ................................... 22, 24

Caplan v. Winslett, 218 A.D.2d 148, 637 N.Y.S.2d 967 (1st Dep't 1996) ........................... 16

Denise Rich Songs, Inc. v. Hester, 5 Misc. 3d 1013A, 798 N.Y.S.2d 708
    (N.Y. Sup. Ct., N.Y. Co. 2004) ......................................................... 10

Fishoff v. Abady, 280 A.D.2d 417, 720 N.Y.S.2d 505 (1st Dep't 2001) .............................. 10

Ford v. Levinson, 90 A.D.2d 464, 454 N.Y.S.2d 846 (1st Dep't 1982) ............................ 9, 10

Halperin v. Salvan, 117 A.D.2d 544, 499 N.Y.S.2d 55 (1st Dep't 1986) ............................ 18

Hollander v. Cayton, 145 A.D.2d 605, 536 N.Y.S.2d 790 (2d Dep't 1988) ........................... 21

Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co.,
    49 N.Y.2d 63, 424 N.Y.S.2d 165 (1979) .................................................. 9

Immuno AG v. Moore-Jankowski, 77 N.Y.2d 235, 566 N.Y.S.2d 906, cert denied,
    500 U.S. 954 (1991) .................................................................... 22

Impallomeni v. Meiselman, Farber, Packman & Eberz, P.C., 272 A.D.2d 579,
    708 N.Y.S.2d 459 (2d Dep't 2000) ...................................................... 16

Information Control Corp. v. Genesis One Computer Corp., 611 F.2d 781
    (9th Cir. 1980) ...................................................................... 24, 25

Jaszai v. Christies, 279 A.D.2d 186, 719 N.Y.S.2d 235 (1st Dep't 2001) .......................... 18, 19

Jones Lang Wootton USA v. LeBoeuf, Lamb, Greene & MacRae, 243 A.D.2d 168,
    674 N.Y.S.2d 280 (1st Dep't 1998) .................................................................. 16

Lacher v. Engel, 33 A.D.3d 10, 817 N.Y.S.2d 37 (1st Dep't 2006) .................... 10, 12, 14, 15, 18

Lee v. Brooklyn Union Publ'g Co., 209 N.Y. 245, 103 N.E. 155 (1913) ................................. 1, 8

Lemberg v. Blair Communs., 258 A.D.2d 291, 685 N.Y.S.2d 435 (1st Dep't 1999) ................. 16

Lesser v. International Trust Co., 175 A.D. 12, 161 N.Y.S. 624 (1st Dep't 1916) ..................... 13

Locke v. Aston, 1 A.D.3d 160, 767 N.Y.S.2d 23 (1st Dep't 2003) ............................................. 20

Marsh v. Ellsworth, 50 N.Y. 309 (1872) ..................................................................................... 17

Marson v. Darrow, 8 A.D.2d 307, 187 N.Y.S.2d 611 (1st Dep't 1959) ...................................... 13

Martirano v. Frost, 25 N.Y.2d 505, 307 N.Y.S.2d 425 (1969) ................................... 11, 12, 13, 16

Mosesson v. Jacob D. Fuchsberg Law Firm, 257 A.D.2d 381, 683 N.Y.S.2d 88
    (1st Dep't 1999) ............................................................................... 11, 12, 13, 17

Ollman v. Evans, 750 F.2d 970, 983 (1974) ................................................................................ 19

O'Loughlin v. Patrolmens Benevolent Ass'n, 178 A.D.2d 117, 576 N.Y.S.2d 858
    (1st Dep't 1991) ......................................................................................................... 21

Papa v. Regan, 256 A.D.2d 452, 682 N.Y.S.2d 94 (2d Dep't 1998) ......................................... 16

Park v. Capital Cities Communs. Inc., 181 A.D.2d 192, 585 N.Y.S.2d 902 (4th Dep't 1992) ... 20

Parks v. Steinbrenner, 131 A.D.2d 60, 520 N.Y.S.2d 374 (1st Dep't 1987) ............................. 21

People ex. rel. Bensky v. Warden of City Prison, 258 N.Y. 55, 179 N.E. 257 (1931) .......... 12, 13

Rand v. New York Times Co., 75 A.D.2d 417, 430 N.Y.S.2d 271 (1st Dep't 1980) ................. 20

Rinaldi v. Holt, Rinehart & Winston, Inc., 42 N.Y.2d 369, 397 N.Y.S.2d 943 (1977),
    cert denied, 434 U.S. 969 (1977) ..................................................................................... 18

Seltzer v. Fields, 20 A.D.2d 60, 244 N.Y.S.2d 792 (1st Dep't 1963),
    aff'd, 14 N.Y.2d 624, 249 N.Y.S.2d 174 (1964) ................................................. 11, 12, 13

Sexter & Warmflash, P.C. v. Margrabe, 38 A.D.2d 163, 828 N.Y.S.2d 315
    (1st Dep't 2007) ......................................................................................... 12, 13, 14, 15, 16

Soumayah v. Minnelli, 19 A.D.3d 337, 797 N.Y.S.2d 287 (1st Dep't 2005) .............................. 17

Steinhilber v. Alphonse, 68 N.Y.2d 283, 508 N.Y.S.2d 901 (1986) ...................................... 19, 24

Ticketmaster Corp. v. Lidsky, 245 A.D.2d 142, 665 N.Y.S.2d 666 (1st Dep't 1997) ................ 17

Ulrich v. Hausfeld, 269 A.D.2d 526, 704 N.Y.S.2d 495 (2d Dep't 200) ................................... 17

Williams v. Williams, 23 N.Y.2d 592, 298 N.Y.S.2d 473 (1969) ............................................... 17

Youmans v. Smith, 153 N.Y. 214, 47 N.E. 265 (1897) ................................................ 1, 11, 12, 16

**FEDERAL CASES**

Karp v. Hill & Knowlton, Inc., 631 F. Supp. 360 (S.D.N.Y. 1986) ............................................. 25

Lehman Bros. Commercial Corp. v. China Intl United Petrol. & Chem. Co., Ltd.,
    No. 94 CIV. 8304 (JFK), 1995 WL 608313 (S.D.N.Y. Oct. 16, 1995) ........................... 10

O'Brien v. Alexander, 898 F. Supp. 162 (S.D.N.Y. 1995),
    aff'd in part, rev. on other grounds in part, 101 F.3d 1479 (2d Cir. 1996) ...................... 17

P&G Co. v. Quality King Distribs., Inc., 974 F. Supp. 190 (E.D.N.Y. 1997) ............................. 11

Pandozy v. Tobey, No. 06 Civ. 12885 (CM), 2007 U.S. Dist. LEXIS 76400
    (S.D.N.Y. Oct. 11, 2007) ............................................................................................... 18

Riel v. Morgan Stanley, No. 06 CV 524, 2007 U.S. Dist. LEXIS 11153
    (S.D.N.Y. Feb. 16, 2007) ............................................................................................... 10

Southridge Capital Mgmt., LLC v. Lowry, No. 01 Civ. 4880 (RO),
    2003 U.S. Dist. LEXIS 153 (S.D.N.Y. Jan. 7, 2003) ..................................................... 10

The Savage Is Loose Co. v. United Antitrust Theater Circuit, Inc.,
    413 F. Supp. 555 (S.D.N.Y. 1976) ................................................................................. 10

**DOCKETED CASES**

Penthouse 2009, Inc., et al. v. Plaza Residential Owner LP, et al., Index No. 602578/08 ............ 4

**STATE STATUTES**

N.Y. Civ. Rights Law § 74 (2008) ................................................................................................. 8

## Preliminary Statement

This defamation case strikes at the heart of a cardinal principle of our judicial system. This lawsuit is predicated by Plaintiffs upon allegedly defamatory statements made by the Defendants that accurately summarize allegations in a complaint filed by them in this Court. It is well-settled that Section 74 of the New York Civil Rights Law provides absolute protection to such fair and accurate reports of or about judicial proceedings. There is no, and could not be any, contention that the allegedly actionable statements do not fairly summarize allegations in a complaint filed by Defendants. Nor can there be any serious contention that the complaint that Defendants summarized is itself not entitled to absolute legal protection. The action, nonetheless, proceeds based on the notion that an accurate characterization of a duly-filed complaint that is itself protected by an absolute privilege can provide the basis for a defamation action.

