EXHIBIT  19

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------------------------X
                                      :

PENTHOUSE 2009, INC. and
PENTHOUSE 2011, INC.,                   :      Index No.

                 Plaintiffs,   :

      - against -                :

                                        **COMPLAINT**

PLAZA RESIDENTIAL OWNER LP, CPS 1  :
REALTY LP, EL-AD PROPERTIES NY LLC,
STRIBLING MARKETING ASSOCIATES LLC  :
and KRAMER LEVIN NAFTALIS & FRANKEL
LLP, as Escrow Agent                :

              Defendants.  :

--------------------------------------------------------------X

Plaintiffs Penthouse 2009, Inc. and Penthouse 2011, Inc. (collectively, "Plaintiffs"), by their attorneys, Morrison Cohen LLP, as and for their Complaint against defendants Plaza Residential Owner LLP ("Sponsor"), CPS 1 Realty LP ("CPS 1"), El-Ad Properties NY LLC (collectively, with Sponsor and CPS 1, "El-Ad"), Stribling Marketing Associates LLC ("Stribling") and Kramer Levin Naftalis & Frankel LLP, as Escrow Agent ("Kramer Levin") (collectively, the "Defendants"), allege, upon information and belief, as follows:

## NATURE OF THE ACTION

1.      Plaintiffs bring this action against Defendants to, among other things, enforce their rights in connection with agreements, dated February 5, 2007, relating to their purchase of two luxury penthouse apartments in the Plaza Condominium Residences located at One Central Park South at the corner of Central Park South and Fifth Avenue in New York City (the "Penthouses").

2.      The residential portion of the Plaza Condominium Residences (the "Plaza") consists of approximately 181 private residences developed in connection with El-Ad's extensive renovations to the landmark building on the grounds of the historic Plaza Hotel in New York City (the "Building").

3.      The Penthouses were constructed as new construction on the top of the existing structure of the Building and were represented to be outstanding in every respect, including in terms of their quality, condition, overall appearance and unique views.

4.      The Penthouses were represented by El-Ad as the epitome of luxury living at the world's most prestigious address. El-Ad represented the private residences as oases of "endless possibilities" and "timeless elegance," with "superb views." Together, through the purchase agreements for the Penthouses (the "Agreements"), the offering plan for the Plaza and the building plans, among other things, El-Ad represented that the Penthouses in their finished condition would be magnificent and reflective of the "one of a kind property" that El-Ad proclaimed the Plaza to be.

5.      The Penthouses were bought, sight unseen, based upon representations made by El-Ad, and by the Sponsor individually, in the Agreements and the offering plan for the condominium as well as the building plans and building models for the Plaza (collectively, the "Representations"). However, unlike in the classic *Eloise* series of children's books set in the Plaza Hotel, where the rooms at the Plaza Hotel embodied the height of elegance and sophistication, the same can not be said of the Penthouses. The completed Penthouses utterly fail to live up to the representations of El-Ad to Plaintiffs of superior condition, quality and overall appearance.

2

6.       Plaintiffs contracted to purchase the Penthouses for a combined purchase price of $53,500,000.  Plaintiffs have placed into escrow a combined deposit of $10,700,000 for the Penthouses.

7.       After the Agreements were executed, the Sponsor made unilateral and impermissible design changes to the Penthouses diminishing the livable square footage, cutting down sight lines, minimizing windows and lowering ceilings, and failed to disclose such changes to Plaintiffs.

8.       The adverse material changes were made to the Penthouses and the other penthouse apartments in the Building during the planning approval and construction phases of the building renovation.   Although these changes materially impacted the apartments in a negative way, El-Ad chose not to disclose the changes but, through deceit and omission of material facts, on which it was advised by its counsel, purposely misled Plaintiffs.

9.       El-Ad and its selling agent, Stribling, intentionally concealed the modifications to the design of the Penthouse by refusing to permit access, refusing to provide drawings and building plans, and failing to disclose the changes in any amendment to the Offering Plan.

10.      Purchasers of the penthouse apartments did not discover the true condition of their units until a walk-through inspection scheduled shortly before the anticipated closing date set by El-Ad.  If there was objection by a purchaser, El-Ad would, as a matter of practice, seek to intimidate the purchaser by declaring a default under the purchase agreement and then threatening to keep the purchaser's substantial deposit as a form of liquidated damages.  El-Ad's intimidation tactics also included threatening to hold prospective purchasers liable for any adverse publicity that making a claim might bring upon the Plaza or El-Ad.  In cases where

intimidation did not work, El-Ad has sought to pacify complaining purchasers with modest purchase price adjustments.

11.     El-Ad, knowingly and intentionally, engaged in a "bait and switch" whereby the Agreements and its representations promised one thing and it then delivered something quite different.

12.     Through this well-orchestrated scheme motivated by its own self-interest and greed, El-Ad engaged in a strategy designed to induce the purchasers of the private residences to proceed to closing and to avoid a mass exodus of prospective purchasers from the Plaza.

13.     In the same manner, El-Ad, along with Stribling, misled other purchasers and prospective purchasers of units in the Building as well as the public at large as to the condition and quality of the private residences. By their actions, they perpetrated a fraud against the public and those involved in the exclusive luxury condominium market.

14.     Plaintiffs seek a judgment (1) declaring that Sponsor is in breach of its obligations under the Agreements, (2) directing that Plaintiffs be offered a fifteen day period within which they may rescind the Agreements and, upon rescission, be entitled to the return of their deposits with interest thereon, and, or in the alternative, (3) awarding monetary damages in an amount to be determined at trial to compensate Plaintiffs for, among other things, (i) the costs and expenses that they have incurred relating to the Penthouses, (ii) the higher prices that they will now need to spend to secure alternative comparable living accommodations as a result of price inflation in the market for such residences, (iii) the decreased value of the Penthouses, and (iv) the deposits for the Penthouses, or any portion thereof, that the Court may deem Plaintiffs to have forfeited.

## PARTIES

15.     Plaintiff Penthouse 2009, Inc. is a corporation organized and existing under the laws of the State of New York with an address c/o Salisbury & Ryan LLP located at 1325 Avenue of the Americas, New York, New York 10019.

16.     Plaintiff Penthouse 2011, Inc. is a corporation organized and existing under the laws of the State of New York with an address c/o Salisbury & Ryan LLP located at 1325 Avenue of the Americas, New York, New York 10019.

17.     Defendant Plaza Residential Owner LP is a limited partnership organized and existing under the laws of the State of Delaware with its principal place of business located c/o El-Ad Properties NY LLC at 575 Madison Avenue, New York, New York 10022. The Sponsor is one hundred percent owned by El-Ad Properties NY LLC.

18.     Defendant CPS 1 Realty LP is a limited partnership organized and existing under the laws of the State of Delaware with a place of business c/o El-Al Properties NY LLC at 575 Madison Avenue, New York, New York 10022. It was the original sponsor for the Plaza, and is also completely owned by El-Ad Properties NY LLC.

19.     Defendant El-Ad Properties NY LLC is a limited liability company organized and existing under the laws of the State of New York with its principal place of business located at 575 Madison Avenue, New York, New York 10022. El-Ad Properties NY LLC is affiliated with the El-Ad Group, a global real estate company that owns and develops properties around the world.

20.     Defendant Stribling Marketing Associates LLC is a limited liability company organized and existing under the laws of the State of New York, with an office located at 924 Madison Avenue, New York, New York 10021. Stribling is listed as the Selling Agent for the

Plaza in the Offering Plan and was the primary sales point of contact for Plaintiffs in connection with their purchase of the Penthouses.

21.     Kramer Levin Naftalis & Frankel LLP, named herein in its capacity as escrow agent pursuant to the Agreements, is a limited liability partnership organized and existing under the laws of the State of New York, with its principal office located at 1177 Avenue of the Americas, New York, New York 10036. Pursuant to the Agreements, Kramer Levin is the Sponsor's counsel as well as the Escrow Agent for the escrow account in which the deposits for the Penthouses are held.

## JURISDICTION AND VENUE

22.     This Court has personal jurisdiction over Defendants pursuant to CPLR § 301. Defendants are residents of New York and the actions complained of arose in New York.

23.     Venue is proper within this judicial county pursuant to CPLR § 503 in that Plaintiffs and Defendants are residents of this judicial county.

## FACTS COMMON TO ALL CAUSES OF ACTION

### A.     The Development of the Plaza

24.     CPS 1 acquired the land located at Fifth Avenue and Central Park South, and all improvements thereon, including the Plaza Hotel, on or about October 15, 2004 for approximately $675 million.

25.     Upon CPS 1's purchase of the Building, El-Ad embarked upon a renovation of the Building costing a few hundred million dollars. It unveiled a plan to, among other things, convert and develop part of the Plaza Hotel into private condominium residences while retaining a portion of the Building as a hotel.

26.     As part of its renovations, El-Ad constructed two new floors on top of the Building to be sold as penthouse apartments. The Penthouses are located, in part, on these two floors of new construction.

27.     El-Ad's plans for the Building are detailed in the Offering Plan for the Plaza Condominium Residences (along with amendments thereto, the "Offering Plan"), filed on or about December 7, 2005. Plaintiffs received a copy of the Offering Plan before agreeing to purchase the Penthouses.

28.     In the Offering Plan, CPS 1 is listed as the sponsor for both the residential and hotel portions of the Plaza.

29.     Pursuant to the Seventh Amendment to Condominium Offering Plan for the Plaza Condominium Residences, dated April 7, 2006, the Sponsor assumed all of the rights, privileges, obligations, responsibilities, undertakings and liabilities of CPS 1 in connection with the Plaza project.

**B.    El-Ad's Efforts To Create A Premium Worldwide Brand
       Based Upon Its Development Of The Plaza And The Plaza
       Hotel's Reputation For Being A World Class Symbol Of Luxury**

30.     The Plaza Hotel in New York City is an iconic hotel that opened in 1907 and has been known and widely acclaimed for its class, elegance and standards of excellence for over 100 years.

31.     The Building was designated as a landmark by the New York City Landmark Preservation Commission (the "Landmarks Commission") in 1969. Consistent with this designation, the Building is governed by Chapter 8-a of the Administrative Code of the City of New York and all exterior modifications to the Building must be approved by the Landmarks Commission. At all relevant times, El-Ad was aware of this requirement.

32.     El-Ad and its affiliates have embarked upon a business plan to expand the Plaza brand to major cities around the world and are actively developing properties for the brand.

33.     The El-Ad Group is in the process of developing a $6 billion multi-use complex in Las Vegas, Nevada using the Plaza brand.

34.     The Plaza brand, due to the class and elegance associated with the legendary Plaza Hotel, has a reputation for standards of excellence and luxury around the world.

35.     El-Ad and its agents have marketed the Plaza as a place of "endless possibilities" and "timeless elegance." They have also extolled the "superb views" and "high ceilings" at the Plaza.