The absolute privilege itself is deeply rooted in our history. It is applicable whether the person making the report is a member of the press, a lawyer, a litigant or even a curious member of the general public. The privilege exists to protect the powerful "public interest in having proceedings of courts of justice public, not secret, for the greater security thus given for the proper administration of justice." Lee v. Brooklyn Union Publ'g Co., 209 N.Y. 245, 248, 103 N.E. 155, 156 (1913). The absence of an absolute privilege "would be an impediment to justice, because it would hamper the search for truth, and prevent making inquiries with that freedom and boldness which the welfare of society requires." Youmans v. Smith, 153 N.Y. 214, 220, 47 N.E. 265, 267 (1897).

#1433887 v7 \020437 \0002

Here, the statements at issue are, on their face, fair and true reports of the pending judicial proceeding; thus, the reports cannot be the subject of a defamation lawsuit. Moreover, even if the statements in the press were not protected by Section 74, the statements consist of descriptions about the alleged condition of the apartments at issue in the case. These statements are classic non-actionable opinion. Indeed, the context in which the statements were made -- i.e., made by counsel in a recently-commenced lawsuit, describing his client's position in the suit -- clearly conveyed that the statements were the non-actionable opinions of the parties to the litigation, and therefore not the proper basis of a claim for libel. There is no legal basis for a defamation claim here, and the Complaint must be dismissed with prejudice.

## Statement of Facts

The facts set forth below are taken from the complaint in this action (the "Defamation Complaint"). A true copy of that Complaint is attached as Exhibit 1 to the Affirmation of Floyd Abrams dated September 29, 2008 (the "Abrams Aff.").

### A.     The Parties and the Dispute Between Them

Plaintiff Plaza Residential Owner LP is the sponsor (the "Sponsor") of a condominium offering plan (the "Offering Plan") for penthouse residences at the "world-renowned" Plaza Hotel (the "Plaza Condominium"). Plaintiff CPS 1 Realty LP is the former sponsor (the "Former Sponsor") of the Plaza Condominium. El-Ad Properties NY LLC is a real estate developer, and the owner of a controlling interest in the Sponsor and the Former Sponsor of the Plaza Condominium. (See Defamation Compl. ¶¶ 2-5.). The plaintiffs are referred to collectively in this memorandum as "Plaza."

- 2 -

The Defendants Penthouse 2009, Inc. and Penthouse 2011, Inc., referred to as collectively as the "Purchasers", are proposed purchasers of two penthouse apartments at the Plaza Condominium, apartments 2009 and 2011 (the "Apartments").[1]   The Purchasers were to buy the Apartments pursuant to two contracts of sale between the Purchasers and the Sponsor, both dated February 5, 2007 (the "Contracts.").    The total purchase price for the two Apartments was $53,500,000.  (Defamation Compl. ¶¶ 15-18).

When the Contracts were executed in February 2007, the Apartments had not yet been built.  (Defamation Compl. ¶ 24).  Nearly a year and a half later, on June 26, 2008, Plaza permitted defendant Vavilov and his wife to have their first walk-through of the Apartments. (Defamation Compl. ¶¶ 24-30).  Plaza concedes that the Purchasers expressed dissatisfaction as to the size of the Apartments at the time of the walk-through, and shortly thereafter the Purchasers claimed that Plaza was in default under the Contracts due to several material adverse design changes to the Apartments, as well as various shortcomings in the appearance, quality and condition of the Apartments.  (Compl. ¶¶ 30-31; 39).  Plaza concedes that it rejected the Purchasers' concerns and refused to address them.  (Compl. ¶ 41).

---

[1]      Defendant Andrey Vavilov (incorrectly sued as Andrei Vavilov) is not a party to the Contracts at issue or to the Real Estate Complaint that gives rise to this action.  Additionally, Mr. Vavilov is not alleged to have been the source of any false or defamatory statement.  Indeed, it was the Plaintiffs who injected Mr. Vavilov's name into this litigation via a press release, and then sued Mr. Vavilov for defamation.  Mr. Vavilov reserves all of his rights with respect to these issues.

**B.**    **Purchasers File the Real Estate Complaint**

On September 5, 2008, after failing to persuade Plaza to address the Purchasers' concerns about the Apartments, the Purchasers filed a complaint (the "Real Estate Complaint") against Plaza.[2] The Real Estate Complaint, filed in an action entitled Penthouse 2009, Inc., et al. v. Plaza Residential Owner LP, et al., Index No. 602578/08 (the "Real Estate Action"), contains eleven causes of action, all of which arise from the now-aborted purchase of the Apartments. (Abrams Aff., Ex. 2).

The Real Estate Complaint alleges, among other things, that Plaza breached the Contracts and/or the Offering Plan by secretly making material adverse design changes to the Apartments during construction that resulted in, among other things, apartments with smaller windows, lower ceilings, less square footage, unacceptable setbacks, and other unappealing features. (Real Estate Compl. ¶ 125). The Purchasers contend that these design changes were contrary to, and in breach of, representations made to the Purchasers in the Offering Plan, the Contracts, the architectural plans for the Apartments and/or the marketing materials issued in connection with the sale of the Apartments. (Real Estate Compl., ¶¶ 215-217).

Purchasers contend in the Real Estate Action that the Sponsor was required, under the terms of the Offering Plan, to provide Purchasers with notice and a right of rescission of the Contracts if the Sponsor made material adverse design changes to the Apartments during construction:

---

[2]    Plaza's selling agent, Stribling Marketing Associates LLC, and the Plaintiffs' escrow agent under the Contract, Kramer Levin Naftalis & Frankel, are also named in the Real Estate Complaint. They have not, however, sued for libel.

> Sponsor reserves the right, without prior notice to Purchasers or amendment of this Plan (but subject to obtaining any required approval(s) of any governmental authorities having jurisdiction), to: (a) amend from time to time any of the Plans and Specifications (including changes in layouts and designs, changes in the size or number of Units and/or their respective percentages of Common Interest, changes in the size or quality of the Common Elements and changes affecting the materials, appliances, equipment and fixtures that are of equivalent or better quality and design in place of those described in the Plans and Specifications. **Any such changes if material (for example, variations in square footage in excess of 5%) shall be disclosed by Sponsor in a duly filed amendment to the Plan and, when applicable, to the Declaration. . . . Sponsor will, in the amendment disclosing such material adverse change, offer the affected Purchaser(s) the right, for at least 15 days, to rescind their Agreement(s) and receive a refund of their Deposit(s), together will all interest earned thereon. . .**

(Real Estate Compl. ¶ 59).

The Purchasers further contend that Plaza made numerous material adverse design changes, but fraudulently concealed those design changes from the Purchasers in an effort to deprive the Purchasers of their bargained-for right of rescission, which was guaranteed by the Offering Plan. (Real Estate Compl. ¶¶ 228-261).