36.     El-Ad and its agents believe that key to the further development of the Plaza brand is showcasing a particular type of lifestyle predicated on the finest the world has to offer in design, amenities, service and luxury. It is El-Ad's goal to have the Plaza brand project all of those qualities and to benefit financially as a result.

37.     To that end, El-Ad and its agents have highly touted the sales of apartments at the Plaza, including the record breaking sale prices for the private residences and the quick pace of such sales. Among other things, El-Ad is marketing the Plaza brand, in part, based upon such information and the aura of magnificence and exclusivity that it engenders.

## C.    The Agreements

38.     On or about February 5, 2007, Penthouse 2009, Inc. entered into an agreement with the Sponsor to purchase Unit No. PH 2009, a triplex penthouse apartment at the Plaza, for a purchase price of $39,500,000 (the "PH 2009 Agreement"). PH 2009 covers sections of the 19th through 21st floors of the Building.

39.     In connection with the purchase of PH 2009, Penthouse 2009, Inc. paid a cumulative deposit of $7,900,000, with a $3,950,000 deposit paid upon the execution and

submission of the PH 2009 Agreement, and another $3,950,000 deposit paid on or about April 5, 2007.

40.    On or about February 5, 2007, Penthouse 2011, Inc. entered into an agreement with the Sponsor to purchase Unit No. PH 2011, a duplex penthouse apartment at the Plaza, for a purchase price of $14,000,000 (the "PH 2011 Agreement"). PH 2011 covers sections of the 19th and 20th floors of the Building.

41.    In connection with the purchase of PH 2011, Penthouse 2011, Inc. paid a cumulative deposit of $2,800,000, with a $1,400,000 deposit paid upon the execution and submission of the PH 2011 Agreement, and another $1,400,000 deposit paid on or about April 5, 2007.

42.    The terms of the Agreements are identical except for the purchase prices and deposits referenced above and the fact that each agreement concerns a different condominium apartment.

43.    The terms of the Agreements, excluding the price and the amount of the deposits, are also substantially similar, if not identical, to the purchase agreements signed by the other purchasers of units in the Plaza. The Sponsor refused to accept virtually all of the comments or changes to the Agreements that were requested by Plaintiffs.

44.    In connection with their execution of the Agreements, Plaintiffs contracted to buy two storage bin licenses for storage bins at the Plaza for the cumulative price of approximately $85,000 and placed deposits thereon in the amount of approximately $17,000.

45.    In connection with their purchase of the Penthouses, Plaintiffs' beneficial owner entered into two Hardware, Purchase, Software License and Installation Agreement, dated October 24, 2007, with Concierge Direct Corporation ("CDC") for the purchase and installment

9

of equipment and operations solely for use in the Penthouses. The combined price for the purchase and installation of such equipment and operations was $1,235,723.44. Approximately one third of such purchase price has been paid to date.

46.    Section 4.2 of the Agreements provides that the deposits related to the Penthouses are to be held in an escrow account until Kramer Levin, acting as escrow agent, is otherwise directed in "(a) a writing signed by both Sponsor and Purchaser; or (b) a determination of the Attorney General pursuant to the dispute resolution procedures contained in the Attorney General's regulations; or (c) a judgment or order of a court of competent jurisdiction."

47.    Section 4.4 of the Agreements provides that the Sponsor will not object to the release of escrowed funds to "a purchaser who timely rescinds in accordance with an offer of rescission contained in the Plan or an amendment to the Plan."

48.    Section 4.5 of the Agreements provides, in relevant part, as follows:

> Purchaser or the Escrow Agent may apply to the Attorney General in the event of a dispute for a determination on the disposition of the escrowed funds and any interest thereon. Sponsor must avail itself of this procedure if there is a dispute which needs to be resolved.

49.    Pursuant to Section 4.6 of the Agreements, the Sponsor agreed that if the Plaintiffs became entitled to cancel the Agreement and did so in accordance with the terms of the Agreements, Plaintiffs' deposits, and any interest earned thereon, would be refunded in full.

50.    Section 11 of the Agreements provides that the Offering Plan is incorporated into the Agreements.

51.    Section 17.1 of the Agreements provides:

> The construction of the Building and the Unit, including the materials, equipment and fixtures to be installed therein, shall be substantially in accordance with the Plan and the Plans and Specifications (as defined in the Plan), subject to the right of Sponsor to amend the Plan and the Plans and Specifications in

10

order to substitute materials, equipment or fixtures of equal or better quality provided that the approval of any governmental authorities having jurisdiction is firs obtained (if required) … nothing herein contained shall excuse Sponsor from its obligation to correct any defects in construction in accordance with the conditions set forth in the Plan in the Section entitled "Rights and Obligations of Sponsor."

52.     Part I, Section P(1)(a) of the Offering Plan provides:

Sponsor will perform such work and supply such materials, or will cause the same to be performed and supplied, as is necessary to complete the renovation of the Residential Section with a quality of construction comparable to the currently prevailing local standards and substantially in accordance with the Plans and Specifications for the work filed with the Department of Buildings of the City of New York and other appropriate governmental authorities … Sponsor is obligated to complete its renovations and construction in accordance with all applicable codes and filed building plans and specifications …

53.     Part I (Section 28) of the Offering Plan represents that the Building "…has been designated as a landmark, governed by Chapter 8-a of the Administrative Code of the City of New York."

54.     There is no language in the Offering Plan or the Agreements providing Plaintiffs' agreement to, and acceptance of materially adverse changes required by the Landmarks Commission.

55.     There is no language in the Offering Plan or the Agreements advising that there was a significant possibility or likelihood of the Landmarks Commission mandating material changes to the Penthouses.

56.     Exhibit 4 to the Offering Plan, and incorporated therein, is a Description of Property and Building Condition (the "Description"). By virtue of page 33 of the Description, appearing at page 265 of the Offering Plan, the Sponsor represents that the ceiling heights in the

11

principal living spaces in the residential units will be 9 feet to 11 feet, but may vary from floor to floor.

57.    Schedule A on page 42 of the Offering Plan lists the approximate square footage for PH 2009 at 6,316 square feet and for PH 2011 at 2,906 square feet.

58.    Part I, Section DD of the Plan provides as follows:

> Sponsor has exercised due diligence to obtain a detailed technical report on the condition of the Property as at a date contemporary with this Plan. Sponsor is not an architect or engineer, but believes and hereby represents that the Description of Property and Building Condition, with additional information by Sponsor, if any, as indicated, as set forth in Part II of the Plan, represents accurately what will be the condition of the Building upon substantial completion.

59.    Importantly, Part I, Section P(1)(a) of the Offering Plan further provides as follows with respect to the Sponsor's obligations:

> Sponsor reserves the right, without prior notice to Purchasers or amendment of this Plan (but subject to obtaining any required approval(s) of any governmental authorities having jurisdiction), to: (a) amend from time to time any of the Plans and Specifications (including changes in layouts and designs, changes in the size or number of Units and/or their respective percentages of Common Interest, changes in the size or quality of the Common Elements and changes affecting the materials, appliances, equipment and fixtures that are of equivalent or better quality and design in place of those described in the Plans and Specifications. **Any such changes if material (for example, variations in square footage in excess of 5%) shall be disclosed by Sponsor in a duly filed amendment to the Plan and, when applicable, to the Declaration. No such change will be made if the same would materially adversely affect any Purchaser under any Agreement which has been countersigned by Sponsor and returned to the Purchaser unless (i) the same is dictated by construction conditions at the Property (such as coordination of Building systems, conflicts with structural members or elements, conforming with Legal Requirements, unforeseen events, etc., and, in all cases, in good faith, reasonably necessary due to factors not within Sponsor's reasonable control, and where no practicable alternative (in the exercise of**

sound construction management practices) exists), and in such event, <u>Sponsor will, in the amendment disclosing such material adverse change, offer the affected Purchaser(s) the right, for at least 15 days, to rescind their Agreement(s) and receive a refund of their Deposit(s), together will all interest earned thereon,</u> (ii) the affected Purchaser consents and (iii) the Purchaser is in default ....

(Emphasis supplied.)

60. Part I, Section CC of the Plan provides as follows:

<u>The Plan does not knowingly omit any material fact or knowingly contain any untrue statement of material fact.</u> Sponsor believes that the Plain constitutes a fair summary of the material provisions of the documents referred to in the Plan ... Sponsor reserves the right ... to substantially revise the terms and conditions upon which the Units offered hereunder are to be sold ... However, <u>no such change with respect to any such Unit for which an Agreement is then in effect may be made without the consent of the Purchaser thereunder. All substantive or material revisions will be contained in a duly filed amendment to the Plan.</u>

(Emphasis supplied.)

61. As of the date of this Complaint, there have been thirteen (13) amendments filed to the Offering Plan. In each amendment, the Sponsor represented that there were <u>no material changes in the Offering Plan other than as set forth in the respective amendment.</u>

62. Kramer Levin drafted the Offering Plan for the Sponsor as well as all of the amendments to the Offering Plan.

63. The first amendment to the Offering Plan dated December 15, 2005 failed to disclose any of the material changes addressed herein.

64. The second amendment to the Offering Plan dated December 19, 2005 failed to disclose any of the material changes addressed herein.

65. The third amendment to the Offering Plan dated January 9, 2006 failed to disclose any of the material changes addressed herein.

13

66.    The fourth amendment to the Offering Plan dated January 17, 2006 failed to disclose any of the material changes addressed herein.

67.    The fifth amendment to the Offering Plan dated February 14, 2006 failed to disclose any of the material changes addressed herein.

68.    The sixth amendment to the Offering Plan dated March 3, 2006 failed to disclose any of the material changes addressed herein.

69.    The seventh amendment to the Offering Plan dated April 17, 2006 failed to disclose any of the material changes addressed herein.

70.    The eighth amendment to the Offering Plan dated July 25, 2006 failed to disclose any of the material changes addressed herein.

71.    The ninth amendment to the Offering Plan dated January 24, 2007 failed to disclose any of the material changes addressed herein.

72.    The tenth amendment to the Offering Plan dated February 6, 2007 failed to disclose any of the material changes addressed herein.

73.    The eleventh amendment to the Offering Plan dated March 29, 2007 failed to disclose any of the material changes addressed herein.

74.    The twelfth amendment to the Offering Plan dated August 3, 2007 failed to disclose any of the material changes addressed herein.

75.    The thirteenth amendment to the Offering Plan dated March 6, 2008 failed to disclose any of the material changes addressed herein.

**D.    The Role Of Stribling Relating To The Purchase Of The Penthouses**

76.    At all relevant times, Stribling has been the exclusive sales and marketing agent for the Plaza.

77. As such, Stribling was integrally involved in the contemplated sale of the Penthouses to Plaintiffs and familiar with all of the details concerning the private residences at the Plaza, including but not limited the actual condition of the completed units and design and construction changes that were made to the units.