The Real Estate Complaint further alleges that the Purchasers were disappointed with the overall appearance, quality and condition of the Apartments, as well as the design changes that had not previously been disclosed to them. (Real Estate Compl. ¶¶ 118-122). The Real Estate Complaint outlines in detail the material adverse design changes that did not conform to the representations made in the Offering Plan, the Contracts and/or the building plans, and which, Purchasers believed, entitled Purchasers to a right of rescission under the Offering Plan. (Real Estate Compl. ¶¶ 123-148). The Real Estate Action seeks declaratory relief, specific performance and damages arising from Plaza's breach of contract, fraud, negligent misrepresentation and breach of the covenant of good faith and fair dealing and violation of GBL § 349. (Real Estate Compl. ¶¶ 192-342). There are no claims in the Real Estate Complaint that do not arise out of, or in connection with, the aborted purchase of the Apartments.

The Purchasers were not the only parties to encounter problems in connection with a purchase at the Plaza Condominium. On September 15, 2008, an entity known as The Plaza PH2001 LLC filed an action against the Plaintiffs in Supreme Court, New York County alleging claims similar to those set forth in the Real Estate Complaint. (Abrams Aff., Ex. 7)

## C.    **The Defamation Complaint**

Twelve days after the Purchasers filed the Real Estate Complaint, and before is-sue was even joined in the Real Estate Action, Plaza filed the Defamation Complaint against the Purchasers and Vavilov. (Abrams Aff., Ex. 1). The Defamation Complaint alleges, in conclu-sory fashion, that the Real Estate Complaint is a "sham," apparently because Plaza contends that the claims in the Real Estate Complaint are barred by the "No Representations" clause contained in the Contracts. (Defamation Compl. ¶ 43). While the Defamation Complaint alleges that the Real Estate Action is "replete with unnecessary and defamatory allegations" (Def. Compl. ¶ 54), Plaza does not even seek to identify *any* specific allegation of the Real Estate Complaint that is supposedly  impertinent to the Real Estate Action -- a hopeless task in any event, because none of them are.

Plaza relies upon four allegedly defamatory statements published about the Real Estate Complaint:  (a) a September 8, 2008 press release issued by Purchasers regarding the fil-ing of the Real Estate Complaint (the "Press Release"), (b) a September 9, 2008 article published in the New York Post that quotes Defendants' attorney, Y. David Scharf ("Scharf") (the "First Post Article"), (c) a September 9, 2008 article in the Wall Street Journal that quotes from the Real Estate Complaint (the "WSJ Article") and (d) a September 10, 2008 article published in the New York Post that quotes Scharf (the "Second Post Article"). (Abrams Aff., Exhibits 3, 4, 5

and 6).  Each of the Press Release, the First Post Article, the Second Post Article and the WSJ

Article specifically reference the pending Real Estate Action and quote or paraphrase the allega-

tions of the Real Estate Complaint.  All but the WSJ Article quote attorney Scharf, and in each

case where he is quoted, Scharf simply summarizes allegations contained in the Real Estate

Complaint.

   As set forth below, each of the four out-of-court statements identified in the

Defamation Complaint, are absolutely privileged.  In addition, even were they not privileged, all

of the out-of-court statements consist of non-actionable opinion.  Accordingly, the Defamation

Complaint must be dismissed with prejudice.

**ARGUMENT**

**I.**

**THE FOUR STATEMENTS AT ISSUE ARE
ABSOLUTELY PRIVILEGED UNDER
SECTION 74 OF THE CIVIL RIGHTS LAW**

   The four statements relied upon by Plaza are protected by the absolute privilege

contained in Civil Rights Law Section 74.

**A.**  **Every Out-of-Court Statement Cited in the
Defamation Complaint Is Privileged Under
New York Civil Rights Law Section 74**

   New York Civil Rights Law provides an absolute privilege to reports of pending

proceedings: "A civil action cannot be maintained against any person, firm or corporation, for

the publication of a fair and true report of any judicial proceeding, legislative proceeding or other

official proceeding, or for any heading of the report which is a fair and true headnote of the

statement published." (N.Y. Civ. Rights Law § 74 (2008)).  The purpose of this statutory privi-

lege is "the public interest in having proceedings of courts of justice public, not secret, for the

greater security thus given for the proper administration of justice."  Lee, 209 N.Y. at 248, 103

N.E. at 156.

        To qualify for protection under Section 74, two criteria are examined:  the state-

ment must be "fair and true," and it must describe a "judicial proceeding."  The Defamation

Complaint alleges that the Defendants, through their attorney, made four out-of-court statements

on behalf of the Purchasers.  (Abrams Aff., Ex. 3, 4, 5 and 6).  Even assuming, *arguendo*, that

each of the out-of-court statements was defamatory (and the Defamation Complaint contains no

recitation of the purported defamatory meaning of any of the statements), all four of the state-

ments attributed to Defendants are both "fair and true" and concern a "judicial proceeding."  Ac-

cordingly, all of the statements are protected by the absolute privilege of Section 74 of the Civil

Rights Law.

### 1.   The Statements Describe a Judicial Proceeding

        Plaza concedes that at the time each of the out-of-court statements was made,

there was a pending judicial proceeding – i.e., the Real Estate Action.  Indeed, Plaza concedes

that each of the four out-of-court statements directly references the pending Real Estate Action

and describes the allegations of the Real Estate Complaint. (Defamation Compl. ¶¶ 42, 44-48).

As such, there can be no serious dispute that all four of the statements concern a "judicial pro-

ceeding."

## 2. The Statements Were a "Fair and True" Report of a Judicial Proceeding

The reports were also "fair and true," and thereby comply with the second requirement for protection under section 74. "For a report to be characterized as 'fair and true' within the meaning of [Section 74]. . . it is enough that the substance of the article be substantially accurate. ... When determining whether an article constitutes a 'fair and true' report, the language used therein should not be dissected and analyzed with a lexicographer's precision." Holy Spirit Ass'n for Unification of World Christianity v. New York Times Co., 49 N.Y.2d 63, 67-68, 424 N.Y.S.2d 165, 167-168 (1979).

The First Department's ruling in Ford v. Levinson, 90 A.D.2d 464, 454 N.Y.S.2d 846 (1st Dep't 1982), is instructive. In that case, the plaintiffs alleged that the lawyer for a competing model agency had defamed them in connection with a lawsuit that had been commenced by the competing agency. The lawyer was charged with making the following statements about the plaintiffs to a newspaper reporter:

> "(1) that they personally 'sabotaged' Fame Models, Ltd., into bankruptcy; (2) that the plaintiffs personally mismanaged the said agency so as to 'capture' its models for themselves; (3) that the plaintiffs 'used their positions as stockholders of Fame for their own personal benefit'; and (4) that the plaintiffs created 'a vehicle for getting the models away from Elite."

Ford, 90 A.D.2d at 464, 454 N.Y.S.2d at 847.

The Court undertook "[a] comparison of the allegations attributed to defendant in the newspaper article, with the allegations set forth in the underlying complaint in the action which was the subject of the article." Id. at 465, 454 N.Y.S.2d at 847. The Court noted that the complaint alleged that the Fords "did willfully and intentionally interfere with and sabotage the operations of Fame Models, Ltd." and "conspired with others for the purpose of diverting assets

- 9 -

belonging to Fame Models, Ltd." Id.  In light of the fact that the newspaper statements "[fell] within [] the allegations of the complaint," the Court found them to be privileged under Section 74. Id. at 845, 454 N.Y.S.2d at 848.