78. Stribling operates the on-site sales office in the Plaza and also conducts viewings of the on-site model apartments on behalf of El-Ad.

79. Stribling personnel were present each time that the model apartments and the Model were shown to Plaintiffs and have been present at all, or virtually, all of the meetings that Plaintiffs and their agents have had with El-Ad since executing the Agreements.

80. Stribling has been closely involved in all marketing and sales efforts relating to the Plaza on behalf of El-Ad.

81. Stribling receives a commission for each sale of a unit in the Plaza upon the closing for a particular apartment.

82. At all relevant times, Stribling was fully aware of the Representations and the details of El-Ad's communications with Plaintiffs concerning the Penthouses.

83. At all relevant times, Stribling was aware of the materially adverse changes made to the Penthouses and the significant possibility, if not likelihood, that such changes would be mandated by the Landmarks Commission.

84. Stribling knowingly cooperated with and assisted El-Ad in concealing material information from Plaintiffs concerning the Penthouses.

E. **The Sponsor's Materially False Representations Regarding the Penthouses**

85. The Sponsor relied heavily upon a large interactive model (the "Model") in its dealings with Plaintiffs concerning the Penthouses, both before and after the execution of the Agreements. Along with the Offering Plan, the Agreements and the building plans, the Model

15

was utilized to demonstrate the expected appearance of the Penthouses in their completed condition to Plaintiffs.

86.     The Model was displayed and showcased to all potential purchasers and purchasers of the private residences by the Sponsor and Stribling. At all relevant times, the Model was displayed in the sales office operated by Stribling on the ground floor at the Plaza.

87.     The high-tech Model was operated by remote control which allowed the Sponsor and/or Stribling to illuminate the interiors of the apartments, in particular, the penthouses to show to prospective and actual purchasers of the units.

88.     During meetings with Plaintiffs and their representatives, the Sponsor and Stribling used the Model to represent and highlight the floor to ceiling windows and high ceiling elevations that were part of the design for the Penthouses.  Among other things, they would illuminate the interior of the Penthouses which were visible through the floor to ceiling windows in the Model.

89.     In connection with its representation of the Penthouses, the Model reflected the full open views and light which could be expected in a penthouse apartment. This Model was the primary tool used by the Sponsor and Stribling to illustrate the appearance of the Penthouses to Plaintiffs.

90.     Plaintiffs were attracted to the Plaza by the Representations, including those provided in the Agreements and through the Model. In particular, the sweeping views and abundant light offered by the floor to ceiling windows were a central part of the appeal of the Penthouses.

91.     The Model is excluded from the "No Representations" section of the Agreements. The Agreements do not provide that Plaintiffs could not rely on the Model.

16

92.     As the Penthouses had not yet even been constructed before the Agreements were executed, the only representations upon which the Plaintiffs could rely in purchasing the Penthouses were the Agreements, the Offering Plan and the Model.

93.     Since the penthouse apartments had yet to be constructed at the time that the Plaintiffs entered into the Agreements, the only apartment units that had been displayed to Plaintiffs at that point in time were the model apartments on the 12th floor of the Building.

94.     The model apartments highlighted, among other things, the high ceilings and grand views that Plaintiffs expected would exist in the Penthouses.

95.     Plaintiffs and their agents viewed the model apartments several times subsequent to the execution of the Agreements, including in September and October of 2007.   Neither Stribling nor El-Ad advised Plaintiffs at any time that the general quality, condition and overall design appearance of the Penthouses would be different than that of the model apartments.

96.     El-Ad required all, or virtually all, purchasers of private residences in the Plaza to purchase their apartments, sight unseen, before any renovations to the apartments were performed.  El-Ad purposely sold the apartments in such a manner because it expected that the renovated apartments and newly constructed penthouses might not live up to El-Ad's representations and the expectations of the purchasers.

97.     El-Ad utilized this approach to drive up the purchase prices for the private residences beyond the values that the completed units would otherwise be able to support.   The approach also forced purchasers to commit to the apartments and submit substantial deposits before any problems became evident to purchasers relating to the construction and/or renovations.

17

98.     At the time that they executed the Agreements, Plaintiffs understood as a result of the Agreements, the building plans, the Model and El-Ad's other representations that, among other things, the Penthouses would include the following design features: (1) the 20th floor living rooms would have floor to ceiling windows and unobstructed views; (2) the 20th floor would not be set back from the lower floors of the Building while the 21st floor would only be slightly set back from the 20th floor; (3) the absence of air conditioning units placed in the columns in the Penthouses; and (4) the ceiling heights would be 12.5 feet on the 19th Floor, 10 feet on the 20th Floor and 8.5 feet on the 21st Floor. Based on the Representations, there was to be no hideous drainage grate that would impede the views on the 20th floor.

**F.      El-Ad's Concealment of Design Changes to the Penthouses**

99.     Plaintiffs intended to combine PH 2009 and PH 2011 to create one large penthouse apartment and conveyed that intention to El-Ad.  In connection with these plans, Plaintiffs retained the services of numerous professionals, including but not limited to an architect, an interior designer, consultants, and attorneys, and have incurred substantial costs in connection with their services.

100.    Plaintiffs and their representatives repeatedly requested and were denied access to the Penthouses by El-Ad and/or Stribling in connection with each request.

101.    Between September 2007 and January 2008, Plaintiffs requested access to the Penthouses on at least four occasions.  On each occasion, Plaintiffs and their representatives were advised that it was against El-Ad's policy to allow them access to the Penthouses.

102.    Plaintiffs and/or their representatives requested such access on or about September 19, 2007, September 26, 2007, October 1, 2007 and January 7, 2007.  The requests were made by Plaintiffs, their attorney and their real estate broker to Ruti Baron-Gil, Project Manager for El-Ad Properties NY LLC, among others associated with El-Ad or Stribling.

18

103.     At a meeting between Plaintiffs and their representatives and El-Ad and its agents, including Stribling personnel, on January 18, 2008, Plaintiffs' interior designer, Howard Slatkin, repeatedly requested a full set of the plans and construction documents for each of the Penthouses. In the absence of the plans, he requested the ceiling heights and wall elevations for each of the Penthouses.

104.     El-Ad and Stribling representatives and/or agents present at the January 18, 2008 meeting included Petra Bergstrand (General Manager), Jeffrey Cohen (Property Manager) and Susan Song (Sales). The meeting took place in one of the model apartments at the Plaza.

105.     Despite the fact that full plans and elevations must have existed at that time in order for the Sponsor to obtain necessary building permits for construction, Mr. Cohen and Ms. Song both advised Mr. Slatkin and Plaintiffs that neither a full set of the plans nor plans concerning elevations existed at that time.

106.     El-Ad and Stribling knew that full plans with the elevations for each floor existed at the time.

107.     El-Ad and Stribling advised Plaintiffs otherwise because they knew that the adverse changes to the elevations would be material to Plaintiffs and that the plans would reflect other adverse design changes to the Penthouses.

108.     Plaintiffs and their agents continued to request access to the Penthouses after the January 18, 2008 meeting.

109.     El-Ad and Stribling continued to refuse to grant either Plaintiffs or their representatives access to the Penthouses.

110.     El-Ad did allow other purchasers of units in the Building to examine their units well in advance of closing.

111.   El-Ad, with Stribling's assistance, would not permit Plaintiffs to access the Penthouses because El-Ad and Stribling were aware that, unlike with many of the other floors, significant adverse design changes had been necessitated by the Landmarks Commission on the penthouse floors.

112.   El-Ad and Stribling wanted to conceal the design changes to the Penthouses for as long as possible, and conspired with each other to do so by, among other things, refusing access to the Penthouses by Plaintiffs.

113.   El-Ad and Stribling also did not allow other penthouse purchasers to access their units in advance of a pre-closing walk-through inspection because they feared that the design changes would be discovered.

114.   El-Ad and Stribling believed that if Plaintiffs or other penthouse purchasers were provided access to their units before the pre-closing walk-through, they would be dissatisfied with the condition of the units.

115.   El-Ad and Stribling feared that Plaintiffs would demand that they be allowed to exercise their right of rescission upon viewing the Penthouses for the first time.

116.   El-Ad and Stribling feared that other penthouse purchasers would also demand that they be allowed to exercise their right of rescission upon viewing the adverse design changes to their apartments.

117.   The closing for the sale of the Penthouses was originally scheduled by the Sponsor to be held on June 25, 2008 but was adjourned until July 10, 2008.

118.   On June 25, 2008, approximately two weeks before the scheduled closing and after being theretofore repeatedly denied access to the Penthouses, Plaintiffs were finally allowed to view the Penthouses for the first time since agreeing to purchase them in early 2007.

20

119.    Upon viewing the completed Penthouses, Plaintiffs were shocked with the overall appearance, quality and condition of the Penthouses as well as the design changes that had not been previously disclosed to them. Plaintiffs felt as if they had been misled and defrauded by El-Ad and its agents.

120.    There are numerous material variations between the completed Penthouses and what had been represented in, among other things, the Agreements, the building plans and the Model.

121.    The construction and design quality of certain items in the completed Penthouses, including but not limited to the windows, air conditioning units, lighting and bathroom tile, is also subpar.

122.    Plaintiffs and their agents repeatedly requested access to the Penthouses again in the weeks immediately following their walk-through, but were denied access by El-Ad and Stribling.

## G.    The Discovery of Materially Adverse Design Changes

123.    Subsequent to the execution of the Agreements, materially adverse design changes were made to the Penthouses without any disclosure to the Plaintiffs.

124.    Similar changes were made to other units in the Building without any disclosure to the purchasers of those units.

125.    In particular, Plaintiffs were defrauded in connection with, among other things, (1) the absence of unobstructed floor to ceiling windows on the 20th floor, as had been represented, (2) the lower than represented ceiling heights/elevations of the Penthouses, (3) the installation of air conditioning units in columns in the Penthouses, (4) unappealing drainage grates which further impeded Plaintiffs' views from the 20th floor, and (5) the setback position of the 20th and 21st from the lower floors of the Building. These changes, both independently

and collectively, constitute materially adverse changes to the Penthouses, and have a material negative impact on the overall experience of the apartment space.

126. The Sponsor did not disclose any of these materially adverse changes to Plaintiffs in an amendment to the Offering Plan.

127. The Sponsor and El-Ad, with the assistance of Stribling, continued to grossly misrepresent and conceal the appearance of these design features subsequent to the changes being made.

128. The windows on the 20th Floor were repeatedly represented by El-Ad to Purchasers as floor to ceiling windows through, among other things, the Model.

129. Instead, in the finished Penthouses, the Sponsor has installed three feet of wall from the ground up, then three-foot square windows with skylights on a slanted ceiling. Further, there is a ledge outside of the windows rising as high as three feet and also obstructing the view. These windows in the completed Penthouses make the space more closely resemble an attic than a luxury penthouse living room.