Courts routinely dismiss defamation claims relating to out-of-court statements, including ones by counsel, that contain a "fair and true" report of a judicial proceeding.  See Lacher v. Engel, 33 A.D.3d 10, 817 N.Y.S.2d 37 (1st Dep't 2006) (dismissing libel claim based by statement given to New York Journal reporter about pending malpractice case); Fishoff v. Abady, 280 A.D.2d 417, 720 N.Y.S.2d 505 (1st Dep't 2001) (dismissing defamation claim arising from statements made by lawyer during a press conference concerning a pending lawsuit); Branca v. Mayesh, 101 A.D.2d 872, 476 N.Y.S.2d 187 (2d Dep't 1984) (dismissing libel claim arising from statements made by a lawyer during a lecture that referred to a previously-dismissed lawsuit), aff'd, 63 N.Y.2d 994, 483 N.Y.S.2d 1011 (1984); see also Denise Rich Songs, Inc. v. Hester, 5 Misc. 3d 1013A, 798 N.Y.S.2d 708 (N.Y. Sup. Ct., N.Y. Co. 2004) (dismissing claim predicated on statements made by lawyer and client to the media concerning a discrimination lawsuit); Riel v. Morgan Stanley, No. 06 CV 524, 2007 U.S. Dist. LEXIS 11153 (S.D.N.Y. Feb. 16, 2007) (dismissing defamation claim arising from statements made by client to Wall Street Journal concerning pending litigation); see also Southridge Capital Mgmt., LLC v. Lowry, No. 01 Civ. 4880 (RO), 2003 U.S. Dist. LEXIS 153 (S.D.N.Y. Jan. 7, 2003) (dismissing plaintiff's defamation claim because complained-of press release was true and fair report of judicial proceeding); see also, The Savage Is Loose Co. v. United Antitrust Theater Circuit, Inc., 413 F. Supp. 555 (S.D.N.Y. 1976) (statements made by counsel to magazine held privileged.) Lehman Bros. Commercial Corp. v. China Int'l United Petrol. & Chem. Co., Ltd., No. 94 CIV. 8304 (JFK), 1995 WL 608313, at *5 (S.D.N.Y. Oct. 16, 1995) (statements made by a representative of

- 10 -

plaintiff after litigation commenced that defendant was "welshing" and "stiffing people" are

privileged because they represent an accurate recitation of allegations in complaint); P&G Co. v.

Quality King Distribs., Inc., 974 F. Supp. 190, 196 (E.D.N.Y. 1997) (dismissing defamation

claim because statements were fair and true reports of judicial proceedings and a substantially

accurate rendering of allegations in complaint).

**B.     The Real Estate Proceeding is Absolutely Privileged and Cannot
         Be The Basis for Liability Being Imposed Upon Defendants**

All statements contained in the Real Estate Complaint are themselves protected by an

absolute privilege and thus cannot constitute the basis for a defamation claim.  Accordingly, any

claims predicated upon statements in the Real Estate Complaint must be dismissed.

**1.     Statements Made in the Course of a Legal
        Proceeding are Absolutely Privileged**

"The Court of Appeals long ago established that a statement made in the course of

legal proceedings is absolutely privileged if it is at all pertinent to the litigation." Mosesson v.

Jacob D. Fuchsberg Law Firm, 257 A.D.2d 381, 382, 683 N.Y.S.2d 88, 89 (1st Dep't 1999) (em-

phasis added) (citing Youmans, 153 N.Y. at 219);  see Seltzer v. Fields, 20 A.D.2d 60, 61, 244

N.Y.S.2d 792 (1st Dep't 1963), aff'd, 14 N.Y.2d 624, 249 N.Y.S.2d 174 (1964).[3]

---

[3]     The Court of Appeals has recognized that the adoption of an absolute privilege sometimes comes
at a price. See Martirano v. Frost, 25 N.Y.2d 505, 508, 307 N.Y.S.2d 425, 427 (1969) (Fuld, C.J.) ("It
may be unfortunate that the plaintiff must suffer an attack on his professional integrity without any means
of judicial redress"). But that price is outweighed by the importance of encouraging vigorous advocacy.
Any other rule would chill lawyers from effectively representing their clients – which would have serious
adverse consequences:

Footnote continued on next page.

The test for whether a statement is "at all pertinent" is very broad, and encompasses anything that could *possibly* be pertinent to the litigation. See Andrews v. Gardiner, 224 N.Y. 440, 445, 121 N.E. 341, 343 (1918) ("The privilege embraces anything that may possibly be pertinent"); People ex. rel. Bensky v. Warden of City Prison, 258 N.Y. 55, 59, 179 N.E. 257, 259 (1931) ("It is only when the language used goes beyond the bounds of reason and is so clearly impertinent and needlessly defamatory as not to admit of discussion that the privilege is lost"); Sexter & Warmflash, P.C. v. Margrabe, 38 A.D.3d 163, 173 828 N.Y.S.2d 315, 324 (1st Dep't 2007) ("To be actionable, a statement made in the course of judicial proceedings 'must be so outrageously out of context as to permit one to conclude, from the mere fact that the statement was uttered, that it was motivated by no other desire than to defame.'"); Lacher v. Engel, 33 A.D.3d 10, 41 817 N.Y.S.2d 37, 41 (1st Dep't 2006) ("the privilege 'embraces anything that may possibly be pertinent . . .'"); Mosesson, 257 A.D.2d at 382 ("All that is required in a statement to be privileged is a minimal possibility of pertinence of the simplest rationality"); Baratta, 136 A.D.2d at 469 ("'[T]he privilege embraces anything that may possibly be pertinent or which has

---

Footnote continued from previous page.

> "But the possible harm to him as an individual is far outweighed by the need --reflected in the policy underlying the privilege here involved -- to encourage parties to litigation, as well as counsel and witnesses, to speak freely in the course of judicial proceedings To decide that a party speaks at his peril, if it later be determined that some statement of his was not technically relevant to the issue involved 'would be an impediment to justice, because it would hamper the search for truth and prevent making inquiries with that freedom and boldness which the welfare of society requires.'"

Martirano, 25 N.Y.2d at 508-509 (quoting Youmans, 153 N.Y. at 220); see also Baratta v. Hubbard, 136 A.D.2d 467, 469, 523 N.Y.S.2d 107, 108 (1st Dep't 1988) ("The rationale for the privilege is that the power of clients to enforce their rights should not be imperiled by subjecting their attorneys to the constant risk of suits for libel or slander. The due administration of justice requires that counsel should be uninhibited in speaking freely to safeguard his clients' interests") (citing Seltzer v. Fields, 20 A.D.2d 50, 244 N.Y.S.2d 792 (1st Dep't 1963); Youmans, 153 N.Y. 214).

enough appearance of connection with the case so that a reasonable man might think it rele-
vant'") (quoting, Seltzer, 20 A.D.2d at 63).

The question of whether a statement is pertinent and protected by the privilege "is
a question of law for the court." Sexter & Warmflash, P.C. v. Margrabe, 38 A.D.2d 163, 173,
828 N.Y.S.2d 315, 324 (1st Dep't 2007); Mosesson, 257 A.D.2d at 382 (citing Bensky v. War-
den, 258 N.Y. at 60) ("Pertinency is a question of law for the court to decide").  In determining
pertinency, '"[a]ll doubt should be resolved in favor of [] relevancy or pertinency, and for the
purposes of relevancy the court will assume the alleged slanderous charges to be true, however
false they may have been in fact'." Baratta, 136 A.D.2d at 469 (quoting, Seltzer, 20 A.D.2d at
62-63).[4]

Under this extremely broad test for pertinence, all of the allegations of the Real
Estate Complaint are pertinent and thus privileged, as explained more fully below.