130. The panoramic views and attendant light and overall effect that would have resulted from the floor-to-ceiling windows, which was the primary reason that the Purchasers desired the Penthouses, are absent from the finished Penthouses.

131. Had the Purchasers known that the Penthouses would not have floor-to-ceiling windows, they would not have purchased the Penthouses.

132. The windows on the 19th floor are also undersized based upon New York City code requirements for light and air.

133. The size of the windows on the 19th floor adversely impacts the views from these rooms and violates the requirement in the building plans on file with the Department of

Buildings that "Every Dwelling Unit Shall Meet the Light & Air Requirements of Section 700 of the Multiple Dwelling Law."

134.    El-Ad and its agents, including Stribling, represented to Plaintiffs and their agents on or about January 18, 2008 that ceiling heights in the Penthouses would be 12.5 feet on the 19th Floor, 10 feet on the 20th Floor and 8.5 feet on the 21st Floor.

135.    The ceiling heights on the 19th and 20th Floors in the completed Penthouses are substantially less than what was represented by El-Ad and its agents to Plaintiffs, in the Offering Plan and elsewhere.

136.    The Offering Plan provides a range of nine to eleven feet for ceiling heights in the principal living spaces of the private residences, but the majority of the ceiling heights in the Penthouses are all at the lowest end of that range and some are below that range.

137.    The model apartments on the twelfth floor of the Plaza that were shown to Plaintiffs represented, and led Plaintiffs to believe, that the ceiling heights in the Penthouses would not be at the minimum of the range provided for the ceiling heights throughout the Penthouses.

138.    The model apartments contained grand fourteen foot ceilings that are higher than the ceiling heights specified in the Offering Plan.

139.    The model apartments suggested minimum ceiling heights in only one room and that the ceiling heights would not be less than the lowest end of the range anywhere in the Penthouses.  In certain areas, the ceiling heights in the Penthouses are below the lowest end of range for ceiling heights that is stated in the Offering Plan.

140.    Rather than panoramic penthouse views, the decreased elevations of the ceilings in the Penthouses create the impression of glorified attic space.

23

141.   The setback positions of the 20th and 21st floors were also not disclosed and differ from that which was represented to Plaintiffs in, among other things, the building plans and the Model. Those floors were set back approximately three feet from the lower floors of the Building.

142.   As a result of such changes, there has been a significant loss of square footage in each of the Penthouses. The modified setback is clearly visible when viewing the Plaza from the plaza in front of the General Motors Building across the street on Fifth Avenue.

143.   In both PH 2009 and PH 2011, there is a large unattractive drainage grate that is located directly outside of one of the windows in the 20th floor living room. The drainage grates materially impede the views from the completed Penthouses and are inconsistent with the aesthetic vision represented to Plaintiffs.

144.   The drainage grates obstruct the views from the living rooms by, among other ways, requiring someone to stand directly at the window in order to get an unobstructed view above the three foot ledge outside the window.

145.   The drainage grates are not disclosed in either the Offering Plan or the Model. The grates are also not represented in the building plans.

146.   Without disclosure to the Plaintiffs, large air conditioning units were installed in columns in the Penthouses instead of in an appropriate location such as the ceiling.

147.   Neither the Model, the floor plans nor the model apartments at the Plaza disclosed that air conditioning units would be placed in the columns of any of the apartments at the Plaza.

148.   The installation of air conditioning units in certain columns in the Penthouses substantially restricts the use of square footage and the flow of the Penthouses.

149.    Most, if not all, of the above design changes were mandated by the Landmarks Commission.

150.    The Sponsor was aware that all of the above changes were material and adversely affected the Plaintiffs, yet purposefully failed to disclose such changes, which occurred subsequent to the execution of the Agreements, in any amendment to the Offering Plan.

151.    In fact, in the ninth amendment to the Offering Plan, dated January 24, 2007 (the "Ninth Amendment"), the Sponsor disclosed that the ceiling heights in the kitchens, powder rooms, bathrooms and foyers in the Plaza would be decreased slightly from nine feet to approximately eight feet, six inches.

152.    Although the Sponsor disputes that such ceiling height decreases represent a material change, the Sponsor amended the Offering Plan to reflect such changes because they were, indeed, material.

153.    By setting a precedent in the Ninth Amendment with respect to slight decreases in ceiling heights, the Sponsor knew or should have known that the decreased ceiling heights in the principal living spaces of the Penthouses were also material and were required to be disclosed in an amendment to the Offering Plan.

154.    Kramer Levin advised the Sponsor not to disclose the design changes described herein to Plaintiffs and was integrally involved in the Sponsor's decision not to file any amendment to the Offering Plan related to such changes.

155.    The Sponsor fought against certain of the changes detailed above, including but not limited to the installation and size of the drainage grates, that were dictated by the Landmarks Commission.

156.    The Sponsor contested such changes because it knew that the changes were material and would be unwelcome by purchasers of the units at the Plaza.

157.    The Sponsor contested such changes with the full knowledge of Stribling and the other El-Ad entities.

158.    At all relevant times, El-Ad knew or should have known that there was a substantial possibility, if not a likelihood, that the Landmarks Commission would require the above described design changes, especially in connection with the newly constructed penthouse units which were constructed on the landmarked exterior of the Building.

159.    El-Ad did not disclose such information to the Plaintiffs at any point, either by way of the Offering Plan and its amendments or otherwise.

160.    The Sponsor intentionally concealed this information from potential purchasers and marketed the private residences based upon the Model which highlighted design features that were unlikely to garner the approval of the Landmarks Commission.

161.    Kramer Levin advised the Sponsor to withhold information from the purchasers of units in the Plaza concerning the significant possibility or likelihood of material design changes that could be mandated by the Landmarks Commission.

162.    The design changes described above have resulted in a significant decrease in the value of the Penthouses.

163.    The Sponsor never requested Plaintiffs' consent to any of the design changes described herein nor have Plaintiffs been in default of any of their obligations under the Agreements.

164.    El-Ad concealed the materially adverse changes described above in an effort to protect the Plaza brand and avoid offering the right of rescission as well as adverse publicity that

could impact the public's perception of the Plaza and El-Ad's other projects around the world.

165.    El-Ad feared that if reports of problems with the private residences at the Plaza surfaced and the purchasers were afforded a right of rescission, many purchasers might exercise such right.    Under such circumstances, the prospects of resale of those units at the inflated original sales prices would be unlikely.

166.    Adverse publicity would detract from the reputation of the Plaza brand and potentially shake the public's confidence in El-Ad's projects with the Plaza brand around the world, especially in the current financial credit crisis.

167.    As the Las Vegas Plaza project was put on hold earlier this year because of the ongoing credit crisis in world financial markets, El-Ad could ill afford further adverse publicity.

168.    Such harm to the reputation of the Plaza brand would not only be embarrassing for El-Ad, but could also have a material negative impact on its financial performance.

**H.    The Sponsor's Refusal To Allow Plaintiffs To Rescind
The Agreements Or To Return Their Deposits**

169.    By letter dated July 1, 2008, Plaintiffs' counsel raised the above design issues concerning the windows, air conditioning units and ceiling heights with the Sponsor's counsel.

170.    By letter dated July 8, 2008, Sponsor's counsel responded that the Sponsor was in the process of addressing the issue concerning the air conditioning units in the columns.    In the letter, Sponsor's counsel represented that the Sponsor had properly advised Plaintiffs as to issues concerning the windows and ceiling heights.

171.    Plaintiffs' counsel followed up on July 9, 2008 with a further description of the material design changes to the Penthouses as well as the fraud committed by the Sponsor.    In the letter, among other things, Plaintiffs demanded that they be afforded a right of rescission and the

right to a return of their deposits in view of the Sponsor's violation of its contractual obligations to disclose any materially adverse changes to the Penthouses.

172.     In the letter, Plaintiffs' counsel further advised the Sponsor that it was in violation of its contractual obligation to only effectuate materially adverse changes to the Penthouses under certain circumstances as detailed in Part I, Section P(1)(a) of the Offering Plan.

173.     The parties subsequently adjourned the closing scheduled for July 10, 2008, first to July 18, 2008 and then to July 22, 2008.

174.     As the Sponsor continued to refuse to offer Plaintiffs the right to rescind the Agreements and collect their deposits back, by letters dated July 21, 2008, Plaintiffs formally advised the Sponsor that it was in default of its contractual obligations under the Agreements.

175.·    By letters dated July 23, 2008, the Sponsor took the next step in the scheme detailed above and advised Plaintiffs that they were in default of their obligations under the Agreements. The letters provided that if Plaintiffs did not cure such default within thirty days, the Sponsor would terminate the Agreements and retain Plaintiffs' deposits as liquidated damages.

176.     By letter dated July 29, 2008, Plaintiffs formally advised Kramer Levin, as Escrow Agent, to the existence of a dispute concerning Plaintiffs' deposits. Pursuant to the terms of the Agreements, Plaintiffs advised Kramer Levin that it was prohibited from releasing Plaintiffs' deposits to the Sponsor as detailed in the July 23, 2008 default letters.

177.     By letter dated August 7, 2008, Kramer Levin, as counsel to the Sponsor, advised Plaintiffs that, to the extent that Plaintiffs' notice dated July 29, 2008 purports or is deemed to restrict the Sponsor's rights or remedies under the Agreements, or to impose additional limitations or obligations not required by the Agreements, the Sponsor rejects such notice.

178.    The Sponsor seeks to deprive Plaintiffs of their rights of rescission in an effort to avoid the adverse publicity that would be created if it had to put the Penthouses back on the market at this time.

179.    Through its default letters, the Sponsor sought to intimidate Plaintiffs and pressure them to proceed with the closings for the Penthouses or face the loss of their substantial deposits.

180.    There are other purchasers of penthouse apartments in the Plaza who are similarly situated to Plaintiffs in that they have been damaged by, and are incredibly disappointed and unhappy with, the quality, condition and overall appearance of their finished units.

181.    There are other purchasers of penthouse apartment in the Plaza who believe that gross misrepresentations and material omissions were made to them in connection with their apartments.

182.    El-Ad has failed to offer any purchasers of units in the Building a right of rescission in an effort to avoid adverse publicity and the financial repercussions that would be generated by any purchaser (including Plaintiffs), or a rash of purchasers, exercising such right.

183.    El-Ad compelled such dissatisfied purchasers to close on their purchases through a pattern of coercive conduct and threats, or in the alternative, paid them off to avoid the adverse publicity.

184.    Purchasers of other residences in the Plaza who have complained to El-Ad about the variations to their units and the condition and quality of their apartments were given "hush money" by the Sponsor to close on their purchases.

185.    The "hush money", provided in the form of modest discounts on the apartment prices, were designed to mute any public criticism that could have a negative effect on El-Ad or

29

the Plaza.