---

[4]     The standard for determining pertinence cannot be met by claiming that a statement was unneces-
sary or irrelevant to the underlying claim:

> "[I]t will not suffice merely to show that it was unnecessary to plead the offending al-
> legations . . . Thus, the distinction is made in the law of defamation between the ma-
> terial and relevant and the possibly pertinent.  At least for the law of defamation,
> therefore, whatever may be the logic or the rule elsewhere, the possibly pertinent
> need be neither relevant nor material to the threshold degree required in other areas
> of the law.  It is enough if the offending statement may possibly bear on the issues in
> litigation now or at some future time.  Presumably, there is some residual test of ra-
> tionality, but it would seem that the barest rationality, divorced from any palpable or
> pragmatic degree of probability, suffices."

Seltzer, 20 A.D.2d at 62, 244 N.Y.S.2d at 795-796; see also Martirano, 25 N.Y.2d at 508 ("In considering
whether a particular statement is 'pertinent' and, by that token, privileged, we are not limited, as has been
urged, to the narrow and technical rules normally applied to determine the admissibility of evidence");
Marson v. Darrow, 8 A.D.2d 307, 309, 187 N.Y.S.2d 611, 613 (1st Dep't 1959) ("The privilege has been
sustained even where the libelous matter was stricken as impertinent in the original action") (citing Lesser
v. International Trust Co., 175 A.D. 12, 17, 161 N.Y.S. 624 (1st Dep't 1916)).

**2. Any Statements in the Real Estate Complaint Were "Possibly Pertinent" to the Real Estate Action and Were Therefore Protected by the Absolute Privilege**

While Plaza improperly fails to identify any specific allegation of the Real Estate Complaint that it claims is defamatory, there can be no reasonable dispute that *all* of the allegations of the Real Estate Complaint are "pertinent" and thus privileged as a matter of law. All the allegations pertaining to the material adverse design changes to the Apartments; the size, condition, configuration and quality of the Apartments; the Plaintiffs' alleged concealment of the design changes; the alleged false representations of the Plaintiffs and their marketing agent in connection with the sale of the Apartments; and all other allegations of the Real Estate Complaint are clearly pertinent to the Purchasers' claims in the Real Estate Action. Indeed, one could scarcely conceive of a real estate contract dispute that does not refer to the property that is the subject of the dispute; or a fraud claim that does not describe the allegedly fraudulent acts of the parties; or a claim for breach of the covenant of good faith and fair dealing that does not allege bad faith acts of the defendants. All of the allegations of the Real Estate Complaint are pertinent to the claims in the Real Estate Action and, as such, are absolutely privileged.

The First Department has recently reaffirmed the expansive scope of the absolute privilege when it dismissed two defamation complaints that were based on statements made in a judicial proceeding. Sexter & Warmflash, P.C. v. Margrabe, 38 A.D.3d 163, 828 N.Y.S.2d 315 (1st Dep't 2007); Lacher v. Engel, 33 A.D.3d 10, 817 N.Y.S.2d 37 (1st Dep't 2006). In Lacher, the plaintiff and defendant were both attorneys. Lacher sued Engel after Engel filed a malpractice complaint against Lacher on behalf of clients whom Lacher had previously represented. Engel's malpractice complaint, Lacher alleged, was a "sham" filed for the sole purpose of permitting Engel and his clients to defame Lacher while cloaked with the privilege. While the Trial

- 14 -

Court permitted Lacher's defamation claim to proceed, the First Department reversed and dis-

missed Lacher's defamation claims in their entirety because all statements made in the malprac-

tice complaint were absolutely privileged.

        The First Department in Lacher recognized the strong public policy underlying

the absolute privilege and protected Engel's allegations that Lacher was a "liar," a "thief," and a

"pathological character" who had "defrauded" his clients and "extort[ed] payments" from them.

Despite the fact that the First Department found the statements to be "lacking in both style and

restraint" the statements were nonetheless absolutely privileged because they were made in the

course of judicial proceedings. Lacher, 33 A.D.3d at 16, 817 N.Y.S.2d at 42. The First Depart-

ment went on to say that the defamation claims would be dismissed even if the malpractice com-

plaint had been without legal merit:

> If the privilege existed only in cases that were ultimately sustained, none of the
> persons whose candor is protected by the rule -- parties, counsel or witnesses --
> would feel free to express themselves.

Lacher, 33 A.D.3d at 14, 817 N.Y.S.2d at 41. Thus, Plaza's assertion allegation that the Real

Estate Complaint lacks legal merit (Defamation Compl. ¶ 43) is utterly irrelevant to the determi-

nation of "pertinence" and the concomitant applicability of the privilege.

        In Sexter & Warmflash, the First Department similarly dismissed a defamation

complaint that was predicated upon statements made in the course of judicial proceedings. In

Sexter & Warmflash, certain allegedly defamatory statements were made in a letter from a cli-

ent's representative to Sexter & Warmflash, P.C., the client's former attorney. Sexter & Warm-

flash sued for defamation, claiming that the letter falsely stated that Sexter & Warmflash had

committed malpractice, exercised poor legal judgment, charged a usurious fee, and subverted its

- 15 -

client's interests in favor of a quick settlement. Despite the harsh and negative content of the

letter which gave rise to the defamation suit, and the alleged malice with which the letter was

published, the First Department, recognized the broad scope of the absolute privilege for judicial

proceedings and dismissed the defamation complaint:

> In view of the public policy to permit persons involved in judicial proceedings to
> write and speak about it freely among themselves, pertinent statements made in
> the course of such proceedings are afforded the protection of privilege 'irrespec-
> tive of the motive with which [the statements] are made.'

Sexter & Warmflash, 38 A.D.3d at 172, 828 N.Y.S.2d at 323.

      Courts routinely dismiss actions involving statements made in the course of judi-

cial proceedings because such statements are absolutely privileged. Martirano, 25 N.Y.2d at

508, 307 N.Y.S.2d at 427 (party's unsworn statement in open court held privileged); Youmans,

153 N.Y. at 214 (statement in a letter from attorney to fifty potential witnesses subpoenaed for

trial held privileged); Arts4All, Ltd. v. Hancock, 5 A.D.3d 106, 108, 773 N.Y.S.2d 348, 351 (1st

Dep't 2004) (statement in letter from witness to judge that plaintiff was trying to intimidate him

held privileged); Impallomeni v. Meiselman, Farber, Packman & Eberz, P.C., 272 A.D.2d 579,

580, 708 N.Y.S.2d 459, 460 (2d Dep't 2000) (statement in letter from attorney to judge about the

behavior of a court reporter held privileged); Lemberg v. Blair Communs., 258 A.D.2d 291, 292-

293, 685 N.Y.S.2d 435, 436 (1st Dep't 1999) (out-of-court verbal exchange between attorneys

subject to privilege); Papa v. Regan, 256 A.D.2d 452, 453, 682 N.Y.S.2d 94, 95 (2d Dep't 1998)

(communications among parties to a matrimonial action and their respective counsel held privi-

leged); Jones Lang Wootton USA v. LeBoeuf, Lamb, Greene & MacRae, 243 A.D.2d 168, 182-

83, 674 N.Y.S.2d 280, 290 (1st Dep't 1998) (statement at settlement conference held privileged);

Caplan v. Winslett, 218 A.D.2d 148, 152-153, 637 N.Y.S.2d 967, 970 (1st Dep't 1996) (state-

ment made by lawyer to opposing counsel that plaintiff was either on drugs or mentally unstable held privileged); O'Brien v. Alexander, 898 F. Supp. 162, 170-171 (S.D.N.Y. 1995) (statements made at a meeting where potential witnesses were asked to testify in a case were privileged), aff'd in part, rev. on other grds in part, 101 F.3d 1479 (2d Cir. 1996).