186.   The building plans for the Plaza reflect the various design changes referenced above and the timing of such changes.

187.   The building plans for the Plaza are required to be on file with the New York City Department of Buildings (the "DOB").

188.   Plaintiffs have made numerous attempts to obtain such plans from the DOB, but access to them has been impeded because most of the plans, including the microfilm with all of the plans, have been taken out from the DOB for review by another private party.

189.   Such documents may be in the custody of El-Ad or its agents in order to keep the full building plans from Plaintiffs or other unsatisfied purchasers in the Building.  Since El-Ad is required to maintain copies of all of the building plans in its own files pursuant to the Agreements, such conduct would be representative of the pattern and practice of deceitful conduct that El-Ad has exhibited in connection with the sale of the Penthouses.

190.   Plaintiffs, relying upon the Representations, placed significant deposits on the Penthouses.  Plaintiffs are entitled to the return of these deposits in view of the material nondisclosures by El-Ad and the Sponsor's violation of its contractual obligations.  Additionally, as a result of the wrongful conduct by El-Ad and Stribling, Plaintiffs are entitled to damages in an amount to be determined at trial.

191.   In this action, Plaintiffs seek, among other things, specific performance of the Agreements; namely, that they be offered the right of rescission and the return of their deposits, with interest thereon, damages in an amount to be determined at trial but believed to exceed $20 million, punitive damages and declaratory relief.  Such relief is necessitated as a result of, among other things, El-Ad's failure to abide by its express and implied obligations as set forth in the

Agreements, its misrepresentations, material omissions and fraudulent concealment, and its deceptive trade practices.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment Against the Sponsor and Kramer Levin)

192.   Plaintiffs repeat and reallege each and every allegation contained heretofore as if fully set forth at length herein.

193.   Pursuant to the Agreements, the Sponsor was obligated to disclose materially adverse changes to the Penthouses to Plaintiffs in an amendment to the Offering Plan.   In connection therewith, the Sponsor was obligated to offer Plaintiffs a contractual right of rescission and the return of the deposits paid for the Penthouses.

194.   Plaintiffs contend that the changes referenced above in connection with the windows, ceiling heights, drainage grates, air conditioning units and setback positions, among other things, constitute materially adverse changes requiring an amendment to the Offering Plan triggering the right of rescission and entitling Plaintiffs to the return of their deposits.

195.   The Sponsor contends that the design changes referenced above do not constitute materially adverse changes to the Penthouses.

196.   The Sponsor has advised Plaintiffs that if they do not cure their purported default under the Agreements on or before August 22, 2008, Sponsor will be entitled to receive and retain, as liquidated damages, Plaintiffs' deposits relating to the Penthouses, with all interest earned thereon.

197.   Pursuant to Section 4.2 of the Agreements, Kramer Levin may not release Plaintiffs' deposits from escrow unless it is so instructed by the mutual written consent of Plaintiffs and the Sponsor, a determination by the Attorney General or a judgment or order of a court of competent jurisdiction.

31

198.     An actual and justiciable controversy currently exists between the parties concerning their rights and obligations under the Agreements, whether the Sponsor must proffer an amendment to the Offering Plan detailing the above-referenced changes, in whole or in part, while offering Plaintiffs a fifteen (15) day right of rescission, and the manner in which the Escrow Agent handles Plaintiffs' deposits.

199.     A declaration is therefore necessary to resolve the above described issues.

200.     Plaintiffs are entitled to a declaration that (1) they are entitled to a right of rescission in connection with the Agreements, (2) the Escrow Agent is precluded from releasing Plaintiffs' deposits to the Sponsor and (3) the Escrow Agent must return Plaintiffs deposits relating to the Penthouses, together with all interest thereon.

### SECOND CAUSE OF ACTION
**(Specific Performance Against the Sponsor)**

201.     Plaintiffs repeat and reallege each and every allegation contained heretofore as if fully set forth at length herein.

202.     Plaintiffs and the Sponsor are parties to valid and enforceable contracts.

203.     Plaintiffs have complied with their obligations under the Agreements or are excused from performing their obligations under the Agreements.

204.     Plaintiffs have not committed any breaches of the Agreements that would excuse the Sponsor from its performance of obligations thereunder.

205.     Pursuant to Part I, Section P(1)(a) of the Offering Plan, the Sponsor is obligated to disclose any materially adverse changes to the Penthouses in an amendment.

206.     In connection with an amendment disclosing a materially adverse change to the Penthouses, the Sponsor must offer Plaintiffs a right to rescission and a return of their deposits, with all interest collected thereon.

207.    Section Part I, Section P(1)(a) further provides that no materially adverse changes may be effectuated unless: (1) dictated by construction conditions at the Building (and in all cases in good faith, the changes are "reasonably necessary due to factors not within Sponsor's control, and where no practicable alternative ... exists ..."); (2) the affected purchaser consents; or (3) the Purchaser is in default of its obligations.

208.    Each of the Sponsor's failures to disclose materially adverse changes to the Penthouses in an amendment constitutes a material breach by it of its obligations under the Agreements.

209.    Each of the Sponsor's failures to offer Plaintiffs a right of rescission in connection with a materially adverse change to the Penthouses constitutes a material breach by it of its obligations under the Agreements.

210.    But for the Sponsor's breach of its obligation under the Agreements, Plaintiffs would have been ready, willing and able to close on the purchases of PH 2009 and PH 2011 on July 10, 2008 and on every adjourned closing date.

211.    The Sponsor was not reading, willing and able to close on the purchases of PH 2009 and PH 2011 on July 10, 2008 and on every adjourned closing date.

212.    The Sponsor's actions, or lack thereof, threaten to damage Plaintiffs and deprive them of the benefits they are entitled to pursuant to the Agreements; namely, the right of rescission and the return of their deposits.

213.    Plaintiffs have no adequate remedy at law as monetary damages are inadequate. Barring specific performance, Plaintiffs cannot be made whole by an award of monetary damages.

214. By reason of the foregoing, Plaintiffs are entitled to a judgment declaring and adjudging that the Sponsor must file an amendment to the Offering Plan concerning the changes referenced above and must offer Plaintiffs a fifteen day right of rescission and the return of their deposits in connection therewith.

**THIRD CAUSE OF ACTION**
**(Breach of Contract Against the Sponsor)**

215. Plaintiffs repeat and reallege each and every allegation contained heretofore as if fully set forth at length herein.

216. Plaintiffs and the Sponsor are parties to valid and enforceable contracts.

217. Part I, Section P(1)(a) of the Agreements provides as follows, in relevant part:

> Sponsor reserves the right, without prior notice to Purchasers or amendment of this Plan (but subject to obtaining any required approval(s) of any governmental authorities having jurisdiction), to: (a) amend from time to time any of the Plans and Specifications (including changes in layouts and designs, changes in the size or number of Units and/or their respective percentages of Common Interest, changes in the size or quality of the Common Elements and changes affecting the materials, appliances, equipment and fixtures that are of equivalent or better quality and design in place of those described in the Plans and Specifications. **Any such changes if material (for example, variations in square footage in excess of 5%) shall be disclosed by Sponsor in a duly filed amendment to the Plan and, when applicable, to the Declaration. No such change will be made if the same would materially adversely affect any Purchaser under any Agreement which has been countersigned by Sponsor and returned to the Purchaser unless (i) the same is dictated by construction conditions at the Property (such as coordination of Building systems, conflicts with structural members or elements, conforming with Legal Requirements, unforeseen events, etc., and, in all cases, in good faith, reasonably necessary due to factors not within Sponsor's reasonable control, and where no practicable alternative (in the exercise of sound construction management practices) exists), and in such event, <u>Sponsor will, in the amendment disclosing such material adverse change, offer the affected Purchaser(s) the right, for at least 15 days, to rescind their Agreement(s) and receive a</u>**

**refund of their Deposit(s), together will all interest earned
thereon,** (ii) the affected Purchaser consents and (iii) the Purchaser
is in default ....

(Emphasis supplied.)

218.    Plaintiffs have complied with their obligations under the Agreements or are

excused from performing their obligations under the Agreements.

219.    The Sponsor has committed numerous breaches of Part I, Section P(1)(a) of the

Agreements.

220.    The Sponsor made numerous materially adverse design changes to the Units

which were prohibited pursuant to the terms of the Agreements.

221.    In the absence of a default by Plaintiffs or the written consent of Plaintiffs, the

Sponsor was only allowed to make a materially adverse change to the Penthouses if such change

was required by construction conditions and in good faith, such changes were reasonably

necessary due to factors outside of Sponsor's control.

222.    As the Sponsor knew or should have known at all relevant times that there was a

significant possibility, if not a likelihood, that the materially adverse changes described herein

would be mandated by the Landmarks Commission, and the changes were thus within its

reasonable control, the Sponsor is liable to Plaintiffs for the damages caused by such design

changes.

223.    In connection with any materially adverse changes to the Penthouses that were

permitted pursuant to Part I, Section P(1)(a) of the Agreements, the Sponsor breached such

section by failing to disclose the materially adverse changes in an amendment to the Offering

Plan and offering Plaintiffs a right of rescission in connection therewith.

224.    The Agreements provide that Plaintiffs are entitled to a return of their deposits for

the Penthouses, together with all interest thereon, upon their exercise of a right of rescission.

225.   But for the Sponsor's breach of its obligation under the Agreements, Plaintiffs would have been ready, willing and able to close on the purchases of PH 2009 and PH 2011 on July 10, 2008 and on every adjourned closing date.

226.   The Sponsor was not reading, willing and able to close on the purchases of PH 2009 and PH 2011 on July 10, 2008 and on every adjourned closing date.

227.   As a result of the foregoing breaches, Plaintiffs are entitled to compensatory and consequential damages in an amount to be determined at trial, but believed to be in excess of $20,000,000, including but not limited to: (1) the costs and expenses that they have incurred relating to the Penthouses, including but not limited to costs and fees for an architect, designer, attorneys, and other professionals as well as costs related to equipment, operations and storage bins related to the Penthouses; (2) the higher prices that they will now need to spend to secure alternative comparable living accommodations as a result of lost market opportunities and price inflation in the market for such residences; (3) the decreased value of the Penthouses; and (4) the deposits for the Penthouses, or any portion thereof, that the Court may deem Plaintiffs to have forfeited.

## FOURTH CAUSE OF ACTION
### (Fraud/Fraudulent Concealment Against El-Ad)

228.   Plaintiffs repeat and reallege each and every allegation contained heretofore as if fully set forth at length herein.

229.   El-Ad and its agents intentionally made numerous material misrepresentations and/or omissions of material facts to Plaintiffs with knowledge of their falsity or in reckless disregard thereof.

230.   El-Ad and its agents knew, at all relevant times, that the aforesaid misrepresentations and/or material omissions were false.

231.    As set forth above, El-Ad's false and fraudulent material representations and/or omissions of material facts were intentionally made in an effort to induce Plaintiffs to proceed with their purchase of the Penthouses.