### 3. Plaintiffs Cannot Circumvent the Privilege With a Conclusory Allegation of "Malice" Or "Sham" Pleading

Plaza has sought to evade the protections of Section 74 by maintaining that the Real Estate Complaint was "sham" because it was filed "merely in an effort to blackmail Plaintiffs into returning Defendants' deposit and that Defendants' actions were really motivated by the inability of Defendants to purchase additional penthouse apartments and by the fact that PH 2009 and PH 2011 were not readily combinable and thus, that Vavilov would not have the biggest apartment in the world renowned Plaza." (Defamation Complaint, ¶ 50). Putting aside that Plaza has made no motion challenging the sufficiency of the Real Estate Complaint, the motivation ascribed by Plaza to the Purchasers is insufficient, on its face, to avoid the terms of section 74: "The absolute privilege conferred upon statements made in the course of litigation is complete, irrespective of the motive with which [the statements] are used." Mosesson, 257 A.D.2d at 383 (quoting, Marsh v. Ellsworth, 50 N.Y. 309, 311-12 (1872)); see also Ticketmaster Corp. v. Lidsky, 245 A.D.2d 142, 143, 665 N.Y.S.2d 666 (1st Dep't 1997).

The only exception to Section 74 thus far recognized is when a complaint is filed "solely as a vehicle and occasion to disseminate false and defamatory material", Soumayah v. Minnelli, 19 A.D.3d 337, 797 N.Y.S.2d 287 (1st Dep't 2005), "solely as a shield against liability for the dissemination of defamatory accusations", Ulrich v. Hausfeld, 269 A.D.2d 526, 704 N.Y.S.2d 495 (2d Dep't 2000), simply as an "ingenious means of defamation", Williams v. Wil-

- 17 -

liams, 23 N.Y.2d 592, 598, 298 N.Y.S.2d 473, 479 (1969). No such claim has even been made

here. Indeed, where, as here, a defendant is diligently pursuing its claim and no court has held its

action to constitute a sham, any claim that Section 74 is inapplicable must be rejected. [5] See La-

cher, 33 A.D.3d at 14, 817 N.Y.S.2d at 40-41.

Every statement in the Real Estate Complaint is pertinent to the dispute contained

therein. As such, every statement is protected by absolute privilege and the Defamation Com-

plaint must be dismissed.

## II.

### THE FOUR STATEMENTS AT ISSUE ARE
### NON-ACTIONABLE OPINION

New York law constitutionally protects opinions, which may not be the subject of

defamation actions. See Rinaldi v. Holt, Rinehart & Winston, Inc., 42 N.Y.2d 369, 380, 397

N.Y.S.2d 943, 950 (1977), cert denied, 434 U.S. 969 (1977) ("Opinions, false or not, libelous or

not, are constitutionally protected and may not be the subject of private damage actions, provided

that the facts supporting the opinions are set forth"); Jaszai v. Christie's, 279 A.D.2d 186, 188,

719 N.Y.S.2d 235 (1st Dep't 2001).

---

[5]     Plaintiffs' conclusory allegation that the Real Estate Complaint was a "sham" may also be an ef-
fort to squeeze within the purview Halperin v. Salvan, 117 A.D.2d 544, 499 N.Y.S.2d 55 (1st Dep't
1986). Halperin does not apply here -- that case is an "aberration" that "misstates the law," Pandozy v.
Tobey, No. 06 Civ. 12885 (CM), 2007 U.S. Dist. LEXIS 76400 (S.D.N.Y. Oct. 11, 2007). The more re-
cent First Department cases upon which Defendants rely reveal Halperin has been largely disavowed and
limited to its peculiar facts.

Courts consider four factors when differentiating fact from opinion:

1. "whether the specific language in issue has a precise meaning which is readily understood or whether it is indefinite and ambiguous";

2. "whether the statement is capable of being objectively characterized as true or false";

3. "the full context of the communication in which the statement appears"; and

4. "the broader social context or setting surrounding the communication including the existence of any applicable customs or conventions which might 'signal to readers or listeners that what is being read or heard is likely to be opinion, not fact.'"

Steinhilber v. Alphonse, 68 N.Y.2d 283, 292, 508 N.Y.S.2d 901 (1986) (quoting, Ollman v. Evans, 750 F.2d 970, 983 (1974)); Jaszai, 279 A.D.2d at 188. Whether a statement constitutes fact or opinion is a question "of law for the court." Steinhilber, 68 N.Y.2d at 290. When each of these factors is considered, it is clear that the statements in the Press Release and the three cited articles contain opinion, nothing more.

## A. The Statements Attributed to Scharf Used Ambiguous and Indefinite Language that Lacked Precise Meaning and Could Not Be Objectively Characterized as True or False

The first two factors considered by New York courts require a finding that the statements attributed to defendants were protected opinion. The statements attributable to the defendants here are classic expressions of opinion that cannot be objectively verified. For example, Plaza claims the following statement is defamatory:

"My client was lead [sic] to believe that it would receive one of the most luxurious apartments in New York history, it got far less than it bargained for."

(Defamation Compl. ¶ 58).

- 19 -

Whether an apartment is the "most luxurious," something less than that, or something more than that, is obviously a subjective matter of opinion, which cannot be actionable. Similarly, the allegation that a space was "attic-like" or that a drainage grate was "unattractive" are similarly matters of non-actionable opinion. (Defamation Compl. ¶ 58). And similarly, the allegation that the Apartments did not "embod[y] the height of elegance and sophistication" is again purely a subjective statement. (Defamation Compl. ¶ 59). Likewise, the statement that the Plaintiffs' design changes "diminished the condo's size, shrank windows and lowered ceilings" is susceptible to subjective interpretation, and constitutes non-actionable opinion. (Defamation Compl. ¶ 60).

Courts have repeatedly found similar statements to be non- actionable because of their ambiguity, subjective nature and inability to be objectively verified. In 600 W. 115th St. Corp. v. Von Gutfield, 80 N.Y.2d 130, 142, 589 N.Y.S.2d 825, 831 (1992), the Court of Appeals held that a statement that a restaurant "denigrated" the building in which it was located was not actionable. The statement fell "far short of any requirement of verifiability." Id. It was "no more or less factual than a claim that the restaurant 'enhanced' the building, and it cannot support an action for defamation." Id.

Similarly, Rand v. New York Times Co., 75 A.D.2d 417, 422, 430 N.Y.S.2d 271, 273 (1st Dep't 1980), concerned a charge that the plaintiff had "screwed over" his client. This Court held that the comment "is classically pure opinion, and thus not actionable, no matter how derogatory [defendant's] description of [plaintiff's] managerial talents." Id. at 423; see also Locke v. Aston, 1 A.D.3d 160, 160, 767 N.Y.S.2d 23, 24 (1st Dep't 2003) ("defendant's statement that plaintiff did 'substandard' work and that the manuscript was 'not up to standard' are constitutionally protected opinion"); Park v. Capital Cities Communs. Inc., 181 A.D.2d 192, 197,

585 N.Y.S.2d 902 (4th Dep't 1992) (statement that a doctor was a "rotten apple" held to be non-actionable); Amodei v. New York State Chiropractic Ass'n, 160 A.D.2d 279, 281, 553 N.Y.S.2d 713, 716 (1st Dep't 1990) (accusation of "unprofessional conduct" held to be "constitutionally protected expression of opinion"); Hollander v. Cayton, 145 A.D.2d 605, 606, 536 N.Y.S.2d 790, 792 (2d Dep't 1988) (statements that a physician was "immoral," "unethical" and had "mismanaged cases" held to be "indefinite, ambiguous and incapable of being objectively characterized as true or false"); O'Loughlin v. Patrolmen's Benevolent Ass'n, 178 A.D.2d 117, 118, 576 N.Y.S.2d 858, 859 (1st Dep't 1991) (statement that a police officer was a "disgrace to the entire police service" not actionable); Parks v. Steinbrenner, 131 A.D.2d 60, 61, 520 N.Y.S.2d 374 (1st Dep't 1987) (statement that an umpire was a "scab" "not capable of handling" his job was not actionable).