232.    At all relevant times, including in the Agreements and the Offering Plan, El-Ad concealed from Plaintiffs that the Landmarks Commission was likely to require materially adverse changes to, among other things, the floor to ceiling windows, ceiling elevations and setback positions for the Penthouses.

233.    El-Ad failed to disclose materially adverse design changes to the Penthouses that occurred subsequent to the execution of the Agreements.

234.    Through such material omissions, El-Ad purposely misrepresented and concealed the condition, quality and overall appearance of the Penthouses from Plaintiffs.

235.    On January 18, 2008, in a meeting with Plaintiffs' representatives, El-Ad, by itself and through its agents, misrepresented to the Plaintiffs that full building plans and elevations related to the units did not exist at that time. By doing so, it actively concealed the true condition of the Penthouses.

236.    El-Ad and its agents denied numerous requests by Plaintiffs and their agents, including those made on or about September 19, 2007, September 26, 2007, October 1, 2007 and January 1, 2008, to gain access to the Penthouses prior to the pre-closing walk-through. By doing so, it actively concealed the true condition of the Penthouses.

237.    El-Ad and its agents concealed the fact that material changes to the Penthouses had occurred because they knew that the changes were material and feared that Plaintiffs would object to such changes, rescind the Agreements, and exercise their right to the return of their deposits.

37

238. El-Ad was fearful that Plaintiffs' rescission of the Agreements would cause adverse publicity for the Plaza.

239. El-Ad possessed superior knowledge not available to Plaintiffs concerning the materially adverse design changes to the Penthouses and the significant possibility, or likelihood, that the Landmarks Commission was likely to require materially adverse changes to, among other things, the floor to ceiling windows, ceiling elevations and setback positions for the Penthouses from that which had been related in the Representations.

240. El-Ad knew that Plaintiffs were acting on the basis of mistaken knowledge and it sought and intended to take advantage of the same.

241. El-Ad knew that Plaintiffs would rely upon the misrepresentations and/or omissions of material facts described above and acted with the intention of deceiving and defrauding Plaintiffs.

242. In reliance upon the truthfulness of the representations set forth by El-Ad and its agents, among other things: (1) Plaintiffs tendered their deposits for the Penthouses to the Sponsor; (2) Plaintiffs entered into agreements, and paid significant monies, in connection with storage bins, equipment and operations related to the Penthouses; (3) Plaintiffs ceased their search for alternative residential accommodations in New York City; and (4) Plaintiffs retained and paid numerous professionals, including but not limited to an architect, designer and attorneys for services related to the Penthouses.

243. Plaintiffs reasonably relied to their detriment on El-Ad's misrepresentations and/or material fraudulent omissions.

244. Had the Sponsor disclosed the true material facts to Plaintiffs, Plaintiffs would have, among other things, continued or restarted their search for alternative living

accommodations, ceased paying professionals for services related to the Penthouses, exercised their contractual right of rescission and demanded that their deposits for the Penthouses be returned to them.

245.   As a direct and proximate result of the false representations made by El-Ad and its agents, and Plaintiffs' reasonable reliance thereon, Plaintiffs have suffered consequential, compensatory and foreseeable damages in an amount to be determined at trial but believed to be in excess of $20,000,000, including but not limited to: (1) the costs and expenses that they have incurred relating to the Penthouses, including but not limited to costs and fees for an architect, designer, attorneys, and other professionals as well as costs related to equipment, operations and storage bins related to the Penthouses; (2) the higher prices that they will now need to spend to secure alternative comparable living accommodations as a result of lost market opportunities and price inflation in the market for such residences; (3) the decreased value of the Penthouses; and (4) the deposits for the Penthouses, or any portion thereof, that the Court may deem Plaintiffs to have forfeited.

246.   El-Ad's misrepresentations were undertaken with malice and/or the intent to harm Plaintiffs and to deprive them of their deposits and legal rights or with conscious disregard of Plaintiffs' rights, thereby entitling each plaintiff to punitive or exemplary damages in an amount to be determined at trial but believed to be at least $5,000,000.

## FIFTH CAUSE OF ACTION
### (Fraudulent Concealment Against the Sponsor)

247.   Plaintiffs repeat and reallege each and every allegation contained heretofore as if fully set forth at length herein.

248.   The Sponsor had a duty to disclose any materially adverse design changes relating to the Penthouses to Plaintiffs.

249.    The Sponsor was aware of the materially adverse changes described herein at all relevant times.

250.    The Sponsor intentionally, actively, recklessly, maliciously and/or willfully concealed and/or failed to disclose the materially adverse changes to the units to Plaintiffs in violation of its duty to do so.

251.    The Sponsor intentionally, actively, recklessly, maliciously and/or willfully concealed these material changes with the intent that Plaintiffs rely to their detriment on the Sponsor's knowing concealment. The Sponsor's concealment was as part of a scheme to avoid offering Plaintiffs a right of rescission and the return of their deposits relating to the Penthouses, and to avoid adverse publicity for El-Ad and/or the Plaza.

252.    Each and every amendment that the Sponsor filed to the Offering Plan constitutes a separate independent act of fraudulent concealment by the Sponsor because the Sponsor failed to disclose the materially adverse changes in any of the amendments.

253.    The Sponsor filed respective amendments to the Offering Plan on or about the following dates:

| | |
|---|---|
| First Amendment | December 15, 2005 |
| Second Amendment | December 19, 2005 |
| Third Amendment | January 9, 2006 |
| Fourth Amendment | January 17, 2006 |
| Fifth Amendment | February 14, 2006 |
| Sixth Amendment | March 3, 2006 |
| Seventh Amendment | April 17, 2006 |
| Eighth Amendment | July 25, 2006 |
| Ninth Amendment | January 24, 2007 |
| Tenth Amendment | February 6, 2007 |
| Eleventh Amendment | March 29, 2007 |
| Twelfth Amendment | August 3, 2007 |
| Thirteenth Amendment | March 6, 2008 |

254.    Each and every amendment failed to disclose the materially adverse changes described herein.

255.    Each and every amendment that the Sponsor filed to the Offering Plan contains the following statement:

> There have been no material changes in the Plan except as set forth in this Amendment.   The Plan, as hereby amended, does not knowingly omit any material fact.

256.    The Sponsor possessed superior knowledge not available to Plaintiffs concerning the materially adverse design changes that had been made to the Penthouses.

257.    The Sponsor knew that Plaintiffs were acting on the basis of mistaken knowledge and it sought and intended to take advantage of the same.

258.    In reliance upon the truthfulness of the representations set forth by the Sponsor, among other things: (1) Plaintiffs tendered their deposits for the Penthouses to the Sponsor; (2) Plaintiffs entered into agreements, and paid significant monies, in connection with storage bins, equipment and operations related to the Penthouses; (3) Plaintiffs ceased their search for alternative residential accommodations in New York City; and (4) Plaintiffs retained and paid numerous professionals, including but not limited to an architect, designer and attorneys for services related to the Penthouses.

259.    Had the Sponsor disclosed the true material facts to Plaintiffs, Plaintiffs would have, among other things, continued or restarted their search for alternative living accommodations, ceased paying professionals for services related to the Penthouses, exercised their contractual right of rescission and demanded that their deposits for the Penthouses be returned to them.

260.    By reason of each of the foregoing acts of fraudulent concealments, Plaintiffs have suffered damages in an amount to be determined at trial, but believed to be in excess of $20,000,000, in addition to reasonable costs and attorneys' fees.

261.    The Sponsor's actions were undertaken with malice and/or the intent to harm Plaintiffs and to deprive them of their deposits and legal rights or with conscious disregard of Plaintiffs' rights, thereby entitling each plaintiff to punitive or exemplary damages in an amount to be determined at trial but believed to be at least $5,000,000.

### SIXTH CAUSE OF ACTION
#### (Fraudulent Concealment Against Stribling)

262.    Plaintiffs repeat and reallege each and every allegation contained heretofore as if fully set forth at length herein.

263.    Stribling was the primary sales point of contact between Plaintiffs and the Sponsor in connection with the Penthouses.

264.    Stribling intentionally, actively, recklessly, maliciously and/or willfully concealed and/or failed to disclose the true condition of the Penthouses, as well as the materially adverse design changes described herein, to Plaintiffs.

265.    Stribling intentionally, actively, recklessly, maliciously and/or willfully concealed these matters with the intent that Plaintiffs rely to their detriment on its knowing concealment and proceed with their purchases of the Penthouses.

266.    At all relevant times, including in the Agreements and the Offering Plan, Stribling concealed from Plaintiffs that the Landmarks Commission was likely to require materially adverse changes to, among other things, the floor to ceiling windows, ceiling elevations and setback positions for the Penthouses.

267.   Stribling failed to disclose materially adverse design changes to the Penthouses that occurred subsequent to the execution of the Agreements.

268.   Through such material omissions, Stribling purposely misrepresented and concealed the condition, quality and overall appearance of the Penthouses from Plaintiffs.

269.   On January 18, 2008, in a meeting with Plaintiffs' representatives, Stribling misrepresented to Plaintiffs that full building plans and elevations related to the units did not exist at that time. By doing so, it actively concealed the true condition of the Penthouses.

270.   Stribling denied numerous requests by Plaintiffs and their agents to gain access to the Penthouses prior to the pre-closing walk-through. By doing so, it actively concealed the true condition of the Penthouses.

271.   Stribling concealed the fact that material changes to the Penthouses had occurred because they knew that the changes were material and feared that Plaintiffs would object to such changes, rescind the Agreements, and exercise their right to the return of their deposits.

272.   Stribling was fearful that Plaintiffs' rescission of the Agreements would cause adverse publicity for the Plaza as well as El-Ad and its affiliates, with whom Stribling had a business relationship.

273.   Stribling possessed superior knowledge not available to Plaintiffs concerning the materially adverse design changes to the Penthouses and the significant possibility, or likelihood, that the Landmarks Commission was likely to require materially adverse changes to, among other things, the floor to ceiling windows, ceiling elevations and setback positions for the Penthouses from that which had been related in the Representations.

274.   Stribling knew that Plaintiffs were acting on the basis of mistaken knowledge and it sought and intended to take advantage of the same.

275.    In reasonable reliance thereon, among other things: (1) Plaintiffs tendered their deposits for the Penthouses to the Sponsor; (2) Plaintiffs entered into agreements, and paid significant monies, in connection with storage bins, equipment and operations related to the Penthouses; (3) Plaintiffs ceased their search for alternative residential accommodations in New York City; and (4) Plaintiffs retained and paid numerous professionals, including but not limited to an architect, designer and attorneys for services related to the Penthouses.

276.    Had Stribling disclosed the true material facts to Plaintiffs, Plaintiffs would have, among other things, continued or restarted their search for alternative living accommodations, ceased paying professionals for services related to the Penthouses, exercised their contractual right of rescission and demanded that their deposits for the Penthouses be returned to them.