All the statements that were protected opinion in these cases—e.g., that a restaurant "denigrated" a building, that a manager "screwed over" a client, that a doctor was a "rotten apple" or an "unethical" character who had "mismanaged cases", that a police officer was a "disgrace," etc.--are not materially different than Scharf's statements that the Apartments were "unattractive," "less than what [Purchasers] bargained for," or that the space was "attic-like" or that the windows were "dwarfed." Scharf's out-of-court statements were opinion as matter of law and the Defamation Complaint must be dismissed on that basis as well.

**B.    The Context in Which the Statements Appeared and the Broader Social Context Surrounding the Statement Support a Finding that the Statement was Opinion**

Analysis of the third and fourth factors confirms Scharf's statement were protected opinion.

1.    **Scharf was Identified in the Article as the Lawyer
       Representing the Plaintiffs in the Real Estate Action
       and was Clearly Not a Disinterested Observer**

The context in which Scharf made the statements requires them to be found opin-

ion. The very same sentence which quoted Scharf, also identified him as the lawyer representing

the Purchasers in the Real Estate Action, thereby alerting the reader that he was not a dispassion-

ate observer but an advocate for a particular position. See Brian v. Richardson, 87 N.Y.2d 46, 53,

637 N.Y.S.2d 347, 352 (1995) (statements in a newspaper article were non-actionable because

"[a]t the outset of the article, defendant disclosed that he had been Inslaw's attorney, thereby

signalling that he was not a disinterested observer"); see also Immuno AG v. Moore-Jankowski,

77 N.Y.2d 235, 254, 566 N.Y.S.2d 906, 916, cert denied, 500 U.S. 954 (1991) ("[Defendant] (a

known animal rights activist) and IPPL [International Primate Protection League] (whose very

name broadcasts its point of view) were fully identified to readers of the letter. The letter made

clear that its purpose was to voice the conservationist concerns of this partisan group. . .").  As in

the above cases, any reasonable reader would have understood that Scharf's statements were

made as an advocate's opinion in support of his client's cause, and are thus not actionable.

2.    **The Statements Were Clearly Identified as
       Allegations in a Lawsuit, Not Statements of Fact**

The Press Release and each of the three articles cited by Plaintiffs used particular-

ized language that carefully signaled the reader that the statements about Plaintiffs and the

Apartments contained in the Real Estate Complaint were not established facts, but mere allega-

tions.  The Press Release contains a general description of the allegations of the Real Estate

Complaint, and each and every paragraph of the Press Release contains language making it clear

that the statements in the Press Release are solely allegations contained in a complaint, and are

not statements of fact:

"the would-be buyer filed a lawsuit . . ."

"The lawsuit alleges . . ."

". . . the Complaint further alleges . . ."

". . . as alleged, the conditions of the Penthouses utterly failed to live up to the standards of luxury . . ."

". . . this lawsuit was filed . . ."

"The lawsuit claims . . ."

". . . as alleged in the Complaint."

"The lawsuit claims . . ."

"As we allege in our Complaint . . ."

(Abrams Aff., Ex. 3).

Similarly, the First Post Article makes it clear that the statements are simply a report on allegations made in connection with Purchasers' legal proceeding and not statements of fact. ("In a $31 million suit . . . The suit says . . ."). (Abrams Aff. Ex. 4). The First Post Article also contains a response from Plaintiffs' lawyer Jay Neveloff: "El-Ad lawyer Jay Neveloff said the suit is 'baseless at its core.'" (Abrams Aff. Ex. 4).

The WSJ Article does not quote Scharf, but merely reports on the allegations in the lawsuit, making it clear that the statements are mere allegations. ("The lawsuit, filed September 5 in New York State Supreme Court . . .") (Abrams Aff. Ex. 5). The WSJ Article also gives equal time to the Plaintiffs' lawyer, who is quoted as saying that the Real Estate Complaint's "meritless allegations are aimed at camouflaging the Purchaser's failure to meet his legal obligation to close." (Abrams Aff., Ex. 5).

The Second Post Article, published on September 10, 2008, quotes Scharf as al-

legedly stating that "people have reached out to us to share their experiences with El-Ad at the

Plaza." (Defamation Compl. ¶ 61; Abrams Aff. Ex. 6). The Defamation Complaint does not

identify how or why this innocuous statement would be considered defamatory. In any event,

the statement is demonstrably true, as at least one other proposed purchaser of a Plaza Condo-

minium has sued El-Ad alleging the same type of misconduct as alleged by the Purchasers in the

Real Estate Complaint. (See Abrams Aff., Ex. 7).

Given the actual words used, any reasonable reader would have understood

Scharf's quote to be nothing more than allegations in a lawsuit. See Brian, 87 N.Y.2d at 53 ("a

reasonable reader would understand the statements defendant made about plaintiff as mere alle-

gations to be investigated rather than as facts") (emphasis in the original). That further requires a

finding that Scharf's statements were opinion.

### 3. The Statements Were Identified as Being Made in the Context of Litigation

A reader of the article would have known that the statement was made in the con-

text of a hotly-disputed litigation. Indeed, Plaintiffs' own lawyer was quoted in each of the three

articles that were cited in the Defamation Complaint. In each case, the Plaintiffs' counsel deni-

grates the Real Estate Complaint.

The fact that the statement was made in the context of litigation supports a finding

of opinion. See Steinhilber, 68 N.Y.2d at 294 ("'[E]ven apparent statements of fact may assume

the character of statements of opinion, and thus be privileged, when made in public debate,

heated labor dispute, or other circumstances in which an 'audience may anticipate [the use] of

epithets, fiery rhetoric or hyperbole'"), quoting, Information Control Corp. v. Genesis One Com-

puter Corp., 611 F.2d 781, 784 (9th Cir. 1980); Karp v. Hill & Knowlton. Inc., 631 F. Supp. 360, 365 (S.D.N.Y. 1986) ("The release identified the speaker as the president of Buckingham, a party to the ongoing litigation. His statement, that he found support in the court's ruling, could reasonably have been understood only as an effort to put the best face on an unfavorable Second Circuit ruling.").

In Information Control Corp., a case relied upon by the Court of Appeals, see Steinhilber, 68 N.Y.2d at 294, the Ninth Circuit held that a comment was protected opinion in part because the "statement was published as part of an article dealing with the litigation". Information Control Corp., 611 F.2d at 784 n. 1. The court explained: "Business litigants frequently disparage an opponent's suit as a meritless tactical device. Such charges may not be commendable, but they are highly unlikely to be understood by their audience as statements of fact rather than the predictable opinion of management." Information Control Corp., 611 F.2d at 784. For the same reasons, Scharf's statements (or Mr. Neveloff's counterstatements, for that matter) would not have been understood as one of fact, rather than an advocate's opinion, and the Defamation Complaint must be dismissed.