277.    As a direct and proximate result of the false representations made by Stribling, and Plaintiffs' reasonable reliance thereon, Plaintiffs have suffered consequential, compensatory and foreseeable damages in an amount to be determined at trial but believed to be in excess of $20,000,000, including but not limited to: (1) the costs and expenses that they have incurred relating to the Penthouses, including but not limited to costs and fees for an architect, designer, attorneys, and other professionals as well as costs related to equipment, operations and storage bins related to the Penthouses; (2) the higher prices that they will now need to spend to secure alternative comparable living accommodations as a result of lost market opportunities and price inflation in the market for such residences; (3) the decreased value of the Penthouses; and (4) the deposits for the Penthouses, or any portion thereof, that the Court may deem Plaintiffs to have forfeited.

278.    Stribling's fraudulent concealment was undertaken with malice and/or the intent to harm Plaintiffs and to deprive them of their deposits and legal rights or with conscious

disregard of Plaintiffs' rights, thereby entitling each plaintiff to punitive or exemplary damages in an amount to be determined at trial but believed to be at least $5,000,000.

### SEVENTH CAUSE OF ACTION
**(Conspiracy to Commit Fraud Against El-Ad and Stribling)**

279.   Plaintiffs repeat and reallege each and every allegation contained heretofore as if fully set forth at length herein.

280.   At all relevant times herein, El-Ad Properties NY LLC, CPS 1, the Sponsor and Stribling knowingly conspired with one another to defraud Plaintiffs as to the condition, quality and overall appearance of the Penthouses.

281.   These defendants agreed to fraudulently misrepresent the quality, condition and overall appearance of the penthouse apartments in the Plaza, including the Penthouses, to prevent adverse publicity for El-Ad and to induce the purchasers of those units to proceed to closing on their apartments.

282.   As described herein, these defendants each participated in this fraudulent scheme. Each of these defendants acted in furtherance of the conspiracy, including but not limited to: (1) CPS 1 failing to disclose in the Offering Plan the substantial possibility or likelihood of materially adverse changes to the Penthouses; (2) the failure to amend the Offering Plan to reflect such adverse changes; and (3) continuing affirmative misrepresentations and omissions of material facts by El-Ad and Stribling to conceal the changes.

283.   As a direct and proximate result of this conspiracy to commit fraud, Plaintiffs have suffered damages in an amount to be determined at trial but believed to be in excess of $20,000,000 in addition to reasonable costs and attorneys' fees.

## EIGHTH CAUSE OF ACTION
### (Aiding and Abetting Fraud Against Stribling)

284.    Plaintiffs repeat and reallege each and every allegation contained heretofore as if fully set forth at length herein.

285.    At all relevant times herein, Stribling had actual knowledge of the fraud and fraudulent concealment detailed herein.

286.    At all relevant times herein, Stribling knowingly aided and abetted El-Ad, and the Sponsor individually, in causing them to fraudulently conceal and misrepresent the quality, condition and overall appearance of the completed units at the Plaza.

287.    Stribling actively assisted El-Ad and the Sponsor in the perpetration of the fraud and fraudulent concealment detailed herein, and actively concealed material information concerning the Penthouses from Plaintiffs.

288.    Stribling provided substantial assistance to El-Ad, and the Sponsor individually, in furtherance of the fraud concerning the materially adverse changes to the Penthouses described herein.

289.    By aiding and abetting El-Ad and the Sponsor, Stribling intended to defraud Plaintiffs by intentionally disregarding, acting in reckless disregard for, or acting with gross negligence towards the materially adverse changes made to the Penthouses.

290.    Plaintiffs reasonably relied upon the misrepresentations and material omissions of El-Ad and the Sponsor to their detriment and suffered damages as a result.

291.    Based upon the foregoing, Stribling is liable to Plaintiffs for aiding and abetting the fraud and fraudulent concealment committed by El-Ad and the Sponsor against Plaintiffs

292.    As a direct and proximate result of the aiding and abetting of fraud by Stribling, Plaintiffs are entitled to damages in an amount to be determined at trial but believed to be in excess of $20,000,000.

### NINTH CAUSE OF ACTION
### (Negligent Misrepresentation Against El-Ad)

293.    Plaintiffs repeat and reallege each and every allegation contained heretofore as if fully set forth at length herein.

294.    By virtue of the Sponsor's contractual relationships with Plaintiffs, El-Ad, including the Sponsor, had a duty to Plaintiffs to accurately represent the quality, condition and overall appearance of the design features for the completed Penthouses.

295.    El-Ad also had a duty to Plaintiffs to accurately represent and to advise Plaintiffs of materially adverse design changes to the Penthouses as well as the significant possibility or likelihood that such changes would be necessitated.

296.    El-Ad concealed, among other things, the materially adverse design changes described herein and continued to misrepresent the appearance of the Penthouses subsequent to the design changes described herein being made with the knowledge that Plaintiffs would rely upon such representations by virtue of El-Ad's relationship to Plaintiffs.

297.    In each amendment to the Offering Plan, the Sponsor misrepresented that no materially adverse design changes had been made to the units.

298.    On January 18, 2008, in a meeting with Plaintiff's representatives, El-Ad, by itself and through its agents, misrepresented to the Plaintiffs that full building plans and elevations related to the units did not exist at that time.

299.    By virtue of the conduct described above, El-Ad breached its duties to Plaintiffs.

300. El-Ad knew or should have known that Plaintiffs would rely on the misrepresentations and/or omissions of material facts described herein in connection with their intentions concerning the Penthouses and in making plans about their living arrangements.

301. El-Ad knew or should have known that the design changes described herein were material and would be viewed as such by Plaintiffs.

302. El-Ad knew or should have known that the information provided to Plaintiffs concerning the windows, setback position of the floors, air conditioning units and elevations was inaccurate.

303. The representations made by El-Ad as set forth herein were made negligently, recklessly and carelessly in order to induce Plaintiffs to take actions, or refrain from acting, in reliance thereon.

304. Plaintiffs did reasonably rely upon such misrepresentations.

305. As a direct and proximate result of El-Ad's negligent misrepresentations, Plaintiffs have suffered substantial damages in an amount to be determined at trial, but believed to be in excess of $20,000,000.

306. Since El-Ad's conduct in connection with the misrepresentations detailed herein was willful, wanton and reckless, Plaintiffs are also each entitled to punitive damages of $5,000,000.

### TENTH CAUSE OF ACTION
**(Breach of the Implied Covenant of Good Faith and Fair Dealing Against the Sponsor)**

307. Plaintiffs repeat and reallege each and every allegation contained heretofore as if fully set forth at length herein.

308. Implied in the PH 2009 Agreement as well as the PH 2011 Agreement is a covenant of good faith and fair dealing which requires the Sponsor to act in good faith.

309.  Implied in this obligation was the requirement that the completed Penthouses have the grand ceiling heights and magnificent views that Plaintiffs had been promised by the Sponsor.

310.  Implied in this obligation is also the requirement that the Sponsor would exercise good faith if the completed Penthouses materially differed from the expectations described above.

311.  At all relevant times, the Sponsor, as well as its affiliates and predecessor, represented to Plaintiffs that the Penthouses would reflect that quality, condition and overall appearance expected for high priced penthouse apartments in New York City.

312.  As described above, the Sponsor marketed all of the private residences at the Plaza, but especially the Penthouses, by highlighting, among other things, the spectacular views and high ceilings that the purchasers of these luxury units would enjoy from their apartments.

313.  As a result of the Representations, Plaintiffs expected the Penthouses to be reflective of the elegance, luxury and sophistication reserved for the highest end of premier penthouse apartments in New York City.

314.  The Penthouses were built on newly constructed floors.  As such, the Sponsor was not bound by any pre-existing conditions with respect to their design.

315.  As a result of the representation in the Offering Plan that ceiling heights would range from nine to eleven feet and the grand heights in the model apartments at the Plaza, which exceeded that range, Plaintiffs expected that the ceiling heights in the Penthouses would not be at the lowest end of that range, and lower, throughout the vast majority of the Penthouses.

316.    The Model and the model apartments at the Plaza also created the expectation that the 20th floor living rooms in the Penthouses would contain floor to ceiling windows and superb views.

317.    The completed Penthouses failed to meet the expectations that had been established by the Agreements and the Sponsor's actions.

318.    The Agreements required that the Sponsor provide notice of any material changes to the Penthouses by amendment to the Offering Plan.

319.    The Sponsor breached its obligations of good faith by repeatedly failing to disclose the materially adverse changes described above despite knowing of their importance to Plaintiffs and not delivering the quality, condition and overall appearance for the Penthouses that had been represented by El-Ad and expected by the Plaintiffs.

320.    By virtue of the manner in which the Sponsor elected to construct the Penthouses, including but not limited to the material changes described herein, and the manner in which it represented the Penthouses to Plaintiffs, the Sponsor denied Plaintiffs the benefits of their bargain to purchase the Penthouses to convert into one fabulous $53.5 million penthouse apartment.

321.    By, among other things, purposely misrepresenting the condition of the windows, ceiling heights, air conditioning units and setback positions for the Penthouses and by failing to disclose the material changes to those items, the Sponsor breached its implied covenant of good faith and fair dealing, and wrongfully deprived Plaintiffs of the benefits of their bargain and their rights under the Agreements.

322.    By reason of the foregoing, Plaintiffs are entitled to specific performance by the Sponsor of its obligations under the Agreements, including its obligation to disclose the material

changes described herein in an amendment to the Offering Plan and to offer Plaintiffs a right of rescission in connection therewith.

323.    In the alternative, Plaintiffs are entitled to compensatory and consequential damages in an amount to be determined at trial, but believed to be in excess of $20,000,000, including but not limited to: (1) the costs and expenses that they have incurred relating to the Penthouses, including but not limited to their retention and payment of numerous professionals such as an architect, designer, attorneys, and other professionals as well as costs related to equipment, operations and storage bins related to the Penthouses; (2) the higher prices that they will now need to spend to secure alternative comparable living accommodations as a result of lost market opportunities and price inflation in the market for such residences; (3) the decreased value of the Penthouses; and (4) the deposits for the Penthouses, or any portion thereof, that the Court may deem Plaintiffs to have forfeited.

## ELEVENTH CAUSE OF ACTION
### (Deceptive Trade Practices Claim Pursuant to GBL § 349 Against El-Ad and Stribling)

324.    Plaintiffs repeat and reallege each and every allegation contained heretofore as if fully set forth at length herein.