## CONCLUSION

For all the foregoing reasons, the Defamation Complaint should be dismissed with prejudice, together with such other and further relief as the Court deems just and proper.

Dated:  New York, New York
        October 1, 2008

Respectfully submitted,

CAHILL GORDON & REINDEL, LLP

By: _____
    Floyd Abrams
    Sogol Somekh
    80 Pine Street
    New York, New York 10005
    (212) 701-3000

-and-

MORRISON COHEN LLP

By: _____
    W David Scharf
    David A. Piedra
    Ethan R. Holtz
    909 Third Avenue
    New York, New York  10022
    (212) 735-8600

*Counsel for Defendants Penthouse 2009, Inc., Penthouse 2011, Inc. and Andrei Vavilov*

# NEW YORK POST

## My Suite at Plaza Is Sour Deal

By Lois Weiss and Eric Lenkowitz
September 9, 2008

Low ceilings. Columns in the living room. Drainage grates outside the windows.

What sounds like a Lower East Side tenement is actually a $53.5 million pair of Plaza penthouses bought by Russian hedge-fund manager Andrei Vavilov, who says the developer promised him the epitome of luxury and then handed over an "attic-like space."

In a $31 million suit, Vavilov says the purchase - which would have represented the second-highest amount for a residential sale in New York City history - was the result of a bait-and-switch scam. Unlike The Plaza hotel of the children's story "Eloise," where rooms "embodied the height of elegance and sophistication, the same cannot be said of the penthouses," said lawyer Y. David Scharf, who filed the suit Friday in Manhattan Supreme Court.

"The disparity between what they were supposed to get and what [developer] El-Ad was planning to deliver to them is outrageous."

Vavilov's wife, Russian actress Maryana Tsaregradskaya, "burst into tears" when she first saw the finished unit on June 28.

The "expansive" middle floor of the triplex has a massive column in the center of the living room, photos taken during their walk-through show.

The promised floor-to-ceiling windows start three feet from the floor and have thick frames around each pane.

And what should be a sweeping view of Central Park is obstructed on the middle floor by a "hideous" drainage grate, which the suit says was not part of the plans presented to the couple.

Vavilov, a former Moscow lawmaker who made $600 million with the 2002 sale of his oil company, put down a $10.6 million deposit on the triplex and duplex units, which he planned to combine into one living space.

Vavilov says he was led to believe the ceilings would reach 12.5 feet on the middle floor. He ended up with barely nine.

The suit says developer El-Ad and its selling agent, Stribling, "intentionally concealed" all the alterations.

Scharf said the couple was refused access to the units and repeatedly told that no updated construction plans existed.

El-Ad lawyer Jay Neveloff said the suit is "baseless at its core."

"The apartments as delivered are the apartments as described on the plans he reviewed and the contract he signed," he said.

Note: The *New York Post* story was picked up by the *Drudge Report* and the *Norfolk Examiner*.



**Plaza Hotel Owner Is Sued**
Penthouses Buyer Says El-Ad Engaged In 'Bait and Switch'

By Jonathan Karp
September 9, 2008; Page B8

A buyer who agreed to pay $53.5 million for two penthouse condominiums in New York's Plaza Hotel sued developer El-Ad Properties NY LLC for fraud, seeking a refund of his $10.7 million deposit and more than $20 million in damages.

The lawsuit, filed Sept. 5 in New York State Supreme Court, is one of the highest-profile examples of the mushrooming legal actions by condo buyers throughout the country because of the collapse of home values. Until recently, Manhattan's luxury-condo market was relatively unscathed by the crisis, but it is beginning to show signs of stress.

The lawsuit names the buyer of the penthouses only by corporate names, but people familiar with the deal identified him as Andrey Vavilov, a financier and former deputy Russian finance minister. Plaintiff's attorney Y. David Scharf wouldn't confirm or deny if Mr. Vavilov is the buyer. Mr. Vavilov didn't respond to an email for comment.

The suit alleges that El-Ad engaged in a "bait and switch" in which the developer made -- and failed to disclose – "unilateral and impermissible design changes" that diminished the condos' size, shrank windows and lowered ceilings.

The lawsuit states that the penthouses were purchased "sight unseen," based on representations by El-Ad and models, since the units hadn't been built. Yet instead of the promised elegance, "the completed penthouses utterly fail to live up to the representations...of superior condition, quality and overall appearance," the suit says.

El-Ad paid $675 million for the Plaza in 2004 and says it has spent $500 million renovating the property.

El-Ad dismissed the allegations as baseless. Jay Neveloff, a lawyer representing the developer, in a statement said: "Its meritless allegations are aimed at camouflaging the purchaser's failure to meet his legal obligations to close" the purchase.

El-Ad declared the buyers, named Penthouse 2009 Inc. and Penthouse 2011 Inc., in default when they refused to follow through with the purchase and kept deposits of $10.7 million.

# NEW YORK POST

**White Elephant**
Peeved Plaza Buyers Reselling Half the Apts

By Braden Keil and Lukas I. Alpert
September 10, 2008

Eloise may be very lonely.

As many as 25 apartments in the world-famous Plaza are back on the market, with many owners struggling to sell their units in the problem-plagued building, The Post has learned.

"It's overwhelming," said one broker. "That's more than 50 percent of the residences that are for sale. I've never seen it happen before."

The relisted residences in the revamped building range in price from $1.8 million to $50 million. Some have languished on the slumping sales market for as long as six months with multimillion-dollar reductions. And more may be available soon, insiders said.

Many who bought into the building after its three-year renovation have been dissatisfied with a range of issues, from small windows to low ceilings to buckling floors.

Out of all the listings, just one apartment appears to be in contract, records show, and some sellers have been dropping their asking prices.

There are also 20 apartments for rent ranging from $5,800 to $75,000 a month.

The latest apartments to appear on the market include one owned by fashion icon Tommy Hilfiger, who is asking $50 million.

Other high rollers who have bought into the legendary property include embattled developer Harry Macklowe, New England Patriots owner Robert Kraft and James Cayne, head of now-defunct Bear Stearns. None are pulling out just yet.

The flood of listings comes as word that the apartments that had been sold - sight unseen - during renovations were not as promised.

The Post reported yesterday that Russian hedge-fund manager Andrei Vavilov filed a $31 million lawsuit against the project's developer El-Ad, claiming that the penthouse apartment they sold him was more like an "attic" than the luxury digs he'd been promised.

Vavilov's attorney argued his client was not alone in his discontent.

"Since this lawsuit was filed, people have reached out to us to share their experiences with El-Ad at The Plaza," Vavilov's attorney, David Scharf, told The Post.

"The biggest disappointment is it's not what was promised, from the windows to the ceiling heights," one broker said. "They should've been more honest."

Elizabeth Stribling, President and owner of Stribling & Associates that markets The Plaza Residences, stood by the project.

"This situation strikes me as a good old-fashioned case of 'buyer's remorse,' " she said in a statement. "The purchaser, who now appears to have changed his mind and wishes to break his contract, has no basis for doing so."

Brokers have also complained that potential clients had been treated cavalierly by Stribling.

"They wouldn't even allow them to go upstairs to see the views and the actual space," said one high-end agent who brought in a customer with a $20 million-plus budget.

Another broker, Dolly Lenz, said her customer just gave up after a few visits to the building.

"My client felt he wasn't getting the full story and finally decided to go elsewhere," she said.

There have been other problems as well.

One buyer of a two-bedroom apartment said her floors were buckling and that her ceiling was falling, said a person familiar with the sale.

The lighting on the building is also in need of replacing, after it was discovered that the lights El-Ad installed weren't weatherproof.