325.    El-Ad and Stribling conduct business, trade and commerce within the State of New York.

326.    In connection with their business activities in New York, El-Ad and Stribling engaged in materially deceptive conduct, including but not limited to: (1) materially misrepresenting the condition, quality and overall appearance of the Penthouses; including but not limited to aspects concerning the ceiling heights, windows, air conditioning units and setback positions of the Penthouses; (2) failing to disclose and actively concealing materially adverse design changes to the Penthouses; and (3) failing to disclose and actively concealing that they

51

knew that there was a significant possibility, if not a likelihood, that materially adverse design changes to the Penthouses would likely be required by the Landmarks Commission.

327. El-Ad and Stribling also committed such deceptive conduct in connection with the other private residences at the Plaza.

328. The materially deceptive conduct of El-Ad and Stribling, accomplished through numerous means, including but not limited to their marketing materials for the Plaza, a DVD they distributed to prospective purchasers, the Model, the model apartment in the Plaza, the Representations, their representations to Plaintiffs, statements to the press and their concealment of material information concerning the Penthouses as well as the other private residences, was also directed at the public generally.

329. El-Ad's marketing campaign for the Plaza was built upon a portrayal of the private residences, and especially the penthouses, as premier apartments reflecting the best the world has to offer in terms of luxury, design, quality, condition and overall appearance.

330. El-Ad and Stribling represented that the private residences, especially the penthouses which had not yet been constructed, would be outstanding in every respect, including in terms of their quality, condition, overall appearance and unique views.

331. In practice, the marketing by El-Ad and Stribling stressed the opulence of the private residences and, in particular, the penthouses, which were promoted as the embodiment of the highest standards of luxury.

332. El-Ad and Stribling marketed the Plaza, among other ways, as a "one of a kind" property and a place of "endless possibilities" and "timeless elegance."

333. In their marketing materials and advertising as well as their statements to the public and the press concerning the Plaza, El-Ad and Stribling highlighted, among other things,

the "superb views", "high ceilings" and "sumptuous décor" of the private residences.

334.    The deceptive conduct of El-Ad and Stribling was misleading in that the quality and condition of the private residences is materially and adversely different than the premier residences that El-Ad and Stribling had led Plaintiffs and the public to expect through their marketing campaign, sales process and public statements.

335.    The completed Penthouses lack many of the design and construction features that were particularly emphasized by El-Ad and Stribling in the Plaza sales process and marketing campaign, including but not limited to grand ceilings and unparalleled majestic views.  Many of the other private residences at the Plaza lack the same features.

336.    The deceptive conduct of El-Ad and Stribling was also misleading in that the design and construction quality of certain items in the completed Penthouses and many of the other private residences is inferior and inconsistent with the representations of El-Ad and Stribling as well as reasonable market expectations concerning luxury condominium residences.

337.    At all relevant times, El-Ad and Stribling knew or should have known that their marketing representations in connection with the penthouses and the other private residences were not, or would not be, accurate given the design changes required by the Landmarks Commission and the cost-saving shortcuts that El-Ad employed in the construction process.

338.    In marketing the penthouses and the other private residences at the Plaza in the manner that they did, El-Ad and Stribling knowingly misled Plaintiffs and the public at large.

339.    The misconduct of El-Ad and Stribling, as described in this complaint, constitutes materially deceptive trade acts and/or practices in the conduct of business, trade or commerce in knowing violation of Section 349 *et seq.* of New York General Business Law.

340.  By reason of such conduct, Plaintiffs have been actually damaged in an amount to be determined at trial, but believed to exceed $20,000,000.

341.  Moreover, because the misconduct of El-Ad and Stribling was willful, wanton, in gross disregard of Plaintiffs' rights, aimed at the public generally (including by materially misleading the public as to the overall appearance, quality and condition of the private residences at the Plaza) and committed knowingly, El-Ad and Stribling, jointly and severally, are liable to Plaintiffs for an award of treble damages in accordance with GBL § 349(h).

342.  Plaintiffs are also entitled to an award of their reasonable attorneys' fees pursuant to GBL § 349(h).

WHEREFORE, Plaintiffs demand judgment against the Defendants as follows:

(a)  on the First Cause of Action, a judgment declaring that Plaintiffs are entitled to a right of rescission in connection with the Agreements, the Escrow Agent is precluded from releasing Plaintiffs' deposits relating to the Penthouses to the Sponsor, and the Escrow Agent must return Plaintiffs' deposits relating to the Penthouses, together with all interest thereon;

(b)  on the Second Cause of Action, a judgment declaring in favor of Plaintiffs and against the Sponsor and an order directing that the Sponsor must file an amendment to the Offering Plan concerning the changes referenced above and must offer Plaintiffs a fifteen day right of rescission and the return of their deposits in connection therewith;

(c)  on the Third Cause of Action, a judgment in favor of Plaintiffs and against the Sponsor in an amount to be determined at trial but believed to be in excess of $20,000,000;

(d)  on the Fourth Cause of Action, a judgment in favor of Plaintiffs and against El-Ad, jointly and severally, in an amount to be determined at trial but believed to be in excess of $20,000,000, in addition to punitive damages in an amount to be determined at trial but believed to exceed $5,000,000;

(e)  on the Fifth Cause of Action, a judgment in favor of Plaintiffs and against the Sponsor in an amount to be determined at trial but believed to be in excess of $20,000,000, in addition to punitive damages in an amount to be determined at trial but believed to exceed $5,000,000;

(f)     on the Sixth Cause of Action, a judgment in favor of Plaintiffs and against Stribling in an amount to be determined at trial but believed to be in excess of $20,000,000, in addition to punitive damages in an amount to be determined at trial but believed to exceed $5,000,000;

(g)     on the Seventh Cause of Action, a judgment in favor of Plaintiffs and against El-Ad and Stribling, jointly and severally, in an amount to be determined at trial but believed to be in excess of $20,000,000;

(h)     on the Eighth Cause of Action, a judgment in favor of Plaintiffs and against Stribling in an amount to be determined at trial but believed to be in excess of $20,000,000;

(i)     on the Ninth Cause of Action, a judgment in favor of Plaintiffs and against El-Ad, jointly and severally, in an amount to be determined at trial but believed to be in excess of $20,000,000, in addition to punitive damages in an amount to be determined at trial but believed to exceed $5,000,000;

(j)     on the Tenth Cause of Action, a judgment in favor of Plaintiffs and against the Sponsor in an amount to be determined at trial but believed to be in excess of $20,000,000;

(k)     on the Eleventh Cause of Action, a judgment in favor of Plaintiffs and against El-Ad and Stribling, jointly and severally, in an amount to be determined at trial but believed to be in excess of $20,000,000, in addition to treble damages pursuant to GBL § 349(h):

(l)     an award of interest as well as the costs and disbursements of this action, including attorneys' fees; and

(m)     such other and further relief as the Court deems just and proper.

Dated: New York, New York
        August 20, 2008

MORRISON COHEN LLP

By: _____
Y. David Scharf
Jay R. Speyer

909 Third Avenue
New York, New York 10022
(212) 735-8600

*Attorneys for Plaintiffs*

55

**Press Release**

**Fraud at the Plaza? Lawsuit by Penthouse 2009/2011, Inc. Alleges Bait-and-Switch After Deal for Hotel's Most Expensive Condo Goes Bust** .

New York, Sep 08, 2008
Business Wire

Following a classic bait-and-switch involving the purchase of a $53.5 million penthouse condo in New York's world famous Plaza Hotel (what would have been the second most expensive condo purchase in New York real estate history), the would-be buyer, Penthouse 2009/2011, Inc., filed a lawsuit late Friday against the Plaza Hotel, its condo developers El-Ad Properties and its brokers Stribling & Associates.

The lawsuit alleges that, while still under construction, El-Ad lured buyers to the rehabilitated Plaza and its condos with representations that its private residences would be oases of "endless possibilities" and "timeless elegance," with "superb views." And, its Penthouses, to be newly constructed structures built on top of the existing hotel, would be its piece de rA(C)sistance, when in finished condition, a magnificent, "one of a kind" property.

Enticed by such tales of opulence and perfection, both Penthouses were bought, sight unseen, based on these representations, as well as a video tour of a home replica and the building's plan and models offered by El-Ad and Stribling, the complaint further alleges. A $10.7 million deposit was given, with the balance due at the closing following completed construction. However, the completed Penthouses were far from what was described. Shockingly, in the days immediately preceding the scheduled closing, when the buyer, its architect and designer were finally allowed entry into the Penthouses for the first time to inspect and view it, what was found was far from what was promised; as alleged, the conditions of the Penthouses utterly failed to live up to the standards of luxury represented by El-Ad and Stribling. An attic-like space was found with ceiling heights far lower than promised, views were obstructed, window sizes dwarfed, square footage diminished, large unattractive drainage grates installed directly outside of certain windows, among other drastic changes not disclosed.

As a result, the buyer refused to close. When El-Ad Properties declared a default under the buyer's purchase agreement and sought to keep its nearly $11 million security deposit, this lawsuit was filed on the purchaser's behalf by well known trial lawyer Y. David Scharf of New York's Morrison Cohen LLP.

The lawsuit claims that El-Ad and its brokers willfully and unlawfully concealed from the buyer major changes made to the Penthouse which were mandated by the Landmarks Preservation Commission by virtue of the Plaza's landmark status designation in 1969. The changes, stemming from determinations made by Landmarks which prohibited the Penthouse addition atop the building to be seen from the sidewalk or park, put severe size and placement constraints on the construction and "[diminished] the livable square footage, [cut down] sight lines, [minimized] windows and [lowered] ceilings" as alleged in the complaint. Indeed, a litany of

material changes to the Penthouses were made; had they been disclosed in the multiple amendments made to the Offering Plan, the buyer would have been alerted of the diminished condition of the Penthouse, entitling it to a return of its deposit. Yet, the buyer was never informed of and never agreed to such changes.

The lawsuit claims, among other things, breach of contract, fraud, fraudulent concealment, conspiracy to commit fraud, aiding and abetting fraud, deceptive trade practices and negligence; it seeks the return of the $10.7 million security deposit and damages in excess of $20 million. The lawsuit also seeks a declaration as to legal powerhouse Kramer Levin Naftalis & Frankel LLP, which is acting as the escrow agent in this transaction, that it may not release the buyer's deposit from escrow unless it is so instructed by the agreement of the parties or by Attorney General or an appropriate court order.

Y. David Scharf, the buyer's attorney, said "This is a classic bait-and-switch. As we allege in our complaint, my client was lead to believe that it would receive one of the most luxurious apartments in New York history; it got far less than what it bargained for." Scharf added, "The complaint alleged that El-Ad and Stribling misled my client through deceit and omissions about the state and condition of this Penthouse and its construction. When they then tried to deliver something vastly different than they presented, they had the temerity to assert the right to our multi-million dollar deposit. That is just plain wrong. We hope that Attorney General Cuomo, whose office reviewed the Offering Plan and the amendments, takes a close look at the facts and circumstances of this matter."

Please contact Y. David Scharf for a copy of the complaint.

SOURCE: Penthouse 2009/2011, Inc.